**B –1. 1**

have been designated as Residential Common Elements.  Sponsor and the Commercial Unit Owners have the right to designate portions of the Common Elements as Limited Common Elements in connection with the combining or subdividing of Units as provided in the Declaration.

The Residential Units may be used solely for dwelling purposes and such "home occupation" use under the Zoning Resolution of the City of New York as may be permitted by law.

Subject to certain conditions contained in the By-Laws, each Unit Owner may mortgage his Unit with a lender and in such amount as he chooses (see **"Procedure to Purchase"**). Each Unit is separate and is not subject to the lien of any mortgage placed by other Unit Owners on their respective Units.

Sponsor is not offering to arrange institutional financing or to act as agent for any lender with respect to the financing of Units under this Plan.  Commercial and savings banks as well as some savings and loan associations may make loans to help Purchasers finance the acquisition of their Units.  Each institution has its own lending policies and credit requirements. The Sponsor makes no representation or warranty that institutional financing will be available to Unit Owners or as to the terms and conditions upon which financing might be available.  Notwithstanding the foregoing, in order to condition a Purchase Agreement upon receiving a loan commitment,  the Financing Rider that is appended to the Purchase Agreement must be executed by both the Sponsor and the Purchaser and the Purchaser must apply for a mortgage through GuardHill Financial Corp. or another mortgage broker or "Institutional Lender" (as such term is defined in the Financing Rider) of Purchaser's choice.

A Unit Owner may decorate the interior of his Unit in any way he desires subject to compliance with the By-Laws and the Rules and Regulations thereunder.  Except for compliance with law, there are no limitations or restrictions upon the right of the Commercial Unit Owners or the Sponsor or its designees to decorate or alter their respective Units.  A Unit Owner will be responsible for the cost of maintenance and interior repairs to his Unit.

The Sponsor will make application to divide the Property into separate tax lots for each Unit and its Common Interest, which Unit (and its Common Interest) will then be taxed as a separate tax lot for real estate tax purposes.  Once a separate tax lot is established for a Unit and apportionment of the assessed valuation of the Property to a Unit is officially made, a Unit Owner will then be responsible for the payment of the real estate taxes on his, but not any other, Unit and his Unit will not be affected by virtue of nonpayment of real estate taxes with respect to any other Unit.  The amount of the tax assessed against any Unit will depend upon various factors affecting value, including but not limited to, square footage, location, purchase price and other factors taken into consideration by the taxing authorities. Until the Units are separately assessed as described above, real estate taxes assessed against the Property will be treated as a Common Expense.

8

With certain exceptions, any sale or lease of a Residential Unit will be subject to a right by the Condominium to acquire or lease such Unit or to produce a third party to acquire or lease such Unit on the same terms as were offered to the Owner of such Unit. The Sponsor and its designees may sell or lease all or any portion of their Units without any restriction or limitation imposed pursuant to the Declaration or By-Laws. The Commercial Unit Owner (including Sponsor) may sell or lease any portion of the Commercial Units as if they were a separate commercial property without any restriction or limitation imposed pursuant to the Declaration or By-Laws. (See **"Rights and Obligations of Unit Owners and Board of Managers; Summary of By-Laws"**).

Operation and management of the Condominium will be vested in the Board as more particularly set forth in the By-Laws. Each Unit Owner will have a right to vote for members of the Board as provided in the By-Laws. The Board will determine the amount of Common Expenses. Common Expenses include without limitation the expenses of maintaining and operating the Common Elements and the other expenses set forth in Schedule B. Each Unit Owner will be required to pay Common Charges in accordance with Sections 339-i and 339-m of the New York Real Property Law. Every Unit Owner will be required to pay his proportionate share (which share is based generally on the Common Interests of such Unit) of expenses incurred by the Condominium Board that are applicable to the Common Elements. Certain expenses are applicable to the Residential Units only and will be borne by all Residential Unit Owners in proportion to their respective Common Interests. The costs that relate to the operation of Limited Common Elements appurtenant to Commercial Unit C will be borne by the owner of Commercial Unit C. At least monthly, the Board will assess such Common Charges against each Unit Owner to meet expenses, including Common Expenses. See **"Definitions"** and **"Rights and Obligations of Unit Owners and Board of Managers; Summary of By-Laws"** for a description of the Common Elements, including the General Common Elements. Certain Common Elements are restricted for use by the Residential Unit Owners and are referred to as "Residential Common Elements." An eighteen (18) inch strip around the perimeter of the roof of the mechanical penthouse bulkhead is a Limited Common Element appurtenant to Commercial Unit C.

Each Unit will be individually metered for electricity, and the owners of such Unit will be responsible for the cost of electricity consumed in such Unit. The cost of electricity consumed in and for the Common Elements will be shared by all Unit Owners in accordance with their Common Interests. The cost of gas will be a Common Expense to be borne by all Residential Unit Owners and has been included in the projected budget for the first year of Condominium operation. It is anticipated that Commercial Unit A will be separately metered for gas; it is not anticipated that gas will be utilized in Commercial Unit B or Commercial Unit C. Water and sewer expenses relating to (i) the Residential Units will be shared by all Residential Unit Owners in proportion to their Common Interests and will be included in the Common Charges payable by the Residential Unit Owners, and (ii) the Common Elements are included as part of the Common Expenses to be borne by all Unit Owners, as described in Schedule B. Commercial Unit A will bear the reasonable cost of water and sewer allocable to such Unit until water is separately metered or sub-metered; it is not anticipated that Commercial Unit B or Commercial Unit C will utilize water or sewer. Notwithstanding the foregoing, should Commercial Unit B or Commercial Unit C require gas,

9

water or sewer in the future, until and unless such utilities are separately metered or submetered to Commercial Unit B and/or Commercial Unit C, as the case may be, the owner of such Units reserves the right to cause the Condominium Board to provide such utilities and, in such event, the Commercial Unit Owner will reimburse the Condominium the reasonable cost of any utilities so consumed.

In the opinion of counsel to the Sponsor, under present income tax laws, a Residential Unit Owner, substantially like a homeowner, may deduct from his income for federal, New York State and New York City resident income tax purposes, the real estate taxes paid with respect to his Residential Unit and the interest paid on the mortgage, if any, on his Residential Unit, but subject to the conditions and restrictions discussed in **"Counsel's Tax Opinion"**.  For the most part a Residential Unit Owner may only deduct interest on debt incurred to acquire his principal residence or a designated secondary residence subject to certain limitations (See **"Counsel's Tax Opinion"**).

The Condominium shall maintain fire insurance policies insuring the Building (but not including appliances or any furniture, furnishings or other personal property in the Unit) covering the interests of the Condominium, the Board, all the Unit Owners and their mortgagees as their respective interests may appear, in an amount equal to at least eighty percent of the full replacement value of the Building exclusive of excavation and foundations and deduction for depreciation.  Each Unit Owner is advised to insure the interior of his own Unit and the contents thereof, including appliances, furniture, furnishings, or other personal property within the Unit.  In addition, a Unit Owner may desire to obtain insurance covering his liability to others for personal injury or property damage occurring within or to his Unit.

Miscellaneous

The Plan (including all Schedules and Parts A, B and C of the Exhibits submitted by the Sponsor to the Department of Law) constitutes the entire offer of Sponsor.  Copies of the Plan, and Parts A, B, and C of the Exhibits referred to above, are available to prospective Purchasers and their attorneys for inspection without charge and for copying at a reasonable charge, at the office of the Selling Agent during regular business hours, and if and when a sales office is maintained at the Property, then at such sales office.

The Plan is offered only to individuals who are 18 years of age or older and who reside in the State of New York, or other entities with offices in the State of New York.

THE PURCHASE OF A CONDOMINIUM UNIT HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES. THE ATTORNEY GENERAL STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING A PURCHASE AGREEMENT.

## DEFINITIONS

"Board" or "Board of Managers" means the Board of Managers of the Condominium.

"Building" means the building located on the Land.

"By-Laws" means the By-Laws governing the operation of the Condominium, the form of which is set forth in Part II of the Plan, as the same may be amended from time to time.

"Commercial  Unit" means any or all of: Commercial Unit A, Commercial Unit B and/or Commercial Unit C.

"Commercial Unit A" refers to the Commercial Unit that is situated on a portion of the first floor, mezzanine and cellar levels of the Building, which is designated as such in the Declaration and Floor Plans.

"Commercial Unit B" refers to the Commercial Unit that is situated on a portion of the sub-cellar of the Building, which is designated as such in the Declaration and Floor Plans.

"Commercial Unit C" refers to the Commercial Unit that is situated on a portion of the sub-cellar, which is designated as such in the Declaration and Floor Plans.

"Commercial Unit Owner" means the owner of a Commercial Unit.

"Closing Date" means the date of closing pursuant to the Plan, unless another closing date is set forth in a Purchase Agreement covering a Unit, in which event such other date shall be the Closing Date for such Unit.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Charges" means any charges assessed by the Board against any Unit Owner.

"Common Elements" include the General Common Elements, the Residential Common Elements and any Limited Common Elements.

"Common Expenses" means all costs and expenses incurred or paid generally by the Board in connection with the operation of the Condominium which, pursuant to the Plan, the Declaration and the By-Laws, are, except as set forth in the Plan and the Condominium By-Laws, to be paid by the Unit Owners in proportion to their Common Interests, as summarized in **"Rights and Obligations of Unit Owners and Board of Managers; Summary of By-Laws"** and as more fully described in the Declaration and the By-Laws.

"Common Interest" means the proportionate undivided interest expressed in numerical percentages in the Common Elements pertaining to each Unit as determined in accordance

with the Declaration. The total of all Common Interest percentages pertaining to all Units equals 100%. Common Interest is the basis of determining, among other things, a Unit Owner's voting power and, in general, as to Common Expenses, liability for a share of such Common Expenses and share of any distributions upon termination of the Condominium.

"Condominium" means The Franklin Tower.

"Condominium Act" means Article 9-B of the Real Property Law of the State of New York as the same may be amended from time to time.

"Condominium Documents" means collectively this Plan, the Declaration and the By-Laws and the Rules and Regulations thereunder, as the same may be amended from time to time.

"Declaration" means the Declaration of Condominium, a copy of which is set forth in Part II of this Plan, as the same may be amended from time to time.

"Department of Law" means the Real Estate Financing Bureau Department of Law, 120 Broadway, 23rd Floor, New York, New York.

"Exhibits" means collectively Exhibits A, B, C and D which were submitted to the Department of Law in connection with the submission of this Plan to such Department.

"Floor Plans" means the condominium floor plans of the Building, to be filed with the Office of the City Register, New York County, copies of which are reproduced in Part II of the Plan.

"Force Majeure" means weather, floods, epidemics, quarantine restrictions, strikes, lockouts, acts of God, freight embargoes, shortages of or inability to obtain materials, equipment or labor, governmental restrictions or preemption, damage by fire or the elements, or any other cause over which the Sponsor has no material and direct control.

"General Common Elements" means the Land and all parts of the Building, other than the Units, the Residential Common Elements and the Limited Common Elements. The General Common Elements include the foundations, roof and supports of the Building, certain columns, walls, beams, supports, wood joists, floors, partitions and ceilings on or under the Building (to the extent the same are not expressly included as part of a Unit, the Residential Common Elements and the Limited Common Elements) and all other parts of the Property, areas or facilities, apparatus and installations for the common use of the Units and the Unit Owners and all other parts of the Property included as "General Common Elements" under the Declaration.

"Insurance Trustee" means a New York State bank or trust company or savings institution designated by the Board as insurance trustee pursuant to the provisions of the By-Laws.

"Land" means the parcel of land upon which the Building is situated, as more fully described in the Declaration.

12

"Limited Common Elements" means, with respect to each Unit, those Common Elements, if any, which are so designated on the Floor Plans or in the Declaration (or re-designated as a Limited Common Element in accordance with the Declaration) and which in either case serve or benefit exclusively such Unit.  If any two Units which have access to the same shared hallway shall at any time be owned by the same owner such hallway shall thereafter be treated as a Limited Common Element until such time as such Units shall have two different owners.    An eighteen inch strip around the full perimeter of the roof of the mechanical penthouse bulkhead is a Limited Common Element appurtenant to Commercial Unit C.  In addition, Sponsor and the Commercial Unit Owners have the right to designate portions of the Common Elements as Commercial Limited Common Elements in connection with the combining or subdividing of Units as provided in the Declaration.

"Majority in Common Interest of Unit Owners" shall mean those Unit Owners having more than 50% of the total authorized votes of all Unit Owners present in person or by proxy and voting at any meeting of Unit Owners determined in accordance with the By-Laws.

"Managing Agent" means RAL Management or any successor managing agent designated by the Board.

"Permitted Encumbrances" means the title exceptions set forth in "Terms of Sale; Closing of Title to Units" subject to which a Unit may be conveyed.

"Permitted Mortgage" shall mean any first mortgage of record against a Unit.

"Permitted Mortgagee" shall mean the holder of any Permitted Mortgage of record against a Unit.

"Plan" means the Condominium Offering Plan of The Franklin Tower promulgated by the Sponsor.

"Property" means collectively the Land and the Building.

"Purchase Agreement" means the agreement to purchase a Unit pursuant to the Plan, the form of which is set forth in Part II of the Plan.

"Purchaser" means a purchaser of a Unit pursuant to a Purchase Agreement.

"Residential Common Elements" means those Common Elements which are so designated on the Floor Plans or in the Declaration (or are redesigned as a Residential Common Element).

"Residential Unit" means a Unit which is designated as a Residential Unit in the Declaration and/or the Floor Plans.

"Residential Unit Owner" means the owner of a Residential Unit.

13

"Rules and Regulations" means the rules and regulations made in accordance with the By-Laws and attached thereto as Schedule A as the same may be amended from time to time.

"Selling Agent" shall mean Stribling-Wells & Gay or any successor selling agent designated by sponsor.

"Service Equipment" shall mean all of the following now or hereafter installed in the Building, serving one or more Units or the Common Elements, if any, appurtenant thereto: (i) pipes, wires, ducts, risers, cables, conduits and (ii) mechanical, electrical and other equipment, antennas and other communications devices.

"Signs" means any sign, advertisement, notice or other lettering.

"Sponsor" means Corn Associates LLC.  The term "Sponsor" shall be deemed to include any successor to Sponsor. A successor to Sponsor is any (i) individual, corporation or other entity which through an amalgamation, consolidation or other legal succession becomes vested with the rights and assumes the obligations of Corn Associates LLC, or (ii) any person who purchases from Corn Associates LLC or otherwise succeeds to (w) the lesser of (x) ten or more Residential Units or (y) twenty percent (20%) or more of all Residential Units in the Condominium or (2) all remaining Residential Units then owned by Sponsor and is not purchasing such Units for his, her or its own occupancy or for occupancy of such person's family members, and in any case shall include any nominee holding any Unit for the account of the person referred to in clause (i) or (ii) above.

"Unit" or "Units" means any space designated as a Residential Unit or a Commercial Unit in the Declaration consisting generally of (i) in the case of the Residential Unit, a specific apartment and, in the case of a Commercial Unit, a block of commercial space in the Building, and (ii) an appurtenant undivided interest in the Common Elements.  All of such Units are collectively referred to as the "Units."

"Unit Owner" or "Unit Owners" means any owner or owners of a Unit. All of such Unit Owners are collectively referred to as "Unit Owners."

"Unsold Unit" refers to (i) a Residential Unit until such Unit has been purchased by a bona fide purchaser for residential occupancy on or after the Closing Date under the Plan or until the owner of such Unit or a person related by blood or marriage to such owner becomes the residential occupant of such Unit, or (ii) a Commercial Unit until such Unit has been purchased by a bona fide purchaser.

14

"Unsold Unit Owner" shall mean any owner of an Unsold Unit from time to time.

All other capitalized terms used in Part I of the Plan which are not separately defined in Part I shall have the meaning ascribed thereto in the By-Laws or the Declaration, as the case may be.

## DESCRIPTION OF PROPERTY AND IMPROVEMENTS

### The Land

The Land is located at the intersection of the northerly side of Franklin Street with the easterly side of Church Street in the Borough of Manhattan, New York, New York. It is known as 90 Franklin Street (a/k/a 271 Church Street), New York, New York. A metes and bounds description of the Land is set forth in the Declaration in Part II of the Plan. The Property is presently designated as Block 175, Lot 10 on the tax map of the Borough of Manhattan.

### The Building

The Building contains 17 stories, a penthouse, a mezzanine, a cellar and a sub-cellar level. A common corridor above the 17th story will also be used for storage and exits to a three story mechanical penthouse bulkhead. The Building is in the process of rehabilitation. The actual rehabilitation work commenced on or about December 15, 1998. Such rehabilitation shall be substantially completed as described in "Description of Property, Specifications and Building Condition" in Part II of the Plan.

### Description of Improvements

The Sponsor intends to rehabilitate the Building substantially in accordance with the plans and specifications prepared by guenther petrarca llp (a/k/a Architecture + Furniture), 157 Chambers Street, New York, New York 10007, copies of which are available for examination by prospective Purchasers at the Selling Agent's office. Such plans and specifications as the same may be amended from time to time by Sponsor are referred to in this Plan as the "Plans and Specifications."

A general description and outline of the specifications of the Building, equipment, furnishings and facilities as well as a statement of building condition is set forth in "Description of Property, Specifications and Building Condition" in Part II of the Plan.

The improvements described in the Plans and Specifications shall, upon issuance of the permanent certificate of occupancy for the Building, be in compliance with all applicable zoning codes of the City of New York and other applicable regulations, codes and governmental requirements.

Upon completion of the rehabilitation of the Building in accordance with the Plans and Specifications, it is presently contemplated that the Building will contain 25 Residential Units and 3 Commercial Units as described in this Plan.

### Completion of Building and Units

Rehabilitation of the Building commenced on or about December 15, 1998 and it is anticipated that the rehabilitation will be substantially completed on or about October 1,

1999. Construction may be delayed because of, and the obligations of Sponsor under this Plan and any Purchase Agreement are subject to, weather, strikes, lockouts, acts of God, local shortages, inability to obtain materials, equipment or labor, government restrictions or pre-emption, damage by fire or the elements, or any other cause. The period within which the Sponsor must complete any of its obligations under this Plan or any Purchase Agreement shall be extended by the period of such delay.

The rehabilitation shall be deemed fully completed in accordance with the Plans and Specifications when (a) a temporary or permanent Certificate of Occupancy for the Building shall have been issued by the Department of Buildings of the City of New York, and (b) the Sponsor's architect or engineer shall have certified that the Building has been substantially completed in accordance with the Plans and Specifications except for (i) work in Units to be done by or for the account of Purchasers, (ii) work in the Building customarily left incomplete until after occupancy and (iii) punch list items. Issuance of a temporary or permanent Certificate of Occupancy and the certification of the Sponsor's architect or engineer shall be deemed and considered conclusive evidence that the improvements have been completed in accordance with the Plans and Specifications without prejudice however to any rights which the Condominium may have under the Sponsor's obligation to cause defects in construction or materials to be corrected as may hereinafter be set forth in this Plan. (See **"Rights and Obligations of Sponsor"**).

A Purchaser should note that prior to the conveyance of title to him of his Unit he may not perform any work in the Unit without first obtaining the Sponsor's prior written consent. In addition, as provided in the By-laws, prior to the issuance of a permanent certificate of occupancy for the Building following completion of the rehabilitation and construction as described in the Plan, no Unit Owner other than Sponsor shall be permitted to make any alterations or improvements to his Unit without the prior written consent of Sponsor.

<u>Views</u>

Zoning districts can be modified from time to time and views from the Units may be blocked if, among other reasons, (i) the height, bulk or density of an adjacent building is changed, (ii) the zoning district designation is amended to permit greater building bulk and density, (iii) if a zoning variance is obtained, (iv) if the F.A.R. for the zoning district is changed or (v) if the Zoning Resolution is otherwise amended. Sponsor anticipates that a structure will be erected on a triangular parcel across the street and approximately one block to the northwest of the Property. While Sponsor has been advised that such structure will be approximately eight above-grade stories in height, Sponsor is not affiliated with the owner of the property on which such structure is expected to be constructed and makes no representation as to the ultimate height, size or density of such structure nor the use of such structure, if constructed.

In the event that the adjacent buildings to the north or east of the Property are renovated, reconstructed or enlarged at any time in the future, the lot line windows situated on such facades may require infill with fire rated construction. If certain of these windows remain open, they may be required to have sprinkler heads installed and their surrounding wall

areas infilled with fire rated construction; provision for this possibility is being provided in the design capacity of the sprinkler system. It is noted that under current zoning, the buildings immediately adjacent to the Property on the north and on the east are built to their legally permissible height and, for such reason, it is unlikely that the lot line windows on the north and east will require closure. In the unlikely event that closure is required, the cost of infill is estimated to be approximately $50,888 (or approximately $480 per window) based on current prices. Such cost would constitute a Common Expense to be shared by all Unit Owners in accordance with their respective Common Interests. No assurance can be made as to the actual cost of infill in the future.  No assurance can be given that the views currently existing (or existing when Purchaser first purchases or occupies the Unit) will continue to exist unchanged.

New York State Law grants to buyers of certain newly constructed housing units, in buildings of five stories or less, a Housing Merchant Implied Warranty.  This statutory warranty requires the home to be free of certain defects.  Since the Building is in excess of five stories, purchasers will not have the benefit of such statutory warranty, and will instead have the rights offered under this Plan.

Units and Common Elements

It is anticipated that the Condominium will contain 25 Residential Units and 3 Commercial Units.

A summary description of the Units offered for sale under this Plan is set forth in **"Introduction"** and **"Schedule A"**. Floor plans for the Units are set forth in **"Condominium Floor Plans"** in Part II of the Plan.

The legal description of the Units, the General Common Elements, the Residential Limited Common Elements and the Limited Common Elements is set forth in the Declaration in Part II of the Plan and is summarized in **"Rights and Obligations of Unit Owners and Board of Managers, Summary of By-Laws"** in Part I of the Plan.

Roof Recreation Areas; Storage Areas; Laundry Facilities; No Designated Parking or Other Amenities

Roof recreation areas forming a part of the Common Elements will be available to all Unit Owners.  One of the roof recreation areas will include a fitness center which is expected to contain some or more of the following: a treadmill, Nautilus machine (or equivalent) and two exercise bicycles.  A storage facility immediately below the roof level and one in the sub-cellar will also be available to all Unit Owners.  The Condominium Board will prescribe regulations regarding the use of such roof recreation areas and storage facilities and may allocate space in the storage facilities among Unit Owners.  There are no other special recreational facilities or amenities at the Property.  The Building does not contain any parking spaces and Sponsor has not made any arrangements for parking spaces to be rented or purchased by purchasers of Units.  Although the Building does not contain a laundry room, each Residential Unit contains a washer/dryer.

18

Certificate of Occupancy

It should be noted by Purchasers that the closing of individual Units under the Plan may occur prior to obtaining a permanent certificate of occupancy for the Building. A temporary certificate of occupancy may only be renewed, pursuant to current laws and practices, for a total of up to two years from the date of its original date of issuance. If the temporary certificate of occupancy shall have expired prior to obtaining a permanent certificate of occupancy, occupancy (residential and commercial) of the Building will be in violation of the Multiple Dwelling Law and other applicable law subjecting the occupants, the Condominium, the members of the Board, and the Unit Owners to penalties including eviction of occupants. It should be noted however that the Plans and Specifications set forth such alterations to the public portions and common areas of the Building and such alterations to individual dwelling units as may be necessary to obtain a permanent certificate of occupancy for the Building.

## **LOCATION AND AREA INFORMATION**

Location and Services

The Condominium is located on the northeast corner of Church Street and Franklin Street in the easterly part of Tribeca. The neighborhood is composed of a variety of office buildings, apartment buildings, (some of which are now condominiums or cooperatively owned), brownstone-type buildings, loft buildings and factory and warehouse storage buildings, some of which have been converted to residential use.

The Condominium is located in an area known as Tribeca (Triangle Below Canal). This area is a short subway ride to midtown Manhattan, and is within walking distance of SoHo and Greenwich Village. Each of these areas is well know for numerous art galleries, theaters, cafes and boutiques. There is a large and varied selection of restaurants, bars, and other forms of entertainment in the area, as well. The Property is also within a short distance of the World Trade Center, the World Financial Center, Battery Park City parks, City Hall and the South Street Seaport.

A number of hospitals and medical facilities, including New York University Downtown Hospital are in the vicinity of the Condominium.

Public services, including schools, police protection, library, street maintenance, social services and fire protection are provided by the City of New York. The Condominium is located within the public school district that includes The Early Childhood Center, P.S. 234 (one of the top rated public elementary schools in New York City) and P.S./I.S. 89. Stuyvesant High School (one of the most prominent and selective public high schools in New York City) is also located in the vicinity of the Condominium. There are various private schools located in the vicinity of the Condominium including Buckle My Shoe Nursery School, The Little Red School House, The Washington Market School, St. Luke's in the Field School, The Friends School, Elizabeth Irwin High School and Xavier High School. Also within walking distance of the Condominium is the New Amsterdam Branch of the New

York City Public Library system, located at 9 Murray Street. Many religious faiths have congregations within walking distance of the Condominium, such as Our Lady of Victory Church, Trinity Assembly of God, St. Theresa's Church, Wall Street Synagogue and Village Temple.

THE ABOVE LISTING IS NOT ALL INCLUSIVE. NO REPRESENTATION IS MADE THAT MEMBERS OF A UNIT OWNER'S FAMILY WILL BE ENTITLED TO ATTEND ANY PARTICULAR SCHOOL LISTED ABOVE.

Nearby transportation facilities include the 1, 9, A, C and E subway lines, with North-South bus transportation on Varick street, Avenue of the Americas and Broadway. Nearby West Street provides easy access to the downtown financial center and is connected to most regional arteries, including the FDR Drive, the Henry Hudson Parkway, New York State Thruway and Interstate 95.

New York City is the largest city in the United States, as well as one of the principal urban centers of the world. Manhattan is the center of New York City, containing numerous business and financial centers, excellent regional transportation, cultural activities, recreational and open-space park areas, educational facilities, superb medical centers and a vast array of restaurants.

Zoning and Use

The Property is located in the C6-2A zone.

The Property is further located in the Tribeca East Historic District by Landmark Designation Notice recorded in Reel 1962, page 250 in the Office of the New York County Register. The Property is accordingly subject to the restricted use as provided in the New York City Charter, Chapter 8-a. This designation imposes special restrictions upon the construction, alteration, demolition, or reconstruction as such activities affect the external structure of the Building. In the event any external alteration of the Building is needed or desired, the Condominium must apply to the Landmarks Preservation Commission for permission to make such alteration. The Commission, before approving said work, may impose certain conditions and/or standards, making the work more costly than it would otherwise be if the Building were not in an Historic Landmark District. Additionally, there may be added legal costs in connection with obtaining approval for such alteration. Landmark status should be viewed as a general limitation upon the alterations of the external structure.

## SCHEDULE A
## THE FRANKLIN TOWER
### Schedule of Purchase Prices and Other Related Information
### for the Projected First Year of Condominium Operation
### October 1, 1999 to September 30, 2000

| Unit | Approx. Area (1) | Purchase Price (2) | Percentage of Common Interest (3a) | Residential Relative Interest (3b) | Estimated Common Charges Monthly (4) | Annual (4) | Projected Real Estate Taxes without J-51 Benefits Monthly (5) | Annual (5) | Projected Real Estate Taxes with J-51 Benefits Monthly (5) | Annual (5) | Projected Total Carrying Charges without J-51 Benefits Monthly (6) | Annual (6) | Projected Total Carrying Charges with J-51 Benefits Monthly (6) | Annual (6) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | | | | | | |
| 2 North | 1,895 | $775,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 2 South | 2,633 | $1,150,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 3 North | 1,895 | $795,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 3 South | 2,633 | $1,225,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 4 North | 1,895 | $815,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 4 South | 2,633 | $1,250,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 5 North | 1,895 | $850,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 5 South | 2,633 | $1,275,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 6 North | 1,895 | $925,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 6 South | 2,633 | $1,315,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 7 North | 1,895 | $925,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 7 South | 2,633 | $1,350,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 8 North | 1,895 | $935,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 8 South | 2,633 | $1,450,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 9 North | 1,895 | $950,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 9 South | 2,633 | $1,595,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 10 North | 1,895 | $995,000 | 2.3404% | 2.4427% | $1,084 | $13,013 | $685 | $8,218 | $665 | $7,984 | $1,769 | $21,232 | $1,750 | $20,997 |
| 10 South | 2,633 | $1,750,000 | 3.2518% | 3.3939% | $1,507 | $18,081 | $952 | $11,419 | $924 | $11,092 | $2,458 | $29,499 | $2,431 | $29,173 |
| 11 | 5,027 | $2,850,000 | 6.2084% | 6.4797% | $2,877 | $34,520 | $1,817 | $21,801 | $1,765 | $21,178 | $4,693 | $56,321 | $4,641 | $55,698 |
| 12 | 5,027 | $2,995,000 | 6.2084% | 6.4797% | $2,877 | $34,520 | $1,817 | $21,801 | $1,765 | $21,178 | $4,693 | $56,321 | $4,641 | $55,698 |
| 13 | 5,027 | $3,125,000 | 6.2084% | 6.4797% | $2,877 | $34,520 | $1,817 | $21,801 | $1,765 | $21,178 | $4,693 | $56,321 | $4,641 | $55,698 |
| 14 | 5,027 | $3,225,000 | 6.2084% | 6.4797% | $2,877 | $34,520 | $1,817 | $21,801 | $1,765 | $21,178 | $4,693 | $56,321 | $4,641 | $55,698 |
| 15 | 5,027 | $3,325,000 | 6.2084% | 6.4797% | $2,877 | $34,520 | $1,817 | $21,801 | $1,765 | $21,178 | $4,693 | $56,321 | $4,641 | $55,698 |
| 16 | 5,027 | $3,500,000 | 6.2084% | 6.4797% | $2,877 | $34,520 | $1,817 | $21,801 | $1,765 | $21,178 | $4,693 | $56,321 | $4,641 | $55,698 |
| 17 | 7,764 | $5,500,000 | 8.9233% | 8.9924% | $3,815 | $45,776 | $2,409 | $28,909 | $2,357 | $28,286 | $6,224 | $74,685 | $6,172 | $74,062 |
| **Residential Total** | 78,678 | $44,845,000 | 95.8135% | 100.0000% | $44,395 | $532,739 | $28,038 | $336,461 | $27,253 | $327,039 | $72,433 | $869,190 | $71,648 | $859,778 |
| **Commercial** | | | | | | | | | | | | | | |
| A | 6,362 | N/A | 4.0552% | N/A | $997 | $11,967 | | | | | | | | |
| B | 1,412 | N/A | 0.1221% | N/A | $30 | $360 | | | | | | | | |
| C | 106 | N/A | 0.0092% | N/A | $2 | $27 | | | | | | | | |
| **Commercial Total** | 8,331 | N/A | 4.1865% | N/A | $1,030 | $12,354 | | | | | | | | |
| **TOTAL:** | 87,009 | $44,845,000 | 100.0000% | 100.0000% | $45,424 | $545,093 | | | | | | | | |

## FOOTNOTES TO SCHEDULE A

1.      Listed floor space (square footage) is only approximate and may exceed the useable square footage of the Unit.  The floor space of each Unit has been measured as follows: to the center line of demising walls between Units; to the center line of non-structural common walls; to the inside face of common structural walls; to the inside face of common structural walls or elements; and to the outside face of exterior walls.  The trash room serving each Residential Unit comprises part of such Unit.  Stairways and mechanical space that are interior to a Unit comprise part of such Unit.  A roof terrace, a portion of which will be enclosed, the penthouse roof and the roof of the first level of the mechanical penthouse comprise part of Unit 17.  The elevator lobbies of Units 11,12, 13, 14, 15, 16, and 17 comprise part of each such Unit.

 If any two Units which have access to the same shared hallway shall at any time be owned of record by the same owner, such hallway shall thereafter be treated as a Limited Common Element until such time as such Units shall have two different owners.  Those Common Elements which are used by or service two or more Residential Unit (but not any of the Commercial Units) have been designated as Residential Common Elements.  In addition, Sponsor and its designees and the Commercial Unit Owner have the right to designate a portion of the Common Elements as a Limited Common Element in connection with the combining or subdividing of two Units or as otherwise provided in the Declaration.  See **"Rights and Obligations of Unit Owners and Board of Managers; Summary of By-Laws."**

 As provided in the By-Laws, prior to the issuance of a permanent certificate of occupancy for the Building, no Unit Owner shall add or permit to be made any alterations or improvements to his Unit without the prior written consent of the Sponsor.  The foregoing restrictions shall be inapplicable to Units owned by Sponsor.

2.      The Sponsor reserves the right to change the price of any Unit without prior notice or amendment to the Plan except that a duly filed amendment to the Plan will be required for (a) an across the board price change affecting one or more lines of Units or Unit models, (b) a price change that is to be advertised, or (c) a price increase for an individual purchaser.

 The offering price of a Unit is negotiable and may be changed. Thus, the prices paid by Purchasers for similar Units may be different without altering the Common Interest allocated to the Units or the Common Charges with respect thereto. See **"Changes in Prices and Units."**

 For a discussion of estimated closing costs which a Purchaser may be required to pay in connection with his purchase under the Plan, see **"Closing Costs and Adjustments."**

3(a)    The percentage of Common Interest for each Unit has been determined as provided in Section 339-i(1.)(iv) of the Real Property Law, that is, based upon floor space, subject to the location of such space and the additional factors of relative value to other space in the Condominium, the uniqueness of the Unit, the availability of Common Elements for exclusive or shared use, and the overall dimensions of the particular Unit. The Common Interest of each Unit that includes below grade space has been computed based upon 100% of the above grade space and 7% of the below grade space. The Common Interest of Unit 17 is computed based on the full floor area of all interior room of any space comprising such Unit, including the enclosed portion of the roof terrace and 50% of the floor area of all exterior space (i.e., the roof terrace and second level penthouse floor roof terrace) comprising such Unit. The percentage interest of each Unit in the Common Elements (Common Interest) is set forth in this column of Schedule A. The floor area of the trash room and any mechanical space situated within a Unit as well as the elevator lobbies serving (and comprising part of) Units 11, 12, 13, 14, 15, 16, and 17 have been included in the floor area of such Unit for the purpose of computing such Unit's Common Interest. Every Unit Owner will be responsible for his proportionate share of the Common Expenses of the Condominium, based upon his Common Interest (except as otherwise provided in Schedule B, the Declaration or By-Laws), and will have the same proportionate share of any common profits of the Condominium or any distribution upon termination or condemnation of the Condominium.

3(b)    The Common Expenses payable by each Residential Unit Owner are apportioned in the proportion that the individual Residential Unit's Common Interest bears to the aggregate Common Interests of all Residential Units.

4.    The estimated monthly Common Charges for each Residential Unit is calculated by multiplying the Common Expenses attributable to all Residential Units (estimated to be $44,395 monthly for the projected first year of Condominium operation) by the Common Interest of each Residential Unit relative to the aggregate Common Interests of all Residential Units. The estimated Common Charges are for the period from October 1, 1999 through September 30, 2000, which period is assumed to be the first year of condominium operation. This period is used only for purposes of projection and illustration. Sponsor does not warrant that Condominium operation will commence on October 1, 1999. The estimated Common Charges are based upon the estimates of income and expenses set forth in Schedule B. The actual amounts of income and expenses may differ from the estimates thereof and may change in subsequent years. Due to the possibility of unforeseeable changes in the economy or increase or decrease in the amount of income and/or expenses of operation, the projections are not intended to be taken as guarantees or warranties of any kind whatsoever or as any assurance that the actual expenses or income of the Condominium for any period of operation may not vary from the amounts shown. In fact, it may be expected, based on current trends, that the operating expenses, including heating costs, utilities, maintenance and repairs, labor and other related expenses, will increase in the future. Each Commercial Unit Owner will bear a proportionate share of the Common Charges payable by all Commercial Unit Owners, which share shall be based on the Common Interest of the particular Commercial Unit relative to the aggregate Common Interests of all Commercial Units.

In addition to the estimated Common Charges, each Unit Owner will be responsible for paying: (i) debt service payments under any loan or loans obtained to finance the acquisition of his or her Unit; (ii) the cost of any cable television service and/or satellite dish and/ other television service (iii) the cost of electricity supplied to his or her Unit, which, electricity shall be separately metered and payable by the Unit Owner directly to the utility company as and when billed; (iv) the cost of carpeting, painting and decorating his or her Unit; (v) the cost of interior repairs to and the maintenance of his or her Unit, including but not limited to, repairs to and maintenance of walls, including the exterior face thereof, ceilings and floors and all kitchen and bathroom fixtures and appliances, and as to Unit 17, all maintenance, repairs and replacements to the portions of the roof comprising part of such Unit, which repairs and replacements shall be performed by such Unit Owner; (iv) the cost of any insurance that he or she obtains covering (a) furniture, belongings, equipment and other personal property and (b) liability to others for personal injury or property damage as a result of occurrences in his or her Unit; (vii) real estate taxes; and (viii) water charges and sewer rents, if separately assessed against the Unit.

5.      This column contains an estimate of the real estate taxes that will be payable by Residential Unit Owners during the first year of Condominium operation (i.e., October 1, 1999 to September 30, 2000).

The Mazursky Group, Inc., 42 Broadway, Suite 1744, New York, New York 10004, has estimated that the actual assessed valuation of the Property after the completion of the rehabilitation will be $6,000,000 and the transitional assessed valuation of the Property after the completion of the rehabilitation will be $5,748,100. Real estate taxes are payable on the lower of the actual assessed valuation or the transitional assessed valuation. The Mazursky Group Inc. has estimated that based on the transitional assessed valuation of the Property estimated above, $5,173,290 will be allocable to the Residential Units and $574,810 will to be allocable to the Commercial Units.

Based on an estimated tax rate per $100 of assessed valuation for Residential Units of $10.95 and for the Commercial Units of $10.45 (which estimated tax rates reflect an approximately two percent (2%) increase above the rate in effect during tax year 1998/1999 of $10.739 per $100 of assessed valuation for the Residential Units and $10.236 for the Commercial Units) the estimated real estate taxes during the first fiscal year following the completion of the rehabilitation (i.e., July 1, 2000 to June 30, 2001) will be $626,543 of which approximately $566,475 is estimated to be allocable to the Residential Units.

The actual assessed valuation of the Property for tax year 1998/1999 is $2,911,500 and the transitional assessed valuation for such year is $2,588,400; the tentative actual assessed valuation for tax year 1999/2000 is $3,060,000 and the tentative transitional assessed valuation for such year is $2,762,100. As more fully described below, such assessed valuations do not reflect any increases that may reflect the rehabilitation or change in use of the Property.

The first year of Condominium operation is expected to consist of nine months of tax year 1999/2000 and three months of tax year 2000/2001. Since the rehabilitation of the

24

Building was not complete on the "taxable status date" for tax year 1999/2000, which date is the date that the Building's assessed valuation for tax year 1999/2000 was tentatively determined, such assessed valuation was not based on the value of the Property upon the completion of the rehabilitation. Further, such assessed valuation does not reflect any increase attributable to a change in use of the Property (i.e., from a commercial building to residential and commercial condominium units). **While the real estate taxes payable by Residential Unit Owners for the anticipated first year of Condominium operation (i.e., the period from October 1, 1999 to September 30, 2000) have been estimated at $336,451[1] (assuming the J-51 Benefits described below are not available), and $327,039 (assuming the J-51 Benefits described below are available[2]) the real estate taxes for the first year of Condominium Operation that are attributable to the first nine months of such year (which are included in tax year 1999/2000) are lower than the real estate taxes for the last three months of such year (which are included in tax year 2000/2001). It is anticipated that commencing with fiscal year July 1, 2000 to June 30, 2001 and thereafter, the assessed valuation of the Property will increase (as discussed above) to reflect the value of the physical improvement to the Building and the change in the use of the Property. Thus, the estimates set forth in Schedule A are approximately $230,024 (or 68.4%) lower (in the absence of J-51 Benefits) than the taxes that are estimated to be payable by Residential Unit Owners (equal to an aggregate of $566,475, in the absence of J-51 Benefits), during tax year 2000/2001. Assuming the availability of J-51 Benefits, the estimated real estate taxes for the Residential Units set forth on Schedule A for the period from October 1, 1999 to**

---

[1]        Approximately 10% of the Building's assessed valuation for the tax year 1999/2000 has been allocated to the Commercial Units. The assessed valuation allocable to the Residential Units in tax year 1999/2000 is estimated at $2,485,890. Based on the estimated tax rate of $10.45 per $100 of assessed valuation, the taxes attributable to the Residential Units would be $259,776 (or $194,832 for the 9 month period from October 1, 1999 to June 30, 2000). Based on the estimated valuation of $5,173,290 for the Residential Units in tax year 2000/2001 and an estimated tax rate of $10.95 per $100 of assessed valuation, the taxes attributable to the Residential Units for such tax year are estimated to be $566,475 (or $141,619 for the 3 month period from July 1, 2000 to September 30, 2000). The real estate taxes for the first year of Condominium Operation estimated to be allocable to the Residential Units are the sum of $194,832 plus $141,619) or $336,451. See Footnote 5 above regarding an anticipated increase in assessed value and real estate taxes commencing July 1, 2000.

[2]        Since, as more fully described under J-51 Benefits below, it is not anticipated that J-51 Benefits will be available prior to July 1, 2000, the estimated real estate taxes payable by Residential Unit Owners reflects J-51 Benefits of $9,412, which represents the estimated J-51 Benefits allocable to the three month period from July 1, 2000 to September 30, 2000. Purchasers should refer to the discussion of the J-51 Benefits for an estimate of the J-51 Benefits that are anticipated to be available for the full fiscal year from July 1, 2000 to June 30, 2001.

The post-conversion assessed valuation calculations for the Property yield an assessment per Residential Unit in excess of $206,900 per Unit ($5,173,290 divided by 25 Units), which exceeds the threshold amount of $37,999, and would serve to deny a J-51 tax exemption to the projected increase in Building assessment attributable to the conversion.

## TAX ABATEMENT

The Act provides the benefit of an abatement of property taxes for a period of not more than twenty years, of up to 50% (in the case of a non-residential building being converted to a class "A" multiple dwelling in the borough of Manhattan) of the certified reasonable cost (CRC) as approved by the Department of Housing Preservation and Development, ("HPD"). The Act places a further limitation on the abatement benefits available of up to a maximum of $15,000 per apartment for apartments consisting of three and one half zoning rooms, $17,400 per apartment for apartments consisting of four and one half zoning rooms, and $19,800 per apartment consisting of five and one-half zoning rooms. There is an additional limitation of 8.333% of the total allowable cost which can be deducted in any one year. If, in any year, the abatement is greater than the tax due, the owner's taxes will be reduced to zero. The remaining dollars of abatement may be accumulated and passed along in any abatement year for a period of up to twenty years, after which time the accrued dollars will be lost.

The projections contained herein are based on the following assumptions:

1.   Sponsor is renovating the existing commercial Building comprising one tax lot into a residential development consisting of twenty-five (25) Class "A" dwelling units (as defined by the Multiple Dwelling Law) each consisting of an average of approximately 3,037 square feet, in addition to three (3) Commercial Units, which will not be offered for sale;

2.   The total gross square footage of the Building is approximately 107,000 square feet;

     Of the 5,606 sf located on the ground floor approximately 3,114 sf will be used as lobby space for the Residential Units. The Commercial Units will encompass the remaining 2,492 sf ground floor area, 557 sf in the mezzanine, 3,313 sf in the cellar and 1,518 sf in the sub-cellar;

3.   Construction will be completed on or about October 1, 1999, by which date approximately $6,700,000 in construction costs will have been incurred;

4.   Upon completion of the renovation each apartment shall contain at least one private bathroom and private kitchen for the exclusive use of the occupants therein;

28

**September 30, 2000 are $201,786 or 61.7% lower than the estimated real estate taxes of $528,825 for the period from July 1, 2000 to June 30, 2001.**

This estimate assumed that the assessed valuation will be increased solely due to the purchase and conversion being completed by Sponsor. All prospective Purchasers are advised that although the estimate of assessed valuation upon completion of construction is a good-faith estimate, such projections of the assessed valuation, when actually made, may be less or greater than as estimated above and are not guaranteed.

The real estate taxes for future years will vary in accordance with the tax rate, the Property's assessed valuation and the phasing in of assessed valuation increases. It is noted that under state law, increases in a property's assessed value due to changes in its market value are to be phased in over five (5) years in equal annual increments of twenty percent (20%). Any further increases in the assessed value resulting from still higher market value is to be similarly phased in over an additional five year period from the date(s) of such increase(s). The full increased assessed valuation to be paid at the end of five (5) years is called the "actual assessed valuation." As discussed above, The Mazursky Group, Inc. has estimated the actual assessed valuation for the Property upon the completion of the rehabilitation at $6,000,000.

Until the Residential Units are separately assessed, the entire assessment attributable to the Residential Units will be paid by all Residential Unit Owners in proportion to their relative Common Interests.

On or after the filing and recording of the Declaration and a deed for a Unit, a separate tax lot is to be or will have been created for each Unit in the Condominium. After creation of the separate tax lot for a Unit, the local assessor ("assessor") apportions the assessed valuation of the Property to each of the newly created tax lots representing the Units. There can be no assurance that the assessor will apportion the assessed valuation of the Property (i) to the Residential Units and Commercial Units in the proportion set forth above and (ii) to a tax lot representing a Residential Unit on the basis of the percentage of Common Interest appurtenant to the Unit relative to the other Residential Units. Moreover, there can be no assurance that there will not be an increase in the tax rate or the assessed valuation of a Unit or the Property as described above on or after such apportionment or for any reason. Such an increase will increase a Unit Owner's real estate taxes above the amounts estimated on Schedule A.

The foregoing analysis is based upon the experience of Jerome Mazursky & Associates, Inc. with the Real Property Assessment Bureau and the Tax Commission of the City of New York, and their assessment policies regarding newly renovated properties held in condominium ownership. Application of a particular approach to valuation by an individual assessor may yield a different result. In such event, it might be desirable to commence real property tax review proceedings at the Tax Commission or Supreme Court level to bring the assessment in line with the estimates presented herein.

26