# B-2

**J-51 BENEFITS**

Sponsor intends to make application to the appropriate agencies of the City of New York (the "City") for real estate tax abatement benefits (commonly known as "J-51 Benefits") pursuant to Section 11-243 (formerly Section J-51-2.5) of the Administrative Code of the City of New York (hereinafter, the "Act"). The benefits which are available to eligible projects which meet the qualifications of the statute are as follows:

TAX EXEMPTION

Subject to the restrictions and limitations described below, any increase in assessed valuation resulting from the certified reasonable cost ("CRC")[3] of the conversion, alteration, or improvement of any building or structure performed pursuant to the Act, except insofar as the gross cubic content of the building is increased thereby, or the improvements relate to commercial space, shall be partially exempt from taxation for a period of fourteen years. The land improved by a building which receives benefits pursuant to the Act shall not be exempt from any increase in assessed valuation.

Exemptions will be based upon post-conversion assessment levels for the residential portions of the property only where the property will be occupied for both residential and non-residential purposes. Full exemptions will be granted to property with a post-conversion assessment equal to or less than $18,000 per dwelling unit. No exemption will be granted to a property whose post-conversion assessment equals or exceeds $38,000 per dwelling unit. Properties whose post-conversion assessment falls between $18,000 and $38,000 will be exempt from an increase in taxation to the following extent on an incremental basis:

| | Total Assessed Value | Percent of Increased AV Exempt |
|---|---|---|
| First | $18,000 or less | 100% |
| From | $18,001 to $22,000 | 75% |
| From | $22,001 to $26,000 | 50% |
| From | $26,001 to $30,000 | 25% |
| From | $30,001 to $37,999 | 0% |
| | $38,000 or more | No exemption granted |

[3] Certified reasonable cost or "CRC" means the reasonable cost of conversion or alterations or improvements certified as eligible for the benefits of the Act, as evidenced by the issuance of a Certificate of Eligibility and Reasonable Cost by the Office of Tax Incentive Programs of the Department of Housing Preservation and Development of the City of New York.

5. Commercial and residential portions of the Property will each be Condominium Units and will be assigned separate tax lot numbers;

6. No dwelling units will be used for transient occupancy; and

7. Sponsor will timely provide to HPD such documentation as it may require in connection with the application for J-51 Benefits.

**IMPACT OF J-51 ABATEMENT BENEFITS**

Based on a review of the Unit floor plans included in this Offering Plan, Herrick, Feinstein LLP has estimated that the total CRC for the Building will be limited to $15,000 per dwelling unit multiplied by 9 Residential Units, plus $19,800 per dwelling unit multiplied by 16 Residential Units, or a maximum of $451,800. A maximum of fifty percent (50%) of the CRC (or $225,900) will be available to abate the real estate taxes attributable to the Residential Units. The estimated maximum annual abatement available to offset taxes is one-twelfth of the projected CRC, or approximately $37,650. Assuming the maximum amount is used each year, the abatement will last approximately six years. It is not anticipated that HPD will issue a CRC until July, 2000.

J-51 benefits are not available to any portion of the Property that represents an increase in the gross cubic content of the Building. In this regard, it noted that Unit 17 will include a penthouse level comprised of approximately 500 square feet (more or less) that result in an increase in the gross cubic content of the Building. Schedule A does not reflect the allocation of J-51 benefits to the penthouse portion of Unit 17 (although Schedule A does reflect the allocation of J-51 benefits to the remaining interior portion of Unit 17). While it is not anticipated that the appropriate City agencies will allocate any J-51 benefits to such portion of Unit 17, no assurance can be provided to such effect. Sponsor, its counsel and the Selling Agent shall not be liable to any Unit Owner or any other party if the City allocates J-51 benefits to the penthouse portion of Unit 17 (in which case the allocation of J-51 Benefits to the other Residential Units would be somewhat lower).

Estimated taxes payable by the residential portion of the premises[4] for the period July 1, 2000 to June 30, 2001 (comprising a portion of the first year of Condominium operation) are projected as follows (assuming the site does not qualify for partial J-51 tax exemption, but does qualify for abatement benefits):

| | |
|---|---|
| Residential Units | $566,475 |
| Estimated Tax Exemption | None |
| Maximum Annual Tax Abatement | $ 37,650 |
| Tax Due with Abatement in Place | $528,825 |

---

4 J-51 benefits are unavailable to the Commercial Units.

Because it is not anticipated that J-51 Benefits will be available prior to July 1, 2000, it is estimated that J-51 Benefits equal to approximately $9,412 will be available for the first year of Condominium Operation (i.e., October 1, 1999 to September 30, 2000).

Sponsor shall use all reasonable efforts to file the J-51 application and all related documents on a timely basis and timely comply with all procedures required to process and maintain the J-51 Benefits. Sponsor shall keep all records required by HPD and will make them available to HPD whenever requested to do so. HPD routinely conducts audits, which can result in the reduction or revocation of benefits if proper documentation is not provided. Sponsor shall make all tax benefit documents available to the Condominium Board for inspection and copying for the life of the benefits.

No representation is made that the provisions of law will apply at the time the alterations to the building are completed, and if they do apply, that HPD will hold that the Property is entitled to the benefits conferred by Section 11-243 of the Administrative Code of the City of New York.

No warranty is or can be made that HPD or the City Real Property Assessment Department, or any other agency with jurisdiction, will approve Sponsor's application for J-51 tax benefits. Should tax abatement and/or exemption be denied, in whole, or in part, then each Unit Owner will be responsible for all taxes due and owing from the Closing Date. See "**Counsel's Real Estate Tax Benefits Opinion**" for details.

Once a separate tax lot is established for a Unit and apportionment of the assessed valuation of the Property to the newly created tax lot representing the Unit is officially made, a Unit Owner will not be responsible for the payment of real estate taxes assessed against another Unit [unless such real estate taxes are included in Common Charges because, for example such real estate taxes are assessed against a Unit which is owned as part of the Common Elements (i.e., a Unit acquired by the Condominium Board pursuant to its right of first refusal)] nor will his Unit be subject to any lien arising out of non-payment of real estate taxes assessed against another Unit (except to the extent provided above in this sentence). However, until separate tax bills are available for each Unit, real estate taxes will be paid by the Condominium as a Common Expense. In accordance with the estimates set forth above, the Condominium Board will apportion the real estate taxes for the Property based on the Residential Units bearing 90% of such assessment and the Commercial Units bearing 10% of such assessment. The taxes payable by all Residential Units will be further apportioned among said Residential Units in the proportion that the Common Interest of each Residential Unit bears to the aggregate Common Interests of all Residential Units and such proportionate share of the real estate taxes will be assessed against each Unit as part of the Common Charges. It should be noted that both the tax rate and the assessed valuation of the Property may be changed from time to time.

6. Thess columns estimates the total carrying charges (Common Charges plus real estate taxes both without and with the J-51 Benefits) payable by each Unit Owner.

The real estate taxes described above paid by a Residential Unit Owner with respect to his Unit are deductible by such Residential Unit Owner for income tax purposes provided that the conditions applicable thereto discussed in **"Counsel's Tax Opinion"** are satisfied. These amounts may change in subsequent years as a result of changes in the assessed valuation of Units, the tax rate and the method of assessing real property. If any Residential Unit Owner obtains mortgage financing for his or her Unit, the interest paid on such mortgage indebtedness may also be deductible for income tax purposes, provided the conditions applicable thereto discussed in **"Counsel's Tax Opinion"** are satisfied. For the most part an individual Residential Unit Owner may only deduct interest on debt incurred to acquire his principal residence or a designated second residence subject to certain limitations. See **"Counsel's Tax Opinion."** Such Residential Unit Owner's income tax deduction may vary in future years due to changes in the interest rate on such Residential Unit Owner's mortgage (if any) or from changes in the allocation of constant debt service payments between interest and principal.

Owner will share the cost of the budget item for contingency in the proportion that the Common Expenses payable by the Commercial Unit Owner for all budget items (exclusive of contingency) bears to the Common Expenses payable by all Unit Owners (exclusive of contingency). The cost of Worker's Compensation has been allocated among the Residential Unit Owners and the Commercial Unit Owners in the proportion that the portion of the salary of the Concierge/Superintendent and one porter payable by the Commercial Unit Owner bears to all salary expenses It is anticipated that Commercial Unit A will be separately metered for gas and each Commercial Unit will be either separately metered or sub-metered for electricity. Initially, one meter will serve the Building to measure water consumption. It is anticipated that Commercial Unit A will be separately metered for water and sewer and that Commercial Units B and C will not utilize any water. However, Commercial Units B and C may require the Condominium Board to provide water, in which event the Owner of such Unit(s) shall bear the reasonable cost of any water and sewer charges attributable to such Units, as discussed below. For such reason, unless the Condominium Board provides water to Commercial Unit B and/or Commercial Unit C, the Commercial Unit Owner will bear a pro-rata share of the water and sewer charges attributable to the Common Elements only, which amount is estimated by "Sponsor's Energy Consultant" (defined below) to be $500. Until such time as Commercial Unit A is separately metered for water and sewer, the Commercial Unit Owner will be responsible for the reasonable cost of any water charges and sewer rents allocable to such Unit as more fully described in Footnote 6 below. Should either or both of Commercial Unit B or Commercial Unit C use water and sewer in the future, the owner of such Unit(s) shall either (i) reimburse the Condominium Board the reasonable cost thereof or (b) cause such Unit(s) to be separately metered or submetered, in which case, the owner of such Unit(s) shall pay the cost of water and sewer as measured by such meter or submeter directly to the utility company (in the case of a direct meter) or to the entity operating the submeter (in the case of a submeter) in lieu of any Common Charges imposed by the Condominium Board for water and sewer (other than water and sewer attributable to the Common Elements). The cost of installation of any separate meter or sub-meter measuring the consumption of gas or water (and/or related sewer charges) shall be borne by the Condominium Board.

**2. Labor** **$ 275,591**
**(Residential Unit Owners $271,563)**
**(Commercial Unit Owner $ 4,028)**

The Building staff will consist of one concierge/ superintendent, 1 handyman, 1 porter and 4 lobby attendants. Salaries and benefits have been computed based on the assumption that the employees will not be members of any union. The figure shown includes wages, workers' compensation and disability insurance, payroll taxes and payroll processing.

Wages:

| | |
|---|---|
| Concierge/Superintendent -1 | $ 48,000 |
| Handyman -1 | 26,645 |
| Porter - 1 | 24,190 |

**THE FRANKLIN TOWER**
**SCHEDULE B**
**PROJECTED BUDGET FOR FIRST YEAR OF CONDOMINIUM OPERATION**
**(October 1, 1999 to September 30, 2000)**

**Income (1):**

| | Residential(1a) | Commercial(1b) | Total |
|---|---|---|---|
| | $532,739 | $12,354 | $545,093 |
| | | | |

**Expenses:**

| | Residential | Commercial | Total |
|---|---|---|---|
| Labor(2) | $271,563 | $4,028 | $275,591 |
| Heating and Hot Water (3) | 56,550 | 2,471 | 59,021 |
| Gas for Cooking (4) | 2,281 | 0 | 2,281 |
| Electricity(5) | 62,311 | 2,723 | 65,034 |
| Water Charges and Sewer Rents(6) | 14,479 | 21 | 14,500 |
| Repairs, Maintenance and Supplies (7) | 16,318 | 349 | 16,667 |
| Service Contracts (8) | 27,524 | 263 | 27,787 |
| Insurance(9) | 24,485 | 1,070 | 25,555 |
| Management Fees (10) | 24,673 | 527 | 25,200 |
| Legal Fees and Audit Fees(11) | 7,186 | 314 | 7,500 |
| Contingency(12) | 25,369 | 588 | 25,957 |
| Yearly Reserve(13) | -0- | -0- | 0 |
| **Total Expenses** | **$532,739** | **$12,354** | **$545,093** |

## Footnotes to Schedule B

**1. Total Common Charges** **$ 545,093**

This figure represents the total annual Common Charges to be levied against and collected from, all Unit Owners during the first year of condominium operation following the Closing Date under the Plan. These Common Charges will be utilized by the Condominium Board to defray the Common Expenses incurred in connection with the repair, maintenance, replacement, restoration, and operation of, and any alteration, addition, or improvement to, the Common Elements. The estimate of the annual Common Charges to be collected during the first year of condominium operation, is based upon the assumption that the first year of condominium operation will be the year from October 1, 1999 to September 30, 2000. The actual first year of operation may be earlier or later than that year.

This figure does not include any interest income that may be received by the Condominium from investment of monies constituting the Working Capital Fund. All or part of the Working Capital Fund may be expended during the first or subsequent years of operation. Accordingly, interest income cannot be determined with exactitude and may be inconsequential. For this reason, and for the further reason that such interest income does not reflect normally anticipated income from operations, no interest income has been included in the estimated income for the first year of condominium operation.

**(1a) Residential Common Charges** **$ 532,739**

The figure represents the Common Charges payable by all Residential Unit Owners to defray the Common Expenses attributable to the Residential Units and a pro-rata share of the Common Elements. Each Residential Unit Owner's share of the costs attributable to the Residential Units is based on the proportion that the Common Interest of the particular Unit Owner's Residential Unit bears to the Common Interests of all Residential Units.

**(1b) Commercial Common Charges** **$ 12,354**

The Commercial Common Charges represent the Commercial Units' contribution to the Common Expenses of the Condominium. Notwithstanding that the aggregate Common Interests of the Commercial Units is 4.1865%, the Commercial Units will only be responsible to pay their pro-rata share (i.e., based on their respective Common Interests) of the following budget items: (a) the salary and payroll overhead of the Concierge /Superintendent and one porter; (b) heat and hot water (unless any Commercial Unit is separately heated in the future or uses a disproportionate amount of heat and hot water or water and sewer, as more fully described in footnotes 3 and 6 below); (c) electricity for the Common Elements; (d) service contracts covering extermination and sprinkler maintenance and one-half the cost of such portion of the elevator contract as is allocable to one elevator; (e) insurance; (f) legal and audit; (g) fifty percent (50%) of the cost of repairs, maintenance and supplies; and (h) fifty percent (50%) of the cost of management. The Commercial Unit

| | |
|---|---|
| Lobby Attendants (24 hrs.) - 4 | 96,760 |
| Subtotal | $195,595 |

Benefits:

| | |
|---|---|
| Concierge/Superintendent | $ 7,580 |
| Handyman | 7,580 |
| Porter | 7,580 |
| Lobby Attendants | 32,320 |
| Subtotal | $55,060 |

Employer Liability:

| | |
|---|---|
| FICA (7.65%) | $14,963 |
| FUTA (.8% on first $7,000) | 448 |
| SUI (4.4% on first $7,000) | 2,464 |
| Subtotal | $17,875 |

| | |
|---|---|
| Workers Compensation: | $ 7,061 |

The amounts and method of computation shown above may vary because of changes in the experience rating for the Building or negotiation of benefits or for other reasons.

The estimated amount of payroll taxes and insurance when added to wages, will approximately equal the sum shown in the budget for labor expense. No warranty is made as to the actual wage rates, payroll taxes and benefits during the first year of condominium operation. However, the projected salary and payroll taxes are believed to be reasonable. The budget estimate for labor expense does not violate the New York State or federal minimum wage laws.

It is noted that Section 27-2053 of the New York Administrative Code requires the owner of a multiple dwelling consisting of nine (9) or more units to provide adequate janitorial services by either: (i) providing such services himself or herself if he or she is a resident owner; or (ii) providing a janitor who resides within the greater of (x) one block, or (y) two hundred feet of the Building; or (iii) providing for janitorial services to be performed by a company that is on-call on a 24-hour-a-day basis in a manner approved by the Department of Buildings. If the superintendent/porter does not reside within the foregoing distance from the Building, it may become necessary for a Unit Owner to assume such responsibility or for the Condominium Board to engage a company that maintains such 24 hour-per-day on-call service.

The Commercial Units will bear a pro-rata share (i.e., 4.1865%) of the cost of the Concierge/Superintendent and 1 porter and the related cost of Workers Compensation in the proportion that the portion of the salaries of the Concierge/Superintendent and porter

payable by the Commercial Unit Owner bears to all salaries. The remaining staff is expected to serve and the cost thereof shall be borne by the Residential Units only.

**3. Heading and Hot Water** **$59,021**
**(Residential Unit Owners $56,550)**
**(Commercial Unit Owner $ 2,471)**

This estimate is based upon a projection by Laszlo, Bodack Engineer, P.C., having an office at 45 West 36th Street, New York, New York 10128 ("Sponsor's Energy Consultant"). A steam distribution system will provide primary hot water that will be utilized for all space heating and for generating domestic hot water. This system will serve both the Residential Units and the Commercial Units. Each Unit Owner will share the cost of heat and hot water in accordance with their respective Common Interests. Notwithstanding the foregoing, should any Commercial Unit utilize a disproportionately large or a disproportionately small amount of heat and/or hot water, either the Commercial Unit Owner in question or the Condominium Board shall have the right to obtain an energy survey from a qualified expert regarding the proper allocation of the cost of heat and/or hot water. The other party (i.e., the Commercial Unit Owner in question, or the Condominium Board) shall have the right to obtain its own energy survey from a qualified expert, and the parties shall endeavor to determine the proper allocation of the cost of heat and/or hot water based on such surveys. In the event that the Commercial Unit Owner affected thereby and the Condominium Board cannot resolve the matter, the matter will be resolved by arbitration. Further, the Commercial Unit Owner shall have the right to cause any or all of the Commercial Units to be separately metered for steam or to otherwise be provided with separate heat and/or hot water. In such event, the owner of such Unit will not be responsible to bear the cost of heat and hot water utilized by such Unit Owner as part of its Common Charges.

Heating is based on maintaining 72 degrees Fahrenheit indoors with an outdoor temperature of +15 degrees Fahrenheit and a wind of 15MPH. The estimated cost of steam is $12.90 per thousand pounds of steam inclusive of sales tax. The budget amount is based on 4,442 thousand pounds of steam and includes a three percent (3%) increase for inflation.

This estimate is based on the following assumptions:

1) Existing windows are double pane insulated thermal glass.
2) Roof will have new insulation with a minimum of R-22 insulation value.
3) Existing masonry walls insulation have U=0.2 value.

It is not possible to predict how closely the budgeted figure will reflect the actual expense for heat and hot water to be incurred during the first year of condominium operation, in part because such expense will vary with the level of consumption, the occupancy ratio and the applicable utility rates (including fuel cost adjustments and State and City surcharges). Additionally, space heating is directly affected by varying winter

temperatures. Historically, rates have been increasing, although it is not possible to forecast with certainty the amount or timing of such increases. It is believed that the projected figure should be sufficient to cover any reasonable increase in the cost of steam during the first year of Condominium operation.

**(4) Gas for Cooking** **$2,281**
**(Residential Unit Owners $2,281)**
**(Commercial Unit Owners $ -0- )**

The estimate is based on a projection by Sponsor's Energy Consultant. Each Residential Unit will be provided with a gas stove. The cost of gas will be metered by Con Edison with a single gas meter. It is anticipated that Commercial Unit A will be separately metered for gas. (It is not anticipated that Commercial Unit B or Commercial Unit C will require gas. ) However, if either or all of such Units do, in fact use gas in the future, they shall either be separately metered or sub-metered therefor or, the Owner of such Unit(s) shall reimburse the Condominium the reasonable cost of such gas consumption as determined by an energy survey from a qualified energy consultant. Accordingly, the Commercial Unit Owner will not pay any portion of the cost of gas. If, for any reason, Commercial Unit A is not separately metered for gas, but nevertheless utilizes cooking facilities or other facilities that result in gas consumption in such Unit (which consumption is reflected on the "house meter") the Commercial Unit Owner shall obtain an energy survey from a qualified expert and shall reimburse the Condominium Board for the reasonable cost of such gas. Any dispute between the Commercial Unit Owner and the Condominium Board regarding gas consumption shall be resolved by arbitration.

The above cost of gas for apartment cooking is based on an average usage of 110 therms of gas/ year per apartment at a cost of gas of $.8053. The budget item includes a three percent (3%) increase for inflation and is inclusive of sales tax.

It is not possible to predict how closely the budgeted figure will reflect the actual expense for gas to be incurred during the first year of Condominium operation, in part because such expense will vary with the level of consumption and the applicable utility rates. Historically, utility rates have been steadily increasing, although it is not possible to forecast with certainty the amount or timing of such increases. It is believed that the projected figure should be sufficient to cover any reasonable increase in the cost of gas during the first year of Condominium operation.

**(5) Electricity** **$ 65,034**
**(Residential Unit Owners $62,311)**
**(Commercial Unit Owners $ 2,723)**

The projection is based upon an analysis by Sponsor's Energy Consultant. Each Unit will be separately metered for electricity. Common area electricity is measured by one house meter. The budget item for electricity covers electricity for elevators, machinery,

Avenue, New York, New York. Such contract expires on November 30, 2000 with the right of either party to cancel on 90 days' prior written notice.

b) The cost of exterminating is based on a proposal from EVINS Pest Control Co., Inc., 91 Steamboat Road, Great Neck, New York 11024.

c) The cost of the sprinkler system contract is based on an estimate from Manengineering Bureau Inc., 137 East 13th Street, New York, New York 10003.

The cost of the service contracts for the extermination and sprinkler inspection will be shared by the Unit Owners based on their respective percentages of Common Interests. It is anticipated that the Commercial Unit will limit its use of the elevators to one elevator and that any such use will be minimal. For such reason the Commercial Unit Owner will share fifty percent (50%)of the portion of the elevator contract allocable to one elevator in accordance with the aggregate Common Interests of the Commercial Units.

**(9) Insurance** **$ 25,555**
**(Residential Unit Owners $24,485)**
**(Commercial Unit Owners $ 1,070)**

This projection is based on the estimates of the annual premiums payable on the coverage listed below:

Commercial Liability:

Limits:
$2,000,000 General Aggregate Per Location
$1,000,000 Products Completed Operations
$1,000,000 Personal and Advertising Injury
$ 50,000 Fire Legal Liability
$ 5,000 Medical Payments
$1,000,000 Employee Benefits Liability
$1,000,000 Auto-Non-Ownership and Hired Car
$ 1,000 Water Damage Legal Liability Deductible

Property:

Limits:
$29,200,000 Real Property
$ 500,000 Business Income
Perils: All Risk
Coinsurance waived - includes agreed amount clause
$5,000,000 Earthquake and Flood Limit
Deductibles: $1,000 except $50,000 Flood and Earthquake
$2,000,000 Increased Cost of Construction & Demolition

Commercial Crime:

such Units may either be directly metered or submetered, in which event, the charge for water and sewer shall not be included in the Common Charges payable by such Unit Owner and shall be paid directly to the entity responsible for such meter or submeter.

The estimate for water charges and sewer rents was prepared by Sponsor's Energy Consultant and is based on a combined charge of $2.86 per $100 cubic feet. Per capita load is estimated at 150 gallons/day per estimated occupants.

**(7) Repairs, Maintenance and Supplies** **$ 16,667**
**(Residential Unit Owners $16,318)**
**(Commercial Unit Owners $ 349)**

The budget amount is amount based upon normal maintenance of, and repairs to the Common Elements plus various cleaning supplies and materials, lubricants, bulbs, public fixtures, general and hardware supplies, and painting of common areas. It does not include repairs, maintenance or supplies used with respect to individual Units, the maintenance of which is the responsibility of the Unit Owners, nor does it anticipate the cost of any capital repairs. The cost of repairs, maintenance and supplies will vary among other things with the nature and scope of work performed during the period covered by Schedule B. No warranty can be made with respect to the work which will be required or otherwise desired by the Condominium in connection with the Property, although no major expenditure is expected during the first year of Condominium operation because the Building has been newly renovated. The Commercial Unit Owner will be responsible for sharing fifty percent (50%) of the cost of this item in accordance with the aggregate Common Interests of the Commercial Units.

**(8) Service Contracts** **$27,787**
**(Residential Unit Owners $27,524)**
**(Commercial Unit Owners $ 263)**

This figure is intended to cover service contracts for repair and maintenance of the following systems in the building:

| | |
|---|---|
| Elevator: | $ 25,793 |
| Exterminator: | 1,477 |
| Sprinkler: | 514 |
| Total | $31,356 |

The budget item is based on the following:

a) The cost of elevator maintenance is based on an existing elevator maintenance contract dated December 1, 1998 with New York Elevator Company, 636 11th

Avenue, New York, New York. Such contract expires on November 30, 2000 with the right of either party to cancel on 90 days' prior written notice.

b) The cost of exterminating is based on a proposal from EVINS Pest Control Co., Inc., 91 Steamboat Road, Great Neck, New York 11024.

c) The cost of the sprinkler system contract is based on an estimate from Manengineering Bureau Inc., 137 East 13th Street, New York, New York 10003.

The cost of the service contracts for the extermination and sprinkler inspection will be shared by the Unit Owners based on their respective percentages of Common Interests. It is anticipated that the Commercial Unit will limit its use of the elevators to one elevator and that any such use will be minimal. For such reason the Commercial Unit Owner will share fifty percent (50%) of the portion of the elevator contract allocable to one elevator in accordance with the aggregate Common Interests of the Commercial Units.

**(9) Insurance** **$ 25,555**
**(Residential Unit Owners $24,485)**
**(Commercial Unit Owners $ 1,070)**

This projection is based on the estimates of the annual premiums payable on the coverage listed below:

Commercial Liability:

Limits:
$2,000,000 General Aggregate Per Location
$1,000,000 Products Completed Operations
$1,000,000 Personal and Advertising Injury
$ 50,000 Fire Legal Liability
$ 5,000 Medical Payments
$1,000,000 Employee Benefits Liability
$1,000,000 Auto-Non-Ownership and Hired Car
$ 1,000 *Water Damage Legal Liability Deductible*

Property:

Limits:
$29,200,000 Real Property
$ 500,000 Business Income
Perils: All Risk
Coinsurance waived - includes agreed amount clause
$5,000,000 Earthquake and Flood Limit
Deductibles: $1,000 except $50,000 Flood and Earthquake
$2,000,000 Increased Cost of Construction & Demolition

Commercial Crime:

Limits: $100,000 Blanket Employee Dishonesty

Umbrella Liability: $50,000,000

Directors and Officers:

Limit: $1,000,000 Each Occurrence & Annual Aggregate

Workers Compensation:

Employer's Liability: Each accident $100,000
Policy limit $500,000
Each Employee $100,000

The above mentioned insurance coverage and the annual premium therefore are based on estimates made by BWD Group Limited 3000 Marcus Avenue, CB 5028, Lake Success, NY 11042-0028, (the "Insurance Consultant") in a letter dated April 27, 1999.

Sponsor, at the sole cost and expense of the Condominium, will cause to be delivered to the Condominium on the Closing Date, policies providing the insurance described above, or binders therefor, and such policies and binders may contain any deductibles which are then customary. If the Condominium does not have sufficient funds available on the Closing Date with which to pay any premiums then due on such policies, then the Sponsor will advance such insufficiency, and the amount which is advanced by the Sponsor shall be adjusted between the Sponsor and the Condominium as provided in the **"Closing Costs and Adjustments"** section.

The suggested all risk coverage set forth above is based upon an agreed amount clause which avoids any issue of coinsurance if a partial loss occurs. In the opinion of the Insurance Consultant, the all risk coverage in the amount set forth above is presently sufficient to rebuild the Building should it be totally destroyed by fire. However, the foregoing estimate is not a guarantee and is not intended to take the place of a professional appraiser's estimate in determining replacement cost.

The fire, casualty, and liability insurance to be obtained by the Sponsor as described above shall provide that each Unit Owner is an additional insured, that there will be no cancellation without notice to the Board, that subrogation against each Unit Owner is waived, that invalidity because of the acts of the insured and Unit Owners is waived, and that pro rata reduction, if additional Unit Owners obtain coverage, is also waived.

Unit Owners are advised to obtain at their own cost the following insurance, since it will not be provided by the Condominium: (i) liability coverage for occurrences within their

respective Units and (ii) all-risk coverage for losses relating to Unit contents, replacements, additions, fixtures and improvements. It is recommended that Unit Owners consult with an insurance broker as to the necessity for, and the desirability of obtaining coverage for one or more of such risks and as to the amount of such coverage.

The quotation is an indication of insurance premiums at current rates. It is not possible to predict whether future coverage will continue to be available at the same premium. The cost of this budget item will be shared by all Unit Owners in accordance with their respective Common Interests. However, if the nature of use of a Commercial Unit results in an increased cost to the Condominium for insurance, the Commercial Unit Owner in question shall be responsible for the payment of any such increase in such premium that is a direct result of such use.

**(10) Management Fees $ 25,200**
**(Residential Unit Owners $24,673)**
**(Commercial Unit Owners $ 527)**

The Managing Agent's fee will be fixed by the proposed management agreement to be entered into by the Condominium on or before the Closing Date. The Building will be managed by RAL Management (the "Managing Agent") having an office at 316/318 Fulton Avenue, Hempstead, New York 11150. The agreement will be for an initial period of three (3) years and will provide that the Managing Agent will receive $25,200 for the first year, paid in equal monthly installments of $2,100; $27,720 for the second year, paid in twelve equal monthly installments of $2,310; and $30,492 for the third year, paid in twelve equal monthly installments if $2,541. The Managing Agent is affiliated with a principal of Sponsor. See "**Identity of Parties**." The Managing Agent has represented to Sponsor that, based on information available to the Managing Agent, the annual fees conform with fees generally accepted in the industry and that such annual fees are reasonable. The Commercial Unit Owner will share fifty percent (50%) of the cost of this item in accordance with the aggregate Common Interests of all Commercial Units (i.e., 4.1865%).

The Managing Agent may receive additional compensation as a result of commissions for placing insurance, and fees from Unit Owners in connection with the sale, refinancing or leasing of a Unit. See "**Management Agreement, Contracts and Leases**" for a summary of the provisions of the management agreement.

**(11) Legal Fees and Audit Fees $ 7,500**
**(Residential Unit Owners $7,186)**
**(Commercial Unit Owners $ 314)**

A certified public accountant will be responsible for auditing the Condominium's books and records and preparing the requisite audited financial statements. In addition the accountant will be responsible for filing federal, state and city income tax returns. The amount set aside for this service is $5,000. This budget item is based on an estimate

provided by Levy, Cohen & Gold LLP, Certified Public Accountants, 310 Northern Boulevard, Great Neck, New York 11021-4806.

Legal fees of $2,500 have been set aside for minor miscellaneous legal matters which may arise during the first year of operation.

The cost of this budget item will be borne by all Unit Owners in accordance with their respective Common Interests.

**(12) Contingency** **$ 25,957**
**(Residential Unit Owners $25,369)**
**(Commercial Unit Owners $ 588)**

The contingency provides a fund for possible expenses not included in the projected budget, or possible increases in one or more categories of operating expense beyond the projected amounts. There can be no assurance that such fund will be sufficient to pay for major capital repairs or replacement items which may be needed within the first five years of the Condominium's operation. If additional funds are required over and above these funds, it may be necessary to increase Common Charges or separately assess all Unit Owners. The Commercial Unit Owner will share this item in the proportion that the Common Expenses (other than Contingency) payable by the Commercial Unit Owner bears to all Common Expenses (other than Contingency).

**(13) Yearly Reserve Fund** **$ 0**

The contingency fund (discussed above in Note 12), although not intended as a reserve for capital expenditures, may be utilized by the Board for such purposes. A reserve for capital expenditures is a method of budgeting for capital repairs for improvements which the Condominium may from time to time determine should be made to the Property. Schedule B does not provide for a reserve for capital expenditures, and the contingency fund may not be sufficient to pay for major capital repairs or replacement items which may be needed within the first 5 years of operation of the Condominium.

IN THE OPINION OF THE SPONSOR'S EXPERT THE PROJECTED RECEIPTS ARE ADEQUATE TO MEET THE ESTIMATED EXPENSES FOR THE YEAR OF OPERATION COMMENCING OCTOBER 1, 1999. THE FOREGOING SCHEDULE HOWEVER, IS NOT INTENDED AND SHOULD NOT BE TAKEN AS A GUARANTEE OR WARRANTY BY ANYONE THAT THE COMMON CHARGES FOR SUCH FISCAL YEAR OR ANY SUBSEQUENT YEAR OF OPERATION OF THE PROPERTY BY THE CONDOMINIUM WILL BE AS SET FORTH IN SAID SCHEDULE, AND IT IS LIKELY THAT THE ACTUAL COMMON CHARGES AND OTHER ITEMS OF INCOME AND EXPENSE WILL VARY FROM THE AMOUNTS SHOWN IN THE SCHEDULE.

Sponsor reserves the right (but shall have no obligation) to cause the Condominium Board to reduce the Common Charges payable by the Unit Owners (including Sponsor)

during the first year of Condominium Operation (and during part or all of any further period in which Sponsor controls the Board) to reflect the actual expenses incurred by the Condominium. While Sponsor does not represent or warrant that any Purchaser's Common Charges will be reduced, it is possible that savings may result from the deferral of service contracts for any period during which the equipment that will be the subject of such contracts is covered by manufacturers' warranties and from any economies that may result if the Building is not fully occupied. Sponsor makes no representation that any such savings or reduction in Common Charges will in fact occur.

If the anticipated closing date under the Plan is six (6) months or more after the projected date of the budget year for this Schedule B, then the Plan shall be amended to include a revised budget disclosing current projections. If the aggregate amount of Common Charges disclosed in such amended Schedule B exceeds by 25% or more the aggregate amount of Common Charges set forth in Schedule B as theretofore from time to time amended, then the Sponsor shall offer all Purchasers the right for a period of at least fifteen (15) days from the date of presentation of such amendment to rescind their offer to purchase. Sponsor shall promptly return to a Purchaser who exercises any such right to rescind, his deposit under his Purchase Agreement. Sponsor shall not declare the Plan effective if there are any material changes to the budget if these changes have not been disclosed by an amendment to the offering plan.

OPINION OF LICENSED REAL ESTATE BROKER RE COMPLIANCE WITH REAL PROPERTY LAW SECTION 339-i

March 9, 1999

New York State Department of Law
120 Broadway – 23rd Floor
New York, NY 10271
Attn.: Real Estate Financing Bureau

Re: Condominium Offering Plan (the "**Plan**") for
The Franklin Tower
271 Church Street
New York, NY 10013 (the "**Property**")

Ladies and Gentlemen:

All capitalized items not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

The Sponsor has requested our opinion on whether the method used to determine the undivided percentage interest of each Unit in the Common Elements in the above-referenced Condominium complies with Real Property Law Section 339-i ("**Section 339-i**").

We are a licensed real estate Broker whose principal has been engaged in the real estate brokerage business for approximately 30 years. We have also been engaged in the operation and management of residential and commercial buildings in the greater New York area for approximately 15 years. We presently manage more than 3 buildings consisting of more than 53 units.

In connection with this opinion, we have reviewed Schedule A of the Plan, the proposed Declaration included in Part II of the Plan and the Floor Plans and have assumed the statements and information contained therein are correct and accurate. We have not reviewed or verified the calculations of floor areas used in determining the sizes of Units or the Limited Common Elements.

Article 8 of the Declaration states that "the percentage of Common Interest allocated to each Unit is based upon floor space, subject to the location of such space and the additional factors of relative value to other space in the Condominium, the uniqueness of the Unit, the availability of Common Elements for exclusive or shared use, and the overall dimensions of the particular Unit." Article 8 also states that the aggregate Common Interests of all Units equal one hundred (100%) percent.

Section 339-i requires that the Common Interest of each Unit be based on any one of several methods of calculation. One of these allowable methods is the method stated in Article 8 of the Declaration [Section 339-i(1)(iv)].

We have evaluated the allocation of Common Interest among the Units made by the Sponsor based on the foregoing factors and it is our opinion that the allocation of Common Interest is consistent with Section 339-i.

This opinion is confined to the matters address herein with respect to Section 339-i and is not intended, nor should be construed, as an opinion on any other aspects of the Plan. Further, we assume no obligation to update or supplement this opinion to reflect any changes in statutory law or judicial precedent, or any changes in fact or circumstances, that may hereafter come to our attention pertaining the subject matter hereof.

We consent to the incorporation of this opinion in the Plan and to the references to our name in the Plan in connection with this opinion.

Very truly yours,

By: ______________________
Susan Penzner
SUSAN PENZNER Real Estate

Dated: March 9, 1999
New York, New York

## COMMERCIAL UNITS

Sponsor (and its successors and assigns) reserves the right to use the Commercial Units for any lawful purpose permitted under the Zoning Resolution of the City of New York and other applicable law except that the Commercial Units may not be used for any obscene or noxious purpose. Except as set forth in the preceding sentence, neither the Board nor the Unit Owners will have any right to restrict or limit any lawful use of the Commercial Units. No representation or warranty is made as to who the owner or tenants of the Commercial Units may be at any time or as to the uses to which such Unit may be put at any time.

The Commercial Unit Owner has certain special rights under the Declaration, including the right to subdivide each such Unit. In addition, the Commercial Unit Owner will have the following easements: (i) an easement to construct, operate and maintain an elevator from the cellar to the sub-cellar; (ii) an easement through and along all of the General Common Elements and Residential Common Elements from Commercial Unit C to the Limited Common Element appurtenant to Commercial Unit C, consisting of an eighteen (18) inch strip around the perimeter of the roof of the mechanical penthouse bulkhead, to install, maintain, operate, repair and replace any and all cables, conduits, wires, apparatus and equipment as may be required in connection with telecommunications and similar equipment, such as, without limitation, facilities for wireless and/or cellular communications; (iii) an easement through the residential lobby, for access to Commercial Unit A which easement shall be for the benefit of the Owner of Commercial Unit A [but not any patrons of Commercial Unit A (other than handicapped patrons), except in an emergency or as required by law]; and (iv) Commercial Unit C shall have an easement through Commercial Unit B for access, ingress and egress. The Condominium Board and any individuals assigned by any utility company to read or maintain water meters shall have an easement from the elevators through Commercial Unit A to the water meter room. Any rents, license fees, revenues or other funds of any type whatsoever, that are received by the Owner of Commercial Unit C from leasing or licensing all or any portion of such Limited Common Element appurtenant to Commercial Unit C, shall belong solely to the owner of Commercial Unit C. Further, any utility, cable TV or similar company that is entitled by law to install equipment shall have an easement through the Common Elements therefor, and the right to install such equipment in such portion of the Common Elements and in such manner as shall be reasonably determined by the Condominium Board. Each of the foregoing easements shall be exercised in such manner as not to unreasonably disrupt the use by other Unit Owners of their respective Units. See **"Rights and Obligations of Unit Owners and Board of Managers, Summary of By-Laws."** However, it is Sponsor's opinion that the foregoing rights in favor of the Commercial Unit Owner will not have a material adverse impact upon the Condominium.

The Common Charges payable by the Commercial Unit Owner are based on the Common Interest of the Commercial Units except as expressly indicated in the footnotes

to Schedule B. Based upon the opinion of SPRE Realty Ltd. as contained in the Plan, Sponsor estimates that the Common Charges payable by the Commercial Unit Owner are sufficient to cover the Common Expenses fairly attributable to the Commercial Units. Any disputes between any Unit Owner (including, without limitation, the Commercial Unit Owner) and the Condominium Board will be resolved by arbitration to be conducted in New York City by the American Arbitration Association. Each party shall bear its own costs and expenses in connection with such arbitration, except that the cost of the arbitrator shall be borne by the losing party. In this regard, should any Commercial Unit Owner lose such arbitration, the cost of the arbitrator shall be borne by the Commercial Unit Owner. If Condominium Board should lose any such arbitration, the cost of the arbitrator shall be a Common Expense to be shared by all Unit Owners in accordance with their respective Common Interests.

## CHANGES IN PRICES OR UNITS

The Sponsor reserves the right to change the price of any Unit without prior notice or amendment to the Plan except that a duly filed amendment to the Plan will be required for (a) an across the board price change affecting one or more lines of Units or Unit models, (b) a price change that is to be advertised, or (c) a price increase for an individual purchaser. The offering price of a Unit is negotiable and may be changed.

In order to meet the possible varying demands for the number and type of Units or to meet particular requirements of the prospective Purchasers or for any other reason, the Sponsor reserves the right for itself and its designees at any time, by amendment to the Plan and subject to the conditions set forth below, to: (i) change the price (as set forth above), the manner of payment, and any other term of sale, (ii) change the size, number and/or layout of Units, (iii) reapportion the percentage Common Interests shown in Schedule A, and (iv) change the size or quality of the public areas of the Property. Any reallocation of the percentage Common Interests among Units will vary the estimated Common Charges for such Units from the amounts set forth in Schedule A. After the Declaration is recorded, any of the changes discussed in clauses (ii) through (iv) above may only be made by duly recorded amendment to the Declaration. As more particularly provided in the Declaration, the Sponsor and its designees will have the right to so amend or cause the Board of Managers to so amend the Declaration and Floor Plans to the extent required in order to reflect changes made as provided above. In connection with any of the changes discussed in clauses (ii) and (iv) above, the Sponsor shall obtain the consents of all governmental authorities having jurisdiction (if such consent is required by law).

No material change will be made in the size and no material adverse change will be made in the quality of Common Elements of the Property unless Purchasers who have executed and delivered Purchase Agreements pursuant to the Plan and who are not then in default thereunder either consent or are given the right to rescind such Purchase Agreements by notice of rescission personally delivered or sent by certified or registered mail, return receipt requested, to the Sponsor within fifteen (15) days after the date of presentation of an amendment disclosing such material change.

If a Purchase Agreement covering a Unit has been executed and delivered pursuant to the Plan, then, provided that the Purchaser affected thereby is not in default thereunder, no material change shall made in the Unit size, layout, or percentage of Common Interest of the Unit, unless the Purchaser consents thereto.

<u>Reservation of Right to Negotiate Terms</u>

Sponsor reserves the right, in its sole discretion and without prior notice or amendment to the Plan, to negotiate with purchasers all aspects of the purchase of any Unit, including, but not limited to: renovations, additions, or improvements to the Unit or the fixtures, furniture, furnishings, or equipment contained therein or credit allowances therefor; a reduced deposit towards the purchase price; a financing contingency; an extension of time to secure financing; the application of interim rent towards the purchase

price; maintenance subsidies or rebates; credits against the purchase price; and payment of all or part of the Purchaser's financing costs and/or closing costs (such as attorneys fees, title insurance premiums, origination fees, commitment fees, and interest subsidies or "buy-downs"); and waiver of certain fees and charges to be paid by Purchasers as set forth in the Plan. Sponsor does not represent that it will offer any, all, or any combination of the above incentives on any particular purchase and reserves the right to make, accept or reject such offers in its sole discretion. None of the foregoing benefits will be available to any Purchaser unless specifically agreed to in writing by the Sponsor. The price and terms of all purchases will be solely as set forth in the terms of the Purchase Agreement entered into by and between the Purchaser and the Sponsor. The Sponsor further reserves the right to amend the Plan from time to time to add or delete negotiable terms.

## INTERIM LEASES

Sponsor is not currently offering any Purchaser or non-purchaser the right to enter into a lease for a Unit. Purchasers are advised that Sponsor expressly reserves the right to lease Units to Purchasers and/or non-purchasers on such terms as Sponsor shall determine. In such event the Plan will be amended.

## PROCEDURE TO PURCHASE

### Execution of Purchase Agreement, Deposit and Trust Provisions

A person who wishes to purchase a Unit must complete and sign three copies of a Purchase Agreement together with three copies of the completed and executed Lead-Based Paint Disclosure Form and deliver the same to the Sponsor together with a check equal to the sum of (i) ten (10%) percent of the purchase price, plus (ii) the cost of any special work ordered by the Purchaser. Such check shall be drawn to the order of "Herrick, Feinstein LLP as escrow agent under the Plan for The Franklin Tower." Each prospective Purchaser may be required to pre-qualify for a mortgage loan prior to entering into a Purchase Agreement and to complete such documents and provide such financial information as the Selling Agent or GuardHill Financial Corp. shall request in connection therewith.

The terms of sale and other provisions of an actual Purchase Agreement entered into between the Sponsor and any Purchaser may vary from the provisions contained in the form of Purchaser Agreement contained in Part II of this Plan. However, such variations shall have no effect on the provisions of any other Purchase Agreement theretofore or thereafter entered into between the Sponsor and any other Purchaser nor shall such variations materially and adversely affect the Sponsor's obligations as set forth in the Plan.

All Down Payments paid by Purchasers on account of the purchase price of Units under the Plan, together with all interest accrued thereon (collectively the "Deposits"), will be placed in an account in conformity with the disclosure set forth below. Sponsor will

comply with the escrow and trust fund requirements of Section 71-a of the Lien Law and General Business Law Sections 352-e(2-b) and 352-h and the New York State Attorney General's regulations promulgated pursuant thereto.

Purchasers shall not be obligated to pay any legal or other expense of the Sponsor in connection with the handling or disposition of Deposits paid by such purchasers. However, nothing in the preceding sentence shall limit the obligation of any purchaser to pay the fees and expenses of the Sponsor's attorneys (to the extent such fees and expenses are expressly disclosed in the Plan as amended hereby) in connection with the purchase or closing of the Unit purchased by such purchaser under the Plan.

A Deposit will be deemed to have been unconditionally tendered when it is delivered to the Selling Agent, together with a Purchase Agreement in the form agreed to by the Sponsor and signed by the Purchaser, without any request for a change in such form or the terms of the Purchase Agreement. Each Deposit will be placed, within five business days after the date on which such Deposit has been unconditionally tendered, in a special escrow account of Herrick, Feinstein LLP (hereinafter the "escrow agent"), whose address is 2 Park Avenue, New York, New York and whose telephone number is (212) 592-1400. The signatories on this escrow account, who are each members of Herrick, Feinstein LLP, and any one of whom is authorized to withdraw funds, are: Edward M. Abramson, Harvey S. Feuerstein, Paul R. Herman, Michael Heitner, Leonard Grunstein, Carl F. Schwartz and Mark A. Goldsmith, c/o Herrick, Feinstein LLP, 2 Park Avenue, New York, New York. The name of the escrow account is "Herrick, Feinstein LLP as escrow agent under the Plan for The Franklin Tower" (the "escrow account"), and such escrow account is located in Fleet Bank, 350 Fifth Avenue, New York, New York (the "Bank"). The Bank is covered by federal bank deposit insurance generally to a maximum of $100,000 in the aggregate with respect to all funds deposited by any person in one or more deposit accounts (including, without limit, amounts deposited directly by such person and Deposits held in escrow for such person by the escrow agent).

**If an individual makes a Deposit in excess of $100,000 for the purchase of a Unit, or if the amount of such individual's deposits at the Bank and such Deposit exceed $100,000, the aggregate of such Deposit and all other such deposits will generally not be federally insured in excess of $100,000.**

The escrow account will be interest-bearing and, if the closing of the sale to a purchaser of a Unit occurs under the Plan, interest on a Deposit made by a purchaser will be credited to such purchaser at closing. The interest rate to be earned on the Down Payments will be the rate paid from time to time by the Bank for the same type of account as the escrow account set up for the Purchasers. This rate, as of December 22, 1998, was 2.0% per annum. Interest will begin to accrue when the check for the Down Payment is collected, and provided there is no charge back or debit by the Bank against the amount deposited.

All checks for Down Payments on account of the purchase price of a Unit under the Plan shall be made payable to or endorsed to the order of "Herrick, Feinstein

LLP as escrow agent under the Plan for The Franklin Tower." Within ten business days after unconditional tender and delivery by a purchaser to the Selling Agent of a check for the Down Payment submitted with such Purchaser's Agreement on account of the purchase price thereunder, the escrow agent will notify the Purchaser that such funds have been deposited into the escrow account and will provide the account number and the initial interest rate. Subject to the provisions of the next sentence, if such purchaser does not receive notice of such deposit within fifteen business days after unconditional tender and delivery to the Selling Agent of such Down Payment, then such Purchaser may cancel such purchase and rescind such Purchaser's Purchase Agreement so long as such right to rescind is exercised within ninety (90) days after such Purchaser's unconditional tender and delivery of such Down Payment to the Selling Agent. However, a purchaser shall not be entitled either to rescind such purchaser's Purchase Agreement or to receive a refund of such purchaser's Deposit where proof satisfactory to the Attorney General is submitted establishing that such Down Payment was timely deposited and notice as provided above was timely mailed to such purchaser in conformity with the Attorney General's regulations or at any time after the Deposit has been deposited in the escrow account.

The escrow agent will hold a purchaser's Deposit in escrow until:

(i) otherwise directed in one or more writings signed by each of the Sponsor and such purchaser; or

(ii) otherwise directed in a determination of the Attorney General, pursuant to the dispute resolution procedures contained in the Attorney General's regulations; or

(iii) a judgment or order of a court of competent jurisdiction permits or requires the release of such Deposit; or

(iv) such Deposit is paid by the escrow agent into a court of competent jurisdiction; or

(v) such Deposit is paid to the Sponsor as provided below; or

(vi) such Deposit is paid to such purchaser as provided below.

If there is no written agreement between the Sponsor and a purchaser to release the Deposit paid by such Purchaser, the escrow agent will not pay such Deposit to the Sponsor until after ten business days following the date that the escrow agent has given such Purchaser written notice that the escrow agent intends to pay such Deposit to the Sponsor. Thereafter, such Deposit may be paid to the Sponsor unless the Purchaser has already made application to the Department of Law pursuant to the dispute resolution provisions of the Attorney General regulations and the escrow agent has received, within such ten business day period, notice from such purchaser that such application has been made.

The Sponsor will not object to the release of the Deposit paid by any Purchaser to such Purchaser, provided such Purchaser has not defaulted and has timely and validly rescinded such purchaser's Purchase Agreement in accordance with an offer of rescission contained in the Plan or an amendment to the Plan. The Purchaser shall be deemed to have consented to the release of the Deposit to the Sponsor at his Unit Closing.

A Purchaser or the escrow agent may apply to the Attorney General in the event of a dispute for a determination on the disposition of the Deposit paid by any Purchaser. The Sponsor must avail itself of this procedure if there is a dispute which needs to be resolved between the Sponsor and a Purchaser of a Unit under the Plan relating to such purchaser's Deposit and, in the case of any Purchaser, such Purchaser has given notice of objection to the escrow agent within the ten business day period described above. A form for this purpose is contained in Part II of this Plan. The party applying for a determination must send all other parties a copy of the application.

All funds received by Sponsor for upgrades or extras must initially be placed in the escrow account maintained at the Bank. However, Purchasers should note as a special risk that such funds may be released from the escrow account by the Escrow Agent as long as the Sponsor uses the funds for such upgrades or extras. As a result, in the event a Purchaser is entitled to rescission, the Purchaser will not receive a refund of any funds used for upgrades or extras.

Part II of this Plan contains a copy of the escrow agreement which is subject to the terms of the Attorney General's regulations. In the event of any conflict between such escrow agreement and either any other provision of this Plan, any amendment thereto, or any Purchase Agreement, such escrow agreement shall control. The escrow agent will maintain all records concerning the escrow account for seven years after the closing of such account. Notices given by the escrow agent, the Sponsor, or its agents pursuant hereto shall be deemed given (i) upon delivery if personally delivered or (ii) upon the fifth day after the date of mailing.

The escrow agent shall have the right but not the obligation to deposit any moneys received in an interest bearing account and to purchase treasury bills, certificates of deposit, U.S. government security backed repurchase agreements, and/or money market accounts or funds through the escrow account described above.

New Federal Regulations On Lead-based Paint.

The United States Department of Housing and Urban Development and the Environmental Protection Agency have recently adopted **"Lead-Based Paint Regulations"** applicable to most housing built prior to 1978 (called **"Target Housing"**). Generally, the Regulations concern disclosure of known presence of lead-based paint and lead-based paint hazards in Target Housing. The disclosures are required to be made in contracts of sale or lease (including lease renewals and subleases) of Target Housing. The Regulations apply to all owners of residential co-operative and condominium units in Target Housing, including owners of Residential Unit Owners in the Building.

In order to comply with the Lead-Based Paint Regulations:

(i) Each prospective Purchaser of a Residential Unit will be given a copy of United States Consumer Product Safety Commission pamphlet entitled "***Protect Your Family From Lead in the Home***;"

(ii) Each prospective Purchaser of a Residential Unit and Sponsor will be required to complete and sign a form entitled **"Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**," a copy of which is included in Part II of the Plan (the "Lead-Based Paint Disclosure Form"). The text of the Lead-Based Paint Disclosure Form is the sample disclosure form contained in the Lead-Based Paint Regulations.

(iii) Unless

(a) the Purchaser waives Purchaser's opportunity to conduct a test/inspection for the presence of lead-based paint and/or lead-based paint hazards in the Unit and common areas of the Building by completing the Lead-Based Paint Disclosure Form in the appropriate manner and executing and delivering same to Sponsor (or the Selling Agent) prior to the execution and delivery of the Purchase Agreement by Sponsor; or

(b) in the case where the renovation and rehabilitation of the Unit and the common areas of the Building have been substantially completed in accordance with the Plans and Specifications (as defined in the Plan) prior to the execution and delivery of the Purchase Agreement by the Purchaser, the Purchaser has already received an opportunity for ten days to conduct such a test/inspection for the presence of lead-based paint and/or lead-based paint hazards and/or has indicated that the Purchaser has had such opportunity (or waives such opportunity) on the Lead-Based Paint Disclosure Form executed by the Purchaser and delivered to Sponsor prior to the execution and delivery of the Purchase Agreement by Sponsor;

Purchaser shall be given a 10 day period (the "10 Day Inspection Period") in which to conduct a risk assessment or inspection (collectively, "inspection") for the presence of lead-based paint and/or lead-based paint hazards in the Residential Unit and in the common areas of the Building on the terms and conditions set forth below:

The 10 Day Inspection Period will commence on that date which is three days after the date that Sponsor has sent a written notice ("Inspection Period Commencement Notice") to the Purchaser (at its address set forth in the Purchase Agreement) to the effect that (i) the renovation and rehabilitation of the Unit and the common areas of the Building have been substantially completed in accordance with the requirements of the Plans and

Specifications and (ii) advising the Purchaser that the 10 Day Inspection Period will commence three days after the date of the Inspection Period Commencement Notice. The Inspection Period Commencement Notice will be accompanied by the Lead-Based Paint Disclosure Form as executed by Sponsor. If the testing or inspection discloses any lead-based paint or lead-based paint hazard in the Unit or the common areas, Purchaser shall have the right to terminate the Purchase Agreement (and receive the return of Purchaser's Down Payment with interest, if any, earned thereon) by notice ("Lead Inspection Contract Termination Notice") received by Sponsor prior to the end of the 10 Day Inspection Period, which notice shall be accompanied by the inspection report obtained by Purchaser indicating the presence in the Unit or the common areas of lead-based paint or a lead-based paint hazard. If Sponsor shall fail to receive a Lead Inspection Contract Termination Notice prior to the end of the 10 Day Inspection Period, or if Purchaser shall waive its right to conduct such inspection on the Lead-Based Paint Disclosure Form or by other writing, Purchaser shall have no right to terminate the Purchase Agreement or claim that it is not obligated under the Purchase Agreement or is otherwise not obligated to close thereunder on the basis of any lead-based paint or lead-based paint hazard in the Unit or the common areas.

Sponsor reserves the right to reject and decline to accept (or enter into) a Purchase Agreement unless the Purchaser has first waived Purchaser's opportunity to conduct a test/inspection for the presence of lead-based paint and/or lead-based paint hazards by completing the Lead-Based Paint Disclosure Form in the appropriate manner and executing and delivering same to Sponsor or Selling Agent at the time of the delivery of the Purchase Agreement.

As used in this Plan, the terms "lead-based paint", "lead-based paint hazard" and "common area", are intended to have the meaning given such terms in the Lead-Based Paint Regulations, that is:

"lead-based paint" means paint or other surface coatings that contain lead equal to or in excess of 1.0 milligram per square centimeter or 0.5 percent by weight.

"lead-based paint hazard" means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil or lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency.

"common area" means a portion of a building generally accessible to all residents/users, including, but not limited to, hallways, stairways, laundry and recreational rooms, playgrounds, community centers and boundary fences.

Balance of Purchase Price and Closing Documents

After this Plan has been declared effective, the Sponsor shall fix dates for closing title to all Units (each a "Closing Notice") for which Purchase Agreements have been executed by serving notice on each Purchaser stating the date of the first closing and setting such Purchaser's Closing Date, which notice shall be served not less than thirty(30) days before the date set for the closing of the Units, except if the particular Purchaser shall waive the requirement of 30 days' notice. The balance of the Purchase Price shall be payable on the Closing Date by certified check drawn on and certified by, or by a bank check drawn on and by, a bank which is acceptable to the Sponsor and which is a member of the New York Clearing House Association, to the order of Sponsor or such other payee as Sponsor may direct.

Sponsor anticipates that the first closing of a Unit shall occur on or about October 1, 1999. If the date of the first closing of a Unit shall be delayed by more than 12 months after October 1, 1999, each Purchaser will be offered a right to rescind his Purchase Agreement and receive the return of his Deposit.

On the Closing Date, the Purchaser shall be required to sign and deliver a Power of Attorney covering the Unit in the form contained in the Part II of the Plan and pay certain closing fees, costs and adjustments. The Purchaser shall also execute at the closing the New York State and New York City real property transfer tax returns covering the sale of the Unit, any real estate reporting return and statement required by the Internal Revenue Code (the "Code") or the regulations thereunder, all other documents required by law, and all other documents reasonably required by the Sponsor or required under such Purchaser's Purchase Agreement.

The Purchaser shall also cause his attorney to execute a designation agreement provided by the Sponsor designating such attorney as the "real estate broker" who is required to file a 1099 return with respect to the purchase, and the Purchaser shall indemnify the Sponsor and its attorneys against any costs resulting from the failure of such attorney to fulfill his duties as such "real estate broker."

Default by Purchaser

If a Purchaser defaults in making any payments due under the Purchase Agreement or fails to execute and deliver documents, make the payments described above, or perform any of his other obligations under the Purchase Agreement, then the Sponsor may at its option give written notice of default under the Purchase Agreement to the Purchaser. If the default is not cured within thirty (30) days after written notice thereof, then the Purchase Agreement shall be deemed canceled and Sponsor shall be entitled to the payment due upon execution of the Purchase Agreement and any payments made thereunder (but not exceeding the sum of 10% of the Purchase Price thereunder plus all costs for any special work ordered by the Purchaser) together with interest earned thereon, if any, as and for liquidated damages. Cancellation of a Purchase Agreement will permit the Sponsor to sell the Unit to others as though the Purchase Agreement had never been

made and the Purchaser shall not have any further rights against or obligations to the Sponsor, the Condominium or others purchasing such Unit.

Risk of Loss

The risk of loss or damage to the Property by fire or other casualty until the date of closing of title of the first Unit is assumed by Sponsor but without any obligation or liability upon Sponsor to repair or replace the same. Sponsor may, however, at Sponsor's option, elect to abandon the Plan (see "**Effective Date**") or to repair or replace such loss or damage. If Sponsor elects to replace such loss or damage, then at Sponsor's option it shall be entitled to reasonable adjournments of the closing.

Cooling Off Period and Sponsor's
Acceptance or Rejection of Purchase Agreement

If a Purchaser has not been afforded at least three (3) days to review the Plan and all filed amendments thereto prior to executing and delivering his Purchase Agreement, then such Purchaser may rescind his Purchase Agreement by giving notice of rescission to the Sponsor within seven (7) days after the date of such Purchase Agreement.

Each person interested in the purchase of a Unit will be required to give the Selling Agent a $100 deposit for a copy of the Plan. Such deposit will be refunded to the prospective purchaser if he either (i) tenders a Purchaser's Agreement, (together with the Down Payment and the Lead-Based Paint Disclosure Form) that is accepted by Sponsor or (ii) returns the Plan and all amendments within fifteen (15) days in good, reusable condition.

Within twenty (20) days after the Purchaser delivers to Sponsor three copies of his Purchase Agreement executed by him together with the required deposit, the Sponsor shall either (i) accept such Purchaser Agreement and return one fully executed counterpart to the Purchaser thereunder (or the Purchaser's attorney) or (ii) reject such Purchase Agreement by notice thereof personally delivered or mailed by registered or certified mail return receipt requested to the Purchaser together with a refund of any deposit made by the Purchaser under his Purchase Agreement. If the Sponsor takes no action within such twenty (20) day period, then the Purchase Agreement shall be deemed canceled. Until a Purchase Agreement is executed by Sponsor and returned to the prospective Purchaser, the Sponsor will not be bound by any such Purchase Agreement submitted to it. The Sponsor may reject any Purchase Agreement, without cause or explanation, so long as such rejection is not based upon race, creed, color, national origin, sex or any other ground prohibited by law.

The Units are being sold in the condition described in the **"Description of Property, Specifications and Building Condition"** section of Part II of the Plan and Sponsor will not have any obligation to make any repairs or improvements except as is

expressly provided in the **"Description of Property, Specifications and Building Condition"** or in the **"Rights and Obligations of Sponsor"** section of Part I of the Plan.

Conflicts between Plan and Purchase Agreement

A complete copy of the Purchase Agreement is included in Part II of this Plan. If any provision of the Purchase Agreement is in conflict or inconsistent with any provision of the Plan, then such conflict or inconsistency shall be resolved in favor of the Plan. The Plan and the Purchase Agreement may not contain, or be modified to contain, a provision waiving a Purchaser's rights or abrogating Sponsor's obligations under the Plan or Article 23-A of the General Business Law.

Financing Rider

Although a Purchaser may obtain financing from a lending institution or any other source, Purchaser's obligation to purchase a Unit pursuant to the Purchase Agreement shall not be contingent on the Purchaser obtaining financing for such purchase unless Sponsor and the Purchaser execute the Financing Rider annexed to the Purchase Agreement as Exhibit C.

Purchasers whose Purchase Agreements include a fully executed Financing Rider shall apply for a mortgage through GuardHill Financial Corp. or another mortgage broker or an Institutional Lender of the Purchaser's choice. Purchasers who apply for a mortgage (whether through a mortgage broker or an institutional lender) will be required to pay all fees and costs (including, without limitation, appraisal fees, application fees, origination fees, points, closing costs and other charges) associated with such mortgage application. Purchasers who apply for a mortgage through GuardHill Financial Corp. will be required to pay an appraisal fee of $400 and an application fee of $350. The foregoing appraisal fee and application fee are in addition to any fees, including, without limitation, any additional appraisal fees, origination fees, points, closing costs and other charges that may be imposed by the institutional lender to which the Purchaser has applied. Sponsor is not affiliated with GuardHill Financial Corp. and will not receive any commissions or fees from GuardHill Financial Corp. As a result, Sponsor does not assume any responsibility for the acts of GuardHill Financial Corp. or for the acts of any other mortgage broker or any institutional lender, whether provided by GuardHill Financial Corp. or otherwise, to which a Purchaser submits a mortgage application.

Sponsor and the Condominium Board will execute such documents as an institutional lender produced by GuardHill Financial Corp. may reasonably require in accordance with customary lending practices (such as, for example, a RESPA statement, or a letter indicating the status of Common Charges), provided such documents are standard documents typically executed by sponsor-sellers of condominium units in the New York metropolitan area (or typical documents executed by condominium boards) and provided further that such documents have been submitted for review to Sponsor or the

Condominium Board (as the case may be) at least five (5) business days in advance of the Closing. Neither Sponsor nor the Condominium Board will be required to sign any financing documents that contain obligations or representations on the part of either Sponsor or the Condominium that are beyond the scope of the obligations or representations assumed or made by the Sponsor or the Condominium herein or otherwise fail to conform to the terms of the Financing Rider (if one has been appended to a Purchaser's Purchase Agreement). Sponsor will not be required to sign any financing documents that obligate Sponsor to pay any fees to the lender or to make any modifications to the Unit (other than those renovations that are expressly contained in the Plans and Specifications). Therefore, a Purchaser seeking financing should confirm with his lender that the loan documents will conform to the provisions of the Plan.

Inspection

Purchasers will be required to inspect their Units before the Closing Date and execute an Inspection Statement. If a Purchaser fails to attend the inspection of his or her Unit, the Purchaser shall be deemed to have waived the right to require Sponsor to correct any punch-list items and patent defects with respect to the Unit. See the form of Inspection Statement annexed to the Purchase Agreement.

## ASSIGNMENT OF PURCHASE AGREEMENTS

No Right of Assignment by Purchaser

The Purchaser may not assign his Purchase Agreement without first obtaining the written consent of the Sponsor, which consent may be granted or withheld in Sponsor's sole and absolute discretion.

## EFFECTIVE DATE

The Sponsor's offer to sell Units pursuant to the Plan is contingent upon the Plan being declared effective and compliance with the relevant conditions and time periods described in the Plan. The following provisions shall determine whether, when and how the Plan will be declared effective:

(1) The Sponsor may at its option declare the Plan effective if Purchase Agreements with bona fide purchasers, including investors, have been accepted by the Sponsor for not less than 15% of the Units. The Plan will not be declared effective based on Purchase Agreements:

(i) signed by Purchasers who have been granted a right of rescission that has not yet expired or been waived; or

(e) The release of the Unit and its appurtenant interest in the Common Elements from the lien of any mortgages and other liens, except any mortgage or lien requested or made by the Purchaser on or before the time of closing for such Unit.

(f) Written notice of the Closing Date (which notice shall advise the Purchaser of the opportunity to inspect the Unit and the Common Elements) is given to the Purchaser as provided in this Plan.

(g) The execution and delivery to the Purchaser, the Purchaser's attorneys or the Purchaser's title company of a Unit Deed covering the Unit in the form set forth in Part II of the Plan.

(h) The execution and delivery by the Purchaser of the Power of Attorney, in the form set forth in Part II of the Plan.

(i) The payment by the Purchaser of the purchase price and any closing fees and costs provided under the Plan.

(j) The assignment to the Unit Owner by the Sponsor of assignable manufacturer's warranties, if any, with respect to equipment and appliances installed in and serving only the Unit; and the assignment to the Condominium of any assignable manufacturer's warranties with respect to equipment and appliances installed in and serving only the Common Elements. The Sponsor shall not be obligated to assign any warranties which are not assignable or that have not been delivered to the Sponsor, or that relate to any Common Elements that have not been completed by the Sponsor.

State of Title

Title to each Unit and its appurtenant interest in the Common Elements will be conveyed at the closing of such Unit free and clear of all liens, encumbrances, and title exceptions other than those described in the proposed Unit Deed and the title exceptions and other matters set forth below (collectively the "Permitted Encumbrances"). It is noted that should any owner of property that is the subject of any encroachment seek to litigate with the Condominium regarding such encroachment, the Condominium may incur costs in defending such litigation.

a) Any state of facts shown on (i) the survey made by J. George Holleritz dated December 9, 1949, last revised August 28, 1998 by visual update by Harwood Surveying P.C., and (ii) any additional state of facts a subsequent accurate survey and inspection made on the Closing Date for such Unit would show, provided that such additional state of facts is not otherwise disclosed in this Plan and does not prohibit the use of the Unit for residential or commercial use, as the case may be. Such survey shows the following:

(a) Windows and air conditioners project up to 1 foot over premises adjoining on the north.

(b) Bulkheads of buildings adjoining subject premises on the north and east abut northerly and easterly independent walls of building on subject premises.

(c) Fence at roof of building on subject premises not located.

(d) Westerly wall of building located on premises adjoining on the east leans up to 3-1/2 inches over subject premises.

(e) Flue pipes of building located on premises adjoining on the east enter easterly wall of building on subject premises.

(f) Easterly wall of building located on subject premises encroaches up to 1-1/2 inches over the premises adjoining on the east, but title insurance policies issued by the "Preferred Title Insurance Company" (defined below) will that said wall may remain so long as the same shall stand.

(g) Line of stone piers on the first story, stone course on top of first story and brick front over Franklin Street and Church Street.

(h) The following projections and distances over Franklin Street:

| | |
|---|---|
| Grating | 3 feet 11 inches; |
| Stone Base | 0 feet 1-1/2 inches; |
| Trim | up to 0 feet 6 inches; |
| Metal Door | 0 feet 1 inch; |
| Auto Sprinkler | 0 feet 11 inches; |
| Hose Bib | 0 feet 4 inches; |
| Vent | 0 feet 0-1/2 inches; |
| Air Conditioners | up to 1 foot 3 inches |

(i) The following projections and distances over Church Street:

| | |
|---|---|
| Grating | 1 foot 11 inches; |
| Stone Base | 0 feet 1-1/2 inches; |
| Trim | up to 0 feet 6 inches; |
| Stand Pipe | 1 foot 0 inches; |
| Auto Sprinkler | 0 feet 0 inches; |

| | |
|---|---|
| Hose Bib | 0 feet 6 inches; |
| Vent | 0 feet 2 inches; |
| Air Conditioners | up to 1 foot 3 inches |
| Flag Poles | 10 feet 0 inches |

The Preferred Title Company will insure to each Purchaser who obtains a title insurance policy from it, "that each and all of the foregoing encroachments may remain as long as the building on the subject premises [the Land] shall stand."

b) Landmark Designation Notice in Reel 1962 at page 250 and restricted use as provided under New York City Charter Chapter 8A.

c) As to items C1 through C5 below, at Sponsor's option, the Unit will be released from the foregoing, or Sponsor will satisfy same.

c) 1. Mortgage dated December 1, 1998, made by Corn Associates LLC to Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc. in the original principal amount of $29,197,226 recorded on January 12, 1999 in Reel 2798 at page 400.

2. Building Loan Agreement between Corn Associates LLC and Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc. ("Lehman Brothers"), dated December 1, 1998, filed December 31, 1998.

3. Assignment of Leases and Rents from Corn Associates LLC to Lehman Brothers dated December 1, 1998, recorded January 12, 1999 in Reel 2798 page 546.

4. Assignment of Sales Agreements and Sale Proceeds from Corn Associates to Lehman Brothers dated December 1, 1998, recorded 1/12/99 in Reel 2798 page 561.

5 UCC-1 - Corn Associates LLC, Debtor, Lehman Brothers, Secured party, filed January 7, 1999 County Clerk New York No. 99PN00718.

d) Any other covenants, restrictions, easements, or any other encumbrance (other than for the payment of money), provided that they do not prohibit the existence and residential use of the Residential Unit or the existence and commercial use of the Commercial Unit, as the case may be;

e) Rights, if any, to maintain vaults and chutes under the sidewalk;

f) The lien of any Common Charges, real estate taxes, water frontage and/or meter charges, sewer rents, vault charges and assessments, provided that apportionment of such items is made as provided in this Plan;

g) Service, labor, concessionaire and maintenance agreements contemplated under this Plan;

h) Any Interim Lease with the Purchaser of such Unit and any other leases, tenancies and occupancies permitted by the Purchase Agreement for such Unit;

i) Any lien, encumbrance or lis pendens either (i) for which the instrument required to remove said encumbrance of record is delivered at or prior to the Closing Date to the proper party or to the Purchaser's title insurance company together with the required recording or filing fee or (ii) as to which the Purchaser's title insurance company or the Preferred Title Company will insure that the lien, encumbrance or lis pendens will not be collected out of or enforced against the Unit;

j) The lien of any assessment or assessments which are or may become payable in annual installments of which any installment is then a charge or a lien, provided that apportionment thereof is made as provided below;

k) Party wall agreements, if any;

l) Judgments, bankruptcies or other returns against other persons having names the same as or similar to that of the Sponsor or any of its principals, provided the Sponsor delivers to the Purchaser or the Purchaser's title insurance company or the Preferred Title Company an affidavit showing that such judgments, bankruptcies or other returns are not against the Sponsor;

m) Uniform Commercial Code financing statements or conditional bills of sale provided that (i) such statements were filed on a date more than five years prior to the Closing Date, (ii) Sponsor executes and delivers to the Condominium an affidavit setting forth that the property covered thereby is no longer in the Unit or is fully paid for, or (iii) a tenant is the debtor thereunder;

n) The printed exceptions set forth in Old Republic National Title Insurance Company Title No. REMNY0355 (or in the title insurance policy issued pursuant to such title commitment) or in any title policy issued by a title company that is authorized to do business in the State of New York and that is a Member of the New York Board of Title Underwriters, including without limitation the following:

o) Defects and encumbrances arising or becoming a lien after the Closing Date;

p) Consequences of the exercise and enforcement or attempted enforcement of any governmental, war or police powers over the Unit or the Property;

q) Any laws, regulations or ordinances (including, but not limited to zoning, building, and environmental protection) as to the use, occupancy, subdivision or improvement of the Unit or the Property, adopted or imposed by any governmental body, or the effect of any noncompliance with or any violation thereof;

r) Judgments against the insured or estates, interests, defects, objections, liens or encumbrances created, suffered, assumed or agreed to, by or with the privity of the Purchaser;

s) Title to any property beyond the lines of the Unit or the Property, or title to areas within or rights to easements in any abutting streets, roads, avenues, lanes, ways or waterways, or the right to maintain therein vaults, tunnels, ramps or any other structure or improvement, other than the ordinary rights of access and egress belonging to abutting owners;

t) Title to any personal property, whether the same be attached to or used in connection with the Unit or the Property or otherwise;

u) All of the terms, easements, covenants and conditions of the Declaration and By-Laws as they are subsequently filed or recorded and the Plan and Purchase Agreement and any amendments thereto, including, without limitation, the following:

> i) Easements for the continuance of encroachments on the Unit and on the General Common Elements, the Residential Common Elements or Limited Common Elements, by other Units or portions of the General Common Elements, Residential Common Elements or Limited Common Elements then existing, by reason of the construction, renovation or rehabilitation of the Building, or thereafter occurring by reason of the settling or shifting of the Building, or by reason of the repair, alteration, and/or restoration by any Commercial Unit Owner, Sponsor and/or its designees or the Board or encroachments by such other Units or such General Common Elements, Residential Common Elements or Limited Common Elements, after damage by fire or other casualty or after taking in condemnation or eminent domain proceedings, or by reason of an alteration or repair to any Commercial Unit or the General Common Elements, Residential Common Elements or Limited Common Elements, made by any Commercial Unit Owner, Sponsor or the Board, and similar encroachments by the Unit on other Units, the Common Elements, Residential Common Elements, and/or Limited Common Elements, so that any such encroachments may remain as long as the Building stands;
>
> ii) Easements in favor of the owners of other Units to use sidewalks, pipes, flues, wires, conduits, ducts, cables, storm drainage facilities, sanitary system, water, sewer, utility lines, and other General Common Elements and any Residential Common Elements or Limited Common Elements, including those located in the Unit itself or elsewhere on the Property, serving such