EXHIBIT B-3.1

other Units, and easements of support, subjacency and necessity in favor of each Unit and/or the General Common Elements and any Residential Common Elements and Limited Common Elements;

iii)    Easements to the Sponsor and any affiliate of the Sponsor and their successors, assigns, invitees, licensees contractors, employees and tenants, on, in, over and across all areas of the Property for (i) construction, installation, maintenance, ingress to and egress from and the right to use sidewalks, pipes, flues, conduits, ducts, cables, wires, storm drainage facilities, sanitary system, water, sewer and other utility lines and other General Common Elements and any Residential Common Elements and Limited Common Elements; (ii) ingress to and egress from all areas of the Property and the use thereof (in common with Unit Owners) for construction contemplated by the Plan and for development and maintenance of the Property or any Unit; and (iii) the erection, maintenance, repair and replacement from time to time of one or more signs on the Property for the purposes of advertising the sale of Units and the leasing of space in any Unit (see also the heading **"Sponsor's Right of Access"** in **"Rights and Obligations of Sponsor"**);

iv)    Easements in favor of the Board, its agents, contractors and employees to (i) have an unlimited right of access to the Unit and to the General Common Elements, the Residential Common Elements and Limited Common Elements, to inspect, maintain or repair or to make repairs to the Unit to prevent damage to the General Common Elements and any Residential Limited Common Elements, or Limited Common Elements, or any other Units

v)    Easements in favor of any Commercial Unit Owner to (i) erect, maintain, repair and replace from time to time one or more signs on the Property for the purposes of advertising the sale of any of the Commercial Units and the leasing of space in any of the Commercial Units or advertising any of the services and/or facilities or the services and/or facilities of any tenants occupying any of the Commercial Units, (ii) use the stairways, walkways, elevators, vestibules and other public spaces within the Property for emergency egress, and/or any purpose necessary in connection with the maintenance, repair, operation, improvement or use of any of the Commercial Units and (iii) construct, erect, maintain, repair and replace flues, ducts, conduits and risers including, without limitation any and all cables and electrical lines as may be desirable in connection with the installation, maintenance, repair and/or replacement of telecommunications or similar equipment on the portion of the roof above the mechanical penthouse bulkhead comprising a Limited Common Element appurtenant to Commercial Unit C from any of the Commercial Units to the exterior of the Building and/or to the roof as deemed necessary or desirable by the Commercial Unit Owner. In addition, the Commercial Unit Owner(s) will have the following

67

easements: (i) an easement to construct, operate and maintain an elevator from the cellar to the sub-cellar; (ii) an easement through and along all of the Common Elements from Commercial Unit C to the Limited Common Element appurtenant to Commercial Unit C (consisting of an 18 inch strip around the full perimeter of the roof above the mechanical penthouse bulkhead), to install, maintain, repair and replace any and all cables, conduits, wires, apparatus and equipment as may be required in connection with telecommunications and similar equipment, such as, without limitation, facilities for wireless and/or cellular communications; (iii) an easement through the residential lobby, for access to Commercial Unit A,  for the benefit of the Owner of Commercial Unit A [but not any patrons of Commercial Unit A (except (a) for handicapped patrons, (b) as required by law, or (c) in an emergency)]; (iv) Commercial Unit C shall have an easement through Commercial Unit B for access, ingress and egress; and (v) the Condominium Board and any individuals assigned by any utility company to read or maintain water meters shall have an easement from the elevators through Commercial Unit A to the water meter room;

(vi)  Non-exclusive easements in favor of New York Telephone Company d/b/a Bell Atlantic - New York and Bell Atlantic Video Services Company or other telecommunications firm(s) selected by Sponsor over the (a) Common Elements and (b) such location within the Limited Common Elements appurtenant to Commercial Unit C as may be (a) necessary to provide such telecommunications services and satellite dish services as may be described in such written agreements as may be entered into by Sponsor and/or the Condominium Board and (b) approved in writing by Sponsor (prior to the Closing Date) or the Condominium Board and the owner of Commercial Unit C (after the Closing Date), which consent(s) shall not be unreasonably withheld or delayed,  for the installation, maintenance, repair, replacement and removal of a satellite dish and antennas and any and all related telecommunications equipment and facilities including, without limitation, cables, wires, conduits, horizontal and vertical risers, shafts, terminals, multiplexes  and other equipment and apparatus.   In addition, such telecommunications firms shall have an easement for access to each Unit for the maintenance, repair and replacement of any of the foregoing equipment

If requested by the Purchaser, Rem Abstract Corp., having an address at 1615 Northern Blvd., Manhasset, New York [Tel: (516) 869-9198, Fax (516) 365-3164]  (the "Preferred Title Company"), will agree to insure, upon payment by Purchaser of the premium for such insurance (see the estimate of the cost described below in "Closing Costs and Adjustments"), (i) that the Purchaser has fee title to the Unit, free and clear of all liens and encumbrances except those set forth in the Plan, and subject to the provisions of the Declaration and By-Laws and any mortgage executed, or any other encumbrance created, by the Purchaser; (ii) that the Unit is part of the Condominium which was validly created pursuant to Article 9-B of the Real Property Law. While the Purchaser will be free to select a title company of his choice, the Sponsor's obligation to deliver title to the Unit

as provided above will be deemed satisfied if the Preferred Title Company is prepared to insure such title subject to those title exceptions permitted under this Plan. Since the Sponsor has no obligation to satisfy the requests of any title company other than the Preferred Title Company, Purchasers who use a title company other than the Preferred Title Company may not be able to obtain a title insurance policy that will satisfy the requirements of lenders and other persons.  In addition, Purchaser is required to pay an additional fee of $500 to Sponsor's attorneys if Purchaser obtains title insurance from a title insurer other than the Preferred Title Company, for the additional work involved.

## Deed

The Unit Deed to be delivered by the Sponsor for any particular Unit shall be a bargain and sale deed with covenants against grantor's acts in the form set forth in Part II of the Plan.

## Personal Property

No personal property is included in the sale of any Unit except as expressly provided in the Plan or in the Description of Property and Specifications in Part II. All personal property affixed to or located within the Common Elements that is owned by the Sponsor and is used in connection with the Common Elements on the date of the recording of the Declaration shall be deemed to be part of the Common Elements unless such personal property is used in connection with any Unit which is owned by the Sponsor or unless otherwise provided in this Plan.

Each Purchaser shall accept title to his Unit (without abatement in, or credit against, the purchase price or provision for escrow) notwithstanding that construction of (a) minor details of the Unit or the Building including the so-called "punch list items" or (b) other Units or (c) portions of the Common Elements (including the Residential Elements) have not been completed. The Sponsor, however, will remain obligated to complete construction in accordance with the Plans and Specifications as provided in the Plan.

A Purchaser will be required to examine his Unit with the Sponsor's representative during normal business hours prior to the title closing for his Unit and will be obligated to sign and deliver to the Sponsor at or before the closing an Inspection Statement in the form set forth in Part II acknowledging the condition in which he has received his Unit.

If there are encumbrances (other than Permitted Encumbrances) affecting the Property at the time of the Closing Date under the Plan, the Sponsor, except as set forth below or as otherwise provided in this Plan, shall cause such encumbrances to be cured on or before the Closing Date or within a reasonable time thereafter.

## CLOSING COSTS AND ADJUSTMENTS

Estimated Closing Costs and Adjustments

Summarized below are the estimated closing costs and expenses to be borne by each Purchaser of a Unit:

(1)     Cost of Title Insurance. If the Purchaser orders title insurance then he will have to pay the premium for such title insurance. The premium will vary depending on the purchase price of the Unit. If ordered from the Preferred Title Company, the premiums as of the date of this Plan will be discounted thirty percent (30%) by reason of the initial sale of the Unit by Sponsor. Such discounted premium is seventy percent (70%) of the following rates which are currently estimated as follows for: (a) fee title insurance: $371.00 for the first $35,000 or less of fee insurance, plus $4.31 for each $1,000 (or fraction thereof) of additional fee insurance from $35,001 to $50,000, plus $3.51 for each $1,000 (or fraction thereof) of additional fee insurance from $50,001 to $100,000, plus $2.82 for each $1,000 (or fraction thereof) of additional fee insurance from $100,001 to $500,000, plus $2.58 for each $1,000 (or fraction thereof) of additional fee insurance from $500,001 to $1,000,000, and (b) if a mortgage title insurance policy is simultaneously issued with the fee title insurance policy: (i) on the amount of the mortgage title insurance that does not exceed the amount of the fee title policy, $318.00 for the first $35,000 or less of mortgage title insurance, plus $1.08 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $35,001 to $50,000, plus $0.88 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $50,001 to $100,000, plus $0.71 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $100,001 to $500,000, plus $0.53 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $500,001 to $1,000,000, and (ii) on the amount of the mortgage title policy that is in excess of the fee title policy, $318.00 for the first $35,000 or less of mortgage title insurance, plus $5.13 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $35,001 to $50,000, plus $4.19 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $50,001 to $100,000, plus $3.36 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $100,001 to $500,000, plus $3.06 for each $1,000 (or fraction thereof) of additional mortgage title insurance from $500,001 to $1,000,000. Thus, assuming a $550,000 purchase price and a $412,500 mortgage, the premium for mortgage and fee title insurance in the respective amounts at present rates will be approximately $3,298.68. The above amounts are merely estimates of the amounts that would be charged by the Preferred Title Company, and are subject to change by it.

(2)     Recording Fees and Transfer Taxes. Each Purchaser will have to pay (a) the fee for recording the deed covering the Unit and the power of attorney in favor of the Board of approximately $70.00 for the deed and $65.00 for the power of attorney plus a $10.00 document service charge (based on a rate of $17.00 plus $5.00 per page, plus $25.00 in addition for the deed since it will be accompanied by a New York City real property transfer tax return), (b) for Residential Units, the New York City real property

70

transfer tax of 1.0% (or 1.425% if the purchase price is greater than $500,000) of the purchase price (plus any portion of such tax and the New York State real estate transfer tax paid by the Purchaser), (c) for a Commercial Unit, the New York City real property transfer tax of 1.425% (or 2.625% if the purchase price is greater than $500,000) of the purchase price (plus any portion of such tax and the New York State real estate transfer tax paid by the Purchaser), and (d) the New York State real estate transfer tax of $2.00 per $500 (or fractional portion thereof) of the purchase price (plus any portion of such tax and the New York City real property transfer tax paid by the Purchaser).  Pursuant to Section 11-2104 of the New York City Administrative Code and Section 1404(a) of the New York Tax Law, the New York City real property transfer tax and the New York State real estate transfer tax would be (in the absence of any provision, such as is provided in this Plan, for the Purchaser to pay such tax) the obligation of the seller in connection with the transfer by the seller of the Unit to a purchaser, although such purchaser is liable for such tax if the seller fails to pay it.  While the New York City and New York State transfer taxes are customarily paid for by the seller in condominium unit transactions, the burden of paying those taxes may be modified by contract.  As is common in many other condominium developments in New York State, the Purchase Agreement provides that the Purchaser of a Unit will be required to pay these transfer taxes at the closing. Both New York State and New York City have taken the position that where a Purchaser pays either or both of these taxes, such payment constitutes additional consideration to the seller and must be considered in computing the tax due. A Purchaser of a Residential Unit priced at $550,000.00 would pay approximately $10,220.65 for transfer taxes.  In addition, if the Purchaser pays $1,000,000.00 or more for one or more Residential Units, the Purchaser will be obligated to pay the additional 1% transfer tax (known as the "Mansion" tax).

(3)    Loan Closing Costs.  If the Purchaser of a Unit obtains a purchase money first mortgage loan from a lending institution, then he will customarily pay at the closing of title the following additional costs: (i) mortgage recording tax in the amount of approximately: (a) 2.0% of the mortgage if it does not exceed $500,000, minus a $25.00 deduction if the mortgage states that it covers a one or two family dwelling (although the aggregate mortgage recording tax is generally 2.0%, Chapter 788 of the Laws of 1978 provides that a portion of said tax equal to .25% of the mortgage shall be paid by the lender in certain cases); or (b) 2.125% of the mortgage if the mortgage exceeds $500,000, minus the $25.00 deduction, and if the mortgage states that it covers a one or two family dwelling, subject to the obligation of the lender to pay a portion of said tax equal to .25% of the mortgage in certain cases, as aforesaid; (c) 2.75% of the mortgage amount on mortgage in excess of $500,000 on a commercial unit; (ii) the premium for the mortgage title insurance policy discussed above; (iii) mortgage recording fees based on the rates discussed above; (iv) the lending institution's attorneys' fees pertaining to the mortgage; (v) the lending institution's appraiser's fees; and (vi) origination or other fees.  In addition, the Purchaser may be required by the lending institution to deposit monthly with the lending institution a reserve for the payment of real estate taxes and insurance premiums commencing with the date of closing of title to the Unit.  The amount of the deposit will be a multiple of the estimated monthly real estate taxes and insurance premiums and will vary in accordance with the date of closing of title to the particular Unit.  The Sponsor makes no representation as to what additional closing costs may be charged by a particular

lender. See "**Procedure to Purchase**" for details as to fees payable to the Mortgage Broker.

(4)    Late Fee. If the Purchaser fails to close on the Closing Date for any reason, then (i) the closing adjustments shall be made as of midnight of the day preceding the date originally scheduled for the Closing Date and (ii) the Purchaser shall pay to Sponsor, as a late fee, an amount equal to .03% times the unpaid portion of the purchase price for his Unit for each day's delay, beginning with the date originally scheduled for the Closing Date to and including the day immediately preceding the actual Closing Date. The provisions of this paragraph shall not be applicable if, through no fault of Purchaser, Sponsor postpones the Closing Date except to the extent that thereafter the Purchaser postpones the closing for any reason or is in default.

(5)    Mortgage Recording Tax Credit. To the extent that the Purchaser is entitled to any credit against the mortgage recording tax by reason of any prior mortgage against the Unit or the Property, the Purchaser shall pay to the Sponsor at the closing for such Unit the amount of any such credit.

(6)    Working Capital Fund Contribution. A Working Capital Fund for the Condominium shall be established as follows: Upon the closing of the purchase of a Unit, the Purchaser will be required to pay to the Condominium an amount equal to one months' common charges for such Unit ("Unit Working Capital Fund Contribution") as initial working capital. This contribution is not refundable or transferable if the Purchaser sells his Unit.

(7)    Closing Adjustments. At the closing for any Unit, adjustments will be made between Sponsor and each Purchaser with respect to (a) real estate taxes and any assessments, on the basis of the period for which assessed, (b) common charges for the month in which title closes, (c) accrued rent and any other charges pursuant to the lease to the Purchaser, if any, covering the Purchaser's Unit and (d) water charges and sewer rents if separately assessed. Each Purchaser shall pay to the Sponsor the amount of any net adjustments in favor of Sponsor. All adjustments shall be made between the Sponsor and the Purchaser as of the midnight preceding the date for the closing of title fixed in the original notice of closing for such Unit by the Sponsor, whether or not title actually closes on that date, unless the closing is adjourned at the Sponsor's request. If a Unit has not then been separately assessed for the current tax fiscal year, the apportionment of taxes for such Unit shall be based upon the then existing assessment for the Land and the Building (times the then applicable tax rate) multiplied by the percentage of Common Interest in the Common Elements appurtenant to the Unit as shown in Schedule A, divided by the aggregate of the Common Interests of all Units at the Property subject to such real estate taxes. If the real estate taxes have not yet been paid for the current fiscal year in which the Closing Date for a Unit occurs, then, at the Sponsor's option, the Purchaser of such Unit will pay his proportionate share of such real estate taxes (for such then current fiscal year) to the Sponsor on the date on which title closes, and the Sponsor will then be responsible for payment of such amount paid by the Purchaser to the Sponsor on account of real estate taxes for the then current tax fiscal year. Until separate tax bills are issued with respect to the Units, real estate taxes and any assessments shall be a Common

72

Expense, except to the extent an apportionment is made as provided above, and the Board shall pay such taxes and any assessments to the appropriate local taxing authority.

(8)     Each Purchaser will be responsible for the fees and expenses of his own attorney if he chooses to retain one.

(9)     Each Purchaser shall be required to pay to the Sponsor or Sponsor's attorneys a fee for each Unit purchased which will cover the legal and other fees and expenses of processing the sale of the Unit at the same time as the balance of the purchase price for the Unit is due and payable under the Plan as follows:

(a)     Basic fee for closing of sale, with or without financing (including, without limitation, preparation of the Unit Deed and Power of Attorney, and coordinating and attending the closing as set forth in the Plan) -- $950.

(b)     Additional attendance fee if the closing does not occur at the Property --$350 (in no event shall Sponsor shall be required to close at a location outside of New York City).

(c)     Additional fee if the closing is adjourned for any reason other than at Sponsor's request -- $200 for each time closing is so adjourned.

(d)     If Purchaser obtains title insurance from a title insurer other than the Preferred Title Company, an additional fee of $500 to Sponsor's attorneys for the additional work involved.

Sponsor has designated William Baron, Esq. 316/318 Fulton Avenue, Hempstead, New York [Tel: (516)-483-5200] as the attorney who will handle each individual Unit Closing.

From and after the closing of title to his Unit, the Purchaser will be obligated for the payment of Common Charges, real estate taxes and assessments, water charges and sewer rents (if separately assessed against the Unit) and all other expenses with respect to his Unit whether or not he has taken possession of his Unit.

The mortgage and fee title policy premiums, the recording taxes and charges and the transfer tax rates set forth above are those in effect as of the date of this Plan, and are subject to change. Each Purchaser shall be required to pay the title policy premiums, recording taxes and charges, deed stamps and any transfer taxes in effect as of the date of the closing of title to his Unit.

The Sponsor anticipates that the only items which will be apportioned at the closing of title to the Units will be the items described above. If any other items are to be

73

apportioned at closing, the Sponsor will advise the Purchaser in writing of those items at least three (3) days before the closing.

## Expenses of Offering

The Sponsor will pay all of the expenses of creating the Condominium and of making this offering to Purchasers, including the closing costs of the Sponsor in connection with this Plan, except for such closing fees to be paid by Purchasers as may be described above and in the other provisions of this Plan. For the most part, these costs paid by the Sponsor include legal and other professional fees incurred in connection with the preparation of this Plan, filing fees incurred in connection with submissions to the Department of Law, recording fees for the Declaration, selling commissions of brokers engaged by the Sponsor, and advertising and reproduction costs of the Sponsor.

## Closing Adjustments Between Sponsor and Condominium

The Sponsor will be responsible for all the required operating expenses of the Property accruing prior to the date of the closing of title to the first Unit pursuant to the Plan. The Condominium shall be required to pay all operating expenses of the Property accruing on or after the date of the closing of title to the first Unit pursuant to the Plan.

The following items shall be apportioned between the Sponsor and the Condominium as of midnight of the date preceding the date of the closing of title to the first Unit pursuant to the Plan: (a) water charges and sewer rents (unless separately assessed to Units) based on the fiscal year therefor or, if there be water meters on the Property, the Sponsor shall furnish readings to a date not more than thirty (30) days prior to the date of the closing of title to the first Unit pursuant to the Plan and the unfixed water charges and the unfixed sewer rents, if any, based thereon for the interim shall be apportioned on the basis of such last reading; (b) deposits, fees, charges or payments in connection with all permits, licenses, utilities, service and maintenance agreements which are assigned by the Sponsor to the Condominium; (c) the cost of fuel on hand, if any, as estimated by the Sponsor's supplier and any other supplies on hand; (d) insurance premiums for transferable policies, if any, which Sponsor transfers to the Condominium; (e) employees' wages (vacation and severance pay, pension and welfare benefits) and any other payments or obligations relative to employees, if any; (f) charges for electricity for the Common Elements; and (g) operating expenses and any other prepaid items (including, without limitation, charges for gas and electricity for the Building, if applicable). In addition, the Sponsor shall pay all installments for assessments due prior to the date of closing of title to the first Unit pursuant to the Plan and the Condominium shall pay all such installments due after such date.

If the net closing adjustments are in favor of the Sponsor, then the amount of such net closing adjustments shall be paid to the Sponsor in twelve (12) equal monthly installments commencing one month after the date of closing of the first Unit, in accordance with a promissory note of the Condominium to be delivered to Sponsor on the Closing Date pursuant to the Plan. The note shall mature on the first anniversary of the

74

date of closing of the first Unit at which time all unpaid principal shall be due and payable. The note shall not provide for interest, except that from and after the maturity, whether by acceleration or otherwise, the note shall bear interest at the lesser of (i) 18% per annum or (ii) the highest rate permitted by law. It is noted that net closing adjustments in favor of Sponsor, if any, generally represent costs for which the Condominium is responsible that have been prepaid by Sponsor for a period covering part or all of the first year of Condominium operation and, as such, the amount thereof is reflected in Schedule B - Budget for First Year of Condominium Operation.

## RIGHTS AND OBLIGATIONS OF SPONSOR

Sponsor's Work

No bond or other security has been furnished to secure performance of the following obligations.

Sponsor has undertaken the following obligations in connection with the renovation of the Building:

1.     Sponsor will, at Sponsor's sole cost and expense and with reasonable diligence, perform or cause to be performed such work, and will supply or cause to be supplied all materials, which are necessary to complete the renovation and rehabilitation of the Building substantially in accordance with the description contained in "Description of Property, Specifications and Building Condition" contained in Part II of the Plan.

2.     Sponsor will cause any mechanic's liens arising out of the improvements to the Building to be discharged on or prior to the Closing Date, or in the alternative Sponsor may elect to make arrangements with the company insuring the Purchaser's title to the Unit or the Preferred Title Company to affirmatively insure against collection thereof out of or enforcement against the Unit or any portion thereof by providing an indemnity, posting a bond or escrowing a sum deemed sufficient by such company or the Preferred Title Company.

3.     If, by the Closing Date under the Plan, only a temporary Certificate of Occupancy for the Building or a Unit for which title has closed shall have been issued, then the Sponsor will use all reasonable diligence to cause the local building department to renew continuously the temporary Certificate of Occupancy until the permanent Certificate of Occupancy covering all Units offered under this Plan shall have been issued. Sponsor will, at Sponsor's sole cost and expense, do and perform or cause to be performed all work and supply or cause to be supplied all materials necessary to renew the temporary Certificate of Occupancy and to obtain such permanent Certificate of Occupancy. However, if any Unit Owner is performing or causing to be performed any work in his Unit,

75

the Sponsor shall have no obligation to obtain or renew a partial, temporary, or permanent Certificate of Occupancy with respect to such Unit if the issuance of such Certificate of Occupancy is delayed or prevented by such work. Prospective purchasers are advised that a permanent Certificate of Occupancy is required for permanent use of the Building. A temporary Certificate of Occupancy may only be renewed, pursuant to current laws and practices, for a total of up to two years from the date of its original issuance. If the temporary Certificate of Occupancy shall have expired prior to issuance of a permanent Certificate of Occupancy, occupancy of the Units will be a violation of law, subjecting the occupants to legal penalties, including possible eviction of occupants. The Sponsor anticipates obtaining a permanent Certificate of Occupancy for the Property by no later than two years from the Closing Date and shall use reasonable efforts to obtain same.

If a permanent Certificate of Occupancy for the Building has not been issued as of the date of the closing of the first Unit in the Building and the Sponsor has obtained at least a temporary Certificate of Occupancy for the Building, the Sponsor will cause to continue to be held in escrow all monies previously deposited and being held in escrow pursuant to Section 352-e(2-b) of the General Business Law unless Sponsor's engineer or architect certifies that a lesser amount will be reasonably necessary to complete the work needed to obtain a permanent Certificate of Occupancy. Any sum of money exceeding the amount certified by the Sponsor's engineer or architect will be released to the Sponsor. Upon the issuance of the permanent Certificate of Occupancy, such escrow deposit will be released to Sponsor without the consent of any other party. Alternatively, Sponsor may deposit with an escrow agent an unconditional, irrevocable letter of credit or post a surety bond or maintain unfunded, a portion of the construction loan available to Sponsor for construction purposes in the amount certified by Sponsor's engineer or architect. In such case, Sponsor shall have the right to draw down remaining portions of said construction loan available to Sponsor for construction purposes, provided the unfunded portion thereof is, at all times no less than the amount that Sponsor's architect, engineer or construction manager certifies is adequate to complete the work necessary to obtain a permanent Certificate of Occupancy.

The Sponsor will deliver and assign to the Board upon the recording of the Declaration all manufacturers' and contractors' heating, electrical, plumbing, roofing and appliance warranties and bonds relating to the Common Elements, if any, to the extent made by such manufacturers and contractors and to the extent such warranties and bond are assignable. Sponsor will deliver to the Board a copy of the "as built" plans filed with the recording of the Declaration and, in addition, will provide the Board with a full set of building plans filed with the Department of Buildings. At or prior to the closing of each Unit, Sponsor shall deliver and assign to the Purchaser any manufacturer's warranties with respect to equipment and appliances installed in such Unit to the extent made by the manufacturer and to the extent such warranties are assignable.

5.    In connection with the sale of the Units, the Sponsor will give a Limited Warranty to the Purchasers of such Units for the period ("Warranty Period") which commences on the date of the closing on the sale for such Unit and which ends on that date which is the first anniversary of such date. Each Purchaser should refer to the

76

Limited Warranty appended to the Purchase Agreement. A summary of the terms of the Limited Warranty is as follows:

The Sponsor warrants that during the Warranty Period the Unit (sometimes referred to hereinafter as the "Home") will be free from latent defects that constitute:

(a)     defective workmanship by the Sponsor, or an agent, employee or contractor of the Sponsor;

(b)     defective materials furnished by the Sponsor, or an agent, employee or contractor of the Sponsor;

(e)     defective design, provided by an architect, engineer, surveyor, or other design professional retained exclusively by the Sponsor; or

(f)     defective installation of appliances sold as part of the Home by the Sponsor or an agent, employee or contractor of the Sponsor.

The complete text of the Limited Warranty is contained as an Exhibit to the Purchase Agreement contained in Part II of this Plan, and is subject to the restrictions, conditions and provisos contained therein. THE LIMITED WARRANTY LIMITS SPONSOR'S TOTAL LIABILITY TO A PURCHASER THEREUNDER TO THE LESSER OF TEN PERCENT OF THE PURCHASE PRICE AND $10,000.00, LESS, IN EACH CASE, ANY INSURANCE PROCEEDS RECEIVED BY PURCHASER). Written notice of any warranty claim must be received by Sponsor no later than the first business day after the expiration of the applicable warranty period, failing which Sponsor shall have no duty to respond to the complaint set forth in such notice. IN ADDITION, THE WARRANTY WITH RESPECT TO A UNIT SHALL BE LIMITED TO AN OBLIGATION TO CORRECT MATERIAL DEFECTS IN THE RENOVATION OR REHABILITATION OF THOSE PORTIONS OF THE UNIT WHICH ARE REQUIRED TO BE RENOVATED OR REHABILITATED IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS AND THE WARRANTY EXCLUDES DEFECTS IN THE UNIT, IF ANY, WHICH ARE NOT WITHIN THE SCOPE OF THE REHABILITATION AND RENOVATION WORK AS SHOWN IN THE PLANS AND SPECIFICATIONS.

SINCE THE BUILDING EXCEEDS FIVE STORIES, THE HOUSING MERCHANT IMPLIED WARRANTY SET FORTH IN ARTICLE 36-B OF THE GENERAL BUSINESS LAW DOES NOT APPLY TO THIS OFFERING. THE SPONSOR HEREBY EXPRESSLY EXCLUDES THE HOUSING MERCHANT IMPLIED WARRANTY SET FORTH IN ARTICLE 36-B OF THE GENERAL BUSINESS LAW, AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, OTHER THAN THE LIMITED WARRANTY. SEE THE COMPLETE TERMS OF THE LIMITED WARRANTY CONTAINED AS AN EXHIBIT TO THE PURCHASE AGREEMENT CONTAINED IN PART II OF THE PLAN.

To the extent any coverage under the Limited Warranty applies to Common Elements of the Condominium, such coverage shall be deemed given to the Board of

77

Managers of the Condominium and not to the Purchasers and the warranty period will be deemed to commence to run on the date of the closing of the sale of the first Unit under the Plan. HOWEVER, THE WARRANTY TO THE BOARD OF MANAGERS WITH RESPECT TO THE COMMON ELEMENTS SHALL BE LIMITED TO AN OBLIGATION TO CORRECT MATERIAL DEFECTS IN THE RENOVATION OR REHABILITATION OF THOSE COMMON ELEMENTS WHICH ARE REQUIRED TO BE REHABILITATED IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS AND SUCH WARRANTY EXCLUDES DEFECTS IN THE COMMON ELEMENTS WHICH ARE NOT WITHIN THE SCOPE OF THE RENOVATION OR REHABILITATION WORK AS SHOWN IN THE PLANS AND SPECIFICATIONS. The Sponsor has no obligation to make any repairs to the Common Elements except as expressly set forth in the Plan. Written notice of any warranty claim by the Board of Managers must be received by Sponsor no later than the first business day after the expiration of the applicable warranty period, failing which Sponsor shall have no duty to respond to the complaint set forth in such notice.

The quality of construction and/or rehabilitation shall be comparable to local standards customary in the particular trade and in accordance with the Plans and Specifications.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, SPONSOR SHALL NOT BE RESPONSIBLE FOR CORRECTING OR REPAIRING ANY DEFECTS IN CONSTRUCTION, REHABILITATION OR RENOVATION (INCLUDING, WITHOUT LIMITATION, DEFECTIVE MATERIALS OR DEFECTIVELY CONSTRUCTED COMPONENTS OR PORTIONS OF THE BUILDING OR UNIT) OR DEFECTS IN THE INSTALLATION OR OPERATION OF ANY APPLIANCES (INCLUDING, WITHOUT LIMITATION, KITCHEN APPLIANCES), EQUIPMENT OR FIXTURES, TO THE EXTENT COVERED BY ASSIGNABLE WARRANTIES OR OTHER UNDERTAKINGS (HOWEVER DENOTED) FROM MANUFACTURERS, CONTRACTORS MATERIALMEN, OR OTHERS, ARE ASSIGNED TO EITHER ONE OR MORE PURCHASERS OR THE BOARD.

In addition, without limitation, in no event shall Sponsor or any contractor or supplier be responsible for correcting or repairing any of the following: (i) any condition resulting from normal wear and tear or natural deterioration or from the normal settling or shifting of the Building, (ii) defects of an insubstantial nature, such as, without limitation, nail pops, ridging on sheet rock walls and ceilings, lumber shrinkage, door or window sticking due to weather, door warpage including, without limitation, warpage of the main entrance door within reasonable tolerances of doors of similar size and weight and quality, slight scratches in plastic laminate, porcelain, or other surfaces, imperfect bath and kitchen tile grouting, adjustment of bi-fold doors, walls not square, electrical plates not straight, discoloration or shrinkage, slight separation in joints of flooring or between base and floor, (iii) normal settlement and deflection or any consequential damage resulting therefrom including, without limitation, cracks in concrete roof pavers (if any), or concrete cracks (if any) which do not impair the structural soundness of the Building, (iv) variations in floor levels, (v) ceiling imperfections, (vi) painting defects, (vii) alignment of bathroom finishes, (viii) air infiltration from windows (ix) normal plumbing, elevator, trash chute, heating and air conditioning noises, (x) normal floor noises and creaking, (xi) floor discoloring, (xii)

variations in width, length or tone of wood floors, (xiii) repair of chips, scratches, mars, breaks or other defects in any windows and window sashes, sliding glass doors, shower doors, electrical fixtures and globes, painted surfaces, sinks, tubs, basins, kitchen cabinets and countertops, vanity tops and cabinets, medicine cabinets, ceramic tile, marble floors and walls, resilient flooring, saddles, appliances, woodwork and doors, mirrors, hardware, appliance cabinets and flooring, (xiv) subsequent to the Closing Date, paint touch-ups, repairs of dented appliances, carpet discoloration, stretching or shrinkage, or replacement of fluorescent light ballasts, (xv) variations in tone or color of marble or stone used in bathrooms or variations in tone or color of vanity tops or other marble or stone aggregate surfaces, (xvi) salting or color variation in exterior colored mortar and deep colored brick, (xvii) ponding and/or controlled drainage on the roof surface, (xviii) cracks in pressure treated wood used or intended for use outside the Building, (xix) seepage through masonry walls, (xx) the partial or total death of any trees, shrubs, bushes, ground cover, grass or other landscape improvements, (xxi) damage to walkways or other concrete areas caused by the application of deicers, (xxii) water problems caused by ice dams, normal plumbing and heating noises, (xxiii) carpet stretching, normal settlement cracks on concrete foundations, patios, terraces, green-houses, sidewalks and other flat work, (xxiv) basement leaks resulting from extraordinary acts of God or alteration of landscaping or grading, leakage resulting from "ice dams" forming on roofs, shading variations of the exterior siding straining (on the face surface or grooves), and shading variations on fascias from staining. Sponsor shall be obligated to repair abnormal scratches by filling any plastic laminate scratches or refinishing any porcelain scratches but Sponsor shall not be obligated to replace such plastic laminate or porcelain surfaces. References in this Section or elsewhere this Plan to excluded repairs or excluded conditions with respect various items listed shall not be construed to imply an obligation on the part of Sponsor to do any work, renovation or rehabilitation or to install any equipment, fixtures or appliances or other items except, in each case, as expressly provided in **"Description of Property, Specifications and Building Conditions."**

Nothing contained herein shall be construed to render Sponsor liable for consequential damages (whether based on negligence, or breach of contract, warranty, or otherwise), it being intended that Sponsor's sole obligations pursuant to this section of the Plan shall be to repair or replace, at Sponsor's option, any defective item of construction (arising as a result of substantial and material defects in material or as a result of improper workmanship substantially at variance with the Plans and Specifications) subject to the terms and conditions (and within the time limits) set forth in this section of the Plan.

The Sponsor reserves the right to amend the Plans and Specifications and to make changes in the materials, appliances equipment and fixtures if (a) required or approved or accepted by governmental authorities having jurisdiction over the Property or by the Sponsor's architect; or (b) required by job conditions, local shortages or unavailability or materials; or (c) ordered by a Purchaser for his Unit without affecting Units previously sold. Changes or substitutions in materials, appliances, fixtures and equipment may also be made by the Sponsor provided that such substitutions are of substantially equal or better quality. However, the Sponsor may not change the size, the location of the Building, other

The risk of loss or damage to the Property by fire or other casualty until the date of closing of title of the first Unit is assumed by Sponsor but without any obligation or liability upon Sponsor to repair or replace the same. Sponsor may, however, at Sponsor's option, elect to abandon the Plan (see "**Effective Date**" section of this Plan) or to repair or replace such loss or damage. If Sponsor elects to replace such loss or damage, then at Sponsor's option, it shall be entitled to reasonable adjournments of the closing.

## Survival of Sponsor's Obligations

The Sponsor's obligations and representations under the Plan or under the General Business Law of the State of New York which are to be performed subsequent to the Closing Date shall survive delivery of the deed to a Unit affected by such obligation, for the limited time periods set forth in the Plan. However, except for those obligations and representations under the Plan or under the General Business Law of the State of New York which are to be performed subsequent to the Closing Date as described in the preceding sentence, all obligations of the Sponsor under the Plan with respect to any Unit or Unit Owner and under the Purchase Agreement for such Unit with such Unit Owner shall not survive, and shall be deemed satisfied upon, the delivery of the deed for such Unit unless otherwise expressly provided in the Plan or such Purchase Agreement.

## Sponsor's Obligations for Retained Units

So long as Sponsor retains title to any Units, Sponsor shall pay all Common Charges, special assessments and real estate taxes with respect to such Units. The Sponsor represents that when it has received construction financing, its financial resources will be sufficient to meet its obligations described above in this paragraph and its other obligations under the Plan. Sponsor presently intends to fund such obligations primarily from income from projected sales of Units. However, no bond or other security has been furnished by the Sponsor and the Sponsor's ability to perform its obligations hereunder will depend solely upon its financial condition if and when called upon to perform. No warranty is made that the Sponsor will be financially able to perform any or all of such obligations, provided that if at any time, while Sponsor is making an offering or making sales pursuant to the Plan, Sponsor's financial condition does not permit it to perform its obligations hereunder, Sponsor shall amend this Plan to disclose such change in financial condition and to offer Purchasers with outstanding contracts a right to rescind such contracts and shall cease making sales pursuant hereto until Sponsor's financial condition shall again permit it to perform its obligations hereunder. If Sponsor shall be dissolved or liquidated or shall transfer ten (10) or more Units or twenty percent (20%) or more of the total number of Units in the Condominium, whichever is less, to other than bona fide purchasers for occupancy, Sponsor shall provide one or more financially responsible entities or individuals who will assume the status and obligations of the Sponsor under the Plan, applicable laws or regulations. As used in the preceding sentence, "bona fide purchaser for occupancy" means a purchaser who purchases a Residential Unit for occupancy by such purchaser or for occupancy by a person related by blood or marriage to such purchaser.

Insurance Described in Condominium Budget

Sponsor shall cause the Condominium to obtain and have in effect as of the Closing Date the insurance described in the Condominium Budget set forth as Schedule B. Such coverage will provide for sufficient coverage for the insurance company to waive any co-insurance requirement or will contain an agreed amount replacement value provision.

## CONTROL BY SPONSOR

The affairs of the Condominium shall be governed by the Board. No member of the Board shall receive any compensation from the Condominium for acting as such member. The initial three members of the Board will be designated by the Sponsor. It is anticipated that the initial members of the Board will be Robert A. Levine, Ronny Levine and Aaron Malinsky, each of whom are principals of Sponsor. However, Sponsor reserves the right to designate other individuals to serve as initial members of the Board. See "**Identity of Parties**." The initial Board members will resign in favor of a new five member Board to be elected at a meeting of Unit Owners to be held within forty-five (45) days after the Closing Date. One of the members will be elected or designated by the Commercial Unit Owner and the remaining four members will be elected by the Residential Unit Owners, including Sponsor. A member of the Board need not be a Unit Owner in the Condominium.

The Sponsor and any of its designees owning Units:

(a)     shall not be entitled to elect a majority of the members of the Board from and after the earlier of the following dates: (i) the fifth anniversary of the Closing Date under the Plan, and (ii) the date on which the Sponsor and Sponsor's designees own less than 50% of the outstanding Common Interests of the Condominium. Upon the earlier of the aforementioned dates (the "Transition Date"), so many serving members of the Board elected by the Sponsor and such designees, as shall reduce the number of such members to less than a majority of the Board, shall resign.

(b)     may not exercise a veto over expenditures (i) which are covered in the budget set forth in Schedule B, and which are for the period covered by said budget, (ii) which are for capital repairs required for the operation and maintenance of the Condominium or, (iii) which are required to comply with applicable laws or regulations, to remedy any notice of violation or work order by the insurer with respect to the Property.

Until the sooner of (i) the date on which the Common Interests of all Unsold Units is in the aggregate less than 25% of the Common Interests of all Units, or (ii) the fifth anniversary of the Closing Date, neither the Board of Managers, nor officers, nor Unit Owners, except upon the written consent of the owners of Unsold Units representing a majority of the Common Interests allocated to all Unsold Units, shall (a) increase the number or change the type of. employees described in Schedule B; (b) provide for services other than those described in Schedule B unless the total annual cost of all services to be provided is no greater than the then estimated total cost of the services described in Schedule B; (c) establish reserves or similar funds to undertake any capital or major improvements or additions except as required by law; (d) remove any members of the Board of Managers elected by Sponsor, its designees, or the Commercial Unit Owner, or by the owners of Unsold Units except for cause, or (e) cause their representatives on the Condominium Board of Managers to (i) change the insurance coverage on the Property from the coverage described in Schedule B unless the change does not cause an increase

84

in the total annual insurance premiums then due and payable by the Condominium or unless such change is required by the holder of any mortgage on any Unsold Units or by the insurance carrier insuring the Property to satisfy insurance requirements or (ii) take any action inconsistent with (a), (b), (c) or (d).

## RIGHTS AND OBLIGATIONS OF UNIT OWNERS AND BOARD OF MANAGERS; SUMMARY OF BY-LAWS

### Rights and Obligations of Unit Owners

#### Common Interest

Each Unit has been allocated a percentage ownership of the Common Elements of the Condominium (a "Common Interest") in accordance with New York Real Property Law Section 339-i 1(iv) based upon floor space, subject to the location of such space and the additional factors of relative value to other space in the Condominium, the uniqueness of the Unit, the availability of Common Elements for exclusive or shared use, and the overall dimensions of the particular Unit. The Common Interest of each Unit that includes below grade space has been computed based upon 100% of the above grade space and 7% of the below grade space. The Common Interest of Unit 17 is computed based on the full floor area of all interior space comprising such Unit (including the enclosed portion of the roof terrace) and 50% of the floor area of all exterior space (i.e., the roof terrace and second level penthouse floor roof terrace) comprising such Unit. The floor area of the trash room and any mechanical space situated within a Unit as well as the elevator lobbies serving and comprising part of Units 11, 12, 13, 14, 15, 16, and 17 have been included in the floor area of such Unit for the purpose of computing such Unit's Common Interest. Every Unit Owner will be responsible for his proportionate share of the Common Expenses of the Condominium, based upon his Common Interest (except as otherwise provided in the footnotes to Schedule B, the Declaration or the By-Laws), and will have the same proportionate share of any common profits of the Condominium or any distribution upon termination or condemnation of the Condominium.

#### Description of Unit

A Unit Owner will obtain fee title to the Unit, subject to the Permitted Encumbrances. Generally, each Unit consists of the area measured: (a) vertically from the top of the concrete floor to the underside of the ceiling of the Unit and (b) horizontally to the center line of demising walls between Units; to the center line of non-structural common walls; to the inside face of common structural walls; to the inside face of common structural walls or elements; and to the outside face of exterior walls. The trash room serving each Residential Unit comprises part of such Unit. Stairways and mechanical space that are interior to a Unit comprise part of such Unit. A roof terrace, a portion of which will be enclosed, a penthouse roof and the roof of the first level of the mechanical penthouse comprise part of Unit 17. The mechanical space and, as to Units 11, 12, 13, 14, 15, 16 and 17, the elevator lobby serving such Unit, comprise part of such Unit. For a detailed

description of the Unit to be conveyed, see "Declaration" and "Condominium Floor Plans" in Part II of the Plan.

Each Unit shall be deemed to include also (i) that portion of any wall or partition separating such Unit from Common Elements that lies between the Unit side of such wall or partition and the frame or masonry, as the case may be, of such wall or partition and (ii) the doors and windows which open from the Unit.

Description of Common Elements

The Common Elements of the Condominium consists of the entire Property other than the Units. A Unit Owner will have an undivided interest in all of the Common Elements. The Common Elements may not be divided or partitioned except as provided in the Condominium Act.

The General Common Elements are all of the Common Elements exclusive of the Residential Common Elements and Limited Common Elements and include (even if within the dimensions of a Unit) the following: (a) the Land; (b) any foundations, columns, girders, beams, supports, and wood joists; (c) (to the extent not expressly part of a Unit) the roof, all walls and partitions separating Units from the Common Elements; (d) (to the extent not located within or specifically made part of a Unit or a Residential Common Element or a Limited Common Element), hallways, stairs and corridors within the Common Elements, and entrances to and exits from the Common Elements; (e) the central and appurtenant installations and equipment for services such as power, light, telephone, gas, hot and cold water and sewer and fire safety, including all pipes, ducts, wires, cables and conduits used in connection therewith and all maintenance, meter and common equipment spaces (including the mechanical room, machine room, elevator pits, stairs, building office, meter room, water meter, trash holding room, telephone room, janitor closet, toilet on cellar level, transformer room, water meter room, water pump room, and telecommunications closet) in connection therewith (except for appliances and equipment located in and serving only such Unit which shall constitute a part of such Unit); (f) maintenance and common equipment spaces and the cooling tower, common tanks, pumps, motors, fans and controls or other such equipment; (g) all Units which may hereafter be acquired and held by the Board on behalf of some or all Unit Owners but only while so held; and (h) to the extent not specifically made a part of a Unit, or a Residential Common Element, or a Limited Common Element by the terms of the Declaration, all other parts of the Property including all apparatus and installations existing on the Land for common use or which are necessary or convenient to the existence, maintenance or safety of the Property.

Limited Common Elements

The Limited Common Elements shall consist of those Common Elements, such as the eighteen (18) inch strip running along the full perimeter of the roof of the mechanical penthouse bulkhead, that serve or benefit exclusively a particular Unit and which are identified as a Limited Common Element on the Floor Plans, and/or which are created pursuant to the terms of the Declaration (including, without limitation, the provisions of

Section 9 thereof). In addition, if any two Units which have access to the same shared hallway shall at any time be owned of record by the same owner (other than by Sponsor or its designee) such hallway shall thereafter be treated as a Limited Common Element until such time as such Units shall have different owners; provided that once such Units shall again have different owners, such hallway shall revert to the status of a Common Element.

## Residential Common Elements

The Residential Common Elements comprise part of the Common Elements and consist of the residential vestibule, service hall, entrance hall, residential lobby, the concierge area (including the toilet and storage area adjacent thereto), and those hallways, corridors, rooms, and areas such as the elevator lobbies on floors 2-10, that serve two or more Residential Unit Owners (but not any Commercial Units and not the Limited Common Elements appurtenant to Commercial Unit C). The Residential Common Elements are restricted for use by Residential Unit Owners and their tenants, guests and invitees only.

## Sales and Leases of Units

Any Residential Unit Owner may sell or lease his Residential Unit, provided he first gives the Board notice of his intention to sell or lease such Unit and an opportunity to purchase or lease such Unit, as the case may be, at the same price or rental and on the same terms as are offered in good faith by a prospective purchaser or lessee, as the case may be, as more specifically provided in the By-Laws. If the Board does not elect to purchase or lease such Unit, as the case may be, by giving written notice as provided in the By-Laws to such Unit Owner within fifteen (15) days after receipt of the Unit Owner's notice of intention to sell or lease described above, then the Unit Owner will have a period of ninety days to enter into a written agreement with the prospective purchaser or lessee, as the case may be, embodying the terms set forth in the notice. If such written agreement is not executed by the Unit Owner within the ninety day period, or the sale or lease, as the case may be, is not consummated on or before the intended closing date, or commencement date of the term of the lease which, as the case may be, is provided in the notice, then the Unit Owner will be required to offer again the Unit first to the Board as described above before entering into such sale or lease. The Board may not exercise its option to purchase or lease any Unit without prior approval of a Majority in Common Interest of the Unit Owners. The terms of any such lease, including the rent, will be subject to applicable state and local laws.

If the Board elects to exercise such right of first refusal, the purchase of any Unit by the Board or its designee, on behalf of all Unit Owners, may be made from the funds deposited in the capital and/or expense accounts of the Board. If the funds in such account are insufficient to effectuate any such purchase, the Board may levy an assessment against each Unit Owner, in proportion to his respective Common Interest as a Common Charge, and/or the Board may, in its discretion, finance the acquisition of such Unit, provided, however, that no such financing may be secured by an encumbrance or

87

hypothecation of any portion of the Property other than the Unit to be purchased together with its "Appurtenant Interest" (as such term is defined in the Declaration).

While held by the Board, such Units may be used for any purpose permitted by law for which such Unit may be used pursuant to the Declaration and the By-Laws. The Board may sublet any such Unit which is so leased without the consent of the landlord. Any Unit which is acquired and held by the Board on behalf of all Unit Owners shall become part of the Common Elements, but only while so held. If any Unit shall be acquired by the Board, or its designee, on behalf of some or all Unit Owners, as tenants in common, then all such Unit Owners shall be deemed to have waived all rights of partition with respect to such acquired Unit. The Board has the power to sell, lease, mortgage, or otherwise deal with any Unit acquired by the Board or its designee, on behalf of all Unit Owners, but shall not have the power to cast the votes appurtenant to such Unit. Any proceeds of the disposition of a Unit will be received by the Board for all Unit Owners or for the Unit Owners for whom such Unit was acquired.

The Board may not discriminate against any person for any reason proscribed by applicable civil rights laws.

The sale and lease restrictions described above shall not apply to (i) any Commercial Unit or any Unit which is owned by (a) the Sponsor or its designee, or (b) the Board, or (ii) the sale, transfer or lease of a Unit to or by a mortgagee or its nominee, including, without limitation, a foreclosure sale, provided, however, that a succeeding Unit Owner shall be bound by, and his Unit subject to, the sale and lease restrictions described above; (iii) any Unit transferred by the Unit Owner thereof to his spouse, adult child, parent, adult sibling or to any affiliate (as defined in the By-Laws) of the Unit Owner; or (iv) any Unit transferred by a Unit Owner by gift, devise, will or intestacy; provided, however, that each succeeding Unit Owner shall be bound by, and his Unit subject to, the sale and lease restrictions described above.

Notwithstanding the foregoing, title to a Unit may not be conveyed unless all unpaid Common Charges and liens against such Unit (other than any mortgages) are paid and satisfied at or prior to closing. The foregoing provision is inapplicable to a conveyance by a Permitted Mortgagee (or its nominee) following foreclosure or a deed in lieu of foreclosure by such Permitted Mortgagee of its mortgage on the Unit. However, a sale by a Permitted Mortgagee or its nominee to a bona fide purchaser shall not be deemed to be a sale to a nominee and any conveyance by such bona fide purchaser shall again be subject to the requirement that all Common Charges and liens against the Unit must be paid or satisfied at or prior to closing.

A conveyance of a Unit by a Unit Owner must include the appurtenant Common Interest for such Unit.

New Federal Regulations On Lead-based Paint.