EXHIBIT B-3.2

The Lead-Based Paint Regulations recently adopted by the United States Department of Housing and Urban Development and the Environmental Protection Agency apply to all owners of co-operative and condominium units in Target Housing, including Unit Owners of the Building.

The Regulations do not require an owner to positively test for the presence of lead-based paint and do not impose a duty to abate, contain, remove or correct lead-based paint conditions or hazards. Local Law 1 of 1982 of the City of New York does, however, require the owner of a multiple dwelling to remove or cover specified hazardous lead-based paint or other similar surface-coating material on the interior walls, ceilings, doors, windowsills or moldings in any dwelling unit in which a child six (6) years old or younger resides. Under this Local Law, peeling paint on such surfaces of a residential apartment in any multiple dwelling built prior to 1960 (which includes this Building) is presumed to be hazardous. In addition, if such apartment is occupied by a child aged 6 years or under, the peeling paint constitutes a Class C immediately hazardous violation, subjecting the owner of the multiple dwelling to penalties. Such presumption is rebuttable.

## Restrictions on Occupancy and Use

The Rules and Regulations annexed to the By-Laws provide, in part, as follows:

(i)     no pets other than dogs, cats, caged birds and fish (which do not cause a nuisance, health hazard or unsanitary condition) may be kept in a Residential Unit without the consent of the Condominium Board or the Managing Agent. Any Residential Unit Owner who wishes to keep more than two pets in his or her Unit shall be required to obtain the prior written consent of the Condominium Board. Each Residential Unit Owner who keeps any type of pet in his Unit will be required to (a) indemnify and hold harmless the Condominium, all Unit Owners and the Managing Agent from all claims and expenses resulting from acts of such pet; and (b) abide by any and all reasonable Rules and Regulations of the Condominium adopted with respect thereto. The Condominium Board may require that pet owners enter into an agreement with the Board confirming such owners' obligations with respect to their pets.

(ii)     no sign shall be affixed by any Residential Unit Owner on any part of the outside of the Building, and also no awnings, aerials or other projections shall be attached by any Residential Unit Owner to the outside of the Building, and no blinds, shades or screens shall be used by any Residential Unit Owner on the exterior of any window or door of any Residential Unit, or shall be visible through the exterior windows of any Residential Unit, without, in each case, the prior written consent of the Board, which consent shall not be unreasonably withheld or delayed; The foregoing provisions shall not be applicable to Sponsor.

(iii)     each Residential Unit may be used only for dwelling purposes and such "home occupation" use under the Zoning Resolution of the City of New York as may be permitted by law, as provided in the Declaration, the certificate of occupancy for the

89

Building, and applicable zoning law, except that the Sponsor and any affiliates of the Sponsor shall have the right, without charge, (a) to have a general or sales office in one or more Units or elsewhere on the site, to use one or more Units as models and for other promotional purposes in connection with the sale or lease of Units; (b) to have its employees, contractors and sales agents present on the site; and (c) to do all things necessary or appropriate, including the use of the Common Elements, to sell or lease Units and to complete the renovation of the Building, to comply with their obligations under this Plan and to develop the Property.

(iv)    Residential Unit Owners shall not cause or permit any disturbing noises or objectionable odors from their Residential Units, or permit or keep in their Residential Units any inflammable, combustible or explosive material, chemical or substance (except as required in normal professional and business use);

(v)    the Commercial Units may be used for any lawful purpose other than for any obscene or noxious purpose; SUCH USE MAY BE NOISY, CAUSE HEAVY TRAFFIC AND NEED NOT NECESSARILY BE COMPATIBLE WITH THE RESIDENTIAL CHARACTER OF THE BUILDING;

(vi)    except as provided otherwise in the Declaration, the Common Elements shall not be obstructed or encumbered by refuse or otherwise, or used for any purpose other than (y) ingress or egress to and from the Units and (x) delivering and shipping of merchandise and the like to and from the Units, and the Common Elements shall not be altered or affected by any Unit Owner without the prior written consent of the Board.

There are no restrictions on occupancy of any Unit owned by corporations, partnerships, or fiduciaries in addition to the restrictions on individual Unit Owners.

Further restrictions on the use of Units are set forth in the Declaration, By-Laws and in the Rules and Regulations reproduced in Part II of the Plan.

Mortgage of Units by Unit Owners

Each Unit Owner may mortgage his Unit provided that the Board is notified in writing as provided in the By-Laws of the making of such mortgage and the Board receives a conformed copy of the note and mortgage. The By-Laws provide certain rights to the Sponsor or the holder of a mortgage of record ("Permitted Mortgage") against a Unit.

Common Charges - Determination and Assessment

The Board determines the amount of Common Expenses. Common Expenses include, without limitation, the expenses of maintaining and operating the Common Elements and the types of expenses set forth in Schedule B, which covers the first year of operation of the Condominium. In the discretion of the Board, the Common Expenses

may also include reserves, working capital and other sums necessary to carry on the affairs of a condominium.

The Common Expenses set forth in Schedule B do not include maintenance, repairs or decoration of any of the Units or any portions thereof, payments required pursuant to the terms of the Unit Owners' mortgages, electricity and other utilities consumed within the Unit, and real estate taxes covering the individual Units. However, until the Units are separately assessed, all real estate taxes with respect to the Property will be treated as a Common Expense. See Footnote 5 to Schedule A.

The Board may commence to assess Common Charges upon the closing of title to the first Unit pursuant to the Plan or at any subsequent date as in its sole discretion it may determine. The estimated Common Charges projected for the assumed first year of Condominium operation which will be collected monthly by the Board (based on the Common Expenses as estimated in Schedule B) are set forth on Schedule A. However, additional services which the Unit Owners may desire or other factors can increase these charges. Each Unit Owner will be required to pay a portion of the Common Expenses equal to the product of the percentage amount of his Common Interest, multiplied by the amount of the Common Expenses (except as otherwise provided in Schedule B, the Declaration or By-Laws), which shall be levied as a Common Charge against his Unit. The owner of Commercial Unit C shall pay all of the expenses applicable to the Limited Common Elements appurtenant to such Unit.

At least annually the Board will prepare and furnish to the Unit Owners a budget for Common Expenses. The Board will assess in advance Common Charges against each Unit Owner to meet Common Expenses.

<u>Liens for the Non-Payment of Common Charges and Working Capital</u>

The Condominium Board shall have a lien against each Unit for its unpaid Common Charges prior to all other liens except liens for the payment of taxes and all sums unpaid on a Permitted Mortgage, which lien of a Permitted Mortgage shall be superior to the lien of the Condominium Board. The Board may foreclose the lien in the same manner as a mortgage on real property and in so doing shall be entitled to recover all costs incurred including reasonable attorney's fees. Moreover, if any Unit Owner fails to pay any payment of Common Charges within fifteen (15) days of its due date, such Unit Owner shall be obligated to pay a late charge at the rate of $0.02 per dollar per month or any part thereof for all such overdue Common Charges. The liability of each Unit Owner for the payment of Common Charges thereafter assessed against his Unit shall terminate upon a sale, transfer or conveyance of the Unit in accordance with the provisions of the Declaration and By-Laws. Further, any Unit Owner may convey his Unit to the Board of Managers or its nominee on behalf of all other Unit Owners, without any compensation and in accordance with the Declaration and the By-Laws. In that case, he shall be exempt from any Common Charges thereafter assessed, but not relieved of his obligation to pay his mortgage. A Unit Owner may not exempt himself from liability for his Common Charges by waiver of the use or enjoyment of any of the Common Elements or by abandonment of his Unit. Upon a

resale, the Purchaser of a Unit shall be liable for the payment of unpaid Common Charges assessed against the Unit prior to the acquisition of the Unit by the Purchaser, except as hereinafter provided. A Purchaser of a Unit at a foreclosure sale pursuant to a Permitted Mortgage against such Unit shall not be liable, and such Unit shall not be subject to a lien, for the payment of Common Charges assessed prior to the acquisition of title to the Unit by said Purchaser. However, the owner of such Unit prior to the foreclosure sale shall remain liable for the payment of all unpaid Common Charges which accrued prior to such sale.

## Repairs to and Maintenance of Units, Limited Common Elements, and Common Elements

Generally, all painting, decorating, maintenance, repairs and replacements, whether structural or non-structural ordinary or extraordinary, which are either: (a) in or to any Unit (other than to the Common Elements within the Unit) and, including, without limitation, the exterior surface of windows, electrical, plumbing, and heating fixtures, exterior installations made by the Unit Owner, will be made by the Unit Owner of such Unit at such Unit Owner's sole cost and expense, subject to the restrictions set forth in the By-Laws; (b) in or to the Common Elements and, any infill of lot line windows will be made by the Board and the cost and expense thereof will be charged as a Common Expense, payable by all Unit Owners; and (c) in and to any Limited Common Element, will be made by the Unit Owner having the exclusive use of such Limited Common Element, except that (a) repairs to, maintenance and replacements of the exterior walls of the Building, and (b) structural repairs to entire roof of the mechanical penthouse bulkhead shall be made by the Condominium Board and the cost thereof shall be borne by all Unit Owners as a Common Expense, as provided in the By-Laws. The Condominium Board must obtain the consent of Unit Owners owning Units with aggregate Common Interests in excess of 75% of the Common Interests of all Units and a Majority of the Mortgage Representatives (as defined in the By-Laws) prior to making any addition, alteration or improvement costing in excess of $100,000 in any fiscal year.

Prior to the issuance of a permanent certificate of occupancy for the Building following completion of the rehabilitation and construction as described in the Plan, no Unit Owner other than Sponsor and its designees shall make any alterations or improvements (by himself or with any of his contractors) to such Unit Owner's Unit, including without limitation, installation of any interior walls or partitions without the prior written consent of Sponsor.

The By-Laws provide, among other things, that each Unit and all portions of the Common Elements shall be kept in first class condition. If any Unit Owner fails to keep his Unit in such condition, the Board may, at the expense of such Unit Owner, enter such Unit and perform such acts as are necessary to cure such default (see the heading "Rights of Access" below in this section).

The Property is located in the Tribeca East Historic District by Landmark Designation Notice recorded in Reel 1962, page 250 in the Office of the New York County Register. The Property is accordingly subject to the restricted use as provided in the New

York City Charter, Chapter 8-a. This designation imposes special restrictions upon the construction, alteration, demolition, or reconstruction as such activities affect the external structure of the Building. In the event any external alteration of the Building is needed or desired, the Condominium must apply to the Landmarks Preservation Commission for permission to make such alteration. The Commission, before approving said work, may impose certain conditions and/or standards, making the work more costly than it would otherwise be if the Building were not in an Historic Landmark District. Additionally, there may be added legal costs in connection with obtaining approval for such alteration. Landmark status should be viewed as a general limitation upon the alterations of the external structure.

If any maintenance of, replacement of, or repairs to the Property or any part thereof are necessitated by the negligence of any Unit Owner, his tenants or visitors or occupants of the Unit, then the entire cost thereof shall be borne by such Unit Owner.

## Additions, Alterations and Improvements by Unit Owners

Except as permitted in the Declaration or the By-Laws, no Residential Unit Owner shall make any structural addition, alteration or improvement in or to his Residential Unit, without the prior written consent thereto of the Board, which consent shall not be unreasonably withheld. Non-structural interior additions, alterations, or improvements, by a Residential Unit Owner to his Residential Unit, may be made without the consent of the Board but subject to the Declaration and By-Laws. The Board shall have the obligation to answer any written request by a Residential Unit Owner for approval of a proposed structural addition, alteration or improvement in such Residential Unit Owner's Residential Unit within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board to the proposed addition, alteration or improvement. Any application to any governmental authority for a permit to make an addition, alteration or improvement in or to any Residential Unit permitted hereunder shall be executed by the Board, without, however, incurring any liability on the part of the Board to any contractor, subcontractor or materialman on account of such addition, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom.

A penthouse on the roof forms a part of Unit 17. The owner of Unit 17 is not being offered any special right to erect any additional structure on the roof. Should such Unit Owner wish to construct any structure on the roof it will be required to comply with the Condominium By-Laws, the requirements of the Condominium Board (which may govern, inter alia, times during which work is permitted, the manner in which debris will be handled, measures that must be taken in connection with the security of the Building and to minimize interruption of services, and insurance that may be required) and all applicable laws and regulations with regard thereto and obtain all required permits therefor. In this regard, it is noted that the Building is situated in a historic district and the approval of the Landmarks Preservation Commission must be obtained prior to commencement of any such construction. Sponsor makes no representation that such approval can or will be

93

obtained. Further, Sponsor makes no representation that any additional enclosures can be built "as of right," i.e., without a variance, or that any variance, if required can or will be obtained or whether the Condominium Board will support or oppose any application for a variance.

There are no limitations or restrictions on the right of a Commercial Unit Owner to decorate, alter or otherwise improve the Commercial Units and any Limited Common Elements appurtenant thereto, other than the requirement that the Commercial Unit Owner comply with law and the applicable provisions of the Declaration and By-Laws. Either Sponsor or the owner of any Commercial Unit shall have the right to construct, operate and maintain an elevator in the Common Elements from the cellar level to the sub-cellar level in the area adjacent to the trash holding room. Any such elevator, if so installed, shall become a General Common Element. The owner of Commercial Unit C shall have the exclusive right, without obtaining the consent of the Board and shall have all necessary or convenient access to install, erect, construct, inspect, operate, use, maintain, repair and replace or alter antennas, cellular telephone, telecommunications and similar equipment on any and all parts of the portion of the roof of mechanical penthouse bulkhead comprising a Limited Common Element appurtenant to such Unit and, shall have an easement through the Common Elements to install, erect, construct, inspect, operate, use, maintain, repair and replace or alter such wires, conduits, cables and similar equipment servicing or otherwise required or convenient in connection with the installation, existence, servicing, maintenance, repair and/or replacement of any such antennas, cellular communications, telecommunications or similar equipment (collectively, "Telecommunications Rights"). The owner of Commercial Unit C shall be entitled to collect and retain all revenues derived from such equipment. The owner of Commercial Unit C shall have the right to grant to any party (whether or not a Unit Owner) the foregoing telecommunications rights, whether on an exclusive or non-exclusive basis, as the owner of Commercial Unit C may elect and such grantee(s) (and their successors and assigns) may, in turn, assign such Telecommunications Rights. The Telecommunications Rights described above are in addition to any telecommunications systems serving the Unit Owners. All Telecommunications Rights granted to the owner of Commercial Unit C and Sponsor shall have priority over any similar rights installations that may be made by the Condominium Board. In no event shall the Condominium Board approve the installation of any telecommunications equipment of the type described herein, in any location in which the owner of Commercial Unit C or Sponsor has permitted such equipment to be installed or in any location that would interfere with such equipment or the installation of such equipment.

## Insurance

The insurance coverage to be provided by the Board for the benefit of each Unit Owner, and a Unit Owner's right to obtain supplemental or additional insurance, is set forth under the "Insurance" heading in the "Rights and Obligations of Board of Managers; Summary of By-Laws" section.

Rights of Access

As more fully set forth in the By-Laws, the Board and any managing agents, managers, superintendents, of any, and other persons authorized by the Board will have a right of access to any Unit for the purposes, among others, of making inspections of, or removing violations of governmental laws or regulations against, any part of the Property, curing defaults under the Declaration and By-Laws and the Rules and Regulations thereunder, or correcting any conditions originating in any Unit and threatening another Unit or any Common Element. The Sponsor, and its designees owning Units and each Commercial Unit Owner, shall also have a right of access to each Unit, the Common Elements or elsewhere on the Property in order to inspect, maintain, repair, replace or alter their Units or the Common Elements (including the Limited Common Elements) as provided in the Declaration and the By-Laws. The Condominium Board and its employees shall have such access to each trash room as may be required in connection with the removal of trash. No Unit Owner may impede such access.

Compliance with Terms of Declaration. By-Laws and Rules and Regulations

Each Unit Owner must strictly comply with the provisions of the Declaration and the By-Laws and the Rules and Regulations thereunder. Failure to comply is grounds for an action for damages or injunctive relief, or both. The By-Laws, together with the Rules and Regulations thereunder, will be recorded with the Declaration in the Office of the City Register, New York County.

Units Owned by Commercial Unit Owner. Sponsor or its Designees

Except to the extent prohibited by law, and subject to certain restrictions set forth in the Declaration including compliance with all applicable laws and governmental regulations, if any, Sponsor and its designees owning Units and the Commercial Unit Owner will have the right, without the vote or consent of the Board or the other Unit Owners to: (a) make decorations, alterations (including, without limitation, demolition), additions or improvements, whether structural or nonstructural, interior or exterior, ordinary or extraordinary, of any type or nature whatsoever, in, to, and upon (i) its Unit or the Common Elements; (ii) any utilities servicing such Unit whether located within the Unit or the Common Elements; (b) change the layout and number of rooms of any of its Unit from time to time; (c) change the size and/or number of Commercial Units or subdivide the same into any desired number of condominium units (or by combining any Units resulting from such subdivision); (d) combine any of its Units, and any other Units with the consent of the Owners of the Units to be combined; (e) create and designate a Limited Common Element for the exclusive use of the newly created condominium units, and convert space or constituents of its Unit into a newly designated Limited Common Element and/or convert and designate a Limited Common Element as a part of the newly created condominium units; (f) reapportion among the newly created condominium units resulting from any such subdivision (or combination) their appurtenant Common Interests; (g) in the case of a Commercial Unit, construct, install, maintain, repair, replace or alter a storefront, facade or other exterior portion of such Unit; (h) dedicate certain utility, sewer, and drainage

easements; (i) amend the Certificate of Occupancy for the Building or obtain a new Certificate of Occupancy for the Building; and (j) amend (and cause the Board to amend) the Declaration and/or By-Laws in order to effectuate any of the foregoing.

The consent of the Board and/or the other Unit Owners is not required for the exercise by the Commercial Unit Owner, Sponsor or its designees of the rights and powers described above (including the right to install cellular or telecommunications or similar equipment). Nonetheless, a Commercial Unit Owner or the Sponsor or its designees may require that the Board and other Unit Owners execute any amendment to the Declaration or By-Laws proposed by such Commercial Unit Owner, Sponsor or its designees as provided above and any other application or other document necessary or convenient to the exercise by the such Commercial Unit Owner, or the Sponsor or its designees of any of its rights or powers described above (including, without limitation, any application or document required by the Department of Buildings and/or the Real Property Assessment Bureau of the City of New York in connection with an amendment to the certificate of occupancy of the Building or the establishment of separate tax lots for any newly created Units or reapportionment of assessed valuation by reason thereof). The Commercial Unit Owner and the Sponsor and its designees are granted an irrevocable power of attorney coupled with an interest to execute, deliver and/or record any such amendments, applications or other documents on behalf of the Board and the Unit Owners.

Under the Declaration, Sponsor and/or its designees have an easement, without the necessity of obtaining the consent of the Board of Managers and/or Unit Owners, over any part of the Property, including each Unit and the Common Elements, in order to inspect, maintain, repair, replace or alter its Units or the Common Elements as provided in the Declaration and the By-Laws.

Under the Declaration, Sponsor and/or its designees and each Commercial Unit Owner shall each have an easement without the necessity of obtaining the consent of the Board of Managers and/or Unit Owners (i) over the Property, including each Unit and the Common Elements, for access to and to construct, install, erect, inspect, maintain, repair, operate, use and replace from time to time one or more Signs on the Property (including, without limitation on any Common Element, storefront, exterior facade, lobby or any other public portion of the Property) for the purposes of advertising the sale of Units and the leasing of the Units or of space in any of the Units or advertising any of the services and/or facilities of such Commercial Unit Owner or the services and/or facilities of any tenant occupying such owner's Commercial Unit; (ii) over the Property, including each Unit and the Common Elements for access to and to construct, install, erect, inspect, maintain, repair, operate, use and replace from time to time a storefront, facade or other exterior portion adjacent to such Commercial Unit; (iii) over any part of the Property, including each Unit and the Common Elements (including, without limitation, the stairways, walkways, elevators, vestibules and other public spaces within the Property) for purposes of access to and for all purposes in connection with the installation (whether on Common Elements or within its Unit), inspection, maintenance, repair, operation, improvement or use of any of the following serving a Commercial Unit: the Service Equipment, flues and/or ducts, security system (including, without limitation, alarms, gates, electric eyes or video

cameras), smokestacks, air-conditioning systems and devices and exhaust and ventilation fans, systems and devices, in each case, located anywhere on the Property. Notwithstanding the above for so long as Sponsor owns any Unsold Units, the Commercial Unit Owner may only install such Signs on the exterior of the Building as shall be approved, in writing, by the Sponsor or its designee, and in no case shall a neon sign be installed on the exterior of the Building by the Commercial Unit Owner without the prior written approval of the Sponsor or its designee.

If a Commercial Unit has an entrance or exit leading to the lobby or any interior portion of the Building, and such entrance or exit is locked by the Board of Managers, then the Commercial Unit Owner with respect to such Unit may install an intercom and buzzer-lock system (or alternate system with a similar purpose) to allow persons to pass through such entrance or exit. Notwithstanding the foregoing, while the owner of Commercial Unit A shall be entitled to access such Unit from the lobby, patrons of such Unit will not be entitled to access such Unit from the lobby except (a) if required for handicapped patrons, (b) if required by law or (c) in the event of an emergency. The Commercial Unit Owner shall have the right (i) to erect and maintain a secondary means of ingress and egress through the Common Elements or any public portion of the Building for fire, emergency or such other purposes as may be required by law and (ii) to use the sidewalks adjacent to its Unit, including for the placement of Signs, advertising retail space or other commercial space, operation of a sidewalk cafe and the installation and maintenance of deposit boxes for any banks. The signatures of other Unit Owners and/or the Board of Managers shall not be required in connection with any application or other document necessary or convenient to the exercise by the Commercial Unit Owner of its right to use such sidewalks as provided above. Nevertheless, the Unit Owners and the Board of Managers shall execute any such application or other document and they grant to the Commercial Unit Owner an irrevocable power of attorney coupled with an interest to execute and deliver any such application or other document and the execution and delivery thereof shall not require the consent of the Board of Managers and/or the other Unit Owners. If the Commercial Unit Owner makes use of any sidewalk or submits any application or document pursuant to the preceding two sentences it shall indemnify and hold the Board of Managers, the Sponsor and all other Unit Owners harmless from and against any claim, liability, loss, cost, damage and expense (including reasonable attorneys' fees and expenses) arising out of or in connection with such use and/or such application or document, as the case may be.

In addition to the rights granted to Commercial Unit C described above, the Sponsor and its designees shall have an easement, without the necessity of obtaining the consent of the Board of Managers or the Unit Owners, over the Property (including, without limitation, the Units and the Common Elements to (i) install, erect, construct, inspect, operate, use, maintain, repair and replace or alter any antennas, cellular communications, telecommunications, and similar equipment (whether or not serving a Unit owned by Sponsor and/or its designees) in such locations as Sponsor shall determine (other than in any space designated as a Limited Common Element) and (ii) and to collect any and all income derived from such facilities (such easement and all appurtenant rights as described above, collectively, the "Sponsor's Telecommunication Rights "). Sponsor shall have the

97

right to grant to any party (whether or not a Unit Owner) the Sponsor's Telecommunication Rights, whether on an exclusive or non-exclusive basis, as Sponsor may elect and such grantee(s) (and their successors and assigns) may, in turn, assign their Sponsor's Telecommunication Rights on an exclusive or non-exclusive basis, as they may determine.

The Sponsor or its designees shall have the right to maintain a general or sales office in any Unit owned by any of them and to use any Unit owned by any of them as a model and for other promotional purposes in connection with the sale or lease of Units in the Condominium.

The Sponsor or its designees shall also have the right to apply for tax exemption and/or tax abatement with respect to the Property and/or with respect to any of the Units without the consent of the Board and/or Unit Owners.

## Rights and Obligations of Board of Managers; Summary of By-Laws

The Condominium is an unincorporated association which is created by virtue of submission of the Property to the provisions of the Condominium Act in accordance with the Declaration and By-Laws set forth in Part II of the Plan. Summarized below are certain provisions of the By-Laws, including certain of the provisions relating to governance of the Condominium. A Purchaser should review in detail the full text of the Declaration, By-Laws, and Rules and Regulations thereunder which are set forth in Part II of the Plan.

The Board initially shall be comprised of three members selected by and affiliated with Sponsor. Following the first meeting of Unit Owners, the Board will consist of five (5) members, one of whom will be selected by the Commercial Unit Owner and four of whom will be selected by all Residential Unit Owners (including Sponsor). The Board has no authority to remove any of its members, but the Board may, by the affirmative vote of a majority of its members, remove any officer, either with or without cause.

Any member of the Board may be removed with or without cause by a Majority in Common Interest of the Unit Owners electing any such member pursuant to the By-Laws, except that if any member of the Board was elected by or is a designee of a Commercial Unit Owner, the Sponsor or any of its designees, as the case may be, such member may not be removed for other than cause except by the written consent of the such Commercial Unit Owner, Sponsor or its designees, as the case may be, however, such member may be removed for cause by a Majority in Common Interests of all Unit Owners (inclusive of the Unit Owner(s) electing such member) following notice and an opportunity to be heard.

### Powers and Duties of Board

Subject to applicable laws and the By-Laws, the powers and duties of the Board include, without limitation, (a) the operation and maintenance of the Common Elements, and employment of personnel for such purpose, (b) determination and collection of the Common Charges, (c) amending the Rules and Regulations, (d) having bank accounts and

investing funds for the Condominium, (e) acquiring, selling, leasing, and mortgaging Units, (f) insuring the Property, adjusting claims, and repairing the Common Elements after a casualty or condemnation, (g) enforcing obligations of Unit Owners, (h) borrowing money on behalf of the Condominium, (i) granting certain utilities and other easements, and (j) representing all Unit Owners in connection with a protest of real estate taxes.

The potential personal liability of the Board is discussed under the heading "Liability of Board, Officers, and Unit Owners" which appears later in this section.

## Voting by Unit Owners

At each Unit Owner's meeting, each Unit Owner will be entitled to cast one (1) vote at all meetings of the Unit Owners for each one ten thousandth of one percent (.0001%) of Common Interest applicable to his or its Unit.

Except as provided in the section of the Plan entitled "**Control By Sponsor**," each Unit Owner in the Condominium, including the Sponsor and any of its designees owning Units, will be entitled to vote for members of the Board based on their percentage Common Interest. Subject to the right of the Commercial Unit Owner to elect one member of the Condominium Board and the Residential Unit Owners to elect four members of the Condominium Board. Each Unit Owner may cast the number of votes allocated to his Unit for each Member of the Board to be elected, however, Unit Owners may not cumulate their votes.

The vote of a Majority in Common Interest of Unit Owners present in person or by proxy at a meeting at which a quorum shall be present shall be binding upon all Unit Owners for all purposes except as provided above with respect to the election of the members of the Board and as otherwise provided in the Declaration or the By-Laws.

## Meetings of Unit Owners

After the first meeting of the Unit Owners described above (see "**Control by Sponsor**"), the By-Laws provide that annual meetings shall be held on the second Tuesday of November of each succeeding year unless such day shall be a holiday, in which event the meeting shall be held on the next succeeding business day. At such meeting, the Unit Owners shall elect members of the Board and shall also transact such other business of the Condominium as may properly come before the meeting.

It shall be the duty of the President of the Condominium to call a special meeting of the Unit Owners if so directed by resolution of the Board or upon a petition signed and presented to the Secretary of the Condominium by not less than 5% in Common Interest of all the Unit Owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. The By-Laws provide that no business shall be transacted at a special meeting except as stated in the notice.

## Officers

The principal officers of the Condominium shall be a President, Vice President, Secretary and Treasurer, all of whom shall be elected by the Board. The Board may appoint additional officers. No officer of the Condominium shall, except as may otherwise be provided by the Board from time to time, receive any compensation for acting as an officer of the Condominium.

The President shall be the chief executive officer of the Condominium, and shall have all of the general powers and duties which are incident to the office of President, including presiding at meetings and appointing committees. The President must be a member of the Board. The Vice President performs the duties of the President when he is absent or unable to act. The Secretary keeps the minutes and gives notice of meetings. The Treasurer keeps financial records and deposits funds for the Condominium.

### Repairs and Replacement of Common Elements and Limited Common Elements

The repair, replacement, and maintenance of the Common Elements (and any Residential Common Elements and Limited Common Elements) is discussed under the heading "Repairs to and Maintenance of Units, Limited Common Elements and Common Elements" in **"Rights and Obligations of Unit Owners and Board of Managers; Summary of By-Laws"** above.

### Units Acquired By the Board

All Units acquired or leased by the Board or its designee, shall be held by such Board or its designee, on behalf of all Unit Owners and the rent or purchase price, closing costs and adjustments payable in connection therewith shall constitute a Common Expense. No Units held by the Board shall carry any voting rights.

### Repair or Reconstruction after Fire or Other Casualty

If the Building or any part thereof is damaged or destroyed by fire or other casualty, the Board will, except as set forth below, arrange for the prompt repair and restoration thereof (but excluding machinery, appliances, fixtures, furniture, furnishings or other personal property within a Unit) . If the insurance proceeds are insufficient to cover the cost of repairs or restorations, then such cost shall constitute a Common Expense. Any surplus insurance proceeds shall be paid to all Unit Owners in proportion to their respective Common Interests, except that no payment shall be made to a Unit Owner until there has first been paid, out of his share of such funds, such amounts as may be necessary to reduce unpaid liens on his Unit, in the order of priority of such liens.

If three-fourths or more of the Building is destroyed or substantially damaged and if seventy-five (75%) percent or more in Common Interest of all Unit Owners do not duly resolve within sixty (60) days from the day of such damage or destruction to proceed with the repair or restoration thereof, then the Building will not be repaired and shall be subject

to an action for partition instituted by any Unit Owner or lienor, as if owned in common. In that case the net proceeds of sale, together with the net proceeds of insurance policies, shall be divided among all Unit Owners in proportion to their respective Common Interests, provided, however, that no payment shall be made to a Unit Owner until there has first been paid, out of his share of such funds, such amounts as may be necessary to discharge all unpaid liens on his Unit in the order of the priority of such liens.

Notwithstanding anything contained herein to the contrary, the proceeds of all policies of physical damage insurance maintained by the Board shall be payable as hereinabove provided in the event of a loss amounting to $100,000.00 or less. However if such proceeds are in excess of $100,000.00, then such proceeds shall be payable to and held by the Insurance Trustee pursuant to the provisions of the By-Laws. Lehman Brothers Holdings Inc. (the "Construction Lender") or its successors, assigns or designee, shall, at its option, be the Insurance Trustee for so long it holds any lien on the Property or any Unit. The fees and expenses of the Insurance Trustee shall be paid by the Board and shall constitute a Common Expense.

Insurance

The Board is required to obtain and maintain, to the extent obtainable at reasonable rates and to the extent determined by the Board to be appropriate, the following insurance: (a) fire insurance with all risk extended coverage, and vandalism and malicious mischief endorsements, insuring the Building (but excluding machinery, appliances, fixtures, furniture, furnishings or other personal property within a Unit), together with all service machinery contained therein and covering the interests of the Condominium, the Board and all Unit Owners as additional insured parties, and their mortgagees, all, as their respective interests may appear, in an amount equal to at least 80% of the full replacement value of the Building (exclusive of foundation and footings), without deduction for depreciation; (b) worker's compensation and New York State disability benefits insurance; (c) water damage insurance to the extent, if any, determined by the Board; (d) fidelity bond for the Managing Agent of the Condominium, to the extent, if any, determined by the Board; (e) errors and omissions coverage for members of the Board and officers, to the extent, if any, determined by the Board; (f) comprehensive general liability insurance and (g) such other insurance (including, without limitation, rent insurance, boiler and machinery insurance, elevator liability insurance and plate glass coverage, which are not included in Schedule B) as the Board may determine from time to time.

The amount of fire insurance and all risk extended coverage to be maintained until the first meeting of the Board following the first annual meeting of the Unit Owners shall be in at least the sum set forth in "Footnotes to Schedule B." Purchasers should refer to the "Footnotes to Schedule B" to determine the extent of insurance coverage and the cost thereof for the first year of condominium operation.

All policies of physical damage insurance shall contain, to the extent obtainable at reasonable rates, waivers of subrogation and waivers of any defense based on co-insurance or other insurance or of invalidity arising from any acts of the insured and of pro

rata reduction of liability, and shall provide that such policies may not be canceled or substantially modified without at least ten days' prior written notice to all of the insureds, including all Unit Owners, each of whom shall be an additional insured party and their mortgagees. Duplicate originals or certificates of insurance for all policies of physical damage insurance and of all renewals thereof, together with proof of payment of premiums, shall be delivered to all Unit Owners and their mortgagees at least ten days prior to the expiration of the then current policies. Each such policy shall contain a New York standard mortgagee clause in favor of each mortgagee of a Unit which shall provide that the loss, if any, thereunder shall be payable to the mortgagee as its interest may appear, subject, however, to the loss payment provisions in favor of the Board and the Insurance Trustee hereinafter set forth. Any insurance maintained by the Board may contain such deductible amounts as the Board may determine from time to time.

The premiums for all insurance referred to above shall be a Common Expense unless the Board determines to otherwise equitably apportion the cost of insurance among the Unit Owners as provided in the By-Laws.

Each Unit Owner may carry supplemental or additional insurance for his own benefit, provided that all such policies shall contain waivers of subrogation, and further provided that the liability of the carriers issuing insurance obtained by the Board shall not be affected or diminished by reason of any such supplemental or additional insurance carried by such Unit Owner.

Liability of Board. Officers, and Unit Owners

To the extent permitted by applicable law, no member of the Board or any managing agent, manager, or officer shall have any personal liability with respect to 1) any contract, act or omission of the Board or any managing agent, manager, or officer in connection with the affairs or operations of the Condominium (except in their capacities as Unit Owners), or 2) any mistake of judgment, negligence, or otherwise, except in either case, for their own willful misconduct or bad faith. The By-Laws require that every contract made by the Board or by any managing agent thereof or any officer shall state that (a) it is made only as agent for all Unit Owners and such Board or managing agent or officer shall have no personal liability thereon (except in their capacities as Unit Owners) and (b) the liability of any Unit Owner with respect to such contract shall be limited to (i) such proportionate share of the total liability as the Common Interests of all Units owned by such Unit Owner bears to the aggregate Common Interests of all Units, and (ii) unless provided by the Board in its sole and absolute discretion, such Unit Owner's interest in his Unit and its appurtenant Common Interest. A Unit Owner shall, in the same proportion as his Common Interest, indemnify each member of the Board and each officer against any and all claims, liabilities, damages, costs and expenses (including, without limitation, reasonable attorney's fees) arising out of or related to the performance of such duties as a member of the Board or officer, except those arising out of his own bad faith or willful misconduct, and except as may be provided by law. The Board may contract, or effect any other transaction, on competitive terms, with any member of the Board, any officer, any Unit Owner, Sponsor or its designee, or any

102

affiliate of any of them without incurring any liability for self-dealing, except in cases of bad faith or willful misconduct, and except as may be provided by law.

## Reports. Notice, Books and Records

An annual report of the receipts and expenditures of the Condominium, certified by an independent certified public accountant, shall be submitted by the Board to all Unit Owners within four months after the end of each fiscal year.

Except for the first meeting of Unit Owners after the Closing Date under the Plan, there is no notice required for annual meetings. Instead the By-Laws provide that the annual meeting is to be held on the second Tuesday of November each year, unless such day shall be a holiday, in which event the meeting shall be held on the next succeeding business day.

In accordance with the provisions of the By-Laws, the Board shall furnish the Unit Owners, at least ten (10) days prior to adoption thereof, the proposed annual budget for the Condominium.

Each Unit Owner and each mortgagee of a Unit shall be permitted to examine the books of account of the Condominium at reasonable times, on business days, but not more than once a month.

## Amendments to Condominium Documents

Generally, subject to certain exceptions including, among others, exceptions concerning the Commercial Unit Owner, the Sponsor and its designees, any provisions of the Declaration, By-Laws, or Rules and Regulations may be amended, modified, added to or deleted by affirmative vote of not less than eighty (80%) percent in number and in Common Interest of all Unit Owners. A Majority in Common Interest of the Unit Owners may overrule the Board's amendment of the Rules and Regulations. Notwithstanding the foregoing, no amendment, modification, deletion or addition to the Declaration, By-Laws or Rules and Regulations shall be binding on a Permitted Mortgagee without the prior written consent of a "Majority of the Mortgage Representatives" (as such term is defined in Article VI, Section 15 the By-Laws) and no such amendment, modification, addition or deletion shall be binding on the Construction Lender without its prior written consent for so long as it has a lien on any Unit.

It is possible that amendments, modifications, additions or deletions of or to the Declaration, the By-Laws and the Rules and Regulations, may be necessary, appropriate or desirable in connection with the subdivision or combination of Units owned by Commercial Unit Owner(s) or the Sponsor or its designees and/or the offering for sale or lease of all or any portion of Units owned by (or the exercise of certain rights under the Declaration held by) the Commercial Unit Owner(s), the Sponsor or its designees, and in connection therewith the Commercial Unit Owner(s), the Sponsor or its designees, as the case may be, may, subject to compliance with all applicable laws and governmental

103

regulations, if any, cause the Declaration, the By-Laws and the Rules and Regulations to be so amended, modified, added to or deleted in accordance with the provisions of the Declaration and By-Laws.

## Termination of Condominium

The Condominium shall continue (unless terminated by casualty loss, condemnation or eminent domain as provided in the By-Laws) until such time as the Property shall be withdrawn from the provisions of the New York Condominium Act as a result of the vote to do so of at least eighty (80%) percent in number and in Common Interest of all Unit Owners and all of the holders of mortgages of record affecting the Units. In the event of withdrawal, the Property shall be subject to an action for partition by any Unit Owner or any lienor as if owned in common, in which event the net proceeds of the sale shall be divided among all Unit Owners in proportion to their respective Common Interests after first applying the share of the net proceeds of such sale, otherwise payable to any Unit Owner, to the payment of any liens on his Unit, in the order of such priority of such liens. Until the termination of the Condominium, no Unit Owner shall maintain an action for partition of the Property or the Common Elements.

## Right of First Refusal by Board

The right of first refusal of the Board with respect to the sale or lease of a Residential Unit, if any, is discussed under the heading "Sales and Leases of Units" in **"Rights and Obligations of Unit Owners and Board of Managers; Summary of By-Laws"** and set forth in the By-Laws in Part II of the Plan.

## Review of Real Estate Tax Assessments

The Board may act as an agent of each Unit owner who has given his written authorization to complain or apply to the local and county real estate tax assessment agency or board of review by filing a single complaint on behalf of all such Unit Owners pursuant to the applicable sections of the Real Property Tax Law. The Board may retain legal counsel on behalf of all Unit Owners for which it is acting as agent and assess as a Common Charge against all such Unit Owners a pro rata share of expenses, disbursements, and legal fees paid or incurred in connection with any such complaint or application.

## Reserves

The Board has the right to assess Common Charges for such reserves as the Board may determine to be reasonably necessary for general operating costs and expenses, working capital and/or replacement and improvement of Common Elements.

## Real Property Law Section 339-kk.

Under Real Property Law Section 339-kk ("Section 339-kk"), if the owner of a Residential Unit is a non-occupying owner who rents his Residential Unit to a rental tenant and then fails to make payments due for common charges, special assessments or late fees (collectively "Condominium Charges") for such Unit within sixty (60) days of the expiration of any grace period after they are due, upon notice in accordance with the following paragraph, all rental payments from the tenant shall be directly payable to the Condominium.

If the common charges, special assessments or late fees due for any Residential Unit have not been paid in full, within sixty (60) days after the expiration of any grace period of the earliest due date, the Board shall provide written notice to the tenant and the non-occupying owner providing that, commencing immediately and until such time as all payments for common charges, special assessments or late fees are made current, all rental payments due subsequent to the issuance of such notice are to be made payable to the Condominium Board at the address listed on the notice.

Where a majority of the Board has been elected by and from among the Unit Owners who are in occupancy, the Board may elect not to require that rental payments be made payable to the Board. At such time as payments for common charges, special assessments, and late fees from the non-occupying owner are once again current, notice of such fact shall be given within three (3) business days to the rental tenant and non-occupying owner. Thereafter, all rental payments shall be made payable to the non-occupying owner or a designated agent. A non-occupying owner who disputes the Board's claim to rental payments pursuant to Section 339-kk shall be entitled to present facts supporting such owner's position at the next scheduled meeting of the Board, which must be held within thirty (30) days of the date that such Board receives notice that such owner seeks to dispute such claim.

Nothing in Section 339-kk shall limit any right of Unit Owners or of the Condominium Board existing under any other law or agreement.

Payment by a rental tenant to the Condominium made in connection with Section 339-kk shall relieve that rental tenant from the obligation to pay such rent to the non-occupying owner and shall be an absolute defense in any non-payment proceeding commenced by such non-occupying owner against such tenant for such rent.

Declaration and By-Laws

A copy of the Declaration and By-Laws is set forth in Part II of the Plan.

## INCOME TAX DEDUCTIONS TO UNIT OWNERS
## AND TAX STATUS OF CONDOMINIUM

### Income Tax Deductions to Unit Owners

Ownership of a Unit entitles the owner, subject to certain restrictions described below, to deduct for federal, New York State, and in the case of New York City residents, New York City, income tax purposes, real estate taxes assessed against the Unit and paid by such owner and interest on certain mortgages made against the Unit. Generally, an individual Unit Owner may only deduct interest on debt incurred to acquire his principal residence or a designated secondary residence subject to certain limitations. See **"Counsel's Tax Opinion"**.

### Tax Status of the Condominium

Ordinarily, a condominium board may elect to be exempt from federal income taxes on Common Charges collected from Unit Owners under Section 528 of the Internal Revenue Code, provided certain prerequisites are met.

In order to elect such status,

(a)     the Condominium must be organized and operated to provide for the acquisition, construction, management, maintenance and care of the Property;

(b)     60% or more of the gross income of the Condominium for the taxable year must consist solely of amounts received as membership dues, fees or assessments from owners of Units in the Condominium;

(c)     90% or more of the net expenditures of the Condominium for the taxable year must be for the acquisition, construction, management, maintenance and care of the Property;

(d)     no part of the net earnings of the Condominium may inure (other than by acquiring, constructing or providing management, maintenance and care of the Property and other than by a rebate of excess membership dues, fees, or assessments) to the benefit of any private shareholder or individual;

(e)     substantially all of the Units must be used by individuals as residences; and

(f)     the Condominium must make such election at such time in such manner as the Secretary of the Treasury prescribes by regulations.

While it is anticipated that at least 85% of the Building's total square footage will be used for residential purposes no warranty or guaranty is made to such effect. No provision has been made  for income taxes payable by the Condominium in the projected budget for the first year of condominium operation. See **"Opinion of Counsel"** and **"Budget for First**

106

**Year of Condominium Operation, Schedule B**." Accordingly, the Condominium may be subject to income taxes on the excess of the Common Charges and investment income over the expenses of operating the Condominium (See "**Opinion of Counsel**").

It should be noted that the Condominium would, if permitted to make an election under Section 528 of the Code, still be required to pay a tax for any taxable income it may receive. For this purpose, "taxable income" is defined as the excess, if any, of (a) the gross income for the taxable year (other than "exempt function income" as defined below) over (b) the deductions allowed by the Code which are directly connected with the production of such gross income (excluding "exempt function income") computed with certain modifications provided in Section 528. "Exempt function income" is defined as any amount received as membership dues, fees or assessments from owners of condominium housing units.

If an election under Section 528 is not available, the tax status of the Board will be governed by the rules in effect prior to the enactment of Section 528 under which the tax status of the Condominium is uncertain.

Because the By-Laws provide that the Board will act as agent of the Unit Owners, the Board may take the position that it simply acts as agent for the Unit Owners and is not a separate taxable entity. In such a case, the Unit Owners would include in their gross income, and be taxed on, income derived by the Board. This income may include interest earned from investments on the amounts which are assessed and collected from the Unit Owners, or rental income.

However, the Internal Revenue Service may contend that for purposes of those matters administered through the Board, such as assessment and expenditure of Common Charges, the Board constitutes an association separately taxable as a corporation. In that event, the Condominium may be deemed to be subject to federal corporate income tax on the amount, if any, by which Common Charges (together with any income earned from other sources, such as interim investments of funds by such association) exceed the current expenses paid or incurred by the Condominium as are deductible for federal income tax purposes. The Condominium may likewise be subject to the New York State corporation franchise tax and the New York City general corporation tax. For a further discussion of the tax status of the Condominium, see "**Counsel's Tax Opinion**".

## REAL ESTATE TAXES

Please see Footnotes 5 to Schedule A for the estimated real estate taxes for the Units for the first year of Condominium operation and related disclosure.

The By-Laws provide that the Board of Managers has the power to act as an agent of each Unit Owner who has given his written authorization to complain or apply to the local and county real estate tax assessment agency or board of review by filing a single

107

complaint on behalf of all such Unit Owners pursuant to the applicable sections of the Real Property Tax Law. The Board of Managers may retain legal counsel on behalf of all Unit Owners for which it is acting as agent and assess as a Common Charge against all such Unit Owners a pro rata share of expenses, disbursements, and legal fees paid or incurred in connection with any such complaint or application.

Sponsor reserves the right both (i) to prosecute any tax certiorari proceedings challenging the assessed valuation of the Property, in the tax year in which the Closing Date takes place, and any preceding tax year, in its own name and/or the name of the Condominium, the Board or the Unit Owners by attorneys selected by Sponsor and (ii) to settle any such proceedings in its sole discretion and without the consent of the Board or the Unit Owners. After deducting the cost of such proceedings including, without limitation, attorney's fees, all benefits obtained, including, without limitation, any tax refunds, attributable to either: (x) any tax year ended prior to the Closing Date, shall be paid to the Sponsor, or (y) any tax year commencing after the Closing Date, may be retained by the Condominium or the appropriate Unit Owners as the case may be, or (z) the tax year in which the Closing Date occurs shall be apportioned between the Sponsor and the Condominium as of the Closing Date.