**B-4**

## EXHIBIT A TO PURCHASE AGREEMENT

## FORM OF INSPECTION STATEMENT

Date: _____

_____

_____

_____

Re:  Unit____ at 90 Franklin Street, New York, New York

Gentlemen:

As a result of my/or final inspection, please be advised that except as otherwise noted I/we found the following items in good condition:

| Number | Items | Initials | Exception if any |
|---|---|---|---|
| 1 | Walls | | |
| 2 | Floors | | |
| 3 | Ceilings | | |
| 4 | Windows | | |
| 5 | Doors | | |
| 6 | Electric, plumbing and heating fixtures | | |
| 7 | Painted surfaces | | |
| 8 | Sinks, tubs, bowls | | |
| 9 | Kitchen cabinets and counter tops | | |
| 10 | Vanity tops and base cabinets | | |
| 11 | Medicine cabinets | | |
| 12 | Hardware | | |
| 13 | Kitchen Appliances | | |

I/we understand that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets and vanity knobs may be installed just prior to my/our date of moving in.  I/we agree and I/we will sign off each item requiring adjustment or repairs as it is completed.

_____
Purchaser's Signature

_____     _____
Seller's Representative          Purchaser's Signature

## EXHIBIT B TO PURCHASE AGREEMENT

LIMITED WARRANTY

RIDER TO PURCHASE AGREEMENT DATED _____, 19__ BY AND BETWEEN CORN ASSOCIATES LLC, 316/318 FULTON STREET, HEMPSTEAD, NEW YORK 11550, AS SELLER, AND _____, AS PURCHASER

## LIMITED WARRANTY

NAME OF PURCHASER(S):              _____

ADDRESS OF PURCHASER(S):          _____
                                   _____

                                   To the exclusion of all future owners

DESIGNATION OF UNIT
WARRANTED:                         _____ (sometimes
                                   referred herein as the "Unit" or the "Home")
                                   90 Franklin Street, New York, New York

NAME OF SELLER(S):                 Corn Associates LLC
ADDRESS OF SELLER(S):              316/318 Fulton Avenue
                                   Hempstead, New York 11550

EFFECTIVE DATE OF THIS
LIMITED WARRANTY:                  The date that Purchaser or his(her) family shall first
                                   occupy the Unit warranted or the date of delivery of
                                   the deed to such Unit to Purchaser, whichever
                                   occurs first.

WARRANTOR'S LIMIT OF TOTAL
LIABILITY:                         The Lesser of (i) ten percent (10%) of the purchase
                                   price of the Unit set forth in the Purchase
                                   Agreement to which this Warranty is annexed as a
                                   rider and (ii) $10,000, less, in each case, any
                                   insurance proceeds received by Purchaser.

THIS LIMITED WARRANTY EXCLUDES AND PRECLUDES ALL CONSEQUENTIAL, INCIDENTAL, SPECIAL, AND INDIRECT DAMAGES EXCEPT AS REQUIRED BY NEW YORK STATE LAW.

THIS LIMITED WARRANTY IS IN LIEU OF AND REPLACES AND EXCLUDES ALL OTHER WARRANTIES ON THE CONSTRUCTION, RENOVATION, REHABILITATION AND SALE OF THE UNIT AND ITS COMPONENTS, BOTH EXPRESS AND IMPLIED (INCLUDING ANY

WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE FACE HEREOF. THE PURPOSE OF THIS LIMITED WARRANTY IS TO IDENTIFY THE SELLER'S RESPONSIBILITIES FOR CONSTRUCTION DEFECTS OF A LATENT OR HIDDEN NATURE THAT COULD NOT HAVE BEEN FOUND OR DISCLOSED ON FINAL INSPECTION OF THE HOME AND DO NOT INCLUDE ANY VISIBLE OR PATENT DEFECTS NOT INCLUDED ON THE INSPECTION STATEMENT OR PUNCH LIST SIGNED BY PURCHASER.

1.      To Whom Given. This Limited Warranty is given to the Purchaser named on page 1 while the Purchaser owns the Unit. IT DOES NOT EXTEND TO SUBSEQUENT OWNERS, TENANTS OR MORTGAGEES IN POSSESSION OF THE UNIT, ANY ONE WHO MAY SUCCEED TO THE RIGHTS OF PURCHASER BY SUBROGATION OR OTHERWISE (EXCEPT BY INHERITANCE) OR ANY OTHER PERSONS.

2.      By Whom Made. This Limited Warranty is made exclusively by the Seller whose name and address appear on page 1.

3.      Final Inspection of the Unit. Before the Purchaser moves into the Unit or accepts the deed, the Seller will schedule an appointment for final inspection of the Unit with the Purchaser. The purpose of this final inspection is to discover any defects of a visible, obvious or patent nature, or any other unfinished work.

All defects found on final inspection of the Unit will be itemized on a inspection sheet (hereinafter "Inspection Statement"), which will be signed by the Purchaser and delivered to Seller before occupancy of the Unit or delivery of the deed. Seller shall not be obligated to repair any defects noted on the Inspection Statement unless it is required to do so under the terms of the Condominium Offering Plan for the Building or as it may otherwise agree in writing.

4.      Warranty Coverages and Periods.

This Limited Warranty is for the period beginning on the Effective Date of this Warranty shown on page 1 of this Limited Warranty (the closing date with respect to the purchase of the Unit or the date that Purchaser or his (her) family shall first occupy the Unit, whichever occurs firsts and ending on that date which is the first anniversary of such date (the "Warranty Period").

For the Warranty Period, Seller warrants that the Unit will be free from latent defects that constitute:

A.      defective workmanship by the Seller, or an agent, employee or subcontractor of the Seller;

151

B.      defective materials furnished by the Seller, or an agent, employee or subcontractor of the Seller;

C.      defective design, provided by an architect, engineer, surveyor, or other design professional retained exclusively by the Seller; or

D.      defective installation of appliances sold as part of the Unit by the Seller or an agent, employee or subcontractor of the Seller.

Seller under this coverage is not responsible for any defects in any work or materials ordered directly by Purchaser from Seller's subcontractors or suppliers or other outside suppliers or subcontractors or for incidental or consequential damages resulting from such work or materials.

In all coverages under this Paragraph 4, workmanship, materials, design and installation will be considered to be defective if they fail to meet or exceed the relevant standards and specifications of the applicable building code of the municipality in which the Unit is located, in effect on, at Seller's option, either (a) the date the Building was originally built or (b) the date that the building permit for the renovation and rehabilitation of the Building was issued.

ALL TIME PERIODS FOR THESE COVERAGES ARE OF THE ESSENCE AND WILL NOT BE EXTENDED.

5.      Exclusions From All Coverages.   The following are not covered by this Warranty:

A.      patent defects including defects shown on the Final Inspection Sheet and defects which an examination of the Unit prior to the Effective Date of this Warranty ought to have revealed;

B.      raised butt joints; ridging, scuffing on kitchen cabinet or vanity surfaces; variations of wood stain or staining of kitchen cabinets or vanities; shading variations of exterior siding staining (on the face surface or grooves), and on facias from staining; doors and windows sticking because of weather, adjustment of bi-fold doors; chips, scratches, marks, breaks, or other blemishes in windows, sliding doors, screens, electric fixtures and globes, woodwork and doors; nail pops; dented appliances; broken screens; minor chips (nicks) to cultured marble floors and countertops; and nicks to enameled surfaces (i.e., tubs, tiles, etc.)

C.      defects in any work or materials ordered directly by Purchaser or other person from Seller's subcontractors or suppliers or other outside suppliers or subcontractors and for incidental or consequential damages resulting from such work or materials;

152

D.      damage cause by the failure by the Purchaser or anyone other than the Seller, its employees, agents or subcontractors to comply with the warranty requirements of manufacturers or suppliers of appliances, fixtures or items of equipment;

E.      loss or damage caused or worsened by the misuse, abuse, improper maintenance, negligence, improper operation or interference by Purchaser or anyone other than Seller or its employees, agents and subcontractors with the Seller's original construction or installations;

F.      additional damage caused by the failure of the Purchaser to give notice to the Seller of any defects or damage in a timely manner as provided in this warranty;

G.      damage cause by changes in grade made by anyone other than the Seller, its employees, agents or subcontractors and damage caused by changes in grade made by Seller's agents and subcontractors if such work was ordered directly by Purchaser;

H.      damage caused by changes, alterations or additions made to the Unit by anyone other than Seller or its employees, agents or subcontractors after the Effective Date of this Warranty;

I.      damage caused by changes, alterations or additions made to the Unit by Seller's agents and subcontractors if such work was ordered directly by Purchaser after the Effective Date of this Warranty;

J.      damage cause by dampness or condensation due to the failure of the Purchaser to maintain adequate ventilation;

K.      loss or damage by or resulting from circumstances beyond the control of Seller, including, without limitation, accidents, riot and civil commotion, fire, explosion, smoke, water escape, falling objects, aircraft, vehicles, acts of God, lightning, windstorm, hail, flood, mudslide, earthquake, volcanic eruption, wind-driven water, soil movement and changes in the underground water table and any other acts or events which are not directly caused by a defect for which the Seller is liable;

L.      loss or damage caused by seepage of water unless such loss or damage is the direct result of a construction defect;

M.      any damage which Purchaser has not taken timely action to minimize;

N.      normal wear and tear and normal deterioration;

O.      insect, vermin and/or rodent damage and infestation, or damage caused by other animals or pests;

153

P.     bodily injury, death, or damage to personal property;

Q.     costs of shelter, transportation, food, moving, storage or other expenses related to relocation during repair or replacement;

R.     consequential, incidental, special and indirect damages;

S.     any claim not filed in a manner set forth in Paragraph 7 of this Warranty;

T.     damage which arises while and/or due to the Unit being used in any manner for nonresidential purposes;

U.     damage due to abnormal loading on floors which exceeds design loads as mandated by the applicable building code or building standards.

V.     damage due to sewer back-ups or refusal of sewage to drain;

W.     any damage to the extent that it is caused or made worse by: changes in the grading of the ground by any one other than the Seller, its employees, agents or subcontractors;

X.     any damage caused by soil movement for which compensation is provided by legislation or which is covered by other insurance, including typical Unit Owners and rental policies;

Y.     failure of the Seller to complete construction of the Unit.

6.     What Seller Will do in the Event of a Defect Covered by This Warranty. If a defect occurs in an item covered by this warranty, the Seller will repair, replace, or pay the Purchaser the reasonable cost of repairing or replacing the defective item(s), within sixty (60) days after the Seller's inspection or testing discloses the problem, subject to weather conditions, acts of God, availability of materials, and other events beyond Seller's control. The choice among repair, replacement or payment is solely that of the Seller. In making any repairs or replacement, Seller shall have the right to select the method and materials to be used in performing such repairs or replacements.

Seller's liability under this warranty is limited to the actual cost of any repair or replacement and in the aggregate to the amount listed on page 1 of the Warranty.

Repair of damage to the load-bearing portions of the Unit will be limited to that which is necessary to restore their load-bearing function. Repair of other major structural defects will be limited to repair of those defects which made the Unit unsafe, unsanitary or otherwise unlivable.

7.    Step by Step Claims Procedures.

A.    Written notice of any warranty claim must be made on the attached "Notice of Warranty Claim Form" and must be received by the Seller no later than the first (1st) business day after the expiration of the applicable warranty period. Such notice must be sent by Purchaser to Seller by certified or express mail, return receipt requested. If this form shall not properly be completed and received by the Seller by that deadline, the Seller will have no duty to respond to any complaint or demand contained in such form, and any or all claims may be rejected. COMPLETION AND DELIVERY OF SUCH NOTICE OF WARRANTY CLAIM IN A TIMELY MANNER IS NECESSARY TO PROTECT THE RIGHTS OF THE PURCHASER UNDER THIS LIMITED WARRANTY.

B.    No steps taken by the Seller, Purchaser or any other person to inspect, test or correct defects will extend any time period under this Warranty. No steps taken by Seller in response to an improperly completed or untimely notice of a warranty claim will give rise to any liability of Seller to Purchaser in connection with such claim.

C.    In response to a Notice of Warranty Claim, or any other complaint or request of the Purchaser, the Seller and the Seller's agents will have the right to inspect and test the portion of the Unit to which the claim, complaint or request relates. The Purchaser and occupants of the Unit must provide reasonable access to the Seller and the Seller's Agent during normal business hours, Monday through Friday, to complete inspection, testing and repair or replacement. Failure by Purchaser to provide such access shall invalidate this warranty with respect to the defect(s) set forth on the Notice of Warranty Claim.

D.    The Seller will complete inspection of testing within a reasonable time under the circumstances after receipt of a timely and properly completed Notice of Warranty Claim Form. Upon completion of inspection and testing, the Seller will determine whether to accept or reject the claim. If the Seller rejects the claim, the Seller will give written notice of that decision to the Purchaser at the address shown on the Notice of Claim Form, and Seller shall further charge and be entitled to receive a service call fee for $100. If the Seller accepts the claim, the Seller will take corrective action within a reasonable time under the circumstances. The Seller will use good faith efforts to process and handle claims in a timely manner, but all time periods for repair or replacement of defects necessarily are subject to weather conditions, availability of materials, and other events beyond the Seller's control. When the Seller finishes repairing or replacing the defect or pays the reasonable cost of doing so, a full release of all legal obligations with respect to the defect must be signed and delivered to the Seller.

8.    Legal Actions.

(a) No claim under this warranty may be commenced or asserted against Seller in any lawsuit unless a properly completed Notice of Warranty Claim Form has been received by the Seller in the time period set forth in Paragraph 7 of this Warranty, and no

lawsuits against Seller may be commenced unless first arbitrated in non-binding arbitration by the Arbitration Association of America.

(b)    No lawsuit against the Seller under this Warranty may be commenced more than thirty (30) days after the expiration date of the applicable warranty coverage, or thirty (30) days after Seller has given written notice of its rejection of Purchaser's claim with respect to such claim, or thirty (30) days after Seller has substantially completed corrective action for a defect with respect to such defect.

9.    Miscellaneous Provisions.

A.    Notwithstanding anything to the contrary herein, to the extent any coverage under this Warranty applies to common elements of a Condominium, such coverage shall be deemed excluded from this Warranty and the applicable warranty, if any, to the Board of Managers of the Condominium contained in the Condominium Offering Plan for the Building shall be the sole warranty with respect to the common elements.

B.    This Warranty may not be amended in any way without Seller's prior written consent in each instance.

C.    If any provision of this Warranty will not be enforced by an appropriate court, the determination will not affect the enforceability of the remaining provisions.

D.    Use of one gender in this Warranty includes the other gender, and use of the plural includes the singular, as may be appropriate.

E.    This Warranty shall be governed in accordance with the laws of the State of New York.

F.    The Rider attached hereto is incorporated by reference and made a part hereof.

_____
Purchaser

_____
Purchaser

## NOTICE OF LIMITED WARRANTY CLAIM FORM

Dear Purchaser:

To ask the Seller to correct a defect in your Unit that you think is covered by the Seller's Limited Warranty, you must complete this form and deliver it to the Seller. This is necessary to protect your rights to warranty performance under the Limited Warranty.

The information you will need to fill out the form will be on Page 1 of the Limited Warranty. However, if you do not know the answers to any questions, write "Don't know". Please do not leave any item blank.

|  |  |
|---:|---|
| Your Name: | _____ |
| Mailing Address: | _____ |
|  | _____ |
| Phone: | _____ |
| Designation of Unit Warranted: | _____ |
| Effective Date of the Warranty: | _____ |

Describe the defect(s) which you think are covered by the Limited Warranty. Be sure to include when each defect first occurred or when you first noticed it. Use additional sheets as necessary, to fully describe the problem:

_____     _____
(signature)                                          (date)

_____     _____
(signature)                                          (date)

This completed and signed Form must be sent to Seller at its address listed on the first page of the warranty by certified or express mail, return receipt requested to be received not later than the first business day following the expiration of the applicable warranty period.

157

## RIDER TO LIMITED WARRANTY

PURCHASER(S)/WARRANTEE(S):    _____

SELLER/WARRANTOR:    _____

UNIT WARRANTED:    _____

PREMISES:    90 Franklin Street
NEW YORK, NEW YORK

1.    Any conflict between the terms of this Rider and the Limited Warranty to which this Rider is attached shall be resolved in favor of this Rider.

2.    LIMITATION OF SELLER'S TOTAL LIABILITY. IN NO EVENT SHALL THE WARRANTOR'S TOTAL LIABILITY TO PURCHASER UNDER THIS LIMITED WARRANTY EXCEED THE LESSER OF (i) TEN PERCENT OF THE PURCHASE PRICE OF THE UNIT AND (ii) $10,000, LESS, IN EACH CASE, ANY INSURANCE PROCEEDS RECEIVED BY PURCHASER (THE "MAXIMUM LIABILITY OF SELLER").
**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LIMITED WARRANTY, THIS LIMITED WARRANTY IS LIMITED TO AN OBLIGATION TO CORRECT MATERIAL DEFECTS IN THE RENOVATION OR REHABILITATION OF THOSE PORTIONS OF THE UNIT WHICH WERE REQUIRED TO BE RENOVATED OR REHABILITATED IN ACCORDANCE WITH THE "PLANS AND SPECIFICATIONS" AS DEFINED IN THE PLAN AND THIS WARRANTY EXCLUDES DEFECTS IN THE UNIT, IF ANY, WHICH ARE NOT WITHIN THE SCOPE OF THE RENOVATION AND REHABILITATION WORK AS SHOWN IN THE PLANS AND SPECIFICATIONS. AS USED HEREIN, THE TERM "PLAN" MEANS THE CONDOMINIUM OFFERING PLAN FOR 90 FRANKLIN STREET, NEW YORK, NEW YORK.**

IN ADDITION, WARRANTOR SHALL NOT BE RESPONSIBLE FOR CORRECTING OR REPAIRING ANY DEFECTS IN CONSTRUCTION, RENOVATION OR REHABILITATION (INCLUDING, WITHOUT LIMITATION, DEFECTIVE MATERIALS OR DEFECTIVELY CONSTRUCTED COMPONENTS OR PORTIONS OF THE BUILDING OR UNIT) OR DEFECTS IN THE INSTALLATION OR OPERATION OF ANY APPLIANCES (INCLUDING, WITHOUT LIMITATION, KITCHEN APPLIANCES), EQUIPMENT OR FIXTURES, TO THE EXTENT COVERED BY ASSIGNABLE WARRANTIES OR OTHER UNDERTAKINGS (HOWEVER DENOTED) FROM MANUFACTURERS, CONTRACTORS, MATERIALMEN, OR OTHERS, WHICH ARE ASSIGNED TO PURCHASER OR THE BOARD OF MANAGERS OF THE FRANKLIN TOWER LOCATED AT 90 FRANKLIN STREET, NEW YORK, NEW YORK.

3.    EXCEPT AS EXPRESSLY SET FORTH IN THE LIMITED WARRANTY OR THIS RIDER THERETO, THE WARRANTOR HAS NO OBLIGATION TO CORRECT OR REPAIR ANY OTHER DEFECT OR CONDITION IN THE UNIT OR THE BUILDING OR ANY OTHER INSTALLMENTS, APPARATUSES, FIXTURES OR APPURTENANCES. THE FOREGOING SETS FORTH THE ENTIRE OBLIGATION OF THE WARRANTOR TO CORRECT ANY DEFECTS AND NONE OTHER SHALL BE IMPLIED. THIS LIMITED WARRANTY EXCLUDES THE HOUSING MERCHANT IMPLIED WARRANTY PROVIDED BY CHAPTER 709 OF THE LAWS OF 1988 OF NEW YORK STATE (AND ANY SUCCESSOR OR SIMILAR LAW), AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS OR OTHERWISE. NO CONSEQUENTIAL OR INCIDENTAL DAMAGES MAY BE RECOVERED BY THE PURCHASER UNDER THIS LIMITED WARRANTY OR OTHERWISE FROM THE WARRANTOR OR ANY OTHER PERSON WITH RESPECT TO THE UNIT.

4.    ADDITIONAL EXCLUSIONS FROM WARRANTY.  THIS LIMITED WARRANTY DOES NOT COVER:

A.    ANY DEFECTIVE WORKMANSHIP OTHER THAN BY THE WARRANTOR OR ANY OF ITS AGENTS, EMPLOYEES, OR CONTRACTORS;

B.    ANY DEFECTIVE MATERIALS NOT SUPPLIED BY THE WARRANTOR OR BY ANY OF ITS AGENTS, EMPLOYEES, OR CONTRACTORS;

C.    DEFECTIVE DESIGN NOT PROVIDED BY A DESIGN PROFESSIONAL RETAINED EXCLUSIVELY BY THE WARRANTOR WITH RESPECT TO THE UNIT;

D.    ANY OBVIOUS OR PATENT DEFECT WHICH WAS OMITTED FROM THE INSPECTION STATEMENT DELIVERED BY OR ON BEHALF OF THE PURCHASER PURSUANT TO THE PURCHASE AGREEMENT OR WHICH AN EXAMINATION OF THE UNIT SHOULD HAVE REVEALED, AT ANY TIME BEFORE EITHER THE TRANSFER OF TITLE OF THE UNIT TO THE PURCHASER, OR THE ACCEPTANCE OF THE CONSTRUCTION OF THE UNIT AS COMPLETE, PROVIDED THE PURCHASER WAS GIVEN A REASONABLE OPPORTUNITY TO EXAMINE THE UNIT WITHOUT CAUSING DAMAGE THERETO;

E.    IN THE CASE OF ANY STOVES, REFRIGERATORS, FREEZERS, ROOM AIR CONDITIONERS, DISHWASHERS, CLOTHES WASHERS AND DRYERS, OR, WITHOUT LIMITATION, ANY OTHER GOODS OR FIXTURES WHICH ARE SOLD WITH OR INCLUDED IN THE SALE OF THE UNIT, ANY DEFECTS RELATING TO ANY OF SUCH ITEMS, OTHER THAN DEFECTS DUE TO

159

FAILURE BY THE WARRANTOR OR ANY OF ITS AGENTS, EMPLOYEES, OR CONTRACTORS TO HAVE INSTALLED SUCH ITEMS IN ACCORDANCE WITH THE MANUFACTURER'S INSTRUCTIONS;

F.    ANY WORK WHICH WAS PERFORMED PURSUANT TO PLANS, SPECIFICATIONS, OR INSTRUCTIONS PROVIDED BY OR ON BEHALF OF THE PURCHASER;

G.    ANY INSUBSTANTIAL VARIATIONS IN THE DIMENSIONS OR ARRANGEMENTS OF ANY ROOM, WALL OR OTHER AREAS WITHIN THE UNIT OR ANY COMMON AREAS, OR IN THE PLANS AND SPECIFICATIONS, OR IN THE DESCRIPTION OF THE UNIT OR ANY COMMON AREAS SET FORTH IN THE OFFERING PLAN;

H.    ANY PART OF THE UNIT TO WHICH THE WARRANTOR AND ITS AGENTS, EMPLOYEES, AND CONTRACTORS IS NOT GIVEN FULL ACCESS;

I.    ANY DEFECTS IN ANY APPLIANCES, EQUIPMENT OR FIXTURES WITH RESPECT TO WHICH ASSIGNABLE WARRANTIES OR UNDERTAKINGS FROM MANUFACTURERS, CONTRACTORS, OR OTHERS ARE ASSIGNED TO THE PURCHASER, EXCEPT AS PROVIDED IN PARAGRAPH E ABOVE;

J.    ANY CONDITION RESULTING FROM NORMAL WEAR OR NATURAL DETERIORATION;

K.    1. DEFECTS OF AN INSUBSTANTIAL NATURE, SUCH AS, WITHOUT LIMITATION, NAIL POPS, RIDGING ON SHEET ROCK WALLS AND CEILINGS, LUMBER SHRINKAGE, DOOR OR WINDOW STICKING DUE TO WEATHER, DOOR WARPAGE INCLUDING, WITHOUT LIMITATION, WARPAGE OF THE MAIN ENTRANCE DOOR WITHIN REASONABLE TOLERANCES OF DOORS OF SIMILAR SIZE AND WEIGHTS AND QUALITY, SLIGHT SCRATCHES IN PLASTIC LAMINATE, PORCELAIN, OR OTHER SURFACES, IMPERFECT BATH AND KITCHEN TILE GROUTING, ADJUSTMENT OF BI-FOLD DOORS, WALLS NOT SQUARE, ELECTRICAL PLATES NOT STRAIGHT, DISCOLORATION OR SHRINKAGE, SLIGHT SEPARATION IN JOINTS OF FLOORING OR BETWEEN BASE AND FLOOR; 2. NORMAL SETTLEMENT, SHIFTING OR DEFLECTION OR ANY CONSEQUENTIAL DAMAGE RESULTING THEREFROM INCLUDING, WITHOUT LIMITATION, CRACKS IN CONCRETE ROOF PAVERS, OR CONCRETE CRACKS WHICH DO NOT IMPAIR THE STRUCTURAL SOUNDNESS OF THE UNIT; 3. VARIATIONS IN FLOOR LEVELS;

4. CEILING IMPERFECTIONS; 5. PAINTING DEFECTS; 6. ALIGNMENT OF BATHROOM, KITCHEN OR OTHER FINISHES; 7. AIR INFILTRATION FROM WINDOWS; 8. NORMAL PLUMBING, ELEVATOR, TRASH CHUTE, HEATING AND AIR CONDITIONING NOISES; 9. NORMAL FLOOR NOISES AND CREAKING; 10. FLOOR DISCOLORING; 11. VARIATIONS IN WIDTH, LENGTH OR TONE OF WOOD FLOORS; 12. REPAIR OF CHIPS, SCRATCHES, MARS, BREAKS OR OTHER DEFECTS IN ANY WINDOWS AND WINDOW SASHES, SLIDING GLASS DOORS, SHOWER DOORS, ELECTRICAL FIXTURES AND GLOBES, PAINTED SURFACES, SINKS, TUBS, BASINS, KITCHEN CABINETS AND COUNTERTOPS, VANITY TOPS AND CABINETS, MEDICINE CABINETS, CERAMIC TILE, MARBLE FLOORS AND WALLS, RESILIENT FLOORING, SADDLES, APPLIANCES, WOODWORK AND DOORS, MIRRORS, HARDWARE, CABINETS, AND FLOORING; 13. SUBSEQUENT TO THE EFFECTIVE DATE, PAINT TOUCH-UPS, REPAIRS OF DENTED APPLIANCES, CARPET DISCOLORATION, STRETCHING OR SHRINKAGE, OR REPLACEMENT OF FLUORESCENT LIGHT BALLASTS; 14. VARIATIONS IN TONE OR COLOR OF MARBLE OR STONE USED IN BATHROOMS OR VARIATIONS IN TONE OR COLOR OF VANITY TOPS OR OTHER MARBLE OR STONE AGGREGATE SURFACES; 15. SEEPAGE THROUGH MASONRY WALLS; OR 16. IMPROPER USE OF THE UNIT BY THE PURCHASER OR ANY OTHER PERSON. WARRANTOR SHALL BE OBLIGATED TO REPAIR ABNORMAL SCRATCHES (IF COVERED BY THIS WARRANTY) BY FILLING THE PLASTIC LAMINATE OR REFINISHING THE PORCELAIN BUT WARRANTOR SHALL NOT BE OBLIGATED TO REPLACE SUCH PLASTIC LAMINATE OR PORCELAIN SURFACES.

L.     ANY CHANGES, ALTERATIONS, IMPROVEMENTS OR ADDITIONS MADE BY THE PURCHASER OR BY ANY OTHER PERSON AFTER THE EFFECTIVE DATE.

M.     ANY DAMAGE TO THE EXTENT THAT IT IS CAUSED OR MADE WORSE BY:

       a.     NEGLIGENCE, IMPROPER MAINTENANCE OR THE FAILURE TO PERFORM MAINTENANCE, OR IMPROPER OPERATION BY ANYONE OTHER THAN THE WARRANTOR, ITS EMPLOYEES, AGENTS, OR CONTRACTORS; OR

       b.     FAILURE BY THE PURCHASER OR ANYONE OTHER THAN THE WARRANTOR, ITS EMPLOYEES, AGENTS OR CONTRACTORS, TO COMPLY WITH THE WARRANTY

REQUIREMENTS OF MANUFACTURERS OR SUPPLIERS OF APPLIANCES, FIXTURES OR ITEMS OF EQUIPMENT; OR

c.    FAILURE OF THE PURCHASER TO GIVE NOTICE TO THE WARRANTOR OF ANY DEFECTS OR DAMAGE WITHIN A REASONABLE TIME (NOT MORE THAN THIRTY (30) DAYS AFTER THE OCCURRENCE OF EACH SUCH DEFECT OR DAMAGE) OR AS REQUIRED BY THIS LIMITED WARRANTY; OR

d.    CHANGES IN THE GRADING OF THE GROUND BY ANYONE OTHER THAN THE WARRANTOR, ITS EMPLOYEES, AGENTS OR CONTRACTORS; OR

e.    DAMPNESS OR CONDENSATION DUE TO FAILURE OF THE PURCHASER OR OCCUPANT TO MAINTAIN ADEQUATE VENTILATION.

N.    ANY CONDITION WHICH DOES NOT RESULT IN ACTUAL PHYSICAL DAMAGE TO THE UNIT.

O.    LOSS OR DAMAGE CAUSED BY OR RESULTING FROM CIRCUMSTANCES BEYOND WARRANTOR'S CONTROL INCLUDING, WITHOUT LIMITATION, ACCIDENTS, RIOT OR CIVIL COMMOTION, FIRE, EXPLOSION, SMOKE, WATER ESCAPE, FALLING OBJECTS, AIRCRAFT, VEHICLES, ACTS OF GOD, LIGHTNING, WINDSTORM, HAIL, FLOOD, MUDSLIDE, EARTHQUAKE, VOLCANIC ERUPTION, WIND DRIVEN WATER, CHANGES IN THE UNDERGROUND WATER TABLE, AND ANY OTHER ACTS OR EVENTS WHICH ARE NOT DIRECTLY CAUSED BY A DEFECT FOR WHICH THE WARRANTOR IS LIABLE.

P.    LOSS OR DAMAGE CAUSED BY SEEPAGE OF WATER UNLESS SUCH LOSS OR DAMAGE IS THE DIRECT RESULT OF A CONSTRUCTION DEFECT FOR WHICH THE WARRANTOR IS LIABLE.

Q.    ANY DAMAGE CAUSED BY SOIL MOVEMENT FOR WHICH COMPENSATION IS PROVIDED BY LEGISLATION OR WHICH IS COVERED BY OTHER INSURANCE.

R.    ANY DAMAGE WHICH THE PURCHASER HAS NOT TAKEN TIMELY ACTION TO MINIMIZE.

S.    INSECT DAMAGE.

T.     LOSS OR DAMAGE WHICH ARISES WHILE THE UNIT IS BEING
       USED PRIMARILY FOR NONRESIDENTIAL PURPOSES.

U.     LOSS OR DAMAGE DUE TO ABNORMAL LOADING ON FLOORS
       BY THE BENEFICIARY WHICH EXCEEDS DESIGN LOADS AS
       MANDATED BY THE STANDARDS.

V.     COSTS OF SHELTER, TRANSPORTATION, FOOD, MOVING,
       STORAGE OR OTHER INCIDENTAL EXPENSES RELATED TO
       RELOCATION DURING REPAIR.

W.     ANY CLAIM BY THE BENEFICIARY NOT FILED IN A MANNER SET
       FORTH IN THIS LIMITED WARRANTY.


            5.      Notwithstanding anything to the contrary contained herein or in the
Limited Warranty to which this Rider is attached, to the extent any coverage under the
Limited Warranty or this Rider applies to Common Elements of the Condominium, such
coverage shall be deemed excluded from this Limited Warranty as it pertains to Purchaser
and such coverage is intended to run only in favor of the Board of Managers of the
Condominium in which the Unit is located, subject to the terms of the Plan.

(c)    pay all fees, points and charges required in connection with such application, Commitment and  mortgage loan;

(d)    pursue such application with diligence;

(e)    cooperate in good faith with the Institutional Lender and any mortgage broker through which Purchaser has applied to the end of securing the Commitment and closing the mortgage loan;,

(f)    within five (5) days of the date that Purchaser makes such application, provide the Seller with the name and address of the mortgage broker, if any, and Institutional Lender to which Purchaser has made such application and furnish to Seller a copy of said application(s); and

(g)    comply with all requirements of the Commitment (or of any Commitment accepted by Purchaser) and furnish Seller with a copy thereof promptly after receipt.

The term "Institutional Lender" shall mean a commercial bank, savings bank, trust company, savings and loan association, an insurance company, an educational institution, a federal, state, municipal or similar public employee's welfare, pension or retirement fund system, credit union to which Purchaser is a member, or state or any agency thereof and a political subdivision of a state or an agency thereof.

2.    Definitions

All capitalized terms used in this Financing Rider not defined herein shall have the same meanings ascribed to them in the Purchase Agreement or in the Plan.

3.    Conflicts.

In the event of any inconsistency between the provisions of this Financing Rider and those contained in the Purchase Agreement to which this Financing Rider is annexed and made a part thereof, the provisions of this Financing Rider shall govern and be binding.

IN WITNESS THEREOF, Purchaser has executed this Financing Rider this _day of                , 19  .

PURCHASER (S):

ACCEPTED:

SELLER

Corn Associates LLC

By:

166

Deliver: 2 to Seller; 2 to Purchaser; 1 to Agent

THIS DISCLOSURE IS PART OF, AND INCORPORATED IN, THE [PURCHASE AGREEMENT][CONTRACT OF SALE] BEING SIGNED BY SELLER AND PURCHASER SIMULTANEOUSLY HEREWITH.

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD BASED PAINT HAZARDS

**Lead Warning Statement**
Every purchaser of any interest in residential real property on which a residential dwelling was built prior to ___ is notified that such property may present exposure to lead from lead-based paint that may place young children ___ risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

Seller (√):
(a)(i) or (ii)

**Seller's Disclosure**
(a)     Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
          (i)_____ Known lead-based paint and/or lead-based paint hazards are present in the housing:  (explain)
_____
_____

Seller (√):
(b)(i) or (ii)

          (ii) ___ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)     Records and reports available to the seller (check (i) or (ii) below):

          (i)_____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint hazards in the housing (list documents below).
_____
_____

          (ii)_____ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

Purchaser Initial:
(c)
(d)
(e)

**Purchaser's Acknowledgment  (initial)**

(c)_____ Purchaser has received copies of all information listed above.
(d)_____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
(e)_____ Purchaser has (check (i) or (ii) below):

Purchaser (√):
(i) or (ii)

          (i)_____ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
          (ii)_____ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

Agent Initial:
(f)

**Agent's Acknowledgment** (initial)

(f)_____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

SELLER:                              PURCHASER:                       AGENT:

[Fill in and sign]

[Name of Seller]                 [Signature]                          [Name of Agent]
By:_____

_____                 _____                 By:_____
[Name of Seller's               [Print Name]                        [Signature]
General Partner/Member,
if applicable]
                                        _____                 _____
                                        [Date]                                [Print Name]

By:_____
[Signature]                          _____                 _____
                                        [Signature]                          [Print Title]

_____                 _____                 _____
[Print Name]                       [Print Name]                        [Date]

_____                 _____
[Print Title]                         [Date]

_____
[Date]

168

### The Franklin Tower

## UNIT OWNER'S POWER OF ATTORNEY

All terms used in this Unit Owner's Power of Attorney that are used (a) in the declaration (the **"Declaration"**) establishing a plan for condominium ownership of the premises known as and by the street number 90 Franklin Street, New York (the **"Property"**) under Article 9-B of the Real Property Law of the State of New York, dated _____, 199_, and recorded in the Office of the Register of the City of New York, County of New York, on _____, 199_, in Reel _____, Page ____, or (b) in the by-laws of the Condominium (the **"By-Laws"**) attached to, and recorded together with, the Declaration, shall have the same meanings in this Power of Attorney as in the Declaration or the By-Laws.

The undersigned _____ , (having an office) (residing)″″″ at _____, the owner of the Residential Condominium Unit (the **"Undersigned's Unit"**) known as Unit No. ___ (and Unit No. _) in The Franklin Tower (the "**Condominium**"), known by the street address as 90 Franklin Street, New York, New York and consisting of the real property and improvements thereon as more particularly described on <u>Schedule A</u> annexed hereto and made a part hereof, such Unit being also designated as Tax Lot __ in Block 175 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans, (does)(do)* hereby irrevocably nominate, constitute and appoint the persons who may from time to time constitute the Condominium Board, true and lawful attorneys-in-fact for the undersigned, coupled with an interest, with power of substitution, in their own names, as members of the Condominium Board or in the name of their designee (corporate or otherwise), on behalf of all Unit Owners, in accordance with the Unit Owners' respective Common Interests, subject to the provisions of the By-Laws then in effect, (1)(a) to acquire or lease any Unit, together with its Appurtenant Interests, from any Unit Owner so desiring to sell, convey, transfer, assign or lease, (b) to acquire any Unit, together with its Appurtenant Interests, whose owner elects to surrender such Unit pursuant to the terms of paragraph __ of Section __ of the By-Laws, and (c) to acquire any Unit, together with its Appurtenant Interests, that becomes the subject of a foreclosure or other similar sale, on such terms and, with respect to any transfer pursuant to the terms of subdivision 1(a) or 1(c) of this paragraph at such price or at such rental, as the case may be, as such attorneys-in-fact deem proper, and thereafter to convey, sell, lease, mortgage or otherwise deal with (but not vote the interest appurtenant to) any such Unit so acquired by them, on such terms as such attorneys-in-fact may determine, granting to such attorneys-in-fact  the power to do all things in such premises which the undersigned could do if the undersigned were personally present, and (2) to execute, acknowledge and deliver (a) any declaration or other instrument affecting the Condominium that the Condominium Board deems necessary or appropriate to comply with any law, ordinance, regulation, zoning

---

″″″Delete inapplicable parenthetical(s).

resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the maintenance, demolition, construction, alteration, repair or restoration of the Condominium or (b) any consent, covenant, restriction, easement or declaration, or any amendment thereto, affecting the Condominium or the Common Elements, that the Condominium Board deems necessary or appropriate.

The acts of a majority of such persons constituting the Condominium Board shall constitute the acts of said attorneys-in-fact.

The undersigned (does)(do)**** hereby irrevocably nominate, constitute and appoint Corn Associates LLC (the "**Sponsor**"), as attorney-in-fact for the undersigned, coupled with an interest, with power of substitution, to amend from time to time the Declaration, By-Laws and the Rules and Regulations of the Condominium, or any of such documents, when such amendment (i) shall be required to reflect any changes in Unsold Units and/or the reapportionment of the Common Interests of the affected Unsold Units resulting therefrom made by Sponsor or its designee in accordance with Section 9 and 11 of the Declaration or (ii) will be required by (A) an Institutional Lender designated by Sponsor to make a mortgage loan secured by a mortgage on any Unit, (B) any governmental agency having regulatory jurisdiction over the Condominium, or (C) any title insurance company selected by Sponsor to insure title to any Unit; provided, however, that any amendment made pursuant to the terms of subdivisions (i) or (ii) of this paragraph will not (x) change the Common Interest of the Undersigned's Unit, (y) require a material, physical modification to the Undersigned's Unit, or (z) adversely affect the priority or validity of the lien of any purchase money mortgage or any mortgage held by an Institutional Lender covering the Undersigned's Unit unless the undersigned (in the event described in subdivisions (x) or (y) of this paragraph) or the holder of such mortgage (in the event described in (z) of this paragraph) shall consent thereto by joining in the execution of such amendment. The terms, covenants and conditions contained in, and the powers granted pursuant to, this paragraph will remain in full force and effect until such time as Sponsor or its designee will cease to own any of the Units in the Condominium.

IN WITNESS WHEREOF, the undersigned (has) (have)* executed this Unit Owner's Power of Attorney as of the __ day _____, 199_.

_____

---

****Delete inapplicable parenthetical(s).

STATE OF NEW YORK   )
                     ) ss.:
COUNTY OF            )

       On this ____ day of _____, 199 , before me personally came
_____, to me known to be the individual who executed the
foregoing instrument and, who, being duly sworn by me, did depose and say that he is
a general partner of _____ and that he executed the foregoing
instrument in the firm name of _____ and that he had authority to sign the
same, and acknowledged that he executed the same as the act and deed of said firm.


                          _____

                                 Notary Public

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF         )

       On this _____ day of _____, 199 , before me personally appeared
_____, to me known and known to me to be the person
mentioned and describe in, and who executed the foregoing instrument, and he duly
acknowledged to me that he executed the same.

  .

                            _____

                                    Notary Public

SCHEDULE "A"

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County, City, and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Franklin Street and the easterly side of Church Street; running thence easterly along the northerly side of Franklin Street, a distance of 75 feet; thence northerly and parallel with the easterly side of Church Street, a distance of 75 feet; thence westerly and parallel with the northerly side of Franklin Street, 75 feet to Church Street; thence southerly along the easterly side of Church Street, 75 feet to the northerly side of Franklin Street, the point of place of BEGINNING.

Premises being known as and by street No. 271 Church Street, New York, NY.

THIS PAGE LEFT BLANK INTENTIONALLY

## FORM OF UNIT DEED

THIS INDENTURE, made the _____ day of _____, 19__ between Corn Associates LLC a New York limited liability company, having offices 316/318 Fulton Avenue, Hempstead, New York 11550 ("Grantor"), and _____, a _____, with offices/ residing at _____, New York ("Grantee").

## W I T N E S S E T H

That the Grantor, in consideration of Ten Dollars ($10.00) and other valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Unit known as Unit _____ (the "Unit") in the condominium known as The Franklin Tower ("Condominium") in the building known as and by the street number 90 Franklin Street New York, New York ("Building"), and designated and described as such in the Declaration ("Declaration") establishing a plan for condominium ownership of the Building and the parcel of land on which it is situated (such land and the Building being collectively referred to as "Property"), made by the Grantor under Article 9-B of the Real Property Law of the State of New York, dated _____, 199_, and recorded in the Office of the Register of the City of New York, New York County on the _____ day of _____, 199_ in Reel _____, Page _____ and designated as Tax Lot No. _____ in Block 175 on the Tax Map of the City of New York for the Borough of Manhattan and on the floor plans of the Building ("Floor Plans"), certified by _____, on the _____ day of _____, 199_, and filed in the Office of the City Register, New York County, on the _____ day of _____, 199_.

The Property is described as follows:

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County, City, and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Franklin Street and the easterly side of Church Street; running thence easterly along the northerly side of Franklin Street, a distance of 75 feet; thence northerly and parallel with the easterly side of Church Street, a distance of 75 feet; thence westerly and parallel with the northerly side of Franklin Street, 75 feet to Church Street; thence southerly along the easterly side of Church Street, 75 feet to the northerly side of Franklin Street, the point of place of BEGINNING.

Premises being known as and by street No. 271 Church Street, New York, NY.

TOGETHER with    % interest in the Common Elements;

174

TOGETHER with the appurtenances and all the estate and rights of the Grantor in and to the Unit;

Together with and subject to the rights, obligations, easements, restrictions and other provisions of the Declaration and of the By-Laws of the Condominium (including but not limited to the Rules and Regulations thereunder) as such Declaration and By Laws may be amended from time to time by instruments recorded in the Office of the Register of the City of New York, New York County, all of which rights, obligations, easements, restrictions and other provisions, shall constitute covenants running with the land and shall bind any and all persons having at any time any interest or estate in the Unit, as though recited and stipulated at length herein; and subject to any other matters of record as of the date hereof;

TO HAVE AND TO HOLD the same unto the Grantee, and the heirs or successors and assigns of the Grantee, forever.

Grantee by accepting delivery of this deed covenants and agrees to be bound by and to comply with the provisions of the Declaration and the By-Laws of the Condominium (including but not limited to the Rules and Regulations thereunder) recorded simultaneously with and as part of the Declaration, as the same may be amended from time to time by instruments recorded in the Office of the Register of the City of New York, New York County.

*(Delete if inapplicable)* If the Unit is a Residential Unit (as defined in the Declaration) then such Unit shall be used solely for dwelling purposes and such "home occupation" use under the Zoning Resolution of the City of New York as may be permitted by law.

*(Delete if inapplicable)*If the Unit is a Commercial Unit (as defined in the Declaration) then such Unit may be used for any lawful purpose other than for any obscene or noxious purposes.

The Grantor covenants that the Grantor has not done or suffered anything to be done whereby the Unit has been encumbered in any way whatever, except as set forth in the Declaration and the Condominium By-Laws (and any Rules and Regulations adopted under the Condominium By-Laws). This covenant is for the personal benefit of the Grantee only and cannot be assigned to or exercised by, and shall not inure to the benefit of, any other person or entity, including, but not limited to, any insurer of the Grantee's title or any successor to the Grantee's interest.

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The terms "Grantor" and "Grantee" shall be read as "Grantors" and "Grantees" whenever the sense of the deed so requires.

IN WITNESS WHEREOF, the Grantor has duly executed this deed the day and year first above written.

WITNESS                                GRANTOR:

 

_____

_____          By:_____
                                          Name:
                                          Its:

176

STATE OF NEW YORK      )
                                 ) SS.:

COUNTY OF                  )

On the _____ day of _____, _____, before me personally came _____ to me known, and who executed the foregoing instrument and, who being by me duly sworn, did depose and say that he is the _____ of CORN ASSOCIATES LLC a limited liability company, and that he executed the foregoing instrument in the name of said limited liability company and that he had authority to sign the same, and he acknowledged that he executed the same as the act and deed of said limited liability company.

_____
Notary Public

177

# APPLICATION TO THE ATTORNEY GENERAL
## FOR A DETERMINATION ON THE
## DISPOSITION OF DOWN PAYMENTS

[Send this application to the reviewing attorney assigned to the subject plan.]

Re:    The Franklin Tower
Address of Building:    90 Franklin Street
New York, New York
Name of Project

File Number:_____

Application is made to the Attorney General to consider and determine the disposition of Down Payments held pursuant to GBL Sections 352-e(2-b) and 352-h. The following information is submitted in support of this application:

1.    Name
of Applicant _____

2.    Address
of Applicant _____

3.    Name, Address, and Telephone Number
of Applicant's Attorney (if any) _____

_____

_____

4.    This is an application for

[ ]return of Down Payment.
[ ] forfeiture of Down Payment.
[ ] other: _____

_____

5.    The project is [ ] a conversion of occupied premises.
[ ] newly constructed or rehabilitated.
[ ] vacant (as is).

178

6.     The project is structured as
                        [ ] a cooperative.
                        [ ] a condominium.
                        [ ] a homeowners association.
                        [ ] a time share.

                        [ ] other: _____

7.     Name and Address
        of Sponsor: _____
        _____

8.     Name and Address
        of Escrow Agent: _____
        _____

9.     If Down Payments are maintained in an escrow account:

        (a)     Name of account _____

        (b)     Name and address
                of bank _____

        (c)     Account number (if known) _____

        (d)     Initial interest rate (if known) _____

10.    If Down Payments have been secured by bonds:

        (a)     Name and address of
                bond issuer or surety: _____

        (b)     Copy of bond included in this application.  (DO NOT SEND ORIGINAL
                BOND.)  If not included, explain:

                _____
                _____
                _____
                _____

11.    If Down Payments have been secured by a letter of credit:

        (a)     Name and address of bank which issued the letter of credit:

                _____
                _____
                _____

179

(b)  Date of expiration of the letter of credit, if known:

_____

12.  Plan information:

(a)  Date of filing of plan: _____

(b) Plan
    [ ]  has been declared effective.  Approximate date:

_____

    [ ]  has not been declared effective.

(c)  If effective, the plan

    [ ]  has closed or the first unit has closed.
       Approximate date: _____

    [ ]  has not closed.

    [ ]  don't know.

(d)  Down payments are secured by

    [ ]  escrow account.

    [ ]  bonds.

    [ ]  letter of credit.

13.  Contract information:

(a)  Copy of contract and of all riders or modification letters are attached.  (DO NOT SEND ORIGINALS.)

(b)  Date on which subscription or purchase agreement was signed: _____

(c)  Date(s) of Down Payment(s): _____

(d)  Total amount of Down Payment(s): _____

(e)  Names and addresses of subscribers or purchasers affected by this application:

_____
_____
_____

180

_____

_____

14.   State the basis for your claim.  Please be as specific as possible.  You may add additional sheets.  Attach copies of any relevant documents.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

15.   I am contemporaneously sending a copy of this application to the following persons: _____

_____

_____

_____

Note:  You are required to mail a copy of this Application to all other affected parties.

        In filing this application, I understand that the Attorney General is not my private attorney, but represents the public in enforcing laws designed to protect the public from unlawful business practices.  I also understand that if I have any questions concerning my legal rights or responsibilities I may contact a private attorney.  The above application is true and accurate to the best of my knowledge.  False statements made herein are punishable as a Class A Misdemeanor under Section 175.30 and/or Section 210.45 of the Penal Law.

Signature: _____    Date: _____

Name (Printed): _____

Telephone:  (Home) _____    (Business) _____

Mailing Address: _____

181

## ESCROW AGREEMENT

AGREEMENT made this ___ day of _____, 1999, between Corn Associates LLC ("SPONSOR") as SPONSOR of the offering plan to the extent described below, and Herrick, Feinstein LLP ("ESCROW AGENT"), as ESCROW AGENT.

WHEREAS, SPONSOR is the sponsor of a condominium offering plan for the sale of Condominium Units in a condominium to be known as The Franklin Tower located at 90 Franklin Street, New York, New York (the "Premises") (such plan being called the "Plan"); and

WHEREAS, ESCROW AGENT is authorized to act as an ESCROW AGENT hereunder in accordance with General Business Law ("GBL") Section 352-e(2-b) and the Attorney General's regulations promulgated thereunder; and

WHEREAS, SPONSOR desires that ESCROW AGENT act as ESCROW AGENT for deposits by purchasers on account of the purchase price of units in such Condominium (collectively, "Units" and each a "Unit") under the Plan, together with all accrued interest thereon (collectively the "Deposits"), pursuant to the terms of this agreement.

NOW, THEREFORE, in consideration of the covenants and conditions contained herein and other good and valuable consideration, the parties hereby agree as follows:

1.    ESTABLISHMENT OF THE ESCROW ACCOUNT.

1.1    SPONSOR and ESCROW AGENT hereby establish an escrow account with ESCROW AGENT for the purpose of holding deposits or payments made by purchasers on account of the purchase price of Units under the Plan.  The escrow account has been opened with Fleet Bank at its branch located at 350 Fifth Avenue, New York, New York 10118.

1.2    The name of the account is "Herrick, Feinstein LLP as escrow agent under the Plan for The Franklin Tower."

1.3    Members of the ESCROW AGENT are the sole signatories on such account (the "escrow account").

1.4    The escrow account shall be an interest-bearing account.

182

2.    DEPOSITS INTO THE ESCROW ACCOUNT.

2.1    All Deposits received by ESCROW AGENT from each prospective purchaser of a Unit under the Plan, on account of the purchase price thereunder, prior to closing of such Unit, whether in the form of checks, drafts, money orders, wire transfers, or other instruments which identify the payor, shall be deposited in the escrow account. All instruments to be deposited into the escrow account shall be made payable to, or endorsed by the purchaser or subscriber to the order of "Herrick, Feinstein LLP as escrow agent under the Plan for The Franklin Tower." Any instrument payable or endorsed other than as required hereby, and which cannot be deposited into such escrow account, shall be returned to the prospective purchaser promptly after receipt by ESCROW AGENT of such instrument following any attempts to deposit it; but, in any event, following such unsuccessful attempts to deposit it, ESCROW AGENT shall mail or otherwise send such instrument to such prospective purchaser within five business days of such receipt of such instrument by ESCROW AGENT. In the event of such return of such instrument, then such instrument shall be deemed not to have been delivered to ESCROW AGENT pursuant to the terms of this Agreement.

2.2    For purposes of this Section 2.2, an unconditional tender and delivery of a Down Payment shall be deemed to have been made if a Down Payment is delivered together with a Purchase Agreement in the form agreed to by SPONSOR without any request for a change in such form or the terms of such Purchase Agreement. Within 10 business days after unconditional tender and delivery to the Selling Agent of the Down Payment required to be submitted by a purchaser on account of the purchase of a unit under the Plan, together with the Purchase Agreement for the purchase of such unit, ESCROW AGENT shall notify such purchaser of the deposit of such funds in the bank indicated in the Plan, provide the account number, and disclose the initial interest rate. Subject to the provisions of the next sentence, if such purchaser does not receive notice of such deposit within fifteen (15) business days after unconditional tender and delivery to the Selling Agent of such Down Payment, then such purchaser may cancel the purchase and rescind such purchaser's Purchase Agreement so long as such right to rescind is exercised within ninety (90) days after such purchaser's unconditional tender and delivery of such Down Payment to the Selling Agent, if any, or such purchaser may apply to the Attorney General for relief. However, a purchaser shall not be entitled either to rescind such purchaser's Purchase Agreement or to receive a refund of such purchaser's Deposit where proof satisfactory to the Attorney General is submitted establishing that such Deposit was timely deposited and notice as provided above was timely mailed to such purchaser in accordance with all regulations of the Attorney General.

3.    RELEASE OF FUNDS.

3.1    "Consummation of the Plan" shall mean the first closing of title for the sale of a Unit under the Plan and in accordance with its requirements.

3.2    ESCROW AGENT shall continue to hold a purchaser's Deposit in escrow until: (a) otherwise directed in one or more writings signed (whether on the same or separate counterparts) by each of SPONSOR and such purchaser, or (b) otherwise directed in a determination of the Attorney General, pursuant to the dispute resolution procedures contained in the Attorney General's regulations, or (c) a judgment or order of a court of competent jurisdiction permits or requires the release of such Deposit, or (d) such Deposit is paid by ESCROW AGENT into a court of competent jurisdiction, or (e) such Deposit is paid to SPONSOR as provided below, or (f) such Deposit is paid to such purchaser as provided below.

3.3    SPONSOR shall not object to the release of the Deposit of any purchaser to such purchaser, provided such purchaser has not defaulted and has timely and validly rescinded such purchaser's Purchase Agreement in accordance with an offer of rescission contained in the Plan or an amendment to the Plan.

3.4    If there is no written agreement between SPONSOR and a purchaser to release the Deposit paid by such purchaser, ESCROW AGENT shall not pay such Deposit to SPONSOR until after 10 business days following the date that ESCROW AGENT has given such purchaser written notice that ESCROW AGENT intends to pay to SPONSOR such Deposit.  Thereafter, such Deposit may be paid to SPONSOR unless such purchaser has already made application to the Department of Law pursuant to the dispute resolution provisions contained in the Attorney General's regulations and ESCROW AGENT has received, within such 10 business day period, notice from such purchaser that such application has been made.

4.    RECORD KEEPING.

4.1    ESCROW AGENT shall maintain all records concerning the escrow account for seven years after release of the funds.

4.2    Upon the dissolution of a law firm which was ESCROW AGENT, the former partners or members of the firm shall make appropriate arrangements for the maintenance of these records by one of the partners or members of the firm or by the successor firm and shall notify the Department of Law of such transfer.

4.3    ESCROW AGENT shall make available to the Attorney General, upon his request, all books and records of ESCROW AGENT relating to the funds deposited and disbursed hereunder.

5.    GENERAL RIGHTS AND OBLIGATIONS OF ESCROW AGENT.

5.1    ESCROW AGENT shall maintain the accounts called for in this Agreement under the direct supervision and control of ESCROW AGENT.

5.2    A fiduciary relationship, pursuant to this Agreement, shall exist between ESCROW AGENT and purchasers who have paid Deposits which are held by ESCROW AGENT, and ESCROW AGENT acknowledges such fiduciary obligations.

5.3    ESCROW AGENT undertakes to perform only such duties as are expressly set forth herein.  If there is any conflict or inconsistency between the provisions of this Agreement and either the Plan or any Purchase Agreement (as defined in the Plan), the provisions of this Agreement shall be controlling.

5.4    If conflicting demands are made or notices are served upon ESCROW AGENT with respect to this Agreement, or if ESCROW AGENT shall hold a good faith belief that the rights of a claimant to any Deposit are not absolutely clear, the signatories hereto agree that ESCROW AGENT may refuse to comply with any such claim or demand and, except as hereinafter set forth in this Agreement, may withhold and stop all further proceedings in the performance of this Agreement so long as such disagreement shall continue.  In so doing, ESCROW AGENT shall not be or become liable for damages or interest to any of the signatories hereto or to any other person for its failure to comply with such conflicting or adverse demands or notices.  ESCROW AGENT may continue to so refrain and so refuse to act until (i) the rights of the adverse claimants have been finally adjudicated in a court having and assuming jurisdiction of the parties and/or the Deposit, as the case may be, or (ii) all differences, with respect to any Deposit, shall have been resolved by mutual agreement of SPONSOR and the purchaser who paid such Deposit, and ESCROW AGENT shall have been notified thereof in writing signed by both of said parties.  In the alternative, ESCROW AGENT may, but shall not be obligated to, file a suit in interpleader for a declaratory judgment for the purpose of having the respective rights of the claimants adjudicated, and/or may deposit any Deposit with a court of competent jurisdiction, in which event SPONSOR agrees to pay all costs, expenses and attorneys' fees incurred by ESCROW AGENT in connection therewith.  If ESCROW AGENT shall deposit any Deposit with such court, the ESCROW AGENT shall be fully released and discharged from any and all further duties and obligations hereunder with respect to such Deposit.

5.5    ESCROW AGENT shall not be responsible for any interest on any Deposit except for such as is actually received by ESCROW AGENT.

5.6    SPONSOR hereby agrees to indemnify ESCROW AGENT from, and to hold it harmless against, any loss, liability or expense (including, without limitation, attorneys' fees and expenses) incurred without gross negligence, willful default, or bad faith on the part of ESCROW AGENT, arising out of or in connection with its entering into this Agreement and carrying out its duties hereunder, including the costs and expenses of defending itself against any claim or liability.

5.7    In any action or proceeding, ESCROW AGENT may represent SPONSOR, even if such action or proceeding relates to or involves any Deposit, at the same time as ESCROW AGENT is holding such Deposit pursuant to this Agreement.

185

6.    RESPONSIBILITIES OF SPONSOR.

      6.1    SPONSOR agrees that SPONSOR and its agents, including any selling agents, shall deliver to ESCROW AGENT each Deposit on account of the sale of a unit under the Plan which has been received by SPONSOR or such agents prior to closing of the sale of such unit within one business day of receipt thereof.

      6.2    SPONSOR agrees that it shall not interfere with ESCROW AGENT's performance of its fiduciary duties and compliance with the Attorney General's regulations.

7.    TERMINATION OF AGREEMENT.

      7.1    This Agreement shall remain in effect unless and until it is canceled, by either:

          (a)    Written notice given by SPONSOR to ESCROW AGENT of cancellation of designation of ESCROW AGENT to act in said capacity, which cancellation shall take effect only upon the filing of an amendment to the Plan with the Department of Law providing for a successor ESCROW AGENT; or

          (b)    The resignation of ESCROW AGENT upon giving notice to SPONSOR of its desire to so resign, which resignation shall take effect only upon the filing of an amendment to the Plan with the Department of Law providing for a successor ESCROW AGENT; or

          (c)    All Deposits held by ESCROW AGENT have been paid by ESCROW AGENT from the escrow account as provided in this Agreement.

      ESCROW AGENT shall not be responsible for any delay between either i) any such cancellation by SPONSOR of the designation of ESCROW AGENT or ii) the resignation of ESCROW AGENT, and, in either such case, the date on which an amendment to the Plan appointing a successor ESCROW AGENT has been filed by the Department of Law and notice thereof has been given to ESCROW AGENT.  Once any such cancellation of the designation of ESCROW AGENT has been given to ESCROW AGENT, or once ESCROW AGENT has given to SPONSOR notice of resignation as ESCROW AGENT, then in either case ESCROW AGENT shall not be obligated to accept thereafter any new Deposits in the escrow account.

      7.2    Upon termination of the duties of ESCROW AGENT as described in paragraph 7.1(a) or (b) above, ESCROW AGENT shall deliver any and all Deposits held by it in escrow to the new successor ESCROW AGENT set forth in such amendment to the Plan, provided ESCROW AGENT has received a copy of such amendment.

8.    SUCCESSORS AND ASSIGNS.

     8.1    This Agreement shall be binding upon SPONSOR and ESCROW AGENT and their successors and assigns.

9.    GOVERNING LAW.

     9.1    This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

10.    ESCROW AGENT'S COMPENSATION.

     10.1    SPONSOR agrees that ESCROW AGENT's compensation shall not be paid from the Deposits nor from any interest accruing thereon (unless and to the extent SPONSOR is entitled to be paid such Deposits pursuant to this Agreement) and that compensation to ESCROW AGENT, if any, shall not be deducted from the Deposits (unless and to the extent SPONSOR is entitled to be paid such Deposits pursuant to this Agreement) by any financial institution under any circumstance.  SPONSOR shall reimburse to ESCROW AGENT any fees or charges incurred in connection with the establishment and maintenance of the escrow account.

11.    SEVERABILITY.

     11.1    If any provision of this Agreement or the application thereof to any person or circumstance is determined to be invalid or unenforceable, the remaining provisions of this Agreement or the application of such provision to other persons or to other circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

12.    ENTIRE AGREEMENT.

     12.1    This Agreement, read together with GBL Section 352-e(2-b) and the Attorney General's regulations, constitutes the entire agreement between the parties with respect to the subject matter hereof.

13.    NOTICE.

     13.1    All notices and communications hereunder shall be in writing and shall be deemed to be duly given if personally delivered or sent by regular, certified or registered mail, with or without return receipt requested, postage prepaid, addressed as follows:

          To SPONSOR:    Corn Associates LLC
                       316/318 Fulton street
                       Hempstead, New York 11550

To ESCROW
AGENT:          Herrick, Feinstein LLP
                2 Park Avenue
                New York, NY 10016
                Attn:  Leonard Grunstein, Esq.

or at such other address as any of the above may have furnished, as the address of such party, to the other parties in a notice given in accordance with the provisions of this Section. All notices sent in accordance with this Section shall be deemed given upon personal delivery or five days after the date of mailing, as the case may be.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first written above.

ESCROW AGENT:

HERRICK, FEINSTEIN LLP

By:_____

SPONSOR:

CORN ASSOCIATES LLC

By:_____
  Name:
  Title: