**B-8**

E. REPAIR OF NONFRIABLE MISCELLANEOUS ASBESTOS CONTAINING MATERIALS

If a situation such as a damaged floor tile exists, the best possible response action is replacement this cannot be done, the following is recommended:

1.  Repair work must be performed by qualified individuals, trained according to all federal, state and local regulations.

2.  Personal protective equipment and respiratory protection must be worn as per all applicable regulations.

3.  Post hazard signs and restrict access to the area.

4.  Prohibit access of unauthorized personnel.

5.  Clean up debris from surfaces via wet wipe/HEPA vacuum methods. No drilling, cutting with power tools or sanding is permitted.

6.  Cut all floor tiles with a utility knife.

7.  Fill all holes and cracks with an equivalent non-ACM and/or plaster. Apply a thick coating of bridging encapsulant at full strength. This form of encapsulant differs from a penetrating encapsulant in that it forms a surface layer of "skin" over nonfriable, impenetrable forms of asbestos. Allow to dry and apply a second coat.

8.  Record activities as part of the management plan and repeat periodic cleaning and surveillance as part of the on-going O&M program.

## 4.8 WASTE DISPOSAL

All ACM shall be double bagged in 6 mil polyethylene plastic bags. These bags shall be preprinted as per OSHA and Federal DOT requirements to show they contain ACM. Asbestos waste shall be kept in a secured and controlled location such as a routine and maintenance area of the facility. Filled bags of waste are carried to this area and placed in sealable metal or fiber 55 gallon drums, labeled as per applicable regulations. When the drums are full, they shall be sealed, labeled and transported to a landfill site approved for asbestos by EPA and all other federal, state and local requirements.

The waste containers shall be transported to the landfill site in a covered, lockable vehicle. All transported containers shall be accompanied by a proper chain of custody (manifest) form that details the origin of the material, date and quantities of transport, types of containers and their destinations. If transported by a third party hauler, information on the form is signed at each

**D-15**

transfer point and, after final transport to the landfill site, a copy of the form shall be maintained in the Building Engineer's office.

### 4.9 WARNING LABELS

Warning labels shall be attached immediately adjacent to any friable and nonfriable ACBM located in routine maintenance areas. The labels must be of a size, print and color easily visible to persons entering an area containing ACBM. The labels will read:

**CAUTION ASBESTOS, HAZARDOUS**
**DO NOT DISTURB**
**WITHOUT PROPER TRAINING AND EQUIPMENT**

Warning labels and signs must remain in place until the asbestos containing material(s) is/are removed.

### 4.10 SUGGESTED OPERATIONS AND MAINTENANCE EQUIPMENT

1.  Disposable coveralls
2.  Rubber or latex gloves
3.  Half face, dual cartridge negative pressure respirators with NIOSH and MSHA approved cartridges
4.  Safety goggles
5.  Surfactant
6.  Misting spray bottle
7.  Misting spray tank
8.  Dust mop/broom
9.  Polyethylene sheeting (6 mil)
10. Asbestos disposal bags (6 mil)
11. HEPA vacuum with attachments
12. Duct tape
13. Hand tools
14. Warning signs and labels
15. Scrim cloth and/or foil tape for pipe wrap
16. Encapsulant bridging and penetrating
17. Smoke tube kit
18. Glovebag

**D-16**

## 4.11 DOCUMENTATION AND RECORD KEEPING

As part of the management plan, the Owner must maintain all records in a central file. Th. records shall include documentation of all ACBM locations, conditions, response actions and activities in addition to training, medical records and personnel updates.

**D-17**

E

### DISCLAIMER

The work completed has been performed on behalf of and exclusively for the use of the client. Enviro Techniques, Inc., warrants that its services are performed within the limits prescribed by the client, with the usual thoroughness and competence of the Environmental Consulting and Testing profession. No other warranty or representation, either expressed or implied is included.

The judgmental consideration necessary for the performance of this work have been made by trained professionals, in accordance with generally accepted practices of Engineers and Scientists undertaking similar duties and performing similar projects.

Based on the nature of the work conducted, results of this survey should not be extrapolated to include areas not specifically mentioned.

Enviro Techniques believes that Polarized Light Microscopy is not consistently reliable in detecting asbestos in floor coverings and similar non-friable organically bound materials. Before this material can be considered or treated as non-asbestos containing, confirmation must be made by Quantitative Transmission Electron Microscopy.

**E-1**

# APPENDIX 1

## LETTER FROM NEW YORK INSULATION, INC.

# NEW YORK INSULATION, INC.

COMMERCIAL INSULATION • ASBESTOS REMOVAL

TEL: (718) 777-8861
FAX: (718) 777-8873

March 17, 1999

Mr. William Baron
C/o CORN ASSOCIATES, LLC AND AFFILIATES
316-318 Fulton Ave.
Hempstead, NY 11550

RE:    PROJECT COMPLETION CERTIFICATION
       ASBESTOS ABATEMENT SERVICES
       90 FRANKLIN STREET (AKA 271 CHURCH STREET)
       NEW YORK, NY

Dear Mr. Baron:

Pursuant to your request during our conference on this date, the undersigned is pleased to provide the following information relative to asbestos abatement activities performed within the referenced subject address.  This document shall be utilized in concert with a related report being submitted by Enviro Techniques, Inc., under separate cover, for submission to the Attorney General's office.

**ACP-5 WORK:**       BASEMENT, FLOORS 2-17, (ROOF COOLING TOWER)
**BASE CONTRACT:**    Remove 73,430 S/F of Double layer VAT
**CHANGE ORDER:**     Remove additional 33, 000 S/F of third Layer VAT
**BASE CONTRACT:**    Remove 304 S/F of ACM Transite

**ACP-7 WORK:**       SUB BASEMENT, BASEMENT FLOORS 2-17, PENTHOUSE
**BASE CONTRACT:**    Remove 3,779 L/F of ACM Pipe Insulation
**CHANGE ORDER:**     Remove 240 L/F of ACM Pipe Insulation

This document shall serve as formal certification that all exposed asbestos containing materials identified in the Soil Mechanics, October 16, 1998 report and additional asbestos containing materials exposed during demolition activities have been completely removed and disposed in strict accordance with applicable federal, state and local regulations, by New York Insulation, Inc., a qualified licensed abatement contractor.

I shall be available to assist you in any way necessary to achieve the goal you desire.  Please do not hesitate in contact me at (718) 777-8861, if you have any questions.

Very truly yours,

Michael F. Keith
VICE PRESIDENT

Cc:    Mike Wynn (WYNNE GROUP)
       Kru Jaghad (ENVIRO TECHNIQUES)

"NEW YORK'S INSULATOR"

31 - 19 38TH AVENUE
ASTORIA, N.Y. 11102

THIS PAGE LEFT BLANK INTENTIONALLY

## DECLARATION
## ESTABLISHING A PLAN FOR CONDOMINIUM OWNERSHIP
## OF THE PREMISES
## KNOWN AS AND BY THE STREET NUMBER
## 90 FRANKLIN STREET (a/k/a 271 CHURCH STREET)
## NEW YORK, NEW YORK 10013

Pursuant to Article 9-B
of the Real Property Law of the State of New York

Name            **THE  FRANKLIN TOWER**

Declarant       **CORN ASSOCIATES LLC**

Date of Declaration              , 199__

The land affected by the within instrument lies in Block 175 and Lot 10 on the Tax Map
of the Borough of Manhattan, City of New York.

**HERRICK, FEINSTEIN**
**Attorneys for Declarant**
**2 Park Avenue**
**New York, New York 10016**
**Attention: Leonard Grunstein, Esq.**

THIS PAGE LEFT BLANK INTENTIONALLY

## TABLE OF CONTENTS

**Section**                                                                                    **Page**

| | | |
|---|---|---|
| 1. | Submission of the Property | 312 |
| 2. | The Land | 312 |
| 3. | The Building | 312 |
| 4. | The Units | 312 |
| 5. | Common Elements | 314 |
| 6. | Determination of Common Interest in the Common Elements | 315 |
| 7. | Use of the Building and Units | 316 |
| 9. | Right to Combine, Subdivide or Realign Units | 316 |
| 10. | Encroachments | 318 |
| 11. | Certain Easements and Right of Entry | 319 |
| 12. | Power of Attorney to Declarant and to Board of Managers | 323 |
| 13. | Acquisition of Units by Board of Managers | 324 |
| 14. | By-Laws and Persons Subject to Declaration and By-Laws | 324 |
| 15. | Covenant of Further Assurances | 325 |
| 16. | Amendment of Declaration | 325 |
| 17. | Termination of Condominium | 326 |
| 18. | Invalidity | 327 |
| 19. | Waiver | 327 |
| 20. | Captions | 327 |
| 21. | Certain References | 327 |

311

THIS PAGE LEFT BLANK INTENTIONALLY

## DECLARATION OF THE FRANKLIN TOWER

**(Pursuant to Article 9-B of the
Real Property Law of the State of New York)**

CORN ASSOCIATES LLC, a New York limited liability company, having an office at 316/318 Fulton Avenue, Hempstead, New York 11550 (herein referred to as the "Declarant"), does hereby declare as follows:

    1.    <u>Submission of the Property</u>.

The Declarant is the fee owner of the "Property" as such term is defined below and hereby submits the Land (hereinafter defined) and Building (hereinafter defined) and all other property, real, personal or mixed, intended for use in connection therewith (collectively the "Property") to the provisions of Article 9-B of the Real Property Law of the State of New York (the "Condominium Act"), and pursuant thereto does hereby establish a condominium to be known as "THE FRANKLIN TOWER" (sometimes herein referred to as the "Condominium").

    2.    <u>The Land</u>.

The Property consists, in part, of all that certain tract, plot, piece and parcel of land situate, lying and being in the County, City and State of New York, more particularly described in Schedule A annexed hereto and made a part hereof, together with all easements, rights, privileges and hereditaments appurtenant thereto (collectively sometimes herein referred to as the "Land"). The Land is owned by the Declarant in fee simple.

    3.    <u>The Building</u>

The Property consists in part of a building, the exterior of which is constructed primarily of brick masonry, known as 90 Franklin Street (a/k/a 217 Church Street, New York, New York 10013). The Building contains seventeen stories at or above grade and a mezzanine, a cellar, a sub-cellar, and a three story mechanical penthouse bulkhead. The Building together with all other improvements now or hereafter erected thereon or on the Land are sometimes herein referred to as the "Building."

    4.    <u>The Units</u>.

Schedule B annexed hereto and made a part hereof sets forth the following data with respect to each unit of the Condominium necessary for the proper identification thereof: unit designation, tax lot number, approximate area, Common Elements (hereinafter defined) to which the unit has immediate access and percentage interest of each unit in the Common Elements (sometimes herein referred to as the "Common Interest"). The location of each unit is shown on the floor plans of the Building certified by guenther petrarca, llp (a/k/a Architecture + Furniture) and intended

312

to be filed in the office of the Register of the City of New York in New York County contemporaneously with the recording of the Declaration (herein referred to as the "Floor Plans").

As shown on the Floor Plans, the Condominium consists in part of three (3) condominium units designated on the Floor Plans as  Commercial Units (hereinafter sometimes referred to individually  as a "Commercial Unit" and collectively, as the "Commercial Units") , comprising portions of the first floor, the mezzanine, the cellar and  sub-cellar floors of the Building and such additional space in the Building which is part  thereof as set forth below in this Section 4 and (ii) twenty-five residential condominium units designated on the Floor Plans as Residential Units (hereinafter sometimes collectively referred to as "Residential Units" and individually referred to as a "Residential Unit") comprising portions of the second through seventeenth floors of the Building and such additional space in the Building which is part thereof as set forth below in this Section 4.

The Commercial Units and Residential Units are sometimes collectively referred to as "Units" and individually referred to as "Unit".  The owners of the Commercial Units are hereinafter sometimes referred to collectively as the "Commercial Unit Owners" and individually as a "Commercial Unit Owner."  The owners of the Residential Units are hereinafter sometimes collectively referred to as "Residential Unit Owners" and individually referred to as a "Residential Unit Owner."  The Commercial Unit Owners and Residential Unit Owners are sometimes collectively referred to as the "Unit Owners" and individually referred to as "Unit Owner."

Each Unit consists of the area measured (a) vertically from the top of the concrete ceiling to the underside of the concrete floor and (b) horizontally to the center line of demising walls between Units; to the center line of non-structural common walls; to the inside face of common structural walls; to the inside face of common structural walls or elements; and to the outside face of exterior walls.  The trash room serving each Residential Unit comprises part of such Unit.  Stairways and mechanical space that are interior to a Unit comprise part of such Unit. A roof terrace, a portion of which will be enclosed, a penthouse roof and the roof of the first level of the mechanical penthouse comprise part of Unit 17.  The elevator lobbies of Units  11,12, 13, 14, 15, 16, and 17 comprise part of each such Unit.  Each Unit shall also be deemed to include (i) that portion of any wall or partition separating such Unit from Common Elements that lies between the Unit side of such wall or partition and the frame or masonry, as the case may be, of such wall or partition, (ii) the doors and windows which open from the Unit.

Each of the Units is subject to such encroachments as are described in Section 10 of this Declaration.

313

5.    Common Elements.

(a) The Common Elements of the Condominium ("Common Elements") shall consist of all parts of the Property other than the Units and are comprised of (i) the general common elements which are described in Section (d) of this Article 5, the limited common elements (the "Limited Common Elements") which are described in Section (b) of this Article 5 and the Residential Common Elements (the "Residential Common Elements"), which are described in Section (c) of this Article 5. In addition, the Commercial Unit Owner shall have the right, as more fully described in Section 9 hereof to convert space or constituents of its Units into a newly designated Limited Common Element.

(b) The Limited Common Elements of the Condominium consist of those Common Elements which serve or benefit exclusively a particular Unit and which are identified as a Limited Common Element on the Floor Plans, or which are created pursuant to the terms of this Declaration (including, without limitation, the provisions of Section 9 below). In addition, if any two Units which have access to the same shared hallway shall at any time be owned of record by the same owner (other than by the Declarant or its designee), such hallway shall thereafter be treated as a Limited Common Element until such time as such Units shall have different owners; provided that once such Units shall again have different owners, such hallway shall revert to the status of a Residential Common Element (or a General Common Element) if applicable. A Common Element which is not a Limited Common Element or a Residential Common Element is a "General Common Element." The eighteen (18) inch strip running along the full perimeter of the roof above the mechanical penthouse bulkhead is a Limited Common Element appurtenant to Commercial Unit C.

(c) The Residential Common Elements consist of the residential vestibule, entrance, service hall (nearest the Church Street entrance), residential lobby, vestibule, entrance hall, the concierge area, (including the toilet and storage areas adjacent thereto) and those hallways, corridors, rooms, and areas such as the elevator lobbies on floors 2-10, that serve two or more Residential Unit Owners (but not any Commercial Units and not the Limited Common Elements appurtenant to Commercial Unit C) and any central and appurtenant installations and equipment for services, including all pipes, ducts, wires, cables and conduits, maintenance, meter and common spaces used in connection with or serving two or more Residential Units or other Residential Common Elements or a Limited Common Element appurtenant to a Residential Unit.

(d) The General Common Elements consist of the parts of the Property designated on the Floor Plans as General Common Elements and/or as Common Elements (exclusive of Common Elements, if any, designated on the Floor Plans as Limited Common Elements or which are re-designated as Limited Common Elements pursuant to the terms of this Declaration including Sections 5 and 9 hereof) and exclusive of Residential Common Elements and include (even if within the dimensions of a Unit) the following:

314

        i)      The Land;

        ii)     Any foundations, columns, girders, beams, supports, and wood joists;

        iii)    All walls and partitions separating Units from the General Common Elements;

        iv)    To the extent not located within or specifically made a part of a Unit or the Residential Common Elements or a Limited Common Element, if any, the roof, stairs, stairways, hallways and corridors within the General Common Elements and entrances to and exits from the General Common Elements;

        v)     The central and appurtenant installations and equipment for services such as power, light, telephone, gas, hot and cold water, sewer and fire safety, including all pipes, ducts, wires, cables and conduits used in connection therewith and all maintenance, storage area in sub-cellar and storage area in corridor leading from 17th floor to the roof, meter and common equipment spaces (including the mechanical room, machine room, elevator pits, stairs, building office, meter room, water meter, trash holding room, telephone room, janitor closet, toilet on cellar level, transformer room, water meter room, water pump room and telecommunications closet) in connection therewith (except for appliances and equipment located in and serving only a Unit which shall constitute a part of such Unit);

        vi)    Maintenance and common equipment spaces and common tanks, pumps, motors, fans and controls or other such equipment;

        vii)   All Units which may hereafter be acquired and held by the Board of Managers on behalf of all Unit Owners, but only while so held;

        viii)  To the extent not specifically made part of a Unit, the Residential Common Elements or a Limited Common Element by the terms of this Declaration, all other parts of the Property including all apparatus and installations existing on the Land for common use or which are necessary or convenient to the existence, maintenance or safety of the Property;

    6.    <u>Determination of Common Interest in the Common Elements.</u>

        The Common Interest of each Unit in the Common Elements is set forth in Schedule B and has been determined by the Declarant in accordance with Real Property Law Section 339-I.1(iv), based upon floor space, subject to the location of such space and additional factors of relative value of such space to other space in the Condominium, the uniqueness of the Unit, the availability of Common Elements for exclusive or shared use and the overall dimensions of the Unit. The Common Interest of each Unit that includes below grade space has been computed based upon 100% of the above grade space and 7% of the below grade space. The Common Interest of

315

Unit 17 is computed based on the full floor area of all interior space comprising such Unit (including the enclosed portion of the roof terrace) and 50% of the floor area of all exterior space (i.e., the roof terrace and penthouse roof and roof of the first level of the mechanical penthouse) comprising such Unit. The floor area of the trash room and any mechanical space situated within a Unit as well as the elevator lobbies serving and comprising part of Units 11, 12, 13, 14, 15, 16, and 17 have been included in the floor area of such Unit for the purpose of computing such Unit's Common Interest.

7.    Use of the Building and Units.

The Building is presently used or will be used as a class A multiple dwelling with commercial space located on the ground floor, mezzanine, the cellar and a portion of the sub-cellar of the Building.

The Residential Units may be used solely for dwelling purposes and such "home occupation" use under the Zoning Resolution of the City of New York as may be permitted by law, except as set forth below.

The Commercial Units may, except as set forth in the next sentence, be used for any lawful purpose permitted under the Zoning Resolution of the City of New York and other applicable law. The Commercial Units may not be used for any obscene or noxious purpose.

The Declarant or its designees shall have the right to maintain a general or sales office in any Unit owned by any of them and to use any Unit owned by any of them as a model and for other promotional purposes in connection with the sale or lease of Units in the Condominium.

8.    Person to Receive Service.

The Secretary of State of the State of New York is designated as agent of the Board of Managers of the Condominium (the "Board of Managers" or the "Board") upon whom process against it may be served at the Office of the New York State Department of State in the manner provided by applicable law. The Board of Managers shall file with the Secretary of State the name and post office address of the Condominium for purposes of receiving copies of any process served against the Board of Managers.

9.    Right to Combine, Subdivide or Realign Units.

Notwithstanding any other provision of the Declaration or By-Laws (hereinafter defined), Declarant, its designees and each Commercial Unit Owner (to the extent applicable to such Commercial Unit Owner's Unit, as the case may be, shall have the right, without the consent of any of the other Unit Owners, or the Board of Managers or the mortgagee of any Unit, from time to time, to (a) change its Unit or any

316

part thereof by changing the layout, number of rooms, or size or number of such Unit or by subdividing the same into any desired number of condominium units (or by combining any units resulting from any such subdivision); (b) create and designate a Limited Common Element for the exclusive use of the newly created Units; (c) convert space or constituents of its Unit into a newly designated Limited Common Element and/or convert and designate a Limited Common Element as a part of the newly created condominium units; (d) combine Units with the consent only of the owners of such Units to be combined; (e) reapportion among any newly created condominium unit(s) resulting from any subdivision (or combination) as provided above the Common Interest appurtenant to the Units; (f) in the case of a Commercial Unit, construct, install, maintain, repair, replace or alter a storefront, facade or other exterior portion of such Unit, (g) dedicate any or all utility, sewer, telecommunications or cable television and drainage easements in any portion of the Property to any governmental body, public benefit corporation, telecommunications or cable television company or utility company if such Commercial Unit Owner, Declarant or designee of Declarant shall deem it necessary or desirable for the proper operation and maintenance of its Unit or (as to Declarant) the Property and (h) amend the certificate of occupancy of the Building or obtain a new certificate of occupancy therefor in connection with the exercise of any of its rights under this Section 9. However, by reason of the foregoing, the Common Interest of the other Units shall not be enlarged unless the affected Unit Owner consents thereto, except that Limited Common Elements may be created for the exclusive use of any or all of the aforesaid subdivided (or combined) condominium units as provided above, in which event the Common Expenses exclusively attributable to such Limited Common Elements shall be borne by the owners of such subdivided (or combined) Condominium Units. The Commercial Unit Owners, Declarant and/or its designees, as the case may be, shall each have the right to reflect any of the matters described above in a duly recorded amendment to the Declaration (and the obligation to do so in case clause (a) above applies) or the By-Laws or the Floor Plans, and may further amend the Declaration and By-Laws to provide for the conduct of the affairs of a Unit as subdivided in any manner which does not increase the obligations or decrease the rights of any of the other Unit Owners under the Declaration or the By-Laws, which amendment and the recording thereof shall not require the consent of the Board of Managers and/or other Unit Owners. In making any additions, alterations, or improvements pursuant to this Section 9, such Commercial Unit Owner, Declarant or its designees, as the case may be, shall (i) make all reasonable efforts to minimize any interference with the other Unit Owners' use and enjoyment and business conduct in their Units for permitted purposes; (ii) comply with all laws, ordinances and governmental authorities having jurisdiction and (iii) hold the Board of Managers and the other Unit Owners harmless from any liability arising therefrom. Notwithstanding anything to the contrary contained herein, neither the Declarant nor the Commercial Unit Owner shall take any action described in this Article 9 for so long as the Construction Loan (as such term is defined in the By-Laws) is a lien on any Unit that would be affected by such action, without the prior written consent of the Construction Lender (as such term is defined in the By-Laws).

317

The consent of the Board of Managers and/or other Unit Owners shall not be required for the exercise by any Commercial Unit Owner, Declarant or its designees, as the case may be, of the rights and powers set forth in this Section 9 or in Section 11 below. Neither the provisions of this Section 9 (or of Section 11 below) nor any of the other rights and powers of a Commercial Unit Owner, Declarant or its designees, as the case may be, under this Declaration or the By-Laws, including without limitation the authority of any Commercial Unit Owner, Declarant or its designees, as the case may be, to record an amendment of the Declaration or By-Laws or the Floor Plans pursuant to this Section 9, may be modified or deleted by amendment of the Declaration or By-Laws or otherwise. The signatures of the other Unit Owners and/or Board of Managers shall not be required in connection with any amendment to the Declaration or By-Laws or Floor Plans permitted above or to any application or other document necessary or convenient to the exercise by a Commercial Unit Owner, the Declarant or its designees, as the case may be, of any of their rights or powers under this Section 9 or under Section 11 below, including but not limited to any application or document required by the Department of Buildings, the Real Property Assessment Bureau of the City of New York or any other governmental agency in connection with an amendment to the certificate of occupancy of the Building or the establishment of separate tax lots for any newly created condominium units and reapportionment of assessed valuation by reason thereof. Nevertheless, the Unit Owners and the Board of Managers shall execute any such amendments, applications or other documents and they hereby grant to each Commercial Unit Owner, the Declarant and/or its designees, an irrevocable power of attorney coupled with an interest and granted for a valuable consideration to execute, deliver and/or record any such amendments, applications or other documents on behalf of the Board of Managers and Unit Owners, and any such execution, delivery and/or recording shall not require the consent of the Board of Managers or the Unit Owners.

10.    Encroachments.

If any portion of the Common Elements presently encroaches upon any Unit or if any Unit presently encroaches upon any other Unit or upon any portion of the Common Elements or, if as a result of the manner in which the Building was constructed or as a result of settling or shifting of or as a result of the repair, restoration, and/or alteration of the Building, the Common Elements or a Unit owned by Declarant or its designees, such encroachment shall occur, then a valid easement for the encroachment and for the maintenance of the same, so long as the Building stands, shall exist. If the Building or any Unit therein or any Common Element shall be partially or totally destroyed as a result of fire or other casualty or as a result of condemnation or eminent domain proceedings and then rebuilt, then in such event, encroachments of parts of the Common Elements upon any Unit or of any Unit upon any other Unit or upon any portion of the Common Elements due to such rebuilding shall be permitted and valid easements for such encroachments and the maintenance thereof shall exist so long as the Building shall stand.

11.   Certain Easements and Right of Entry.

Each Unit Owner shall have an easement in common with the other Unit Owners for the use, maintenance, repair and replacement of all pipes, wires, ducts, cables, conduits, public utility lines and other Common Elements located in any of the other Units or elsewhere in the Property and serving his Unit. Each Unit shall be subject to an easement in favor of the other Unit Owners for the use, maintenance, repair and replacement of all pipes, ducts, cables, wires, conduits, public utility lines and other Common Elements serving such other Units and located in such Unit. The Board of Managers shall have a right of access to each Unit to inspect the same, to prevent damage thereto, to remove violations therefrom and to maintain, repair or replace the Common Elements contained therein or elsewhere in the Property subject to any restrictions on such right as may from time to time be provided in the By-Laws. Each Unit and the Common Elements shall have an easement of support, subjacency and necessity and shall be subject to such easement in favor of all the Units and the Common Elements.

The Declarant and any of its affiliates or designees and their successors, assigns, invitees, licensees, contractors, employees and tenants, shall have an easement in, on, over and across all areas of the Property for ingress to and egress from all land areas of the Property and the use thereof (in common with Unit Owners) for construction or renovation of the Building, or any part thereof, the inspection, maintenance and performance of alterations, replacements, and repairs in or about Units owned by the Declarant or its designees or the Common Elements and in fulfilling the Declarant's obligations under the condominium offering plan promulgated by the Declarant for the Property (the "Plan") and for any other lawful purpose provided (i) Declarant or such other party repairs any resulting damage to the Unit or Common Elements, as the case may be, and restores the damaged portion to substantially the condition it was in prior to such entry and (ii) Declarant provides reasonable prior notice to the owner of the Unit to which access is required or the Board in the case of the Common Elements.

Declarant and/or its designees shall have an easement, without the necessity of obtaining the consent of the Board of Managers and/or Unit Owners over any part of the Property, including each Unit and the Common Elements, in order to inspect, maintain, repair, replace or alter its Units or the Common Elements as provided in this Declaration and the By-Laws.

Declarant and/or its designees and each Commercial Unit Owner (to the extent applicable to such Unit Owner's Commercial Unit), shall have an easement without the necessity of obtaining the consent of the Board of Managers and/or Unit Owners (1) over the Property, including each Unit and the Common Elements, for access to and to construct, install, erect, inspect, maintain, repair, operate, use and replace from time to time one or more Signs (as hereinafter defined) on the Property (including, without limitation on any Common Element, storefront, exterior facade, lobby

319

or any other public portion of the Property) for the purposes of advertising the sale of Units and the leasing of the Units or of space in any of the Units or advertising any of the services and/or facilities of such Commercial Unit Owner or the services and/or facilities of any tenant occupying such Commercial Unit; (2) over the Property, including each Unit and the Common Elements in connection with the sales and/or leasing of Units; (3) over the Property, including each Unit and the Common Elements for access to and to construct, install, erect, inspect, maintain, repair, operate, use and replace from time to time a storefront, facade or other exterior portion adjacent to the Commercial Units; (4) over any part of the Property, including each Unit and the Common Elements (including, without limitation, the stairways, walkways, elevators, vestibules and other public spaces within the Property) for purposes of access to and for all purposes in connection with the installation (whether on Common Elements or within its Unit), inspection, maintenance, repair, operation, improvement or use of any of the following serving a Commercial Unit: the Service Equipment (as hereinafter defined), flues and/or ducts, security system (including, without limitation, any and all cables and electrical lines as may be desirable in connection with the installation, maintenance, repair and/or replacement of telecommunications or similar equipment on the portion of the roof of the mechanical penthouse bulkhead comprising a Limited Common Element appurtenant to Commercial Unit C to the exterior of the Building and or to all portions of the roof, as deemed necessary or desirable by the owner of Commercial Unit C) alarms, gates, electric eyes or video cameras, smokestacks, heating, air-conditioning systems and devices and exhaust and ventilation fans, systems and devices, in each case, located anywhere on the Property. Not-withstanding the above, the Commercial Unit Owner may only install such Signs on the exterior of the Building as shall be approved, in writing, by the Declarant or its designee, and in no case shall a neon sign be installed on the exterior of the Building by any Commercial Unit Owner without the prior written approval of the Declarant or its designee.

The Common Elements and the Limited Common Elements appurtenant to Commercial Unit C shall be subject to non-exclusive easements in favor of New York Telephone Company d/b/a Bell Atlantic - New York and Bell Atlantic Video Services Company or other telecommunications firm(s) selected by Sponsor over the (a) Common Elements and (b) such location within the Limited Common Elements appurtenant to Commercial Unit C as may be (a) necessary to provide such telecommunications services and satellite dish services as may be described in such written agreements as may be entered into by Sponsor and/or the Condominium Board, and (b) approved in writing by Sponsor (prior to the Closing Date) or the Condominium Board and the owner of Commercial Unit C (after the Closing Date), which consent(s) shall not be unreasonably withheld or delayed, for the installation, maintenance, repair, replacement and removal of a satellite dish and antennas and any and all related telecommunications equipment and facilities including, without limitation, cables, wires, conduits, horizontal and vertical risers, shafts, terminals, multiplexes and other equipment and apparatus. In addition, such telecommunications firms shall have an easement for access to each Unit for the maintenance, repair and replacement of any of the foregoing equipment, if situated within such Unit.

320

Declarant and the Commercial Unit Owners will have an easement to construct, operate and maintain an elevator from the cellar to the sub-cellar in the area adjacent to the trash holding room; any such elevator, if so installed, shall become a General Common Element. The owner of Commercial Unit C shall have the exclusive right, without obtaining the consent of the Board and shall have all necessary or convenient access to install, erect, construct, inspect, operate, use, maintain, repair and replace or alter antennas, cellular telephone, telecommunications and similar equipment on any and all parts of the portion of the roof of mechanical penthouse bulkhead comprising a Limited Common Element appurtenant to Commercial Unit C and, shall have an easement through the Common Elements to install, erect, construct, inspect, operate, use, maintain, repair and replace or alter such wires, conduits, cables and similar equipment servicing or otherwise required or convenient in connection with the installation, existence, servicing, maintenance, repair and/or replacement of any such antennas, cellular communications, telecommunications or similar equipment (collectively, "Commercial Unit C's Telecommunications Rights"). The owner of Commercial Unit C shall be entitled to collect and retain all revenues of any type whatsoever derived from Commercial Unit C's telecommunication rights and/or such equipment. The owner of Commercial Unit C shall have the right to grant to any party (whether or not a Unit Owner) the foregoing telecommunications rights, whether on an exclusive or non-exclusive basis, as the owner of Commercial Unit C may elect and such grantee(s) (and their successors and assigns) may, in turn, assign such Telecommunications Rights. The Telecommunications Rights described above are in addition to "Declarant's Telecommunication Rights" (as hereinafter defined) and any telecommunications systems serving the Unit Owners. All Telecommunications Rights granted to the owner of Commercial Unit C shall have priority over any similar rights and installations that may be made by either the Declarant or the Condominium Board, and Declarant's Telecommunication Rights (as set forth below) shall have priority over any similar rights and installations that may be made by the Condominium Board. If the Condominium Board receives any offer or solicitation of any type whatsoever from any entity interested in, or that would otherwise entail the use of Telecommunications Rights, the Condominium Board shall notify the Declarant, which shall have the right for thirty days following notice from the Condominium Board, to notify the Condominium Board that it (i.e., the Declarant) intends to enter into an agreement with the offeror. The Declarant shall thereafter have a period of one hundred twenty (120) days to consummate such agreement, failing which the Condominium Board may consummate an agreement with the offeror. In no event shall the Condominium Board approve the installation of any telecommunications equipment of the type described herein, on any Limited Common Element or in any location that would interfere any installation and operation of any such equipment by the owner of Commercial Unit C or the Declarant or their respective successors assignees, lessees or licensees. The Condominium Board of Managers and any individuals assigned by any utility company to read or maintain water meters shall have an easement from the elevators through Commercial Unit A to the water meter room. Each of the foregoing easements shall be exercised in such manner as not to unreasonably disrupt the use by other Unit Owners of their respective Units.

321

If the Commercial Unit has an entrance or exit leading to the lobby or any interior portion of the Building, and such entrance or exit is locked by the Board of Managers, then the Commercial Unit Owner may install an intercom and buzzer-lock system (or alternate system with a similar purpose) to allow persons to pass through such entrance or exit (however, patrons of a Commercial Unit shall not use the elevators in the lobby except (i) for handicapped access to the Commercial Unit, (ii) if required by law, or (ii) in the event of an emergency), and to use the sidewalks adjacent to its Unit, including for the placement of Signs, advertising retail space or other commercial space, operation of a sidewalk cafe and the installation and maintenance of deposit boxes for any banks. The signatures of other Unit Owners and/or the Board of Managers shall not be required in connection with any application or other document necessary or convenient to the exercise by a Commercial Unit Owner of its right to use such sidewalks as provided above. Nevertheless, the Unit Owners and the Board of Managers shall execute any such application or other document and they hereby grant to each Commercial Unit Owner an irrevocable power of attorney coupled with an interest to execute and deliver any such application or other document and the execution and delivery thereof shall not require the consent of the Board of Managers and/or the other Unit Owners. If a Commercial Unit Owner makes use of any sidewalk or submits any application or document pursuant to the preceding two sentences, it shall indemnify and hold the Board of Managers, the Declarant and all other Unit Owners harmless from and against any claim, liability, loss, cost, damage and expense (including reasonable attorneys' fees and expenses) arising out of or in connection with such use and/or such application or document, as the case may be.

The Declarant and its designees shall have an easement, without the necessity of obtaining the consent of the Board of Managers or the Unit Owners, over the Property (including the Units and the Common Elements to (i) install, erect, construct, inspect, operate, use, maintain, repair, replace or alter roof antennas, cellular communications, telecommunications and similar equipment on the Building roof (whether or not serving a Unit owned by Sponsor and/or its designees) in such locations as Declarant shall determine, other than in the space specifically set aside on the Building roof as a Limited Common Element or as roof recreation area to be shared by all Unit Owners and (ii) and to collect any and all income derived from such facilities (such easement and all appurtenant rights as described above, collectively, the "Declarant's Telecommunication Rights"). Declarant shall have the right to grant to any party (whether or not a Unit Owner) the Declarant's Telecommunication Rights, whether on an exclusive or non-exclusive basis, as Declarant may elect and such grantee(s) (and their successors and assigns) may, in turn, assign their Declarant's Telecommunication Rights on an exclusive or non-exclusive basis, as they may determine.

The Declarant and its designees, as the case may be, (without the necessity of obtaining the consent of the Board of Managers or the Unit Owners) and the Board of Managers (without the necessity of obtaining the consent of the Unit Owners) shall each have the right to establish, grant and create easements for any additional electric, transformer, amplifier, gas, cable television, telephone, water, sewer or other utility

lines, flues, ducts and appurtenances (including such equipment rooms as may be required in connection with any of the foregoing) in, under and through the Property including, without limitation, within any of the Units, and to relocate any existing utility, sewer and drainage easements in any portion of the Property including, without limitation, within any of the Units, provided that such additional utilities or the relocation of existing utilities will not prevent or unreasonably interfere with the use of a Unit (or the Limited Common Elements appurtenant thereto) after construction thereof without the consent of the owner of such Unit.

As used in this Section 11 and elsewhere in this Declaration, the following terms shall have the respective meanings set forth below:

"Building roof antennas" shall mean any antennas or other communications devices (including, without limitation, a telephone repeater or other communication antennae or device for cellular telephones) and any ancillary electrical equipment now or hereafter installed on the Building roof by an owner of Commercial Unit C's Telecommunication Rights or Declarant's Telecommunication Rights.

"Service Equipment" shall mean all of the following now or hereafter installed in the Building, serving one or more Units or the Limited Common Elements, if any, appurtenant thereto: (i) pipes, wires, ducts, risers, cables, conduits and (ii) mechanical, electrical and other equipment, including supplemental air-conditioning systems, antennas and other communications devices.

"Signs" means any sign, advertisement, notice or other lettering.

12.    Power of Attorney to Declarant and to Board of Managers.

Each Unit Owner shall grant to the persons who shall from time to time constitute the Board of Managers an irrevocable power of attorney coupled with an interest and granted for a valuable consideration to (a) acquire title to or an interest in any Unit which a Unit Owner decides to surrender, sell or lease, in the name of the Board of Managers or its designees, corporate or otherwise, on behalf of all Unit Owners, (b) convey, sell, lease, mortgage, or otherwise deal with (but not to cast the votes appurtenant to) any Units acquired by the Board of Managers, (c) execute, acknowledge and deliver (i) any application, declaration or other document which the Board of Managers or a Unit Owner deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of any governmental authority (including without limitation, the New York City Department of Buildings, the City Planning Commission and the Board of Standards and Appeals), applicable to the maintenance, demolition, construction, alteration, repair, improvement or restoration of a Unit or the Common Elements or combination or subdivision of a Unit permitted hereunder or (ii) any application, consent, covenant, restriction, easement, declaration, or other document affecting a Unit or the Common Elements as may be required or permitted under this Declaration.

consent thereto in writing, which consent shall not be unreasonably withheld or delayed; and (ii) if the Declarant or its designees or any Commercial Unit Owner shall not have voted in favor of such amendment, then same shall not be effective unless reasonably necessary or convenient to the conduct of the affairs of the Condominium and/or the operation of the Property and such amendment shall not decrease the rights of such Commercial Unit Owner, the Declarant or its designees or increase the obligations of such Commercial Unit Owner, the Declarant or its designees. Notwithstanding anything to the contrary contained herein, no provision of this Declaration relating to the use of the Units or appurtenant Common Interests may be amended without the consent of every Unit Owner affected by such amendment except as expressly provided in Section 9 or Section 11 of this Declaration. Any such amendment shall be executed by the Board of Managers as attorneys-in-fact for the Unit Owners, coupled with an interest and granted for a valuable consideration, and the Board of Managers is hereby authorized by the Unit Owners so as to act as their attorney-in-fact.

Each amendment to this Declaration or the By-Laws must be signed and acknowledged in accordance with the legal requirements for recording a Unit Deed, and shall not be effective, binding or enforceable until recorded in the New York City Register's Office for New York County. In addition, a copy of this Declaration and the By-Laws and any amendments thereto shall be filed with the New York State Department of State.

The provision of this Section 16 and Section 9 may not be amended without the unanimous consent of all the Unit Owners. The terms "amend," "amended" or "amendment" as used in this Declaration shall also be deemed to mean deleting a provision of this Declaration or adopting a new provision.

17.    Termination of Condominium.

The Condominium shall continue until (a) terminated by casualty loss, condemnation or eminent domain, as more particularly provided in the By-Laws or (b) such time as withdrawal of the Property from the provisions of the Condominium Act is authorized by a vote of at least 80% in number and in Common Interest of all Unit Owners and all of the holders of mortgages of record affecting the Units. No such vote under clause (b) in the preceding sentence shall be effective without the written consent of the mortgagees of the Units, if any. In the event said withdrawal is authorized as aforesaid, the Property shall be subject to any action for partition by any Unit Owner or lienor as if owned in common, in which event the net proceeds of sale shall be divided among all Unit Owners in proportion to their respective Common Interests, provided, however, that no payment shall be made to a Unit Owner until there has first been paid from out of his share of such net proceeds, all liens on his Unit, in the order of priority of such liens.

18.   <u>Invalidity</u>.

The invalidity of any provisions of this Declaration or any portion thereof shall not be deemed to impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration and in such event all of the other provisions of this Declaration shall continue in full force and effect as if such invalid provision had never been included herein.

19.   <u>Waiver</u>.

No provision contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

20.   <u>Captions</u>.

The captions herein are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or the intent of any provision hereof.

21.   <u>Certain References</u>.

The use of the masculine gender in this Declaration shall be deemed to refer to the feminine gender and the use of the singular shall be deemed to refer to the plural and vice versa whenever the context so requires.

The terms "herein", "hereof" or "hereunder," or similar terms used in this Declaration, refer to this entire Declaration and are not to the particular provision in which the terms are used unless the context otherwise requires.


IN WITNESS WHEREOF, the Declarant has caused this Declaration to be executed as of this _____ day of _____, 19____.


CORN ASSOCIATES LLC


By:   _____
      Name:
      Its:


327

STATE OF NEW YORK     )
                         ) SS.:
COUNTY OF               )

        On the _____ day of _____, _____, before me personally came _____ to me known, and who executed the foregoing instrument and, who being by me duly sworn, did depose and say that he is the _____ of Franklin Church Associates LLC which limited liability company is the Managing Member of Corn Associates LLC and that he executed the foregoing instrument in the name of said limited liability company and that he had authority to sign the same, and he acknowledged that he executed the same as the act and deed of said limited liability company.

## SCHEDULE A

### Description of Land

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Franklin Street and the easterly side of Church Street; running thence easterly along the northerly side of Franklin Street, a distance of 75 feet; thence northerly and parallel with the easterly side of Church Street, a distance of 75 feet; thence westerly and parallel with the northerly side of Franklin Street, 75 feet to Church Street; thence southerly along the easterly side of Church Street, 75 feet to the northerly side of Franklin Street, the point of place of BEGINNING.

Premises being known as and by street No. 271 Church Street, New York, NY.

In addition, each Unit Owner shall grant to Declarant an irrevocable power of attorney coupled with an interest and granted for valuable consideration, to execute, acknowledge and deliver any application, declaration, document or other instrument affecting the Condominium that Declarant deems necessary or appropriate to comply with any Law, zoning resolution, or requirement of the Department of Buildings, or any other governmental authority applicable to the rehabilitation, maintenance, demolition, alteration, restoration, or repair of the Property or any part thereof.

### 13.    Acquisition of Units by Board of Managers.

If a Unit Owner shall surrender his Unit together with (i) the undivided interest in the Common Elements appurtenant thereto, (ii) the interest of such Unit Owner in any other Units acquired by the Board of Managers or its designees on behalf of the other Unit Owners or the proceeds of the sale or lease thereof if any, and (iii) the interest of such Unit Owner in any other asset of the Condominium (hereinafter collectively referred to as the "Appurtenant Interest") pursuant to the provisions of the Real Property Law of the State of New York, or in the event the Board of Managers shall purchase a Unit together with its Appurtenant Interest pursuant to Article VI of the By-Laws or otherwise, or if the Board of Managers shall acquire, at a foreclosure or other sale, a Unit together with its Appurtenant Interest, then and in such event, title to any such Unit together with the Appurtenant Interest shall be held by the Board of Managers or its designees, corporate or otherwise, on behalf of all Unit Owners in proportion to their respective Common Interests.

### 14.    By-Laws and Persons Subject to Declaration and By-Laws.

Attached to this Declaration and made a part hereof are the By-Laws of the Condominium which set forth detailed provisions governing the Condominium. The By-Laws (including the Rules and Regulations thereunder) as they may be amended from time to time are referred to in this Declaration as "By-Laws." All capitalized terms in this Declaration which are not defined herein shall have the meanings given to those terms in the By-Laws.

All present and future Unit Owners, tenants, visitors and occupants of Units shall be subject to and shall comply with the provisions of this Declaration and the By-Laws, as the same may be amended from time to time. Acceptance of a deed or other conveyance or the entering into of a lease or other occupancy of any Unit shall constitute an agreement that the provisions of this Declaration and By-Laws, as the same may be amended from time to time, are accepted and ratified by such Unit Owner or such other party having an interest in the Unit or by such tenant or other occupant. All of the provisions of this Declaration and By-Laws shall be deemed and taken to be covenants running with the land and shall bind any persons having at any time any interest or estate in any Unit as though such provisions were recited and stipulated at length in each and every deed, conveyance, lease or occupancy thereof. However, the provisions of this Declaration and the By-Laws, as the same may be amended from

time to time, are not intended to create nor shall they be construed as creating any rights in or for the benefit of the general public.

15.    Covenant of Further Assurances.

Any party which is subject to the terms of the Declaration, whether such party is a Unit Owner, a lessee or sublessee of a Unit Owner, an occupant of a Unit, a member or officer of the Board of Managers, or otherwise, shall execute, acknowledge and deliver to such other party such instruments, in addition to those specifically provided for herein, and take such other action, as such other party may reasonably request to effectuate the provisions of this Declaration or the By-Laws or of any transaction contemplated by this Declaration or the By-Laws or to confirm or perfect any right to be created or transferred pursuant to this Declaration or the By-Laws or pursuant to any such transaction.

If any Unit Owner or any other party which is subject to the terms of this Declaration fails or refuses within five (5) days after request therefor to execute, acknowledge or deliver any instrument, or to take any action which such Unit Owner or other party is required to execute, acknowledge and deliver or to take pursuant to this Declaration or the By-Laws, then the Board of Managers is hereby authorized as attorney- in-fact for such Unit Owner and other party, coupled with an interest and granted for a valuable consideration, to execute, acknowledge and deliver such instrument and to take such action, in the name of such Unit Owner or other party.

If any Unit Owner, the Board of Managers or any other party which is subject to the terms of this Declaration fails or refuses within five (5) days after request therefore to execute, acknowledge or deliver any instrument or to take any action which such Unit Owner, the Board of Managers, or other party is required to execute, acknowledge and deliver or to take pursuant to this Declaration or By-Laws at the request of the  Declarant or its designees, as the case may be, then the Declarant or its designees, as the case may be, is hereby authorized as attorney-in-fact for such Unit Owner, the Board of Managers and other party, coupled with an interest and granted for a valuable consideration, to execute, acknowledge and deliver such instrument and to take such action in the name of such Unit Owners, the Board of Managers and/or other party.

16.    Amendment of Declaration.

Except as otherwise provided in the By-Laws and this Declaration with respect to a Commercial Unit Owner, Declarant or its designees, as the case may be, this Declaration may be amended by vote of not less than 80% in number and in Common Interest of all Unit Owners cast in person or by proxy at a meeting duly held in accordance with the provisions of the By-Laws, provided, however, (i) any such amendment shall not be effective against (a) the Construction Lender, for so long as it holds a lien on any Unit, without its prior written consent and (b) a holder of a mortgage of record affecting a Unit, unless a Majority of the Mortgage Representatives shall

## SCHEDULE B

| Unit Designation | Number of Rooms | Tax Lot Number | Approximate Size of Unit in Square Feet Unit | Common Interest | Portion of the Common Elements to Which Each Unit Has Immediate Access | Location in Building |
|---|---|---|---|---|---|---|
| 2 North |  |  |  | 2.3404 |  |  |
| 2 South |  |  |  | 3.2518 |  |  |
| 3 North |  |  |  | 2.3404 |  |  |
| 3 South |  |  |  | 3.2518 |  |  |
| 4 North |  |  |  | 2.3404 |  |  |
| 4 South |  |  |  | 3.2518 |  |  |
| 5 North |  |  |  | 2.3404 |  |  |
| 5 South |  |  |  | 3.2518 |  |  |
| 6 North |  |  |  | 2.3404 |  |  |
| 6 South |  |  |  | 3.2518 |  |  |
| 7 North |  |  |  | 2.3404 |  |  |
| 7 South |  |  |  | 3.2518 |  |  |
| 8 North |  |  |  | 2.3404 |  |  |
| 8 South |  |  |  | 3.2518 |  |  |
| 9 North |  |  |  | 2.3404 |  |  |
| 9 South |  |  |  | 3.2518 |  |  |

| Unit Designation | Number of Rooms | Tax Lot Number | Approximate Size of Unit in Square Feet Unit | Common Interest | Portion of the Common Elements to Which Each Unit Has Immediate Access | Location in Building |
|---|---|---|---|---|---|---|
| 10 North | | | | 2.3404 | | |
| 10 South | | | | 3.2518 | | |
| 11 | | | | 6.2084 | | |
| 12 | | | | 6.2084 | | |
| 13 | | | | 6.2084 | | |
| 14 | | | | 6.2084 | | |
| 15 | | | | 6.2084 | | |
| 16 | | | | 6.2084 | | |
| 17 | | | | 8.2333 | | |
| Commercial A | | | | 4.0552 | | |
| Commercial B | | | | 0.1221 | | |
| Commercial C | | | | 0.0092 | | |

**BY-LAWS**

**of**

**THE FRANKLIN TOWER**

**Article 1.**

**General**

**Section 1.    Purpose and Definition of Terms.**  The purpose of these By-Laws is to set forth the rules and procedures concerning the conduct of the affairs of THE FRANKLIN TOWER, as well as certain obligations of the Unit Owners therein.  All terms used in these By-Laws which are capitalized and are not defined herein shall have the same definition as in the Declaration of which these By-Laws are a part (such Declaration as amended from time to time being herein referred to as the "Declaration").

**Section 2.    Applicability of By-Laws.**  The provisions of these By-Laws are applicable to the Property and to the use and occupancy thereof.

**Section 3.    Application.**  All present and future Unit Owners, mortgagees, lessees and occupants of Units and their employees or guests, and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws and the Declaration.

The acceptance of a deed or conveyance of, or the succeeding to title to, or the entering into of a lease or the act of occupancy of a Unit shall constitute an agreement that these By-Laws and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4.    Principal Office.**  The principal office of the Condominium and of the Board of Managers (as hereinafter defined) shall be located at 90 Franklin Street, New York, New York, or at such other place within the Borough of Manhattan reasonably convenient thereto, as may be designated from time to time by the Board of Managers.

**Article II**

**Board of Managers**

**Section 1.  Number and Term of Office.**  As more particularly set forth in these By-Laws and the Declaration, the affairs of the Condominium shall be governed by a board of managers of the Condominium (the "Board of Managers").  From and after the

332

first meeting of the Unit Owners, the Board of Managers shall be composed of five (5) members. Until the first meeting of the Unit Owners, the members of the Board of Managers shall consist of three (3) persons appointed by the Declarant. Each member of the Board of Managers shall serve for a term of one (1) year or until his respective successors shall have been duly appointed or elected, except as provided in Section 1 of Article III. Each member may be re-elected any number of times.

**Section 2. <u>Powers and Duties</u>.** The Board of Managers shall have the powers and duties necessary for administration of the affairs of the Condominium, as agent for the Unit Owners, and may do all such acts and things except as by law or by the Declaration or by these By-Laws may not be delegated to the Board of Managers by the Unit Owners. Such powers and duties of the Board of Managers shall include, but shall not be limited to, the following:

(a)    Operation, care, upkeep, maintenance, repair, improvement and alteration of the Common Elements.

(b)    Determination of the Common Charges (as hereinafter defined).

(c)    Collection of the Common Charges from the Unit Owners.

(d)    Employment and dismissal of the personnel necessary for the maintenance and operation of the Common Elements (which shall be determined by the Board of Managers, in its sole discretion).

(e)    Adoption of an amendment and additions to the Rules and Regulations subject to the limitations hereinafter set forth in these By-Laws.

(f)    Opening of bank accounts on behalf of the Condominium and designating the signatories required therefor.

(g)    Accepting the conveyance of Units surrendered by Unit Owners to the Board of Managers, or purchasing Units at a foreclosure sale pursuant to Section 7 of Article V, in the name of the Board of Managers, or its designee, corporate or otherwise, on behalf of all Unit Owners (or on behalf of the Unit Owners for whom such Unit was conveyed).

(h)    Selling, leasing, mortgaging, or otherwise dealing with Units acquired by the Board of Managers or its designee, corporate or otherwise, on behalf of all Unit Owners (or on behalf of the Unit Owners for whom such Unit was conveyed), but not casting the votes appurtenant to such Units.

(i)    Organizing corporations to act as designees of the Board of Managers in acquiring title to Units on behalf of all Unit Owners (or on behalf of the Unit Owners for whom such Unit was conveyed).

333

(j)     Obtaining insurance for the Property, including the Units, pursuant to the provisions of Article V, Section 2 hereof, and adjusting and settling any insurance claims thereunder (including executing and delivering releases in connection therewith).

(k)     Making of repairs, restorations, additions and improvements to or alterations of the Common Elements or any part thereof, damaged or destroyed by fire or other casualty, or necessitated as a result of condemnation or eminent domain proceedings.

(l)     Enforcing obligations of Unit Owners, including, without limitation, levying reasonable fines against Unit Owners for violation of the Rules and Regulations.

(m)    Granting of licenses of Common Elements.

(n)    Borrowing money on behalf of the Condominium when required in connection with the operation, care, upkeep, maintenance and alteration of, or the making of repairs, replacements, restorations or additions to the Common Elements, provided that (i) the consent of two-thirds (2/3) in Common Interest of all Unit Owners shall be required for any borrowings in excess of the aggregate amount of $75,000 in any one fiscal year (regardless of the balance of any loans outstanding from previous fiscal years); (ii) no lien to secure repayment of any sum borrowed may be created on any Unit or, except as expressly permitted in Section 339-jj of the Real Property Law, its Appurtenant Interest in the Common Elements without the consent of the owner of such Unit and (iii) the documentation executed in connection with any such borrowing shall provide that, if any sum borrowed by the Board of Managers pursuant to the subparagraph (n) is not repaid by the Board of Managers, any Unit Owner who pays to the creditor thereunder such proportion thereof as his Common Interest bears to the Common Interests of all the Unit Owners shall be entitled to obtain from the creditor a release of any judgment or other lien which said creditor has filed or shall have the right to file against such Unit Owner's Unit.

(o)    Executing, acknowledging and delivering of any declaration or other instrument affecting the Property (i) which the Board of Managers deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of any governmental authorities (including without limitation the New York City Department of Buildings, City Planning Commission, and Board of Standards and Appeals) applicable to the maintenance, demolition, construction, alteration, repair or restoration of the Property, permitted hereunder or under the Declaration or (ii) upon request of a Unit Owner.

(p)    Preparing, executing and recording on behalf of all Unit Owners, as their attorney-in-fact, coupled with an interest (i) amendments of the Declaration and/or these By-Laws, whenever requested by a Commercial Unit Owner, the

334

Declarant or any of its designees, as provided in the Declaration or these By-Laws, or (ii) a restatement of the Declaration and/or By-Laws whenever in the judgment of the Board of Managers it is advisable to consolidate and restate all amendments theretofore made to the Declaration and/or By-Laws.

(q)     Granting utilities or other easements as may, from time to time, be required for the benefit of the Condominium and Unit Owners and controlling power shut-offs and other interruptions of the normal functioning of the Condominium, to facilitate repairs to and renovations of particular Units and/or of the Common Elements.  In making determinations in this area, the Board of Managers will make all reasonable efforts to disrupt the business operations of the Unit Owners as little as possible under the circumstances then prevailing.

(r)     Investing any excess funds in savings accounts, treasury bills, certificates of deposit or other such money market instruments and funds which invest in any such instruments.

(s)     Acting as an agent of each Unit Owner who has given his written authorization to complain or apply to the local and county real estate tax assessment agency or board of review by filing a single complaint on behalf of all such Unit Owners pursuant to the applicable sections of the Real Property Tax Law. The Board of Managers may retain legal counsel on behalf of all Unit Owners for which it is acting as agent and assess as a Common Charge against all such Unit Owners a pro rata share of expenses, disbursements, and legal fees paid or incurred in connection with any such complaint or application.



Section 3.  **Managing Agent and Manager.**  The Board of Managers may employ for the Condominium a managing agent and/or a manager, at a compensation rate established by the Board of Managers, provided that if such rate is greater than five (5%) percent of the gross receipts of the Condominium during any fiscal year of the Condominium from time to time, then such greater rate shall be comparable to standard rates for similar properties in the vicinity of the Condominium, to perform such duties and services as the Board of Managers shall authorize, including but not limited to the duties listed in subdivisions (a), (c), (d), (j) and (k) of Section 2 of this Article II. However, in no event may the Board of Managers delegate to the manager or managing agent, the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (l), (m), (n), (o), (p), (q), (r) and (s) of Section 2 of this Article II. The Board of Managers may retain such attorneys, accountants and other professionals as it deems advisable in exercising any of the powers enumerated in Section 2 of this Article II.

Section 4.  **Removal.**  Any member of the Board of Managers may be removed with or without cause by a Majority in Common Interest of the Unit Owners (inclusive of the Unit Owners who elected or designated such member), except that if such member was elected by or is a designee of the Commercial Unit Owner(s), Declarant or any of its designees, as the case may be, such member may not be removed other than for cause except by the written consent of such Commercial Unit Owner(s), Declarant or its

designees, as the case may be.  Any member of the Board of Managers whose removal has been proposed by the Unit Owners shall be given an opportunity to be heard at the meeting.

**Section 5.  Vacancies.**  Vacancies in the Board of Managers caused by any reason other than as provided in Section 17 of this Article II or in Section 1 of Article III, (i) in the case of a member of the Board of Managers elected or designated by Declarant or its designees, shall be filled by the written consent of the Unit Owners owning a majority of the Common Interest appurtenant to all of the Units owned by Declarant and its designees and (ii) in the case of any other members of the Board of Managers, shall be filled by vote of a majority of the remaining members of the Board of Managers at a special meeting of the Board of Managers held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Managers, until a successor shall be elected at the next annual meeting of the Unit Owners or at a special meeting held for that purpose.

**Section 6.  First Meeting of Board of Managers.**  The first meeting of the Board of Managers shall be held immediately following the first meeting of the Unit Owners and no notice shall be necessary to the newly elected members of the Board of Managers legally to constitute such meeting, provided that a majority of the members of the Board of Managers shall be present at such first meeting.

**Section 7.  Regular Meetings.**  Regular meetings of the Board of Managers may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Managers but at least four (4) such meetings shall be held during each fiscal year of the Condominium.  Notice of regular meetings of the Board of Managers shall be given to each member of the Board of Managers by personal delivery, mail or telegram at least five (5) business days prior to the day named for such meeting.

**Section 8.  Special Meetings.**  Special meetings of the Board of Managers may be called by the President by giving five (5) business days' prior notice to each member of the Board of Managers by personal delivery, mail or telegram, which notice shall state the time, place and purpose of the meeting.  Special meetings of the Board of Managers shall be called by the President or Secretary in like manner and on like notice on the written request of at least one (1) member of the Board of Managers.

**Section 9.  Waiver of Notice.**  Any member of the Board of Managers may at any time waive notice of any meeting of the Board of Managers in writing and such waiver shall be deemed equivalent to the giving of such notice.  Attendance by a member of the Board of Managers at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof.  If all members of the Board of Managers are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

336

**Section 10.  Quorum of Board of Managers.**  At all meetings of the Board of Managers a majority of the members thereof shall constitute a quorum for the transaction of business.

**Section 11.  Decision of the Board of Managers.**  The votes of a majority of the members of the Board of Managers present at the meeting at which a quorum is present shall constitute the decision of the Board of Managers.  Any one or more members of the Board of Managers or any committee thereof may participate in a meeting of the Board of Managers or committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time.  Participation by such means shall constitute presence in person at a meeting.  If all the members of the Board of Managers are present at any meeting of the Board of Managers, no notice shall be required and any business may be transacted at such meeting.  Any action required or permitted to be taken by the Board of Managers or any committee thereof, as the case may be, may be taken without a meeting if all members of the Board of Managers or the committee, as the case may be, consent in writing to the adoption of a resolution authorizing such action, and the writing or writings are filed with the minutes of the proceedings of the Board of Managers or the committee, as the case may be.

**Section 12.  Adjournment of Meeting.**  If at any meeting of the Board of Managers, the members present shall be less than a quorum, a majority of those present may adjourn the meeting from time to time.  At the next meeting at which a quorum is present following such adjourned meeting, any business which might have been transacted at the meeting originally called may be transacted without further notice.

**Section 13.  Fidelity Bonds.**  The Board of Managers may obtain fidelity bonds concerning any or all officers and employees of the Condominium and its managing agent, if any, handling or responsible for funds, and the premium on such bonds shall constitute a Common Expense (as hereinafter defined).

**Section 14.  Compensation.**  No member of the Board of Managers shall receive any compensation from the Condominium for acting as such member.

**Section 15.  Liability of Board of Managers and Officers.**  No member of the Board of Managers or any officer of the Condominium shall have any personal liability with respect to (1) any contract, act or omission of the Board of Managers (except with respect to the Unit Owners as provided below) or any managing agent, manager, or officer in connection with the affairs or operations of the Condominium (except in their capacities as Unit Owners) and the liability of any Unit Owner with respect thereto shall be limited as hereinafter set forth, or (2) any mistake of judgment, negligence or otherwise except with respect to the Unit Owners for such member's own individual willful misconduct or bad faith.  Every contract made by the Board of Managers or by any managing agent, manager or officer thereof shall state that it is made by such Board of Managers, managing agent, manager, or officer as agent for all Unit Owners,

337

that such members of the Board of Managers or managing agent, manager or officer shall have no personal liability thereon (except in their capacities as Unit Owners) and shall also provide that the liability of any Unit Owner with respect to any contract with respect to the Condominium shall be limited to such proportionate share of the total liability as the Common Interest of such Unit Owner bears to the aggregate Common Interests of all Unit Owners and, unless expressly stated to the contrary in any such contract (as determined by the Board of Managers in its sole and absolute discretion), shall be limited to such Unit Owner's interest in his Unit so that such Unit Owner shall have no personal liability for such contract. Nothing in the preceding sentence shall limit a Unit Owner's liability for the payment of Common Charges. Any such contract may also provide that it covers the assets, if any, of the Condominium on whose behalf the contract is made. The Unit Owners, including those who are members of the Board of Managers, to the extent provided below, shall indemnify and hold harmless each of the members of the Board of Managers and the officers of the Condominium against all claims, liabilities, costs and expenses (including, without limitation, liability for reasonable attorneys' fees and any contractual liability to others arising out of contracts made by the Board of Managers or officers on behalf of the Condominium) arising out or relating to the performance of his duties as a member of the Board of Managers or officer except for those arising out of such member's or officers' bad faith or willful misconduct. Each Unit Owner's liability to indemnify a member of the Board of Managers or officer, as provided above, shall be limited to an amount which is in the same proportion to the total liability of such members or officers to be indemnified by all the Unit Owners hereunder as each such Unit Owner's Common Interest bears to the aggregate Common Interests of all Unit Owners. It is intended that the members of the Board of Managers and officers shall have no personal liability with respect to any contract made by them on behalf of the Condominium except as Unit Owners. It is understood that the Board of Managers, which may consist of principals and/or employees of the Declarant, may contract or effect any other transaction with any member of the Board of Managers, any Unit Owner, officer or Declarant or any of their affiliates, without incurring any liability for self-dealing, provided that the either (i) any compensation paid to Declarant or its affiliates is, if material, disclosed in the Plan (as hereinafter defined) or (ii) is commercially reasonable.

Section 16.  **Executive Committee.**  The Board of Managers may, by resolution duly adopted, appoint an executive committee to consist of one or more members of the Board of Managers with at least one of the members of such executive committee being the member of the Board of Managers elected by the Declarant, if any. Such executive committee shall have and may exercise all the powers of the Board of Managers in the management of the business affairs of the Condominium during the intervals between the meetings of the Board of Managers insofar as may be permitted by law.

Section 17.  **Control by Declarant**.  The Declarant and its designees:  (i) shall not be entitled to elect a majority of the members of the Board from and after the earlier of the following dates: a) the fifth anniversary of the Closing Date under the Plan, and b)

the date on which the Declarant and its designees own less than 50% of the out-
standing Common Interests in the Condominium, and (ii) may not exercise a veto over
expenditures conforming to the budget set forth in Schedule B of the Condominium
Offering Plan with respect to the Property promulgated by Declarant ("Plan"), and which
are for the period covered by said budget, or over expenditures which are for capital
repairs required for the operation and maintenance of the Condominium, or over
expenditures which are required to comply with applicable laws or regulations. Upon
the earlier of the event(s) stated in clause (i) above, so many serving members of the
Board elected by the Declarant or its designees as shall reduce the number of such
members to less than a majority of the Board shall resign and such vacancies shall be
filled in accordance with the provisions of Section 5(ii) above.

Until the sooner of (i) the date on which the Owners of Unsold Units
have a Common Interest in the aggregate of less than twenty-five (25%) percent of the
Common Interests of all Units, or (ii) the fifth anniversary of the Closing Date, neither
the Board of Managers, nor any officer, nor any Unit Owner, except upon the written
consent of the Owners of Unsold Units representing a majority of the Common Interests
allocated to all Unsold Units, shall (a) increase the number or change the type of
employees described in Schedule B to the Plan; (b) provide for services other than
those described in said Schedule B unless the total annual cost of all services to be
provided is not greater than the then estimated total cost of the services described in
said Schedule B; (c) establish reserves or similar funds to undertake any capital or
major improvements or additions except as required by law; (d) change the insurance
coverage on the Property from the coverage described in said Schedule B unless the
change does not cause an increase in the total annual insurance premiums then due
and payable by the Corporation or unless such change is required by the holder of any
mortgage on the Property or by the insurance carrier insuring the Property to satisfy
coinsurance requirements; or (e) remove any members of the Board of Managers
elected by the owners of Unsold Units except for cause; any such removal shall be in
accordance with the provisions of Article II, Section 4.

The term "Unsold Unit" as used in this Section 17, refers to each
Unit until such Unit has been purchased by a bonafide purchaser for residential
occupancy on or after the Closing Date under the Plan or until the owner of such Unit or
a person related by blood or marriage to such owner becomes the residential occupant
of such Unit.  The term "Unsold Unit Owner" refers to an owner of an Unsold Unit.

## Article III

### Unit Owners

**Section 1.  Annual Meetings.**  Within forty-five (45) days after the date the
Declarant conveys title to the first Residential Unit pursuant to the Plan, the first
meeting of Unit Owners shall be held.  At such meeting the incumbent Board of

339

Managers shall resign and a new Board shall be elected by the Unit Owners as provided in the By-Laws. Thereafter, annual meetings shall be held on the second (2nd) Tuesday of November of each succeeding year unless such day shall be a holiday in which event the meeting shall be held on the next succeeding business day. At such meetings the Unit Owners shall elect members of the Board of Managers to fill vacancies or to succeed retiring members of the Board of Managers as provided in Article II of these By-Laws and shall also transact such other business of the Condominium as may properly come before the meeting.

**Section 2.** **Place of Meeting.** Meetings of the Unit Owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the Unit Owners as may be designated by the Board of Managers.

**Section 3.** **Special Meetings.** It shall be the duty of the President to call a special meeting of the Unit Owners if so directed by resolution of the Board of Managers or upon a petition signed and presented to the Secretary by not less than twenty five (25%) percent in Common Interest of all the Unit Owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No business shall be transacted at a special meeting except as stated in the notice. If the President fails so to call such special meeting, then any Unit Owner may so call such meeting by notice meeting the requirements of Section 4 hereof (except that such notice need not be given by the Secretary).

**Section 4.** **Notice of Meeting.** It shall be the duty of the Secretary to give a notice to each Unit Owner of record of each annual or special meeting stating the purpose thereof and the time and place where it is to be held. Such notice shall be personally delivered or mailed to the Unit Owner at the address of such Unit Owner at the Property or such other address as such Unit Owner shall have designated by notice in writing delivered to the Secretary at least ten (10) days prior to the giving of such notice of meeting by the Secretary. The giving of a notice in the manner provided in these By-Laws shall be considered notice properly served.

**Section 5.** **Quorum of Unit Owners.** The presence in person or by proxy of Unit Owners owning in the aggregate more than thirty-five (35%) percent of the Common Interests of all Unit Owners (as modified by the provisions of Section 11 of this Article III) shall constitute a quorum at all meetings of the Unit Owners.

**Section 6.** **Adjournment of Meetings.** If any meetings of Unit Owners cannot be held because a quorum is not present, a Majority in Common Interest of the Unit Owners present either in person or by proxy may adjourn the meeting to a time not less than forty-eight (48) hours from the time fixed for the original meeting.

**Section 7.** **Order of Business.** The order of business at all annual meetings of the Unit Owners shall be as follows:

      (a)    Roll call.