**B –9. 1**

## Article XII

## Arbitration

An arbitration provided for in these By-Laws shall be conducted before one arbitrator in New York City by the American Arbitration Association or any successor organization thereof, in accordance with its rules then in effect and the decision rendered in such arbitration shall be binding upon the parties and may be entered in any court having jurisdiction.  If the American Arbitration Association shall not then be in existence and has no successor, any arbitration hereunder shall be conducted in New York City before one arbitrator appointed, on application of any party, by the Supreme Court of the State of New York, in the County of New York.  Each party to any such arbitration shall bear his own legal fees and expenses and other fees and expenses in prosecuting and/or defending, as the case may be, the arbitration.  However the cost of the arbitrator shall be borne by the losing party.  All costs and expenses of the Board of Managers in any such arbitration hereunder, including the fees and expenses of counsel and experts, shall be a Common Expense.

**SCHEDULE A OF THE BY-LAWS**

**RULES AND REGULATIONS OF THE CONDOMINIUM**

21.1    Each Unit Owner shall keep his unit in a good state of preservation and cleanliness. He shall not allow anything whatever to fall from the windows or doors of the Building, nor shall he sweep or throw from the Building any dirt or other substance into any of the corridors or halls, elevators, ventilators or elsewhere in the Building. The Unit Owners shall place their refuse in containers in such manner, at such times and in such places as the Board of Managers or its agent may direct.  The Unit Owners shall obtain extermination services for the Units at such intervals as shall be necessary to maintain the Units free of rats, mice, roaches and other vermin.

21.2    Except as otherwise expressly provided in the Declaration, the sidewalks, entrances, corridors, exits and other Common Elements shall not be obstructed or encumbered by refuse or otherwise, or used for any purpose other than ingress or egress to and from the Units and delivering and shipping of merchandise and the like to and from the Units.

21.3    Employees of the Unit Owners' may not gather or lounge in the Common Elements.

21.4    Supplies, goods and packages of every kind for the  Units are to be delivered in such manner as the Board of Managers or its agent may reasonably prescribe and the said Board of Managers is not responsible for loss of or damage to any such property, including loss or damage that may occur through the carelessness or negligence of the employees of the Building.

21.5    No disturbing noises or objectionable odors may be produced upon or emanate from any Residential Unit including, without limitation, from any musical instrument, phonograph, radio, television, receiver or similar instrument if the same shall disturb or annoy any other Unit Owner. Corridor doors shall be kept closed at all times except when in actual use for ingress and egress.

21.6  Unit Owners shall not permit or keep in their Residential Units any inflammable, combustible or explosive material, chemical or substance, except such products as are required in normal professional and business use.

21.7    Water closets and other water apparatus in the Building shall not be used for any purpose other than those for which they were designed, nor shall any sweepings, rubbish bags or other articles be thrown into same. Any damage resulting from misuse of any water closets or other apparatus in a Unit shall be repaired and paid for by the owner of such Unit.

364

21.8   No vehicle belonging to a Unit Owner or to an employee, or visitor of a Unit Owner shall be parked in such manner as to impede or prevent ready access to any entrance to or exit from the Building or Common Elements by any vehicle of any kind whatsoever.

21.9   Except as provided in Section 9 of the Declaration, no Unit Owner shall (i) do or permit any act or thing to be done in or to his Unit which will invalidate or be in conflict with any public liability, fire, casualty or other policy of insurance at any time carried by the Board of Managers with respect to the Property, (ii) keep anything in his Unit which is prohibited by the Fire Department, Board of Fire Underwriters, fire insurance rating organization or other authority having jurisdiction or (iii) permit a Unit to be used in any manner (other than the use in effect on the date of the Declaration) which will increase the insurance rate for the Property over that in effect as of the date of the Declaration unless such Unit Owner paid the additional cost thereof as provided below.

Any costs, expenses, fines, penalties or damages which shall be imposed upon the Board of Managers by reason of a Unit Owner's default hereunder or any increase in the premium charged for insurance carried by the Board of Managers resulting from a change in the insurance rate for the Property attributable to a use of the Unit which is different from the use of the Unit in effect on the date of the Declaration, shall be assessed as a Common Charge against the Unit Owner. In any action or proceeding relating to the foregoing, a schedule or "makeup" of rate for the Property issued by the New York Fire Insurance Exchange or other body making fire insurance rates applicable to the Property shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate or rates then applicable to the Property.

Each Unit Owner may carry other insurance for his own benefit, provided that all such policies shall contain waivers of subrogation, and further provided that the liability of the carriers issuing insurance obtained by the Board of Managers shall not be affected or diminished by reason of any such additional insurance carried by such Unit Owner.

21.10 Except as provided in Section 9 of the Declaration, no  Unit Owner shall place a load upon any floor of his  Unit exceeding the floor load per square foot area which it was designed to carry and which is allowed by law.

21.11 If any key or keys are entrusted by a Unit Owner or occupant or by any member of his family or by his agent, servant, employee, licensee or visitor to an employee of the Board of Managers, whether for such Unit or an automobile, trunk or other item of personal property, the acceptance of the key shall be at the sole risk of such Unit Owner or occupant, and the Board of Managers shall not be liable for injury, loss or damage of any nature whatsoever directly or indirectly resulting therefrom or connected therewith.

365

21.12  No Unit Owner shall alter, impair or otherwise affect the Common Elements without the prior written consent of the Board of Managers, except as expressly permitted herein or in the Declaration or the By-Laws.

21.13  Each Unit Owner shall:

1.    obtain and keep in full force and effect any governmental license or permit required for the proper and lawful conduct of any business carried on in his Unit, and shall submit same for inspection by the Board of Managers;

2.    Keep clean at all times the interior and exterior of windows and doors (including in each case, the frames thereof) in his Unit, with all such work to be done in conformity with law;

3.    Promptly replace any and all broken or damaged glass (including in windows) in his Unit and the frames for such glass, regardless of the cause of such damage, including the negligence of the Board of Managers, its agents or employees without waiving any claims which such Unit Owner may have by reason of any of the foregoing;

4.    Not at any time, either directly or indirectly, use any contractors and/or labor and/or materials in connection with alterations or improvements to his Residential Unit, if the use of such contractors and/or labor and/ or materials would or will create any difficulty with other contractors and/or labor engaged by the Board of Managers and/or the other Unit Owners in the maintenance and/or operation of the Building and/or the other Units;

21.14  Any amounts assessed against a Unit as Common Charges which are in addition to the regular monthly installments of Common Charges due and payable as provided in the By-Laws shall be paid to the Board of Managers upon demand or if not demanded then with the next monthly installment of Common Charges due and payable as provided in the By-Laws.

21.15  No servant or employee of the Board of Managers or its managing agent shall be sent out of the Building by any Unit Owner at any time for any purpose.

21.16  Complaints regarding services or operation of the Building shall be made in writing to the Board of Managers or its managing agent.

21.17  Any consent or approval given under these Rules and Regulations may be added to, amended or repealed at any time by resolution of the Board of Managers, except that, where a consent or approval may not be unreasonably withheld as herein elsewhere provided, then such consent may be added to, amended or repealed as set forth above provided such addition, amendment or repeal is not unreasonably made. A Unit Owner may apply to the Board of Managers for a temporary waiver of one or more of the foregoing Rules. Such temporary waiver may be granted by the Board of

366

Managers, for good cause shown, if, in the Board's judgment, such temporary waiver will not interfere with the purposes for which the Condominium was formed.

21.18 The fiscal year of the Condominium shall begin on the first day of January in each year or on such other date as the Board of Managers shall establish from time to time.

21.19 Except as provided in the Declaration no sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed from any Residential Unit on any part of the outside of the Building, hung from windows or placed on window sills in or on any Residential Unit, without the prior written consent of the Board of Managers.

21.20        No pets other than dogs, cats caged birds and fish (which do not cause a nuisance, health hazard or unsanitary condition) may be kept in a Residential Unit without the consent of the Condominium Board or the Managing Agent. Any Unit Owner who wishes to keep more than two pets in his or her Unit must obtain the prior written consent of the Condominium Board. Each Residential Unit Owner who keeps any type of pet in his Unit will be required to (a) indemnify and hold harmless the Condominium, all Unit Owners and the Managing Agent from all claims and expenses resulting from acts of such pet; and (b) abide by any and all reasonable Rules and Regulation of the Condominium adopted with respect thereto. The Condominium Board may require that pet owners enter into an agreement with the Board confirming such owners' obligations with respect to their pets.

21.21 No awnings, radio or television aerials or other projections shall be attached from any Residential Unit to the outside walls of the Building, and no blinds, shades or screens shall be attached to, hung or used on the exterior of any window or door of any Residential Unit, without the prior written consent of the Board of Managers, which consent shall not be unreasonably withheld or delayed. No blinds, shades, screens, draperies or drapery backing that are visible through the exterior windows shall be hung or used in any Residential Unit without the prior written consent of the Board of Managers.

367

HERRICK, FEINSTEIN LLP
A LIMITED LIABILITY PARTNERSHIP

2 PARK AVENUE

NEW YORK, N.Y. 10016

(212) 592-1400

104 CARNEGIE CENTER
PRINCETON, N.J. 08540-6232
TELEPHONE: (609) 452-3800
FACSIMILE: (609) 520-9095

FACSIMILE:
(212) 889-7577

May 18, 1999

The Franklin Tower
c/o Corn Associates LLC
316/318 Fulton Avenue
Hempstead, New York  11550

        Re:    90 Franklin Street
              (a/k/a 271 Church Street)
              Block: 175  Lot: 10
              <u>Borough: Manhattan    </u>

Dear Sirs:

        You have advised us that you intend to make application to the appropriate agencies of the City of New York for the referenced premises (the "premises") for real estate tax exemption and abatement benefits pursuant to Section 11-243 (formerly Section J-51-2.5) of the Administrative Code of the City of New York (hereinafter, the "Act"). You have further requested that this firm provide you with an analysis and estimate of the tax exemption or abatement benefits, if any, that may be available to the premises, which is set forth below.

        The analysis and estimate of tax exemption and abatement benefits set forth herein are based on findings set forth in the real estate tax estimate letter prepared by Jerome Mazursky, MAI, CAE dated April 30, 1999 (the "Mazursky letter") estimating the assessed valuation and real estate tax liability of the premises following the completion of the renovations and conversion to condominium ownership contemplated under the Offering Plan to be filed with the Department of Law of the State of New York (the "Offering Plan"). A copy of the Mazursky letter will be included in the Exhibits binder that accompanies the filing of the Offering Plan. No independent review was undertaken by the undersigned to determine the accuracy or validity of the assumptions or estimates set forth in the Mazursky letter, which were utilized solely for the purpose of completing the relevant portions of the J-51 analysis set forth below. The undersigned shall not be liable to any unit owner or any other party if the transitional and/or actual valuation, apportionment of valuation, or estimate of tax liability relating to the premises on a post-conversion basis, as determined by the applicable City agencies, differ from those set forth in this letter and the Mazursky letter.

- 1 -

HERRICK, FEINSTEIN ʟʟᴘ

 

In general, the benefits which are available to eligible projects which meet the qualifications of the Act are as follows:

## TAX EXEMPTION

Any increase in assessed valuation resulting from the certified reasonable cost ("CRC")[1] of the conversion, alteration, or improvement of any building or structure performed pursuant to the Act, except insofar as the gross cubic content of the building is increased thereby, or the improvements relate to commercial space, shall be partially exempt from taxation for a period of fourteen (14) years.

Exemptions will be based upon post-conversion assessment levels for the residential portions of the property only where the property will be occupied for both residential and non-residential purposes. Full exemptions will be granted to property with a post-conversion assessment equal to or less than $18,000 per dwelling unit. No exemption will be granted to a property whose post-conversion assessment equals or exceeds $38,000 per dwelling unit. Properties whose post-conversion assessment falls between $18,000 and $38,000 will be exempt from an increase in taxation to the following extent on an incremental basis:

|  | Total Assessed Value | Percent of Increased AV Exempt |
|---|---|---|
| First | $18,000 or less | 100% |
| From | $18,001 to $22,000 | 75% |
| From | $22,001 to $26,000 | 50% |
| From | $26,001 to $30,000 | 25% |
| From | $30,001 to $37,999 | 0% |
|  | $38,000 or more | No exemption granted |

The post-conversion assessed valuation calculation for the subject property yields an

---

[1]    As defined under the Act, certified reasonable cost, or "CRC," means the reasonable cost of conversion or alterations or improvements certified as eligible for the benefits of the Act, as evidenced by the issuance of a Certificate of Eligibility and Reasonable Cost by the Office of Tax Incentive Programs of the Department of Housing Preservation and Development of the City of New York.

- 2 -

HERRICK, FEINSTEIN LLP

average assessment per residential unit in excess of $206,000 per unit (i.e., $5,748,100 x .90$^2$ divided by 25 units), which exceeds the threshold amount of $37,999, and would serve to deny J-51 tax exemption to the projected increase in building assessment attributable to the conversion.

## TAX ABATEMENT

The Act provides the additional benefit of an abatement of property taxes for a period of not more than twenty (20) years of up to 50% (in the case of a non-residential building being converted to a class "A" multiple dwelling in the borough of Manhattan) of the certified reasonable cost (CRC) as approved by the Department of Housing Preservation and Development ("HPD").

The Act places a further limitation on the abatement benefits available of up to a maximum of $15,000 per apartment for apartments consisting of three and one half zoning rooms, $17,400 per apartment for apartments consisting of four and one half zoning rooms, and $19,800 per apartment for apartments consisting of five and one-half zoning rooms.

Finally, the Act also limits the total allowable cost which can be deducted in any one (1) year to 8.333% (or one-twelfth) of the maximum benefit available over the twenty (20) year period. If, in any year, the abatement is greater than the tax due, the owner's taxes will be reduced to zero. The remaining dollars of abatement may be accumulated and passed along in any abatement year for a period of up to twenty (20) years, after which time the accrued dollars will be lost.

You have advised us of the following facts regarding this project:

1.  Sponsor is renovating the existing commercial building comprising one tax lot into a residential development consisting of twenty-five (25) Class "A" dwelling units (as defined by the Multiple Dwelling Law) each consisting of an average of approximately 3,037 square feet, in addition to three (3) commercial units, which will not be offered for sale;

2.  The total gross square footage of the building is approximately 107,000 square feet (sf);

3.  Of the 5,606 sf located on the ground floor approximately 3,114 sf will be

---

[2]    The Mazursky letter estimates that the allocation of assessed valuation between the residential and commercial units will be 90% and 10%, respectively; therefore, a multiplier of .90 is used to determine that portion of the estimated assessed valuation for the entire premises that is applicable to the residential units.

- 3 -

HERRICK, FEINSTEIN ᴸᴸᴾ

used as lobby space for the residential units. The commercial units will encompass the remaining 2,492 sf ground floor area, 557 sf in the mezzanine, 3,313 sf in the cellar and 1,518 sf in the sub-cellar;

4.    Construction will be completed on or about October 1, 1999, by which date approximately $6,700,000 in construction costs will have been incurred;

5.    Upon completion of the renovation each apartment shall contain at least one private bathroom and private kitchen for the exclusive use of the occupants therein;

6.    Commercial and residential portions of the property will each be condominium units and will be assigned separate tax lot numbers;

7.    No dwelling units will be used for transient occupancy;

8.    Upon completion of construction, you will provide the following: copies of paid bills; canceled checks; installment agreements; contracts (including any change orders) indicating scope of work, location of work in the building, address, and quantities, where appropriate; plans and amendments, if any, approved by the Department of Buildings; inspection reports, permits, sign-offs and certificates of completion for alterations and improvements as required by the Department of Buildings, Department of Air Resources, and other City agencies having jurisdiction over the construction work being done; a permanent Certificate of Occupancy, or a temporary Certificate of Occupancy and an affidavit from a registered architect or licensed engineer and the owner that the only work remaining to secure a permanent Certificate of Occupancy is work to be performed or completed in space to be used for non-residential purposes; and

9.    You will provide evidence of the first sale of a condominium unit; a copy of the Offering Plan which has been accepted for filing by the Attorney General, and all subsequent amendments which are accepted for filing prior to the issuance of a Certificate of Eligibility and Reasonable Cost.

## IMPACT OF J-51 ABATEMENT BENEFITS

Based on our review of the unit floor plans to be included in the Offering Plan, we estimate that:

- 4 -

HERRICK, FEINSTEIN ᴸᴸᴾ

        (i)    the total anticipated tax abatement would be based on a maximum potential CRC limited to approximately $15,000 per dwelling unit multiplied by 9 residential units, plus approximately $19,800 per dwelling unit multiplied by 16 residential units, or $451,800;

        (ii)    based on the foregoing, the estimated maximum __annual__ abatement available to offset taxes is 8.333% (one-twelfth) of the maximum total tax abatement anticipated (i.e., $451,800), or approximately $37,650 per annum;

        (iii)    the Act further limits the dollar amount of the maximum total abatement available for projects of this type to 50% of the maximum potential CRC, or $225,900 over the maximum allowable abatement period under the Act[3] ; assuming the maximum annual abatement is used each year (i.e., $37,650), the abatement will last approximately six (6) years.

        It is anticipated that HPD will issue a Certificate of Eligibility and Reasonable Cost ("Certificate") for the premises by April 1, 2000. Tax abatement benefits under the Act for this property type commence on the first day of January or July, whichever date next follows the filing of the Certificate with the Real Property Assessment Bureau ("RPAB") of the Department of Finance of the City of New York, which filing must be completed during the third or sixth month preceding the start of such tax period. Assuming the Certificate is filed with the RPAB between April 1, 2000 and April 25, 2000[4], we estimate that during the first year of operation the only portion of taxes on the residential portion[5] of the premises available for abatement benefits will be taxes payable for the quarterly period from July 1, 2000 to September 30, 2000. Based on this premise, and the estimates and assumptions set forth in the Mazursky letter concerning, among other things, the apportionment of valuation as between the residential and commercial units, the estimated transitional valuation of the premises following the conversion, and the increase in the applicable tax rates from current levels, the estimated taxes payable for the anticipated first year of operation (i.e. October 1, 1999 to September 30, 2000) are projected to be as follows (assuming the site does not qualify for partial J-

---

    [3]    The Act provides that the maximum period over which any such tax abatement may be used is twenty (20) years.

    [4]    If the issuance of the Certificate is delayed until after April 1, 2000, or the filing of the Certificate with the RPAB is delayed until after April 25, 2000, then the next available opportunity for filing the Certificate with the RPAB will be the period from July 1, 2000 to July 31, 2000 or the period from October 1, 2000 to October 31, 2000, in either case for benefits to be available for the period beginning January 1, 2001. In such event, the tax abatement benefits described herein will __not__ be available whatsoever to offset taxes payable on the premises during the period representing the first year of operation (i.e.,October 1, 1999 to September 30, 2000) .

    [5]    The Act provides that J-51 benefits are unavailable to the commercial units.

- 5 -

HERRICK, FEINSTEIN LLP

51 tax exemption, but does qualify for abatement benefits):

|  |  |
|---|---|
| Tax Liability for Residential Units, October 1, 1999 to June 30, 2000 | $194,832 |
| plus | |
| Tax Liability for Residential Units, July 1, 2000 to September 30, 2000 | $141,619 |
| | $336,451 |
| Estimated Tax Exemption | None |
| Maximum Annual Tax Abatement ($37,650), divided by 12 (to establish monthly benefit), multiplied by 3 months | $ 9,413 |
| Tax Due with Abatement in Place | $327,038 |

When in place, the abatement benefit for the period from October 1, 1999 to September 30, 2000 will reduce the tax liability of each particular residential unit as follows:

Reduced tax liability for individual residential unit = ($9,413) x Proportionate Valuation[6]

Estimated taxes payable by the residential portion[7] of the premises for the full taxable year following the conversion (i.e. July 1, 2000 to September 30, 2001) are projected to be as follows (assuming the site does not qualify for partial J-51 tax exemption, but does qualify for abatement

---

[6]      The Act provides that J-51 benefits are unavailable for any portion of the premises that represents an increase in the 'gross cubic content' (as defined under the Act) of the building comprising part of such premises,. You have advised us that Unit 17 at the premises will include a penthouse level comprised of approximately 500 square feet which appears to result in an increase in the gross cubic content of the building. Therefore, the area comprising the penthouse portion of Unit 17 that results in the increase in the gross cubic content of the building should not be included in such Unit's "Proportionate Valuation" for the purpose of computing the reduction in tax liability for such Unit as hereinabove provided.  However, while it is anticipated that the appropriate City agencies will allocate any J-51 benefits to Unit 17 in accordance with the foregoing, no assurance can be made to such effect. The undersigned shall not be liable to any unit owner or any other party if the City allocates J-51 benefits to the penthouse portion of Unit 17 (in which case the allocation of J-51 benefits to the other residential units would be somewhat lower).

[7]      See footnote 4 above.

- 6 -

373

HERRICK. FEINSTEIN LLP

benefits):

| | |
|---|---|
| Residential Units | $566,475 |
| Estimated Tax Exemption | None |
| Maximum Annual Tax Abatement | $ 37,650 |
| Tax Due with Abatement in Place | $528,825 |

When in place, the abatement benefit for the period from July 1, 2000 to June 30, 2001 will reduce the tax liability of each particular residential unit as follows:

Reduced tax liability for individual residential unit = ($37,650) x Proportionate Valuation[8]

This letter was prepared at the Sponsor's request. The figures set forth herein are approximations derived from material submitted by the Sponsor and are subject to variation. No government agency has passed upon these figures or the estimates of tax abatement and exemption contained herein. We have not passed upon the accuracy of any figures or estimates contained in the plan, and offer no warranties of the amount of any J-51 real estate tax benefits for any period.

The above projections do not take into account any future increases in the assessed valuation of the property or of any real estate tax rate. The opinions expressed above are based on our interpretation of the Real Property Tax Law, the Administrative Code of the City of New York, and the applicable rules and regulations of the Department of Finance in effect as of the date hereof. While we believe our opinions are well founded, they are not intended, and should not be construed as representations or warranties. You should be aware that the laws, regulations and practices of the Department of Finance upon which this opinion is predicated may in the future be revised in a manner adverse to your interests, or that there may be an adverse interpretation of the law or regulations by one or more agencies of the City of New York, or Courts of competent jurisdiction.

The above opinion is based upon our interpretation of Section 11-243 of the Administrative Code of the City of New York and the information provided to us by Sponsor and in the Offering Plan, and is not intended to be a guarantee that tax abatement will be granted. The opinion is further subject to the owner's compliance with the rules and regulations concerning the J-51 tax abatement program.

No representation is made that the provisions of law will apply at the time the alterations to the building are completed, and if they do apply, that the Department of Housing Preservation and Development of the City of New York will hold that the property is entitled to the

---

[8]        See footnote 5 above.

- 7 -

HERRICK, FEINSTEIN LLP

benefits conferred by Section 11-243 of the Administrative Code of the City of New York.

No warranty is or can be made that the New York City Department of Housing Preservation and Development or the New York City Real Property Assessment Department, or any other agency with jurisdiction, will approve Sponsor's application for J-51 tax benefits. The writer of this letter shall not be liable if, because of change of laws and/or regulations, or if the facts as represented by Sponsor prove incorrect, the property fails to obtain in whole or part, J-51 benefits. Should tax abatement be denied, in whole, or in part, then the condominium association will be responsible for all taxes due and owing from the closing date.

We hereby consent to the inclusion of this letter in the Offering Plan.

Very truly yours,

*Herrick, Feinstein LLP*

HERRICK, FEINSTEIN LLP

- 8 -

375

New York State Department of Law
120 Broadway, 23rd Floor
New York, New York 10271

Attention: Real Estate Financing Bureau

Re:    Offering Plan (the "Plan") for The Franklin Tower,
       90 Franklin Street, New York, New York (the "Property")

Ladies and Gentleman:

        We are the sponsor and the principals of sponsor of the Plan for the captioned Property.

        We understand that we have primary responsibility for compliance with the provisions of Article 23-A of the General Business Law, the regulations promulgated by the Department of Law in Title 13 NYCRR Part 20, and such other laws and regulations as may be applicable.

        We have read the entire Plan. We have investigated the facts set forth in the Plan and the underlying facts. We have exercised due diligence to form a basis for this certification. We jointly and severally certify that the Plan does, and that documents submitted hereafter by us which amend or supplement the Plan will:

        (i)      set forth the detailed terms of the transaction and be complete, current and accurate;

        (ii)     afford potential investors, purchasers and participants an adequate basis upon which to found their judgment;

        (iii)    not omit any material fact;

        (iv)     not contain any untrue statement of a material fact;

        (v)      not contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

        (vi)     not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

        (vii)    not contain any representation or statement which is false, where we: (a) knew the truth; (b) with reasonable effort could have known the truth; (c) made no reasonable effort to ascertain the truth; or (d) did not have knowledge concerning the representation or statement made.

        This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made.

        We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

**SPONSOR:**

**CORN ASSOCIATES LLC**

By: Franklin Church Associates LLC, Managing Member

By: _____
     Robert A. Levine, Manager

**PRINCIPALS OF SPONSOR:**

**FRANKLIN CHURCH ASSOCIATES LLC**

By: _____
     Robert A. Levine, Manager


_____
Robert A. Levine


Sworn to before me this
18ᵗʰ day of March, 1999

_____
Notary Public
           William Baron
      Notary Public, State of New York
        Qualified in Nassau County
           No: 02BA6016656
      Commission Expires 11/23/2000

Sworn to before me this
18ᵗʰ day of March, 1999

_____
Notary Public
           William Baron
      Notary Public, State of New York
        Qualified in Nassau County
           No: 02BA6016656
      Commission Expires 11/23/2000

Sworn to before me this
18ᵗʰ day of March, 1999

_____
Notary Public

           William Baron
      Notary Public, State of New York
        Qualified in Nassau County
           No: 02BA6016656
      Commission Expires 11/23/2000

- 2 -

377



**ARCHITECTURE**
*+ furniture*

## CERTIFICATION BY SPONSOR'S ARCHITECT
### Pursuant to Section 20.4 (c)

**Department of Law of the State of New York**
120 Broadway
New York, New York 10271

Attention: Real Estate Financing Bureau
Re: The Franklin Tower, 270 Church Street (aka 90 Franklin), New York, NY

The Sponsor of the offering plan to convert the captioned property to condominium ownership retained Architecture + Furniture, a New York Partnership (the "Firm"), to prepare a report describing the renovation of the property (The "Report"). I visually inspected existing portions of the renovated property on February 26, 1999, and had prepared the building plans, specifications and the Report dated March 8, 1999.

I am a Registered Architect in New York State, the state in which the property is located.

I understand that I am responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Department of Law in Part 20 insofar as they are applicable to this Report.

I have read the entire Report and investigated the facts underlying it with due diligence in order to form a basis for this opinion.

To the best of my knowledge, information, and belief, it is my professional opinion that the report:

(i)     sets forth in narrative form the description and/or physical condition of the entire property as it will exist upon completion of renovation provided that renovation is in accordance with the plans and specifications that the Firm prepared.

(ii)     in my professional opinion affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the description and/or physical condition of the property as it will exist upon completion of renovation and/or construction, provided that renovation and/or construction is in accordance with the plans and specifications that the Firm prepared.

(iii)     does not omit any material fact;

(iv)     does not contain any untrue statement of a material fact;

(v)    does not contain any fraud, deception, concealment, or suppression;

(vi)    does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)    does not contain any representation or statement which is false, where I:

    (a)    knew the truth;

    (b)    with reasonable effort could have known the truth;

    (c)    made no reasonable effort to ascertain the truth; or

    (d)    did not have knowledge concerning the representation or statement made.

I certify that the Firm is not owned or controlled by the Sponsor and has no beneficial interest in the Sponsor and that our compensation for preparing this report is not contingent on the conversion of the Property to a condominium or on the profitability or price of the offering.

This statement is not intended as a guarantee or warranty of the physical condition of the property.



John L. Petrarca AIA RIBA   Principal
Architecture + Furniture

March 8, 1999

Sworn to before me this 8th day of March, 1999

_Lorraine Cheng_
Notary

LORRAINE CHENG
Notary Public, State of New York
No. 31-5011531
Qualified in New York County
Commission Expires 4/19/___

SUSAN PENZNER Real Estate

CERTIFICATION OF ADEQUACY OF BUDGET

March 9, 1999

New York State Department of Law
Real Estate Financing Bureau
120 Broadway – 23rd Floor
New York, NY

Re:  The Franklin Tower
      271 Church Street
      New York, NY  10013 (the "Property")

Ladies and Gentleman:

The Sponsor of the Condominium Offering Plan for the above-referenced
Premises retained the undersigned to review Schedule "B" (the **"Schedule"**)
containing projections of income and expenses for the first year of condominium
operation of the Premises starting September 1, 1999 and ending August 31, 2000.

Undersigned or undersigned's principal(s) have managed or operated cooperatives
or condominiums or rental properties for at least fifteen (15) years.

Undersigned understands that undersigned is responsible for complying with
Article 23-A of the General Business Law and the regulations promulgated by the
Department of Law in Part 20 insofar as they are applicable to Schedule.

Undersigned has reviewed the Schedule and investigated the facts set forth in the
Schedule and the facts underlying it with due diligence in order to form a basis for
this certification.  Undersigned also has relied on undersigned's experience in
managing residential buildings.