**B-1**

**CONDOMINIUM OFFERING PLAN**

# *THE FRANKLIN TOWER*

90 Franklin Street
New York, New York 10013

| Offering Price 25 Residential Units | $44,845,000 |
|---|---|

The Condominium will have 25 Residential Units and 3 Commercial Units.
The 3 Commercial Units are not being offered for sale.

*Sponsor:*

**CORN ASSOCIATES LLC**
316/318 Fulton Avenue
Hempstead, New York 11550
(516) 483-5200

*Selling Agent:*

**STRIBLING- WELLS & GAY**
340 West 23rd Street
New York, New York 10011
(212) 243-4000

The approximate date of the first offering of this Condominium Offering Plan is June 3, 1999.
This Condominium Offering Plan may not be used after June 2, 2000 unless this Plan is amended.

THIS PLAN CONTAINS SPECIAL RISKS TO PURCHASERS. SEE PAGE 1.

THE PRICES AND TERMS OF SALE FOR THESE CONDOMINIUM INTERESTS MAY BE CHANGED SO THAT PURCHASERS MAY PAY DIFFERENT PRICES FOR SIMILAR INTERESTS. THE EFFECT OF THIS IS SET FORTH ON PAGE 49.

THIS OFFERING PLAN IS THE SPONSOR'S ENTIRE OFFER TO SELL THESE CONDOMINIUM UNITS. NEW YORK LAW REQUIRES THE SPONSOR TO DISCLOSE ALL MATERIAL INFORMATION IN THIS PLAN AND TO FILE THIS PLAN WITH THE NEW YORK STATE DEPARTMENT OF LAW PRIOR TO SELLING OR OFFERING TO SELL ANY CONDOMINIUM UNIT. FILING WITH THE DEPARTMENT OF LAW DOES NOT MEAN THAT THE DEPARTMENT OR ANY OTHER GOVERNMENTAL AGENCY HAS APPROVED THIS OFFERING.

© Herrick, Feinstein LLP

Case 1:07-cv-08604-WHP    Document 51-6    Filed 06/09/2008    Page 3 of 20

## TABLE OF CONTENTS

### PART I

**Section** **Page**

| Section | Page |
|---|---|
| SPECIAL RISKS | 1 |
| INTRODUCTION | 6 |
| DEFINITIONS | 11 |
| DESCRIPTION OF PROPERTY AND IMPROVEMENTS | 16 |
| LOCATION AND AREA INFORMATION | 19 |
| OFFERING PRICES AND RELATED INFORMATION, SCHEDULE A | 21 |
| FOOTNOTES TO SCHEDULE A | 22 |
| COMPLIANCE WITH REAL PROPERTY LAW SECTION 339(i) | 45 |
| COMMERCIAL UNITS | 47 |
| CHANGES IN PRICES OR UNITS | 49 |
| INTERIM LEASES | 50 |
| PROCEDURE TO PURCHASE | 50 |
| ASSIGNMENT OF PURCHASE AGREEMENTS | 59 |
| EFFECTIVE DATE | 59 |
| TERMS OF SALE; CLOSING OF TITLE TO UNITS | 61 |
| CLOSING COSTS AND ADJUSTMENTS | 70 |
| RIGHTS AND OBLIGATIONS OF SPONSOR | 75 |
| CONTROL BY SPONSOR | 84 |
| RIGHTS AND OBLIGATIONS OF UNIT OWNERS AND BOARD OF MANAGERS; SUMMARY OF BY-LAWS | 85 |
| INCOME TAX DEDUCTIONS TO UNIT OWNERS AND TAX STATUS OF CONDOMINIUM | 106 |
| REAL ESTATE TAXES | 107 |
| OPINION OF COUNSEL | 109 |
| RESERVE FUND | 116 |
| WORKING CAPITAL FUND | 116 |
| MANAGEMENT AGREEMENT, CONTRACTS AND LEASES | 117 |
| IDENTITY OF PARTIES | 120 |
| REPORTS TO UNIT OWNERS | 121 |
| DOCUMENTS ON FILE | 123 |
| GENERAL | 123 |
| SPONSOR'S STATEMENT OF SPECIFICATIONS OR BUILDING CONDITION | 124 |
| PURCHASE AGREEMENT | 127 |
| FINANCING RIDER TO PURCHASE AGREEMENT | 164 |
| UNIT OWNER'S POWER OF ATTORNEY | 169 |
| FORM OF UNIT DEED | 174 |
| APPLICATION TO THE ATTORNEY GENERAL FOR A DETERMINATION ON THE DISPOSITION OF DOWN PAYMENTS | 178 |
| ESCROW AGREEMENT | 182 |

ARCHITECT'S REPORT ............................................. 189
FLOOR PLANS .................................................... 236
LOCAL LAW 10 REPORT ............................................ 259
ASBESTOS REPORT ................................................ 280
DECLARATION ESTABLISHING A PLAN FOR CONDOMINIUM ................ 310
SCHEDULE B ..................................................... 330
BY-LAWS ........................................................ 332
COUNSEL'S TAX BENEFIT OPINION .................................. 368
CERTIFICATIONS ................................................. 376
   A. SPONSOR AND SPONSOR'S PRINCIPALS ........................ 376
   B. SPONSOR'S ARCHITECT ..................................... 378
   C. SPONSOR'S EXPERT CONCERNING ADEQUACY OF BUDGET ......... 380
   D. SPONSOR'S EXPERT CONCERNING ADEQUACY OF COMMON CHARGES
       PAYABLE BY THE COMMERCIAL UNIT OWNER .................... 383

## **SPECIAL RISKS**

The Commercial Units

        The Commercial Unit Owner has certain special rights under the Declaration including the right to subdivide the Commercial Units and to use same for any lawful purpose, provided that the Commercial Units may not be used for any obscene or noxious purpose. See "**Rights and Obligations of Unit Owners and Board of Managers; Summary of By-laws**".

Control by Sponsor

        The Sponsor shall be entitled to elect a majority of the members of the Board until the earlier of (i) the date that the Sponsor (and its designees owning Units) own less than 50% of the outstanding Common Interests of the Condominium, or (ii) the fifth anniversary of the Closing Date under the Plan. In addition, the Commercial Unit Owner shall have the right to elect or designate one member of the Condominium Board at all times and from and after the first meeting of Unit Owners, the Residential Unit Owners shall have the right to elect four members of the Condominium Board.

        Until the sooner of (i) the date on which the Common Interest of all Unsold Units is in the aggregate less than 25% of the Common Interests of all Units, or (ii) the fifth anniversary of the Closing Date, neither the Board of Managers, nor officers, nor Unit Owners, except upon the written consent of the owners of Unsold Units representing a majority of the Common Interests allocated to all Unsold Units, shall (a) increase the number or change the type of employees described in Schedule B; (b) provide for services other than those described in Schedule B unless the total annual cost of all services to be provided is no greater than the then estimated total cost of the services described in Schedule B; (c) establish reserves or similar funds to undertake any capital or major improvements or additions except as required by law; (d) remove any member of the board of managers elected by the owners of Unsold Units except for cause; or (e) cause their representatives on the Board of Managers to (i) change the insurance coverage on the Property from the coverage described in Schedule B unless the change does not cause an increase in the total annual insurance premiums then due and payable by the Condominium or unless such change is required by the holder of any mortgage on any Unsold Unit or by the insurance carrier insuring the Property to satisfy insurance requirements that are the responsibility of the Board of Managers or (ii) take any action inconsistent with (a), (b), (c) or (d) . See "**Rights and Obligations of Unit Owners and Board of Managers; Summary of By-laws**".

        A principal of RAL Management, the Managing Agent is also a principal of Sponsor. In view of the relationship between the Managing Agent and Sponsor, Sponsor will have influence over a number of services to be performed by the Managing Agent. As a result, to the extent any conflict exists or arises between the interests of Sponsor and the

Condominium Board, a similar potential conflict exists or may arise with respect to the interests of the Managing Agent. See "**Management Agreement, Contracts and Leases**."

Financing Contingency

In the event that a Purchaser and Sponsor execute the Financing Rider annexed to the Purchase Agreement set forth in Part II of this Plan, the Purchase Agreement will be contingent upon financing in accordance with the terms of said Financing Rider. Neither Sponsor nor the Selling Agent makes any representations as to the terms or availability of any mortgage financing. Prospective purchasers should be aware that even if a loan commitment is obtained, its term may be fixed, and it could expire before the Closing Date. In the event a Purchaser and Sponsor do not execute the Financing Rider, the Purchase Agreement will not be contingent upon Purchaser obtaining financing for the purchase of the Unit. It is noted that a Purchaser may be required to pre-qualify for a mortgage loan prior to entering into a Purchase Agreement and to provide such financial information as the Selling Agent or GuardHill Financial Corp. shall request in connection therewith. Please see "**Procedure to Purchase**."

Pursuant to existing law and regulation the Sponsor may declare the Plan effective once it has accepted Purchase Agreements from bona fide purchasers (including investors) with respect to at least 15% of the Units, but it is not a requirement to close the conversion that each Purchaser delivering a Purchase Agreement which is counted toward the 15% actually close on his purchase. Therefore, the conversion may become effective even though the sales of less than 15% of the Units are closed. Purchasers should note that in the current real estate market, banks and other lenders are imposing various restrictions on loans. Such restrictions include requiring that a certain percentage of the units in a building be sold before the lender will consider making a loan. Thus it may be possible for a purchaser to experience difficulty obtaining a loan in a building where the percentage of units purchased is lower than a lender's particular sales minimum. Even once a building undergoes conversion, lenders may still impose minimum sales requirements before granting a loan. It then may be difficult for a purchaser to resell a Unit if prospective buyers are unable to obtain a loan due to such minimum sales requirements.

Payment of Real Property Transfer Taxes.

Pursuant to Section 11-2104 of the New York City Administrative Code and Section 1404(a) of the New York Tax Law, the New York City real property transfer tax and the New York State real estate transfer tax would be (in the absence of any provision, such as is provided in this Plan, for the Purchaser to pay such tax) the obligation of the seller in connection with the transfer by the seller of the Unit to a purchaser, although such purchaser is liable for such tax if the seller fails to pay it. While the New York City and New York State transfer taxes are customarily paid for by the seller in condominium unit transactions, the burden of paying those taxes may be modified by contract. As is common in many other condominium developments in New York State, the Purchase Agreement provides that the Purchaser of a Unit will be required to pay these transfer taxes at the closing. Both New York State and New York City have taken the position that where a

2

Purchaser pays either or both of these taxes, such payment constitutes additional consideration to the seller and must be considered in computing the tax due. Please see **"Procedure to Purchase"**.

Payment of Sponsor's Attorneys' Fees and Other Closing Costs

Each Purchaser will be required to pay to Sponsor or Sponsor's attorneys a fee for the Purchaser's Unit which will cover the legal and other fees and expenses of processing the sale of the Unit, as provided further in **"Closing Costs and Adjustments."**

If through no fault of Sponsor a purchaser fails to close on the date fixed by Sponsor for closing of title to Purchaser's Unit, then Purchaser will (a) pay (among other closing costs) a late fee equal to 0.03% times the unpaid balance of the Purchase Price for each day's delay, beginning with the date originally scheduled for the closing to and including the day immediately preceding the actual Closing Date, (b) reimburse Sponsor for the Unit's carrying charges (that is, Common Charges and real estate taxes) during the period of delay and (c) pay the service fee of $200 for each default letter and $200 for each notice sent to such Purchaser to reschedule the Closing. All of these and other closing costs to be paid by a Purchaser are described in the section of the Plan entitled **"Closing Costs and Adjustments."**

No Bond or Other Security

NO BOND OR OTHER SECURITY HAS BEEN FURNISHED TO SECURE SPONSOR'S OBLIGATIONS UNDER THE PLAN INCLUDING WITHOUT LIMITATION THOSE OBLIGATIONS SPECIFIED IN THE **"RIGHTS AND OBLIGATIONS OF SPONSOR"** SECTION HEREOF.

Property Situated in Historic District

The Property is located in the Tribeca East Historic District by Landmark Designation Notice recorded in Reel 1962, page 250 in the Office of the New York County Register. The Property is accordingly subject to the restricted use as provided in the New York City Charter, Chapter 8-a. This designation imposes special restrictions upon the construction, alteration, demolition, or reconstruction as such activities affect the external structure of the Building. In the event any external alteration of the Building is needed or desired, the Condominium must apply to the Landmarks Preservation Commission for permission to make such alteration. The Commission, before approving said work, may impose certain conditions and/or standards, making the work more costly than it would otherwise be if the Building were not in an Historic Landmark District. Additionally, there may be added legal costs in connection with obtaining approval for such alteration. Landmark status should be viewed as a general limitation upon the alterations of the external structure.

3

<u>Down Payments May Not Be Federally Insured In Excess of $100,000; Purchaser Will Not Receive a Refund of Funds Used by Sponsor for Upgrades or Extras</u>

All Down Payments made by Purchasers on account of the purchase of a Unit will be maintained in an attorneys' escrow account at a depository bank, all as more fully described under **"Procedure to Purchase."** If an individual makes a Down Payment in excess of $100,000 for the purchase of a Unit, or if the amount of such individual's deposits at the depository bank and such Down Payment exceed $100,000, the aggregate of such Down Payment and all other such deposits will generally not be federally insured in excess of $100,000.

All funds received by Sponsor for upgrades or extras must initially be placed in the escrow account maintained at the depository bank described above. However, purchasers should note as a special risk that such funds may be released from the escrow account by the escrow agent as long as the Sponsor uses the funds for such upgrades or extras. As a result, in the event a Purchaser is entitled to rescission, the Purchaser will not receive a refund of any funds used for upgrades or extras.

<u>Power of Attorney</u>

At the closing of the purchase of a Unit each Purchaser shall be required to sign and deliver a Power of Attorney covering the Unit in the form contained in the Part II of the Plan.

<u>Views</u>

Sponsor anticipates that a structure will be erected on a triangular parcel across the street and approximately one block to the northwest of the Property. While Sponsor has been advised that such structure will be approximately eight above-grade stories in height, Sponsor is not affiliated with the owner of the property on which such structure is expected to be constructed and makes no representation as to the ultimate height, size or density of such structure nor the use of such structure, if constructed.

In the event that the adjacent buildings to the north or east of the Property are renovated, reconstructed or enlarged at any time in the future, the lot line windows situated on such facades may require infill with fire rated construction. If certain of these windows remain open, they may be required to have sprinkler heads installed and their surrounding wall areas infilled with fire rated construction; provision for this possibility is being made in the design capacity of the sprinkler system. It is noted that under current zoning, the buildings immediately adjacent to the Property on the north and on the east are built to their legally permissible height and, for such reason, it is unlikely that the lot line windows on the north and east will require closure. However, changes in zoning could affect existing views. No assurance can be given that the views currently existing (or existing when Purchaser first purchases or occupies the Unit) will continue to exist unchanged.

4

**CONDOMINIUM OFFERING PLAN**

# THE FRANKLIN TOWER
### 90 Franklin Street
### New York, New York 10013

Offering Price 25 Residential Units................................................................... $44,845,000

The Condominium will have 25 Residential Units and 3 Commercial Units. The 3 Commercial Units are not being offered for sale.

*Sponsor:*

**CORN ASSOCIATES LLC**
316/318 Fulton Avenue
Hempstead, New York 11550
(516) 483-5200

*Selling Agent:*

**STRIBLING- WELLS & GAY**
340 West 23rd Street
New York, New York 10011
(212) 243-4000

The approximate date of the first offering of this Condominium Offering Plan is June 3, 1999.
This Condominium Offering Plan may not be used after June 2, 2000 unless this Plan is amended.

THIS PLAN CONTAINS SPECIAL RISKS TO PURCHASERS. SEE PAGE 1.

THE PRICES AND TERMS OF SALE FOR THESE CONDOMINIUM INTERESTS MAY BE CHANGED SO THAT PURCHASERS MAY PAY DIFFERENT PRICES FOR SIMILAR INTERESTS. THE EFFECT OF THIS IS SET FORTH ON PAGE 49.

THIS OFFERING PLAN IS THE SPONSOR'S ENTIRE OFFER TO SELL THESE CONDOMINIUM UNITS. NEW YORK LAW REQUIRES THE SPONSOR TO DISCLOSE ALL MATERIAL INFORMATION IN THIS PLAN AND TO FILE THIS PLAN WITH THE NEW YORK STATE DEPARTMENT OF LAW PRIOR TO SELLING OR OFFERING TO SELL ANY CONDOMINIUM UNIT. FILING WITH THE DEPARTMENT OF LAW DOES NOT MEAN THAT THE DEPARTMENT OR ANY OTHER GOVERNMENTAL AGENCY HAS APPROVED THIS OFFERING.

© Herrick, Feinstein LLP

## TABLE OF CONTENTS

### PART I

**Section** — **Page**

SPECIAL RISKS .................................................. 1
INTRODUCTION ................................................. 6
DEFINITIONS ................................................... 11
DESCRIPTION OF PROPERTY AND IMPROVEMENTS ...................... 16
LOCATION AND AREA INFORMATION ................................ 19
OFFERING PRICES AND RELATED INFORMATION, SCHEDULE A ........... 21
FOOTNOTES TO SCHEDULE A ...................................... 22
COMPLIANCE WITH REAL PROPERTY LAW SECTION 339(i) .............. 45
COMMERCIAL UNITS ............................................. 47
CHANGES IN PRICES OR UNITS ................................... 49
INTERIM LEASES ............................................... 50
PROCEDURE TO PURCHASE ........................................ 50
ASSIGNMENT OF PURCHASE AGREEMENTS ............................ 59
EFFECTIVE DATE ............................................... 59
TERMS OF SALE; CLOSING OF TITLE TO UNITS ..................... 61
CLOSING COSTS AND ADJUSTMENTS ................................ 70
RIGHTS AND OBLIGATIONS OF SPONSOR ............................ 75
CONTROL BY SPONSOR ........................................... 84
RIGHTS AND OBLIGATIONS OF UNIT OWNERS AND BOARD OF MANAGERS;
   SUMMARY OF BY-LAWS ........................................ 85
INCOME TAX DEDUCTIONS TO UNIT OWNERS
   AND TAX STATUS OF CONDOMINIUM ............................. 106
REAL ESTATE TAXES ............................................ 107
OPINION OF COUNSEL ........................................... 109
RESERVE FUND ................................................. 116
WORKING CAPITAL FUND ......................................... 116
MANAGEMENT AGREEMENT, CONTRACTS AND LEASES ................... 117
IDENTITY OF PARTIES .......................................... 120
REPORTS TO UNIT OWNERS ....................................... 121
DOCUMENTS ON FILE ............................................ 123
GENERAL ...................................................... 123
SPONSOR'S STATEMENT OF SPECIFICATIONS OR BUILDING CONDITION .. 124
PURCHASE AGREEMENT ........................................... 127
FINANCING RIDER TO PURCHASE AGREEMENT ........................ 164
UNIT OWNER'S POWER OF ATTORNEY ............................... 169
FORM OF UNIT DEED ............................................ 174
APPLICATION TO THE ATTORNEY GENERAL
   FOR A DETERMINATION ON THE
   DISPOSITION OF DOWN PAYMENTS .............................. 178
ESCROW AGREEMENT ............................................. 182

ARCHITECT'S REPORT ................................................. 189
FLOOR PLANS ....................................................... 236
LOCAL LAW 10 REPORT ............................................... 259
ASBESTOS REPORT .................................................. 280
DECLARATION ESTABLISHING A PLAN FOR CONDOMINIUM ............... 310
SCHEDULE B ........................................................ 330
BY-LAWS ........................................................... 332
COUNSEL'S TAX BENEFIT OPINION ..................................... 368
CERTIFICATIONS .................................................... 376
   A. SPONSOR AND SPONSOR'S PRINCIPALS ......................... 376
   B. SPONSOR'S ARCHITECT ...................................... 378
   C. SPONSOR'S EXPERT CONCERNING ADEQUACY OF BUDGET ....... 380
   D. SPONSOR'S EXPERT CONCERNING ADEQUACY OF COMMON CHARGES
       PAYABLE BY THE COMMERCIAL UNIT OWNER .................... 383

## **SPECIAL RISKS**

The Commercial Units

The Commercial Unit Owner has certain special rights under the Declaration including the right to subdivide the Commercial Units and to use same for any lawful purpose, provided that the Commercial Units may not be used for any obscene or noxious purpose. See "**Rights and Obligations of Unit Owners and Board of Managers; Summary of By-laws**".

Control by Sponsor

The Sponsor shall be entitled to elect a majority of the members of the Board until the earlier of (i) the date that the Sponsor (and its designees owning Units) own less than 50% of the outstanding Common Interests of the Condominium, or (ii) the fifth anniversary of the Closing Date under the Plan. In addition, the Commercial Unit Owner shall have the right to elect or designate one member of the Condominium Board at all times and from and after the first meeting of Unit Owners, the Residential Unit Owners shall have the right to elect four members of the Condominium Board.

Until the sooner of (i) the date on which the Common Interest of all Unsold Units is in the aggregate less than 25% of the Common Interests of all Units, or (ii) the fifth anniversary of the Closing Date, neither the Board of Managers, nor officers, nor Unit Owners, except upon the written consent of the owners of Unsold Units representing a majority of the Common Interests allocated to all Unsold Units, shall (a) increase the number or change the type of employees described in Schedule B; (b) provide for services other than those described in Schedule B unless the total annual cost of all services to be provided is no greater than the then estimated total cost of the services described in Schedule B; (c) establish reserves or similar funds to undertake any capital or major improvements or additions except as required by law; (d) remove any member of the board of managers elected by the owners of Unsold Units except for cause; or (e) cause their representatives on the Board of Managers to (i) change the insurance coverage on the Property from the coverage described in Schedule B unless the change does not cause an increase in the total annual insurance premiums then due and payable by the Condominium or unless such change is required by the holder of any mortgage on any Unsold Unit or by the insurance carrier insuring the Property to satisfy insurance requirements that are the responsibility of the Board of Managers or (ii) take any action inconsistent with (a), (b), (c) or (d). See "**Rights and Obligations of Unit Owners and Board of Managers; Summary of By-laws**".

A principal of RAL Management, the Managing Agent is also a principal of Sponsor. In view of the relationship between the Managing Agent and Sponsor, Sponsor will have influence over a number of services to be performed by the Managing Agent. As a result, to the extent any conflict exists or arises between the interests of Sponsor and the

Condominium Board, a similar potential conflict exists or may arise with respect to the interests of the Managing Agent. See "**Management Agreement, Contracts and Leases**."

Financing Contingency

In the event that a Purchaser and Sponsor execute the Financing Rider annexed to the Purchase Agreement set forth in Part II of this Plan, the Purchase Agreement will be contingent upon financing in accordance with the terms of said Financing Rider. Neither Sponsor nor the Selling Agent makes any representations as to the terms or availability of any mortgage financing. Prospective purchasers should be aware that even if a loan commitment is obtained, its term may be fixed, and it could expire before the Closing Date. In the event a Purchaser and Sponsor do not execute the Financing Rider, the Purchase Agreement will not be contingent upon Purchaser obtaining financing for the purchase of the Unit. It is noted that a Purchaser may be required to pre-qualify for a mortgage loan prior to entering into a Purchase Agreement and to provide such financial information as the Selling Agent or GuardHill Financial Corp. shall request in connection therewith. Please see "**Procedure to Purchase**."

Pursuant to existing law and regulation the Sponsor may declare the Plan effective once it has accepted Purchase Agreements from bona fide purchasers (including investors) with respect to at least 15% of the Units, but it is not a requirement to close the conversion that each Purchaser delivering a Purchase Agreement which is counted toward the 15% actually close on his purchase. Therefore, the conversion may become effective even though the sales of less than 15% of the Units are closed. Purchasers should note that in the current real estate market, banks and other lenders are imposing various restrictions on loans. Such restrictions include requiring that a certain percentage of the units in a building be sold before the lender will consider making a loan. Thus it may be possible for a purchaser to experience difficulty obtaining a loan in a building where the percentage of units purchased is lower than a lender's particular sales minimum. Even once a building undergoes conversion, lenders may still impose minimum sales requirements before granting a loan. It then may be difficult for a purchaser to resell a Unit if prospective buyers are unable to obtain a loan due to such minimum sales requirements.

Payment of Real Property Transfer Taxes.

Pursuant to Section 11-2104 of the New York City Administrative Code and Section 1404(a) of the New York Tax Law, the New York City real property transfer tax and the New York State real estate transfer tax would be (in the absence of any provision, such as is provided in this Plan, for the Purchaser to pay such tax) the obligation of the seller in connection with the transfer by the seller of the Unit to a purchaser, although such purchaser is liable for such tax if the seller fails to pay it. While the New York City and New York State transfer taxes are customarily paid for by the seller in condominium unit transactions, the burden of paying those taxes may be modified by contract. As is common in many other condominium developments in New York State, the Purchase Agreement provides that the Purchaser of a Unit will be required to pay these transfer taxes at the closing. Both New York State and New York City have taken the position that where a

2

Purchaser pays either or both of these taxes, such payment constitutes additional consideration to the seller and must be considered in computing the tax due. Please see **"Procedure to Purchase"**.

Payment of Sponsor's Attorneys' Fees and Other Closing Costs

Each Purchaser will be required to pay to Sponsor or Sponsor's attorneys a fee for the Purchaser's Unit which will cover the legal and other fees and expenses of processing the sale of the Unit, as provided further in **"Closing Costs and Adjustments."**

If through no fault of Sponsor a purchaser fails to close on the date fixed by Sponsor for closing of title to Purchaser's Unit, then Purchaser will (a) pay (among other closing costs) a late fee equal to 0.03% times the unpaid balance of the Purchase Price for each day's delay, beginning with the date originally scheduled for the closing to and including the day immediately preceding the actual Closing Date, (b) reimburse Sponsor for the Unit's carrying charges (that is, Common Charges and real estate taxes) during the period of delay and (c) pay the service fee of $200 for each default letter and $200 for each notice sent to such Purchaser to reschedule the Closing. All of these and other closing costs to be paid by a Purchaser are described in the section of the Plan entitled **"Closing Costs and Adjustments."**

No Bond or Other Security

NO BOND OR OTHER SECURITY HAS BEEN FURNISHED TO SECURE SPONSOR'S OBLIGATIONS UNDER THE PLAN INCLUDING WITHOUT LIMITATION THOSE OBLIGATIONS SPECIFIED IN THE **"RIGHTS AND OBLIGATIONS OF SPONSOR"** SECTION HEREOF.

Property Situated in Historic District

The Property is located in the Tribeca East Historic District by Landmark Designation Notice recorded in Reel 1962, page 250 in the Office of the New York County Register. The Property is accordingly subject to the restricted use as provided in the New York City Charter, Chapter 8-a. This designation imposes special restrictions upon the construction, alteration, demolition, or reconstruction as such activities affect the external structure of the Building. In the event any external alteration of the Building is needed or desired, the Condominium must apply to the Landmarks Preservation Commission for permission to make such alteration. The Commission, before approving said work, may impose certain conditions and/or standards, making the work more costly than it would otherwise be if the Building were not in an Historic Landmark District. Additionally, there may be added legal costs in connection with obtaining approval for such alteration. Landmark status should be viewed as a general limitation upon the alterations of the external structure.

<u>Down Payments May Not Be Federally Insured In Excess of $100,000; Purchaser Will Not Receive a Refund of Funds Used by Sponsor for Upgrades or Extras</u>

All Down Payments made by Purchasers on account of the purchase of a Unit will be maintained in an attorneys' escrow account at a depository bank, all as more fully described under **"Procedure to Purchase."** If an individual makes a Down Payment in excess of $100,000 for the purchase of a Unit, or if the amount of such individual's deposits at the depository bank and such Down Payment exceed $100,000, the aggregate of such Down Payment and all other such deposits will generally not be federally insured in excess of $100,000.

All funds received by Sponsor for upgrades or extras must initially be placed in the escrow account maintained at the depository bank described above. However, purchasers should note as a special risk that such funds may be released from the escrow account by the escrow agent as long as the Sponsor uses the funds for such upgrades or extras. As a result, in the event a Purchaser is entitled to rescission, the Purchaser will not receive a refund of any funds used for upgrades or extras.

<u>Power of Attorney</u>

At the closing of the purchase of a Unit each Purchaser shall be required to sign and deliver a Power of Attorney covering the Unit in the form contained in the Part II of the Plan.

<u>Views</u>

Sponsor anticipates that a structure will be erected on a triangular parcel across the street and approximately one block to the northwest of the Property. While Sponsor has been advised that such structure will be approximately eight above-grade stories in height, Sponsor is not affiliated with the owner of the property on which such structure is expected to be constructed and makes no representation as to the ultimate height, size or density of such structure nor the use of such structure, if constructed.

In the event that the adjacent buildings to the north or east of the Property are renovated, reconstructed or enlarged at any time in the future, the lot line windows situated on such facades may require infill with fire rated construction. If certain of these windows remain open, they may be required to have sprinkler heads installed and their surrounding wall areas infilled with fire rated construction; provision for this possibility is being made in the design capacity of the sprinkler system. It is noted that under current zoning, the buildings immediately adjacent to the Property on the north and on the east are built to their legally permissible height and, for such reason, it is unlikely that the lot line windows on the north and east will require closure. However, changes in zoning could affect existing views. No assurance can be given that the views currently existing (or existing when Purchaser first purchases or occupies the Unit) will continue to exist unchanged.

Status of "J-51" Benefits

Upon completion of construction, Sponsor intends to apply for real estate tax abatement benefits pursuant to Section 11-243 of the New York City Administrative Code (which section of law was formerly known as Section J-51-2.5 of the New York City Administrative Code). While Sponsor will use all reasonable efforts to obtain such benefits, no warranty is made that the New York City Department of Housing Preservation and Development, the agency that oversees such benefits will approve Sponsor's application. If such application is not granted, the real estate taxes payable by each Residential Unit Owner will be higher than the real estate taxes that would be payable if such benefits are in effect. Herrick, Feinstein LLP, counsel to Sponsor has estimated that the real estate tax abatement that may be available will last for approximately 6 years, after which time the real estate taxes payable by each Residential Unit Owner will increase. Real estate tax exemption benefits under Section 11-243 of the Administrative Code will not be available, and neither exemption benefits nor abatement benefits will be available, with respect to the Commercial Units. Each purchaser will be required to close title to his Unit whether or not such benefits are granted and, if granted, irrespective of the amount of the benefits. See "**Opinion of Real Estate Tax Counsel**" for details.

Disputes, if Any, Between the Condominium Board and A Owner Will Be Resolved by Arbitration

The Condominium By-Laws provide that any disputes between a Unit Owner (including, without limitation, the Commercial Unit Owner) and the Condominium Board will be resolved by arbitration. Each party will bear its own costs and expenses in connection with such arbitration, except that the cost of the arbitrator shall be borne by the losing party. In this regard, should the Condominium Board lose any such arbitration, the cost of the arbitrator shall be a Common Expense to be shared by all Unit Owners in accordance with their respective Common Interests. See "**Commercial Units**" and the Condominium By-Laws reproduced in Part II of the Plan for details.

Preferred Title Company

Rem Abstract Corp. has agreed to insure, upon the payment by Purchaser of the premium for such insurance, that Purchaser has title to the Unit free and clear of all liens and encumbrances except those set forth in the Plan, subject to the provisions of the Condominium Declaration and By-Laws and any mortgage executed or other encumbrance created by the Purchaser. While the Purchaser will be free to select a title company of his choice, the Sponsor's obligation to deliver title to the Unit as provided above, will be deemed satisfied if Rem Abstract Corp. is prepared to insure such title subject to those title exceptions permitted under the Plan. Sponsor has no obligation to satisfy the requests of any title company other than Rem Abstract Corp. In addition, if a purchaser obtains title insurance from a title insurer other than Rem Abstract Corp., the Purchaser will be required to pay an additional closing fee of $500 to Sponsor's attorney.

## INTRODUCTION

### Purpose of the Plan

Corn Associates LLC (the "Sponsor") presents this offering plan (the "Plan") for the condominium ownership of the building known as 90 Franklin Street (a/k/a 271 Church Street), New York, New York (the "Building") and the parcel of land on which it is situated (the parcel of land and Building are collectively called the "Property") under the provisions of the Condominium Act (as hereinafter defined).

The purpose of this Plan is to set forth all of the material terms of the offer to establish the Property as a condominium and to sell Units therein.

The Plan is presented in two parts which together constitute the entire Plan. Part I sets forth a description of the material terms of the offer and Part II contains, among other things, a description of the Property and the basic documents necessary to create the Condominium and effectuate the provisions of the Plan.

The Plan may be amended from time to time upon the filing of an amendment with the Department of Law of the State of New York ("Department of Law"). Amendments will be served on (i) Purchasers who have executed and delivered Purchase Agreements to the Sponsor and who are not in default, (ii) Unit Owners and (iii) any other person entitled to service pursuant to local law or regulation (collectively "Offerees"). However, certain changes in prices of Units may be effected without filing an amendment with the Department of Law. See **"Changes in Prices or Units."**

### The Sponsor and its Interest in the Property

The Sponsor is a New York limited liability company. See **"Identity of Parties."** Sponsor acquired the Property by deed dated December 1, 1998.

### Property to be Submitted to Condominium Act

The statute concerning condominiums in effect in the State of New York pursuant to which the Condominium will be organized is Article 9-B of the Real Property Law of the State of New York, as amended, commonly known and herein referred to as the "Condominium Act." On or before the Closing Date the Property will be submitted to the provisions of the Condominium Act by Sponsor's recording the Declaration and By-Laws set forth in Part II of the Plan and filing the Floor Plans in the Office of the City Register, New York County. From and after the date of recording the Declaration, Sponsor will be the owner of each of the Units until each is sold or conveyed.

### Offer of Sale of Condominium Units

The Sponsor hereby offers for sale 25 Residential Units on the terms and conditions set forth in the Plan. The 3 Commercial Units are not being offered for sale at this time. It is

6

anticipated that the Commercial Units initially will be owned by Sponsor or an affiliate. Sponsor reserves the right to amend the Plan to offer any or all of the Commercial Units for sale.

The prices of the Units are set forth in "**Schedule A - Prices of Units**." These prices have been set by the Sponsor and are not subject to review or approval by the Department of Law or any other governmental agency.

Current zoning permits the use of the second through seventeenth floor and the penthouse for residential use. Neither the Condominium Board nor the Unit Owners will have any right to restrict or limit any lawful use of any Commercial Unit. No representation or warranty is made as to who the owner(s) or tenant(s) of the Commercial Units may be at any time or as to the uses to which any Commercial Unit may be put at any time. Notwithstanding the foregoing, the Commercial Units shall not be used for any obscene or noxious purpose.

The Condominium Floor Plans set forth in Part II of the Plan show a number of typical floors. Purchasers should refer to the sections of the Plan entitled "**Changes in Prices and Units**" and "**Rights and Obligations of Sponsor**" for a discussion of the right of Sponsor to make changes to the Units.

The Property and the Units therein are being sold in the condition described in the "Description of Property, Specifications and Building Condition" section of Part II of the Plan and Sponsor will not have any obligation to make any repairs or improvements except as is expressly provided in the "**Description of Property, Specifications and Building Condition**" or in the "**Rights and Obligations of Sponsor**" section of Part I of the Plan.

Features of Condominium Ownership

The ownership of a Unit is similar in many respects to the ownership of a residential private home. Each Unit Owner owns fee title to his Unit and is entitled to the exclusive possession thereof. Each Unit Owner also owns in common with other Unit Owners an undivided interest in the Common Elements known as his Common Interest. Each Unit Owner must pay Common Charges with respect to his Unit based upon the Common Interest for such Unit in accordance with the Condominium Act. The Common Elements, as more particularly described in the "**Rights and Obligations of Unit Owners**" section in Part I of the Plan and in the Declaration set forth in Part II of the Plan consist of the General Common Elements, the Residential Common Elements and Limited Common Elements. The Common Elements include the Land, the roof (except to the extent that a portion of the roof comprises part of Unit 17), foundation and supports of the Building and all other parts of the Property, other than the Units. Portions of the Common Elements may be designated as Limited Common Elements. Limited Common Elements are devoted to use in common by less than all of the Unit Owners, as provided in the Declaration. For example, if any two Units which have access to the same shared hallway shall at any time be owned by the same owner such hallway shall thereafter be treated as a Limited Common Element until such time as such Units shall have two different owners. All Common Elements used exclusively by or which service two or more Residential Units (but not the Commercial Units)

7